IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____)
IN RE:  GARDASIL PRODUCTS        )
LIABILITY LITIGATION             )   DOCKET NO. 3:22-MD-03036
_____)

TRANSCRIPT OF PRETRIAL CONFERENCE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES DISTRICT COURT JUDGE
WEDNESDAY, DECEMBER 14, 2022 AT 11 A.M.

APPEARANCES:

On Behalf of the Plaintiff:

ALLISON MULLINS, ESQ.
TURNING POINT LITIGATION
MULLINS DUNCAN HARRELL & RUSSELL PLLC
300 N. Greene St., Suite 200
Greensboro, NC 27401

and

BIJAN ESFANDIARI, ESQ.
BAUM HEDLUND ARISTEI & GOLDMAN
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025

and

ANDREW DOWNING, ESQ.
DOWNING, ALLISON & JORGENSON
3030 N. Central Ave., Suite 507
Phoenix, AZ 85012

KATHY CORTOPASSI, RDR, CRR, CRC
Official Court Reporter
United States District Court
Charlotte, North Carolina

APPEARANCES: (Continued)

On Behalf of the Plaintiff:

PAUL J. PENNOCK, ESQ.
MORGAN & MORGAN
350 Fifth Avenue, Suite 6705
New York, NY 10118


and

KATHRYN RACHEL LANIER
LANIER LAW FIRM
10940 W. Sam Houston Pkwy North, Suite 100
Houston, TX 77064



On Behalf of the Defendant Merck & Co., Inc.:


ALLYSON M. JULIEN, ESQ., ESQ.
GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
200 South Wacker Drive, 22nd Floor
Chicago, IL 60606

and

DAVID EIDSON DUKES, ESQ.
NELSON MULLINS RILEY & SCARBOROUGH
1320 Main St., 17th Floor
Columbia, SC 29201

and

DAVID CALEP WRIGHT, III, ESQ.
ROBINSON BRADSHAW & HINSON, P.A.
101 N. Tryon Street, Suite 1900
Charlotte, NC 28246

1      THE COURT:  Good morning, everyone.

2      ALL:  Good morning.

3      THE COURT:  All right.  We're here in the Gardasil

4  MDL for a second pretrial conference.  And I would ask the

5  lawyers, for the record, to introduce themselves and tell me

6  who you're representing, the lawyers who are going to have

7  some active role in this hearing.

8      MR. PENNOCK:  Good morning, Your Honor.  Paul

9  Pennock for plaintiffs.

10      THE COURT:  Good morning.

11      MS. MULLINS:  Good morning, Your Honor.  Your

12  Honor, I'm Allison Mullins also for the plaintiffs.

13      MS. LANIER:  Good morning, Your Honor.  Rachel

14  Lanier, also for the plaintiffs.

15      MR. DOWNING:  Good morning, Your Honor.  Andrew

16  Downing also for the plaintiffs.

17      MR. ESFANDIARI:  And good morning, Your Honor.

18  Bijan Esfandiari, also on behalf of the plaintiffs.

19      THE COURT:  Welcome to all of you.

20      And do we have anybody participating virtually?

21      MR. ESFANDIARI:  Not at today's hearing, Your

22  Honor, just observing.

23      THE COURT:  Thank you.

24      And for the defendants.

25      MR. WRIGHT:  Good morning, Your Honor.  David

1    Wright on behalf of the defendants.

2             MS. JULIEN:  Good morning, your Honor.  Allyson

3    Julien for Merck.

4             MR. DUKES:  Good morning, Your Honor.  David Dukes

5    for Merck.

6             THE COURT:  Good morning to all of you, as well.

7             I want to thank you for working hard on this case

8    between the last hearing and this.  It seems to me that you

9    all have done a superb job of agreeing to the things that

10   you can agree to and teeing things up for me that need to be

11   resolved by the Court.  That's the way this thing is

12   supposed to work.  And when it does work this way, it's a

13   pleasure to be part of.

14            I'm going to take some things up in the order that

15   I approach them and may be somewhat different than the order

16   of the suggested agenda, but I think that we'll cover all

17   the matters on the suggested agenda; and if not, be happy to

18   hear from you when we're through with it.

19            The first thing I would like to address is on the

20   plaintiff's side, and that is the recommendations for

21   additional involvement on committees by various lawyers.

22            And so we have a -- we have previously appointed

23   liaison and counsel.  And there's a proposal for an

24   executive committee, a steering committee, a federal state

25   court liaison.  And I'd like to know more about that and why

1  you feel it's necessary and how it impacts the cost of the

2  litigation and the effectiveness of the litigation and a

3  little bit more about why we need so many lawyers on so many

4  different committees.

5           I don't know who wants to run with that.

6  Mr. Pennock, you're free to.

7           MR. PENNOCK:  Thank you, Your Honor.

8           We have been working with a number of lawyers as a

9  team.  And there certainly is a core group, which Your

10 Honor, we're grateful, appointed to -- as the top of the

11 leadership.

12          But as is, I think, typical, we need a fulsome

13 team to pursue the action.  There, it's -- the Court, I'm

14 sure, can appreciate, there is a tremendous amount of work

15 that needs to be done in conducting the discovery in this

16 case and defending against the discovery in this case.

17          As indicated in -- you know, briefly in the

18 submission, we have a designated sense of what we think each

19 of these lawyers will bring to the team.  And like any

20 approach to anything, whether it's a -- whether it's an

21 athletic competition or a lawsuit or some commercial

22 project, I mean, there are different roles that are

23 required.  And we feel in order to get to the successful

24 conclusion or to get to a conclusion, however it may come

25 out, and we do feel strongly that the people are needed.

1   And your appointment of them helps to both validate that

2   they are part of the team and also obligate them.

3           Let me address your second question, if I may, as

4   to costs.

5           I don't -- you know, certainly having additional

6   members, I -- theoretically it could ask -- add to the costs

7   that are laid out in advancement of the action, but I think

8   that would only be in certain circumstances.

9           By way of example, if, for example, every lawyer

10  showed up here every month when they really didn't need to

11  be, that would add.  And that is why typically we would say

12  that should not happen.  The only lawyers that should show

13  up in -- are those that were going to have a participatory

14  role and are lead counsel.  And so it's usually limited.

15          Secondly, it -- if depositions have to be taken,

16  let's say there are 30 depositions that are going to be

17  taken around the country, someone has to go do them.  And so

18  there will be costs associated with that work whether it's

19  one lawyer -- or I'm sorry -- five lawyers taking six each

20  or whether it is, you know, ten lawyers taking three each.

21  The costs will effectively be identical.

22          And beyond that, the costs -- outlays of costs are

23  really not increased at all by the addition of team members.

24          I could probably argue that, in fact, without the

25  team members, the costs could go up.

1          So I do not believe it will materially impact --

2     really, I don't think it will impact the costs at all.

3          Of course there will be time that is spent on --

4     by these lawyers.  And, you know, we haven't really gotten

5     to that bridge yet to either cross it or have it blown up,

6     but we -- there will be some application in the future, I'm

7     sure, that time spent by lawyers, if we ever get to a

8     resolution, will be compensated out of a common benefit

9     fund.  Frankly, we haven't even discussed that internally as

10    to teeing that up.

11         But, yes, there will be additional hours put in by

12    additional lawyers; but, again, that time has to be spent by

13    someone.  So, you know, I can only do the work of one

14    person.

15              THE COURT:  All that make sense.

16         How is the role on the executive committee going

17    to be different than, say, the lead counsel, the co-lead

18    counsel?

19              MR. PENNOCK:  Just doing work that we would

20    otherwise have to pull in lawyers from our own firms to do

21    the work.

22         So, I mean, work has to be done.  And as I said,

23    you know, I can -- some people around here can probably do

24    the work of two lawyers.  I can do the work of one.  And

25    there's a lot of -- there's a great deal of work that has to

1   be done.  So someone has to get on it.

2            If I need three lawyers to take care of one

3   particular project, they've got to be pulled from somewhere.

4   And so I would rather that we had senior people dedicated --

5   and passionately dedicated -- to this case, appointed by

6   Your Honor, which is an honor.  It is a privilege.  And

7   people understand that.  And that's why those appointments

8   are sought.

9            There's no one that has applied for these

10  positions that sometimes are called out as being people that

11  just want feathers in their hat.  I don't see that in this

12  slate at all.

13           THE COURT:  Yeah.  I'm impressed by the

14  qualifications of the individuals I have reviewed.  And my

15  inquiry is just to the issues of -- is overlap or

16  duplication and whether all that has been thought through in

17  a way that makes sense to have an executive committee, a

18  steering committee, in addition to the other appointments in

19  the case.

20           MR. PENNOCK:  Well, one of the reasons for the

21  breakdown, Your Honor, is, in fact, to avoid duplication of

22  effort.  So if there is a hierarchy in terms of the

23  decision-making -- well, the discussion and the

24  decision-making and the work, then there is in -- we offer

25  that or suggest that so there is not duplication.

1      In other words, not everyone -- if everyone is

2 part of one large committee with no designation as to where

3 they fit, then, presumably, everyone should be sitting at a

4 table to decide issues.  And we know how that can go, right.

5 The best decisions are made by committees of one, in my

6 opinion.

7      So we want to break it up in the order that

8 there's -- there are the decisionmakers, which Your Honor, I

9 think, has already appointed; but those decisions are being

10 made with the advice and counsel of other people that are

11 working on the case, which is the executive committee, and

12 ultimately the -- you know, any members of the plaintiff's

13 steering committee.

14      But the idea is that being able to efficiently

15 move forward, decisions are ultimately made by a smaller

16 group, counsel to a slightly broader group -- or counsel,

17 counsel comes from a slightly broader group, and the work

18 comes from the whole.

19           THE COURT:  Thank you.

20           MR. PENNOCK:  Thank you, Judge.

21           THE COURT:  Any objection from the defense?

22           MR. BEAM:  Your Honor, we take no position with

23 regard to the plaintiff's conclusion.

24           THE COURT:  So it appears to me that this has been

25 a thoughtful process.  The individuals who are recommended,

1    I'd actually like to explore their credentials some more,

2    not because of concern for their merit, because of the

3    interest in their background.  Because it seems to be very

4    diverse in experience, in a qualified group, so I will

5    approve the slates as suggested.

6            And I'll just note that already there seems to be

7    value, in terms of the interaction between the federal cases

8    and the state court cases.  And that, I would assume, would

9    only be improved upon by -- with a official appointment of a

10   federal state court liaison.  And so the Court will adopt

11   the slates recommended to it.

12           And then on the other issues that seem to be

13   agreed upon with respect to the preliminary MDL orders,

14   proper party orders, agreed waiver service order, agreed

15   direct filing order; besides that, I will refer later in the

16   hearing.  All of those, the Court is prepared to endorse.

17           And then the agreement with respect to pleadings,

18   deadlines for amended pleadings, filing counterclaims,

19   crossclaims and third-party complaints, and the timing and

20   format of the defendant's answer, all of that seems to be

21   agreed upon, unless I'm reading this wrong.

22           MR. WRIGHT:  Your Honor, I apologize, and you're

23   reading exactly correctly.  I did want to say we had an

24   almost two-hour conference this morning to talk about a

25   number of these items that we had not yet reached agreement

1  on, and there were some suggested changes, one of which is
2  implicated by what the Court just said.  If I may report
3  that, it might be helpful.
4  THE COURT:  Yeah, it would be great.
5  MR. WRIGHT:  So our colleagues had requested with
6  respect to the deadline for amended pleadings to extend that
7  by a period of three-weeks, or until January the 6th.  We
8  agreed to that.
9  That will operate to bump some other deadlines
10  that are in the agreed -- in the proposal that was submitted
11  to the Court.  Examples being, our deadline for filing
12  counterclaims would be bumped by three weeks.  Our answer --
13  our generic answer on affirmative defenses are also bumped
14  three weeks.  And our Rule 12 motion would be bumped three
15  weeks.
16  So, we wanted -- if that is amenable to the Court
17  and in order to accommodate the plaintiffs on that, that
18  would be, that would be a suggested change.
19  The other item is not in the order, but I did want
20  to note for the Court is we had requested an additional week
21  to respond to their motion to compel.  They had agreed to
22  that.  Their reply would obviously be extended, as well.
23  But those are some housekeeping deadlines that if
24  the Court is willing to accommodate, they're somewhat
25  different from what's before you.  So I wanted to report

1    that.

2         THE COURT: Great. Thank you.

3         If it's agreeable to you all, it's agreeable to

4    the Court.

5         With respect to whether to allow Rule 12 motions,

6    there's a difference of opinion on that. It appears to the

7    Court I have what I need. Does anybody wish to add to that?

8         MR. WRIGHT: Well, I'm pleased to report, although

9    it's late breaking, that we do have agreement with respect

10    to that. So, in terms of Merck's proposal with respect to

11    Rule 12, the plaintiffs are amendable to that. Mr. Pennock

12    was very quick to disagree with our nomenclature of this

13    being a bellwether.

14         THE COURT: Bellwether, yeah. What's a better

15    word for it? I was trying to come up with a better word.

16         MR. PENNOCK: 12(b)(6) motion in two cases.

17         THE COURT: Yeah, that sounds so good.

18         (Laughter.)

19         MR. PENNOCK: But I'm not that creative, Judge.

20         MR. WRIGHT: On that point, the Court will

21    decide --

22         THE COURT: All right.

23         MR. WRIGHT: -- the prejudicial effect of that.

24    But other than that, I believe we have agreed to that, as

25    well.

1      And while we're on a roll, we also agreed with
2   respect to Merck's proposal with respect to submitting a
3   generic denial and list of affirmative defenses.  There's a
4   -- that's fully set out.
5      But the one tweak there that we agreed to is they
6   wanted the right on remand to be able to file an amendment
7   to deal with state-specific issues as a matter of right, and
8   we agreed to that.
9      So, with that tweak or change, I believe the
10  parties, with respect to the Rule 12 and the answer, they
11  are aligned.  And if the Court is amenable to that, there
12  would be no further decision from the Court required on
13  those issues.
14      THE COURT:  All right.
15      Thank you.
16      MS. GIESER:  And, Your Honor, if I may.  And there
17  are other agreements that we reached this morning, too.  A
18  number of matters that will probably come up as the Court
19  brings them up.
20      And the airlines should know that the -- there --
21  that Zoom has not completely displaced them because the
22  in-person meeting that Mr. Wright suggested this morning was
23  immensely helpful.  In person really works.  We were
24  grateful that he got up early and met us at the office.
25      THE COURT:  Yeah, there's just something that

1  happens when people meet in person that doesn't happen as

2  often when you're sitting behind the keyboard.  And I don't

3  know.  It's an interesting phenomenon, but I appreciate the

4  effort.

5          This is an adversarial system, and we're going

6  to -- y'all are going to fight over various things.  But

7  what seems to be coming out of this case -- and it's kind of

8  juxtaposed to some other experiences I've had recently where

9  that wasn't the case -- it does appear to be a winnowing and

10  a narrowing of things so that the effort is expended on the

11  things that matter, and I appreciate that from all counsel.

12          All right.  I think I have what I need on that.

13          Do y'all wish to be heard on the areas of

14  disagreement on the FAQ sheets, mental health records and

15  social media things?  Or do you believe I have what I need

16  to make decisions in that area?

17          MS. JULIEN:  Your Honor, we're happy to be heard.

18  But, you know, if you believe that you have what you need,

19  we're happy to defer to that, as well.

20          THE COURT:  I think I have what I need.  But if

21  there's a need to hear more, I'm open to that, too.

22          MS. JULIEN:  Yes, Your Honor.

23          I think maybe one area that's perhaps worth

24  clarifying is with respect to the vaccine court file.  Just

25  really wanted to, to hit home the, the lack of burden here.

1         We had an agreement in place with Mr. Esfandiari's

2  firm for more than a year whereby the plaintiff would sign

3  an authorization form, provide a scanned copy of his or her

4  ID, and that was submitted to the vaccine court clerk, and

5  the materials were collected in that manner.  So we really

6  just don't believe that, that there's, you know, any real

7  burden to be had here and think that that status quo system

8  should remain.

9         THE COURT:  Anybody want to respond to that?

10        MS. MULLINS:  Yes, Your Honor.  Actually, I'm glad

11  Ms. Julien brought this up because I do think it's an

12  important issue for the Court to consider, and particularly

13  the differences between the vaccine program and what we do

14  here in Federal Court.

15        For one thing, the presumption is exactly the

16  opposite.  And here in this court, everything is presumed to

17  be open unless Your Honor puts something under seal for some

18  reason.

19        The direct opposite is true in the vaccine

20  program.  And, in fact, those records, by -- even under the

21  Federal Register, are not public record.  And it is very

22  limited what -- who can access those.

23        So to say that there is no burden, first of all,

24  is just factually incorrect.  It is not possible for us to

25  give a release -- first of all, it's not appropriate, but

1    it's also not possible.  They've agreed that they should not

2    receive attorney billing records, which have to be submitted

3    in the vaccine program.

4            And so already we -- there are things that are

5    carved out that can -- that by agreement should not be

6    received.

7            THE COURT:  It is my understanding that you have a

8    third-party vendor that, that screens in, in terms of

9    production of these?

10           MS. MULLINS:  No.

11           THE COURT:  Am I wrong about that?

12           MS. MULLINS:  No, not for these materials.

13           The initial problem is that for that release to go

14   forward, first of all, the Government would have to agree to

15   have all of those files released.

16           Second, now you're asking the clerk's office in

17   the vaccine program to only provide certain information.  So

18   that's just -- that's not possible.

19           What will happen, instead, is that the lawyer who

20   represented that petitioner in the vaccine program would

21   have to go through these materials.  There's literally one

22   lawyer that can do that.  Even if multiple lawyers have

23   entered an appearance, only one lawyer can enter -- can

24   access those materials.

25           And so it is a very significant burden.

1          But more fundamentally, it's very clear under the
2   case law that these materials are not admissible for any
3   purpose in this court, other than to show that the
4   requirements were met of the prerequisite of filing in the
5   program.
6          And we have Mr. Downing here, who his primary
7   practice is in the vaccine program, and that's why we have
8   him.  I'd like, with your Honor's permission, to have him
9   give the Court some orientation to, to just how this program
10  operates and how it's different fundamentally from federal
11  court and from general discovery.
12         THE COURT:  I'd be glad to hear from Mr. Downing.
13  But let me ask you first.
14         What has changed since the summer of '21 and now
15  in terms of your posture with respect to these records?
16         MS. MULLINS:  Well, Your Honor, frankly -- and
17  Mr. Esfandiari would have to address that, but the defense
18  has talked a lot about starting afresh with respect to this
19  court and aligning everything in the MDL.
20         This happened with respect to litigation that was
21  happening pre-MDL, some in California and, frankly, by folks
22  who don't regularly practice in the vaccine program and did
23  not necessarily appreciate the differences and distinctions
24  in that program and why those materials should not just be
25  ported over.

1    And so that's -- it's not necessarily a change in
2  terms of -- well, I think that once we started the MDL, we
3  had people who do operate within the vaccine program and
4  could say "Look, there's all sorts of stuff in this, that
5  goes forth here that should not just be ported over.  It
6  shouldn't be some sort of automatic thing.  It's not -- it's
7  just not an appropriate use of the program materials."
8    What we would say, Your Honor, is there are two
9  things that would be -- two inquiries.  The first is:  Is
10 the document necessary to show that the requirement has been
11 satisfied?  That's limited to two or three documents
12 depending upon how the case exited the program, the
13 petition, the resolution at the court; and if it was
14 resolved by a dismissal or by a judgment, then the rejection
15 of that and the election to come to civil court.
16    So those three things are relevant.
17    Beyond that, the question should be not whether it
18 was filed in the vaccine court or whether it was submitted
19 in that program but, rather, whether it's independently
20 discoverable.
21    So if we get into a case with full discovery,
22 certainly if there's prior sworn statements, for instance,
23 by a witness or by the plaintiff, those are going to be
24 discoverable independent of where they were filed.  And so
25 that would be appropriate to come over into this court.  But

1    -- and into discovery.

2           But beyond that, it's just -- it's, it's -- we

3    have started de novo.  The Supreme Court says that nothing

4    that happened -- this is a de novo consideration of the

5    case.  The case law is replete saying that nothing, no

6    finding, no conclusion, nothing that happened in the vaccine

7    court has any bearing whatsoever on what happens in this

8    court.

9           We are also multiplying issues just by porting

10    that over, in addition to the burdensome nature of it.

11           For instance, if you have expert reports, those

12    people may be consulting experts here; they may not be

13    testifying experts.  And in that case, those materials would

14    be protected under federal rules of civil procedure; they

15    wouldn't be automatically disclosed.

16           On the other hand, if it is an expert that comes

17    forth into this case, the specific -- was in the vaccine

18    program for that plaintiff, is in this case for that

19    plaintiff -- then those materials may be properly

20    discoverable.

21           But it's not because they were in the vaccine

22    program; it's because they're independently discoverable for

23    a different reason.

24           And so I think that by trying to create some

25    blanket provision, we multiply unnecessary issues for

1  materials that the courts have been very clear are not

2  admissible, are not -- have no bearing on the proceedings

3  here.

4          MS. JULIEN:  Your Honor, may I please briefly

5  respond before Mr. Downing speaks?  There were -- there was

6  quite a bit to cover.

7          THE COURT:  When you're not talking, feel free to

8  sit down.

9          MS. JULIEN:  Okay.  So quite a bit was covered

10 there.  But I think to get back to the centerpiece here,

11 Merck is entitled to plaintiff's entire vaccine court file

12 with the exception of the attorney billing records and not

13 the bits and pieces selected by plaintiff's counsel.

14         There -- these files are directly relevant and

15 are -- provide a wealth of probative information about the,

16 the facts at issue here.

17         You Honor, honestly, as I sit here, I struggle to

18 think of a more directly relevant piece of information.

19 These files are a prerequisite legal proceeding regarding

20 the exact same plaintiffs in this MDL who were ostensibly

21 trying to establish that the exact same vaccine at issue in

22 this MDL, Gardasil, supposedly caused the exact same

23 injuries at issue that they -- you know, they claim here in

24 the MDL.

25         Ms. Mullins repeatedly referred to a statutory

1  provision regarding the admissibility of the findings of

2  fact or the conclusion of law of the vaccine court, but

3  that's a far cry from relevance and the question of

4  discoverability.  Rule 26(b)(1) makes clear that they are

5  not one and the same.

6          But beyond the conclusions of law reached by the

7  vaccine court or the factual findings, these materials are

8  full of information that are directly relevant to Merck's

9  defenses, including timeliness, exhaustion, and implied

10  pre-emption with -- which we previewed for the Court in our

11  position statement.

12          Beyond that, the materials in the file are

13  relevant to the plaintiff's credibility.  If he or she made

14  one statement or alleged one thing in vaccine court and then

15  come before Your Honor and alleging something different,

16  that is relevant.  And we are able to cross-examine and

17  consider that as we select bellwether cases.

18          THE COURT:  Well, I think as I understand the

19  plaintiff's position, it's -- various records may indeed be

20  relevant, but their discoverability is based upon the

21  relevance and not the fact that they're part of a record.

22          MS. JULIEN:  Yes, Your Honor.  And I -- you know,

23  if the Court -- if it would be useful to the Court, we're

24  able to more fully brief this issue.

25          But to use one example of pre-emption, in vaccine

court, again, the plaintiffs were attempting to show that Gardasil caused the injuries that they are supposedly claiming in the MDL now. And in vaccine court, the Department of Health and Human Services is the Respondent. And the Department of Health and Human Services is the parent agency of the FDA.

So all of the information that HHS considered and received from the plaintiff, whether that's medical literature, whether that's the opinions of their expert -- of their experts, whether that's the, the facts in the case, all of that information is relevant to what the FDA knew at the time of the use of plaintiff's -- plaintiff's use of the Gardasil vaccine and whether -- and the question of whether their claims are preemptive.

So if HHS, and thereby FDA, knew of all the facts, knew the medical literature, considered that, offered reports explaining why that didn't suffice, that is relevant to Merck's implied pre-emption claim.

Additionally, Ms. Mullins referred to consulting experts in this MDL who provided written opinions in vaccine court and exchanged those with the Federal Government and provided that to a special master.

I'm not quite sure -- I'm not aware of a privilege where a written report has actually been provided to the Federal Government and to the special master, again, in

order to try to establish that the plaintiff -- that
Gardasil caused the plaintiff's alleged injury.

One other issue that I wanted to clarify was with
respect to how Merck's -- how the process would work if the
Court adopted Merck's proposal.

So we do have a vendor who can work through these
files and can redact or remove materials that they're
privileged attorney billing records.  They've actually done
that in the eight vaccine court files that we've already
received from plaintiff's counsel, and they can continue to
do that.

And another option is to -- the vaccine court
file, even though the submissions are sealed, we can see the
docket entry, so we could tell the clerk:  We want the
vaccine court file, but please exclude Docket Number 42 or
45.  So that's a lot simpler than the plaintiff's proposal,
which will require them to wade through potentially
thousands of pages of vaccine court files and pick and
choose which portions they're going to provide to Merck and
when.

And one other issue to clarify is -- I know this
is covering a lot here, but she raised a lot -- is with
respect to what happened before.  And I'm not aware of
anything that has, that has actually changed because
Mr. Downing is counsel of record in Gramza (ph), which was

1    the first case in which we got the vaccine court file.  And

2    we took this issue to the court, it was resolved.

3         Mr. Esfandiari had agreed to give us the vaccine

4    court file, the authorization and the file from Mr. Downing.

5    And so, you know, he was involved.  There was no objection

6    there about appropriateness or relevance at that time, so

7    I'm a bit confused as to what has changed.

8         So, again, Merck just requests that the status quo

9    remain that we receive the expert reports.  They're

10   relevant.  They're, cross examination information.  They're

11   important to potentially lead to other discoverable

12   information.  And that -- really, it just provides a wealth

13   of information.  And plaintiffs have not identified any

14   basis to include the actual underlying materials.

15        We're not talking about the conclusion of law or

16   the finding of fact of the court here.

17        THE COURT:  Mr. Downing, your name's been taken in

18   vain a few times.  I'll be glad to hear from you.

19        MR. DOWNING:  It has, Your Honor.  And this is my

20   first time addressing you in this case.  I appreciate the

21   opportunity.

22        THE COURT:  Yeah, well --

23        MR. DOWNING:  Your Honor, just a few things.  And

24   Ms. Mullins, I think, covered a lot of what I was intending

25   on explaining in terms of how the vaccine program works.

1    But I think it bears noting:  The vaccine program
2  is not a court.  It's been called the "vaccine court."  It's
3  not.  It's an administrative program run by Health and Human
4  Services.  The standards are completely different than they
5  are here.  It's a sealed process.  The only people that have
6  access to anything is one counsel of record for the
7  plaintiff or the petitioner, one counsel of record for the
8  Government, which is the DOJ, and the Court.  That's it.
9  The public's not allowed to attend a hearing.  There is
10  nothing public in those cases.
11    And so in addition to just a sealed process, the
12  way the program operates is different.  The standards are
13  different.  There's no discovery.  The evidentiary standards
14  are completely different.  What you're trying to prove in
15  the vaccine program is completely different and the way you
16  go about it is different than what will be done in this
17  case.  Experts may be different.  And likely will be.
18    What you end up having here -- and I've tried to
19  make some notes as counsel was addressing them.
20    For example, the concern Merck has as far as the
21  FDA's involvement and what they knew and the evidence
22  presented in terms of that, that's not done in the vaccine
23  program.  It's a no-fault system.  The only question that
24  ever gets put to the special master in a vaccine case is:
25  Did you receive the vaccine at issue and were you harmed?

1    That's it. And if you were harmed, you're afforded damages.

2         None of what Merck is trying to get at through

3    pre-emption or any of the other issues that counsel brought

4    up are even at issue in the vaccine program.

5         Ms. Mullins indicated to Your Honor that the

6    process here is de novo. That's -- I mean, that's

7    important. It's a start-over. Were -- you know, these

8    plaintiffs are not bound by what they said in the vaccine

9    program. It's not relevant. It's not admissible. It's not

10    impeachable evidence.

11         Now, when you get into, as both counsel, I think,

12    said, when you get into the bellwether cases and whatever

13    discovery plan Your Honor wants to adopt, those are

14    discovery issues for this court to supervise. You shouldn't

15    simply release a sealed file in every single case where it's

16    not warranted.

17         I think that we cited in our paper that Yale (ph.)

18    versus Aventis case, which was an Eastern District of

19    Louisiana case, that case clearly said that the vaccine

20    proceedings serve really one purpose in a civil filed case

21    that comes later, and that is: Did the plaintiff comply

22    with the prerequisites to appear in this court? Did they

23    file in the vaccine program? And did they get out?

24         So, in these cases, you can give them the

25    petition, which reflects filing. And you can get the

1  concluding document, which shows that they exited.  That
2  demonstrates that these plaintiffs satisfied the
3  prerequisites to appear before Your Honor in this case.  And
4  that is the extent of the relevance, the usefulness, and
5  then I think the discoverability of the entire vaccine file.
6          I can go on and on about the vaccine program.
7          THE COURT:  No.
8          MR. DOWNING:  I think you've got a grasp on that,
9  and I think Ms. Mullins did a good job of describing it.
10 I'll -- I'd be happy to answer any questions that you've got
11 there.
12         THE COURT:  Thank you.
13         MS. JULIEN:  Your Honor, very briefly, I know
14 we've covered this quite a bit, but I think Mr. Downing
15 really drove home a point of the information asymmetry
16 created by the plaintiff's proposal.  So I think the sheer
17 fact that he's sitting at the table with co-lead plaintiff's
18 counsel in this MDL makes clear that they have access to the
19 entire vaccine court file.  Their experts, the lawyers here
20 can access that.
21         Mr. Downing, again, provided the vaccine court
22 file that he had in his possession, at least the plaintiff's
23 portion of it, without issue in Gramza.  And, again, we've
24 had this proposal in place for more than a year where none
25 of these --

1          THE COURT:  You're starting to repeat.

2          MS. JULIEN:  Yes, apologies.

3          And the -- and, lastly, just to clarify with the

4   EO opinion pointed out by Mr. Downing, to be clear, that

5   court did not hold or even suggest that the only potential

6   use of the vaccine court proceeding is a confirmation or

7   box-checking confirmation that a particular plaintiff

8   complied with the statutory prerequisites before filing the

9   lawsuit; the Court merely repeated what is the statutory

10  provision Section 300aa-23(e), which we don't dispute.  That

11  is that the findings of fact and that the conclusions of law

12  are not admissible.

13         But that doesn't speak to the discoverability of

14  the file itself.  In fact, none of their -- none of the

15  cases that they cite support their position there.

16         Thank you.

17         THE COURT:  Yeah.  And the other two issues are --

18  I'm going take all this under advisement -- the other two

19  issues are the mental health records and the social media

20  and photo/video information sought and objected to.

21         Again, I have what I think I need, but if anybody

22  wants to be heard on that, I'd be glad to hear from you.

23         MR. PENNOCK:  We're okay.  Thank you, Judge.

24         THE COURT:  Thank you.

25         MS. JULIEN:  We are, as well.  Thank you.

1          THE COURT:  So now on the discovery plan, you

2   know, it seems to be a fork in the road type of thing.  I'm

3   very -- I see benefits in taking each road in terms of time

4   to destination with respect to the plaintiff's plan and then

5   an earlier assessment of value of the case from both sides

6   with respect to the defendant's proposed phased plan.

7          I intend to pick and proceed, but I'll be glad to

8   hear from either side if you think that I need to consider

9   something other than what you've already proposed to me.

10          MR. DUKES:  Your Honor, just one additional issue.

11   It's -- as a tangible example of the benefit of efficiency

12   with regard to our proposal, just last week in the Zantac

13   MDL, Ms. Rosenberg, down in the Southern District of

14   Florida, had structured that MDL, which my firm and others

15   participated in so that general causation was the Phase 1

16   decision, and last week in a 341-page opinion, she ruled in

17   favor of the defendants and dismissed all of the cases on

18   that docket as a result of the decision on general

19   causation.

20          So I think the parties have thoroughly briefed it.

21   I did just want to provide a tangible recent example of why

22   this process can be so efficient.

23          THE COURT:  I hope there was a summary of opinion

24   in that case.

25          (Laughter.)

1          MR. DUKES:  Your Honor, we have one other

2     agreement.  We got several other agreements.  And it was a

3     good morning.

4          We have agreed to the alleged injuries that would

5     be pursued in discovery under either -- of either proposal.

6     Potts was one that we had proposed that's agreed to.

7          Plaintiffs this morning proposed primary ovarian

8     failure, and Merck has agreed to that.

9          So we now have agreement on which alleged injuries

10    would be pursued from a discovery standpoint.

11         THE COURT:  Would it be helpful, do you all

12    believe, to file an amended report that reflects some of the

13    good work that's been accomplished today?

14         MR. WRIGHT:  And we actually discussed that.  And

15    certainly, also, we'd be willing, although it's a bit

16    unusual to draft the entire proposed order for the benefit

17    of the Court, there are some nuances here.  We may be better

18    situated to reflect that and present it.

19         So we can certainly -- I would suggest maybe doing

20    that as opposed to sort of an amendment of all of this.

21         THE COURT:  It makes sense to me, Mr. Pennock.

22    What do you --

23         MR. PENNOCK:  Yes, Your Honor.  That's --

24         THE COURT:  Yeah, the joint proposed order would

25    be embraced by the Court, --

1              (Laughter.)

2              -- provided it was timely submitted.

3              MR. PENNOCK:  All right.

4              Your Honor, as to the, you know, truncated versus

5     traditional approach, I would just like to add to what has

6     been said in our -- briefly in our papers.  That from our

7     vantage point, although the efficiencies of approaching it

8     our way, we think, are superior in that we will create cases

9     ready for trial should we prevail rather than have to move

10    on as we laid out.

11             But the -- I think there's also a substantive

12    component to our position that I don't want to be lost in

13    the efficiency discussion, and that is that whether or not a

14    part -- this particular compound, the vaccine, caused injury

15    in particular people is something that we would be

16    evaluating and would necessarily have to be evaluated.

17             And so I think that it would be an overstatement

18    for me to say that pursuing just general causation were in a

19    vacuum.  But it's not a -- it's not completely inaccurate.

20    Pursuing a case, the fulsome case, of people who are

21    claiming to have been injured by this vaccine with the

22    constellation of evidence that supports that claim,

23    generally as well as specifically, is not only the way that

24    I think we are all accustomed to proceeding with trying to

25    prove what has happened to someone, but I think that is the

1    best way to get at the root of all of the questions here.

2         THE COURT:  So, in then -- in a "can it, did it"

3    continuum, why can't I take one of those in isolation and

4    deal with it and then have the parties in a better position

5    to deal with the specific causation?

6         MR. PENNOCK:  Well, I think the Court could take,

7    as the court did in the Zantac case, could take -- which, by

8    the way, maybe I should add, I declined being involved in

9    that case because I thought that the general causation was

10   very weak in that case -- but the Court could take it as a

11   general causation only.

12        But what we are doing inevitably or under both

13   proposals, we are doing case-specific discovery.  We are

14   getting at the plaintiff.  We are getting at the

15   plaintiff's, the plaintiff's doctors.  All of that is

16   happening.

17        And yet, then we're just going to put -- pull the

18   emergency brake and not proceed to issue expert reports

19   case-specific -- who by the way, I want to make clear, the

20   case-specific opinions are predicated not upon someone

21   else's general opinion but upon their own general opinion.

22   In a case such as this or any toxic exposure case or

23   pharmaceutical exposure case, the case-specific expert needs

24   to and does evaluate all of the general evidence, evaluates

25   it and comes to the conclusion, if he or she does, that the

1     vaccine is capable of producing the injury claimed.

2             Then that expert takes that view and applies it to

3     an individual case and makes a determination and offers an

4     opinion as to whether or not it happened in that individual

5     case.

6             And, I mean, I'm -- I can tell you quite

7     transparently that there are cases that I've handled many

8     times where the -- where that expert says, "I'm sorry.  I

9     can't offer that opinion in this case."  And the case is

10     dismissed, as the defendants have raised previously.

11     They're concerned about the bellwether pool being reduced by

12     such dismissals.

13             So the process will simply work to evaluate each

14     and every aspect of what happened medically with what will

15     be hundreds of people are claiming in this matter.

16             And so, again, I repeat myself, but substantively,

17     I think this is a better process, not just efficiency-wise.

18             THE COURT:  Thank you.

19             All right.  Y'all don't need to write that part of

20     the --

21             (Laughter.)

22             -- report.

23             How long do you all need to file your proposed

24     order?

25             MR. WRIGHT:  Say, January 6th?

1          MR. PENNOCK:  That's fine.

2          THE COURT:  All right.  And then I'd like to set

3 another meeting because this calendar fills up really

4 quickly these days.  I think it's really helpful for the

5 Court -- and you've demonstrated that it's helpful for you

6 all -- to have a -- a hearing-related reason to get

7 together.

8          And so I'd like to set a, I'd like to set a

9 "science day."  It's a -- but you all -- I'm convinced by

10 myself that I'm an ocean of ignorance in terms of science.

11 And I'm convinced by you all that it would be helpful to get

12 this tutorial in place.  And so I'd like to do it.  And it

13 seems to me the sooner in the process, the better.

14          And I thought it might be an efficient use of time

15 if we combine that with a next hearing date.  And if that's

16 amenable to both sides, I'm suggesting the last week of the

17 month of January 30th.

18          MR. DUKES:  Your Honor, that's amenable for Merck.

19          MR. WRIGHT:  And I believe we actually talked

20 about February 3rd as a science day, which was amenable to

21 the parties, as well.

22          THE COURT:  So a day earlier in that week?

23          MR. WRIGHT:  Fine from our standpoint.

24          MR. PENNOCK:  Judge, sorry.  I'm trying to pull

25 up.  A date earlier in that week would --

```
 1                THE COURT:  February 2nd?
 2                MR. PENNOCK:  -- I think they had a conflict on
 3     that date.
 4                THE COURT:  They do?
 5                MS. JULIEN:  Yes, Your Honor, I apologize.  I
 6     believe one of my colleagues, who would likely be present
 7     here, has a conflict on that day, on February 2nd.  I don't
 8     know if the 30th might work for plaintiff's counsel?
 9                MR. PENNOCK:  Sure.
10                THE COURT:  So any other day that week --
11                MR. PENNOCK:  Is good.
12                THE COURT:  -- is good with the Court.
13                So is the 31st a good day?
14                MR. PENNOCK:  Yes, Your Honor.
15                MS. JULIEN:  Yes, Your Honor.
16                THE COURT:  Let's do that, then.  Tuesday the 31st
17     we'll have a hearing and a science day scheduled for that.
18                MR. DUKES:  Your Honor, we, over the course of
19     negotiations, had several disagreements regarding the exact
20     issues -- not issues, but some of the logistics of science
21     day.  We resolved those this morning, so we'll be prepared
22     to submit --
23                THE COURT:  With a lot of the people in this
24     room --
25                (Laughter.)
```

1          -- the balance of the day, let's see where we

2     stand at the end.

3          All right.  Well, good.  I'll be interested in a

4     proposal on that, too.

5          MR. DUKES:  Yes, Your Honor.

6          MR. WRIGHT:  One aspect of that, just I'll mention

7     because it's an institutional concern for you, is that

8     there's general agreement on our side that this will be a

9     closed proceeding with respect to science day.  I did want

10    to mention that that -- obviously, counsel of record could

11    be here, but that would be our proposal.

12         THE COURT:  Sure.  And I don't know that we even

13    need to have it on record unless either side requested it.

14         The hearing will be transcribed and official, but

15    the science day portion of it will be closed and unofficial.

16         All right.  Anything else we need to discuss this

17    morning?

18         MR. WRIGHT:  Your Honor, I would say one other

19    item that would be helpful to us, if the Court is able to do

20    it, is as we think about status conferences in advance in

21    terms of planning, if there are dates, looking forward, that

22    are open on the Court's calendar that we could at least

23    pencil in subject to change, that would be, also, well

24    received.

25         THE COURT:  Is monthly too frequent at this point?

1          MR. PENNOCK:  No.

2          THE COURT:  So what if we, what if we calendared

3  in, subject to conflict, the last Tuesday of every month?

4          MR. PENNOCK:  That would be great, Judge.

5          MR. WRIGHT:  Thank you.

6          THE COURT:  That works for me because the way we

7  do things around here, the criminal and civil trial terms

8  begin the first Monday of every month.  And so usually by

9  that last week, all of that trial work is resolved.  If that

10  changes, I would be, I would be very pleased with that.

11  That would mean we're having more trials than we're having

12  now.

13          But, well, at the rate we're going, that last week

14  of the month is pretty open for us.  So we'll tentatively

15  calendar in a pretrial conference the last Tuesday of every

16  month at -- is 11 o'clock a good time for you all?

17          MR. PENNOCK:  Yes.

18          THE COURT:  All right.  Well, good.  I look

19  forward to proceeding from this point.  I'll -- I will get

20  out -- I'll receive your proposed order and respond to it

21  quickly and get it out to you so we're making use of our

22  next conference at the end of January effectively.

23          Thank you, all of you.

24              (Court recessed at 11:51 a.m.)

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Kathy Cortopassi, RDR, CRR, CRC, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 21st day of December, 2022.


        /s/ Kathy Cortopassi
        Kathy Cortopassi, RDR, CRR, CRC
        U.S. Official Court Reporter