*EXHIBIT 2*

1              UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF NORTH CAROLINA
2                   CHARLOTTE DIVISION
3   MDL No. 3036
4   3:22-md-03036-KDB
5   - - - - - - - - - - - - - - - - -X
    IN RE:  GARDASIL PRODUCTS          :
6   LIABILITY LITIGATION               :
                                       :
7                                      :
    THIS DOCUMENT RELATES TO           :
8   ALL ACTIONS                        :
    - - - - - - - - - - - - - - - - -X
9
10
11
12              Videotaped deposition of
    MARTIN KULLDORFF, Ph.D. taken at the offices of
13  Morgan & Morgan, 155 Federal Street, Suite 1502,
    Boston, Massachusetts, before Clifford Edwards,
14  Certified Shorthand Reporter and Notary Public, in
    and for the State of Connecticut on October 25,
15  2024, at 9:00 a.m. EDT.
16
17
18
19
20
21          GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
23             deps@golkow.com
24
25

Golkow Technologies,
A Veritext Division
877.370.3377                                      www.veritext.com
Case 3:22-md-03036-KDB    Document 239-3    Filed 01/06/25    Page 2 of 77

1 A P P E A R A N C E S:
2
3 ON BEHALF OF THE PLAINTIFFS:
4 Michael Baum, Esq.
   Cindy Hall (via Zoom)
5 WISNER BAUM, LLP
   11111 Santa Monica Blvd., Suite 1750
6 Los Angeles, California 90025
   besfandiari@wisnerbaum.com
7
8 Michelle Greene, Esq. (via Zoom)
   THE LANIER LAW FIRM
9 535 Madison Avenue
   New York, New York 10022
10 (212)421-2800
   rachel.lanier@lanierlawfirm.com
11 michelle.greene@lanierlawfirm.com
12
13
   ON BEHALF OF THE DEFENDANTS MERCK & CO. INC. AND
14 MERCK SHARP & DOHME LLC:
15 Joe W. Tomaselli, Jr., Esq.
   Thomas Weber, Esq.
16 GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
   7557 Rambler Road, Suite 1450
17 Dallas, Texas 75231
   jtomaselli@goldmanismail.com
18 tweber@goldmanismail.com
19
20 ON BEHALF OF THE DEFENDANT KAISER FOUNDATION
   HOSPITALS, SOUTHERN CALIFORNIA PERMANENTE MEDICAL
21 GROUP, AND ROBIN SCANLON, MD:
22 Jo Lynn Valoff, Esq. (via Zoom)
   KELLY TROTTER FRANZEN
23 111 West Ocean Boulevard, 14th Floor
   Long Beach, California 90801
24 Jlvaloff@kellytrotter.com
25

1 A P P E A R A N C E S:
2   (continued)
3
4 ALSO PRESENT:
5   Robert Martignetti, videographer
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1        EXAMINATION
2                    PAGE
3 DIRECT EXAMINATION BY MR. TOMASELLI        9
4
5        EXHIBITS
6
7 EXHIBIT                    PAGE
8 MK 1, Expert report of Dr. Kulldorff        27
9 MK 2, Materials-Considered List        46
10 MK 3, Rule 26 Expert Disclosure for
11     Martin Kulldorff        68
12 MK 4, Publication by Author Sridhar
13     Published in 2017        69
14 MK 5, Paper Authored by Gee Published
15     in 2011        77
16 MK 6, Paper Published by Katherine Yih
17     in 2016        80
18 MK 7, Publication by Katherine Yih Published
19     in 2018        93
20 MK 8, Klein Paper        101
21 MK 9, Chao Paper        102
22 MK 10, Arnheim Dahlström Paper        102
23 MK 11, Grimaldi-Bensouda 2014 Paper        102
24 MK 12, Langer-Gould Paper        103
25

1        EXHIBITS
2        (continued)
3
4 EXHIBIT                    PAGE
5 MK 13, Scheller 2015 Paper        104
6 MK 14, Naleway Paper        104
7 MK 15, Grimaldi-Bensouda 2017 Paper        104
8 MK 16, Feiring Paper        105
9 MK 17, Miranda Paper        105
10 MK 18, Dr. Sukumaran's Paper Regarding
11     HPV Vaccine Safety        106
12 MK 19, Varricchio Paper        110
13 MK 20, Shimabukuro 2015 Paper        126
14 MK 21, November 2015 EMA PRAC Assessment
15     Report        158
16 MK 22, Rebecca Chandler Paper        164
17 MK 23, European Medicines Agency PRAC PSUR
18     Assessment Report, dated January 2017        168
19 MK 24, Paper by Yih, 2021, American Journal
20     of Epidemiology        174
21 MK 25, Report From Danish Health and
22     Medicines Authority for Consideration
23     by the EMA and Rapporteurs        186
24 MK 26, Merck Report Reviewed in Connection
25     with the Article 20 Procedure        193

Case 3:22-md-03036-KDB     Document 239-3     Filed 01/06/25     Page 3 of 77
Golkow Technologies,
A Veritext Division
877-370-3377                                                     www.veritext.com

EXHIBITS
(continued)

EXHIBIT                                    PAGE
MK 27, Minutes and Responses to PRAC from
    the SAG Vaccines Meeting on HPV
    Vaccines (Article 20 Referral)        208
MK 28, Article by Patricia Wodi           225
MK 29, Paper by Arana, 2017               213
MK 30, Paper by Tatang                    232
MK 31, Article by Slade, et al.           236
MK 32, 2012 Article by Dr. Tomljenovic and
    Dr. Shaw                              239
MK 33, MK 33, Document Entitled "FDA
    Information on Gardasil -- Presence
    of DNA Fragments Expected,
    No Safety Risk"                       259
MK 34, Fukushima Paper                    269
MK 35, Suzuki and Hokono Article          278
MK 36, Invoice                            286
MK 37, New England Journal of Medicine
    Article from Salmon                   290

THE VIDEOGRAPHER: We are now on the record. My name is Robert Martignetti. I'm the videographer for Golkow Litigation Services. Today's date is October 25, 2024, and the time is 9:01 a.m.

This video deposition is being held in Boston, Massachusetts, In Re: Gardasil Products Liability Litigation. The deponent is Martin Kulldorff, Ph.D.

Counsel's appearances will be noted on the stenographic record. The court reporter is Cliff Edwards.

EXHIBITS
(continued)

(Reporter's Note: Original exhibits retained by the court reporter and forwarded to Golkow for production.)

MARTIN KULLDORFF, Ph.D.
residing at 103 Lake View Drive, Ashford, Connecticut, 06278, having first been duly sworn, deposed and testified as follows:

THE COURT REPORTER: Thank you.

MR. TOMASELLI: Great.

DIRECT EXAMINATION

BY MR. TOMASELLI:

Q    Dr. Kulldorff, my name is Joe Tomaselli. And I just introduced myself to you a couple minutes ago; right?

A    Yup.

Q    We've never met before; correct?

A    We have not.

Q    You understand that I represent Merck in this case?

A    Yes.

Q    Okay. You understand that I'm here to take your deposition?

A    Yes.

Q    Great.

Will you please state your full name?

A    Martin Kulldorff.

Case 3:22-md-03036-KDB    Document 239-3 Filed 01/06/25    Page 4 of 77
Golkow Technologies
877-370-3377              A Veritext Division              www.veritext.com

1  Q   And where do you live?
2  A   Ashford, Connecticut.
3  Q   Born in 1962?
4  A   Yes.
5  Q   Have you ever been deposed before?
6  A   Yes.
7  Q   So you understand that the rules of a
8  deposition are that, if we can, we should try not to
9  talk over one another; okay?
10  A   Okay.
11  Q   And if you answer my question, I'll
12  assume that you understood it; okay?
13  A   Okay.
14  Q   You understand that Merck is one of the
15  manufacturers of an HPV vaccine that's distributed
16  worldwide?
17  A   Yes.
18  Q   How many other companies distribute HPV
19  vaccines?
20  A   There's a company -- there's a vaccine
21  called Cervarix.
22  Q   Are you aware of any others?
23  A   No.
24  Q   My understanding is that your primary
25  education was in Sweden; is that right?

1  A   I was educated both in Sweden and the
2  United States.
3       (Whereupon, the court reporter
4       requests clarification.)
5       THE WITNESS:  I was educated both in
6       Sweden and the United States.
7  BY MR. TOMASELLI:
8  Q   Right.
9       In 1984, you received your bachelor of
10  science in mathematics statistics from Umeå
11  University in Sweden?
12  A   Yes.  Umeå.
13  Q   And that's U-m-e-a?
14  A   U-m-e-å, with a circle over the "A."
15  Q   Okay.  And how do you say that?
16  A   Umeå.
17  Q   In 1989, you received your Ph.D. in
18  operations research from Cornell here in the United
19  States; correct?
20  A   Yes.
21  Q   You came to work in the United States for
22  good in about 1995; is that right?
23  A   That sounds right -- about.
24  Q   And what brought you here in 1995?
25  A   My wife, at the time, went to go to

1  graduate school in the U.S.
2  Q   She went to what?
3       I'm sorry.
4  A   Graduate school.
5  Q   Graduate school?
6  A   In the U.S.
7  Q   And did you then work for the National
8  Cancer Institute?
9  A   Yes.
10  Q   And the National Cancer Institute is part
11  of the National Institutes of Health; correct?
12  A   Yes.
13  Q   A governmental agency for the United
14  States; right?
15  A   Yes.
16  Q   You said you've been deposed before in
17  litigation.
18       How many times?
19  A   I believe one time.
20  Q   One time?
21  A   (The witness nods head.)
22  Q   And can you tell me the nature of that
23  case?
24  A   Family court.
25  Q   You've never been deposed or offered

1  expert opinions in a case where a product is alleged
2  to cause an adverse event; right?
3  A   Not before this one.
4  Q   What I said was right?
5  A   (The witness nods head.)
6  Q   Yes?
7  A   Yeah.  I think you said before.  Yeah.
8  Q   You've never before --
9  A   Yes.  Correct.
10  Q   Okay.  Sometimes I'll phrase something
11  one way, and -- and "yes" or "no" -- oftentimes,
12  "no" -- is hard to understand.
13       And so if I say what I said was correct
14  or if I ask you to say "yes," maybe you shook your
15  head or something like that on the record.
16       I'm not trying to be rude or -- or
17  anything.  I just am trying to get a -- a transcript
18  that others can read later.
19       Okay?
20  A   Okay.
21  Q   Thank you.
22       We talked about the National Cancers
23  [sic] Institute and -- and the National Institutes
24  of Health.
25       Do you understand that part of their

Case 3:22-md-03036-KDB    Document 239-3    Filed 01/06/25    Page 5 of 77
Golkow Technologies
A Veritext Division
877-370-3377                                                          www.veritext.com

1 mission is to understand cancers and to prevent
2 cancers if they can?
3    A    Yes.
4    Q    You've been affiliated with Uppsala
5 University; is that right?
6    A    Yes.
7    Q    It's possible that it's pronounced some
8 other way.
9         But if I say Uppsala, is that okay?
10   A    Good enough.
11   Q    Thank you.
12        You've also been affiliated with Harvard
13 medicine -- Medical School; correct?
14   A    Yes.
15   Q    You were a professor of medicine from
16 approximately 2003 to 2021; right?
17   A    I was, first, an associate professor.
18 And then, I was a full processor.
19   Q    Fair enough.
20        And you've also been associated with the
21 Brigham; right?
22   A    Correct.
23   Q    And the Brigham is a teaching institution
24 for Harvard; right?
25   A    Correct.

1    Q    And my understanding is you were a
2 biostatistician for the Brigham from about 2015 to
3 2021; is that right?
4    A    I was a professor and a -- working as a
5 biostatistician.
6    Q    And are you still affiliated with Harvard
7 and the Brigham today?
8    A    No.
9    Q    And was that a voluntary choice on your
10 part?
11   A    No.
12   Q    My understanding is that you've worked
13 with the U.S. Food and Drug Administration's Drug
14 Safety and Risk Management Advisory Committee; is
15 that right?
16   A    Yes.
17   Q    From approximately 2018 to 2022; is that
18 right?
19   A    Sounds right.
20   Q    And was that a paid position?
21   A    There was an honoraria.  But it's -- it's
22 small -- small.
23   Q    Okay.  You were -- you were paid an
24 honoraria for your time in attending the meetings?
25   A    Yes.

1    Q    Okay.  And was it over $10,000?
2    A    I don't think so.
3    Q    Okay.  And do you recall which products
4 that you advised the FDA on with respect to that
5 committee?
6    A    I cannot list them from the memory.  No.
7    Q    Okay.
8    A    But there were a few different ones.
9    Q    Were any of them vaccines?
10   A    No.
11   Q    You were a member of the vaccine safety
12 subgroup of the advisory committee on immunization
13 practices at the Center for Disease Control; is that
14 right?
15   A    Do you mean that for the COVID vaccine?
16   Q    Well, let's start with you were a member
17 of the ACIP's -- strike that.  Withdrawn.
18        You were a member of the vaccine safety
19 group -- safety subgroup for the ACIP for the CDC in
20 approximately 2008 and 2009; is that right?
21   A    No.
22        That's -- that's -- I was a member of
23 a -- a group around 2008 for -- specifically for one
24 vaccine; and then, around 2019, another different
25 working group for a different vaccine.

1    Q    When you --
2    A    And both were -- so sorry.
3    Q    I'm sorry.  Go ahead.
4    A    Both were subgroups ad- -- advising the
5 ACIP.
6    Q    Fair enough.
7        The vaccine that you were a member of the
8 subgroup on in 2008, what was that?
9    A    That was the MMRV, the measles, mumps,
10 rubella, varicella vaccine.
11   Q    And in 2019, what vaccine was that in
12 relation to?
13   A    That was all the COVID vaccines.
14   Q    All the COVID vaccines?
15   A    (The witness nods head.)
16   Q    And was your membership on the vaccine
17 safety subgroup a paid position; or, likewise, did
18 you receive a small honoraria for your time?
19   A    Neither was paid.
20   Q    Are subgroup members actually employees
21 of the CDC?
22   A    No.
23   Q    Are they generally from academic
24 institutions?
25   A    Some -- many academics, I think, and,

Case 3:22-md-03036-KDB    Document 239-3    Filed 01/06/25    Page 6 of 77

1 sometimes, some hospitals. But there could be
2 others, also, in health -- like, health
3 insurance-plans-, HMOs-type things.
4    Q    The subgroup members are, generally,
5 experts in the field that they're asked to consult
6 on; is that right?
7    A    Yes.
8    Q    Have you ever been part of a subgroup or
9 a working group for HPV vaccines?
10   A    No.
11   Q    Do you know any of the individuals that
12 worked or consulted on a working group or subgroup
13 of the ACIP for HPV vaccines?
14   A    Who?
15   Q    I'm asking you if you know of any.
16   A    I know people who have sat on the ACIP,
17 and they may have had to deal with HPV vaccines.
18 But I don't really know who did what, when; so I
19 can't really answer that question. I don't know.
20   Q    Fair enough.
21        My understanding is that you're
22 affiliated now with a group called Acumen, LLC; is
23 that right?
24   A    Yes.
25   Q    And that's been for the last couple

1 years; is that right?
2    A    A- -- about. Yeah.
3    Q    I looked Acumen up, and it says that
4 they're an impartial, data-driven -- I'm sorry.
5 Withdrawn.
6        I looked Acumen up. And it says that
7 they do impartial, data-driven analyses for
8 government agencies to help inform health care
9 decisions.
10       Is that generally correct?
11   A    I think so.
12   Q    Does Acumen, LLC, try and promote the
13 public health in what y'all do today?
14   A    You'd have to ask them.
15   Q    Well, you're part of Acumen.
16       Do you try to promote public health in
17 what you do?
18   A    Yes.
19   Q    In the medical product safety section for
20 Acumen, LLC, it says that they work with federal
21 agencies to monitor safety and efficacy of vaccines;
22 does that sound familiar?
23   A    That's part of what they do. Yeah.
24   Q    And does Acumen, LLC, work on, currently,
25 any HPV vaccines?

1    A    I don't know.
2    Q    And it's true that you never suggested,
3 in your work for Acumen, that Gardasil was not safe
4 or efficacious; correct?
5    A    I have never discussed HPV vaccines with
6 them.
7    Q    So what I said was correct?
8        You've never discussed it with them that
9 Gardasil -- well, withdrawn.
10       You've never told anybody -- withdrawn.
11       It's true that you've never suggested, in
12 your work for Acumen, that Gardasil was not safe or
13 efficacious?
14   A    I have not talked to them about Gardasil
15 in any -- any way in -- on any matter.
16   Q    Are you a medical doctor?
17   A    Nope.
18   Q    Do you hold yourself out as a physician?
19   A    No.
20   Q    Have you ever diagnosed, tested, or
21 treated a patient?
22   A    No.
23       Unless you count my children that I
24 sometimes try to figure out what's going on --
25 what's wrong with them.

1    Q    Just like any parent; right?
2    A    Exactly.
3    Q    And you've never diagnosed, tested, or
4 treated a patient with POTS, primary ovarian
5 insufficiency, chronic regional pain syndrome,
6 chronic fatigue syndrome, or fibromyalgia; right?
7    A    No, I haven't.
8    Q    When we talk about POTS, you understand
9 that I'm referring to postural orthostatic
10 tachycardia syndrome?
11   A    Yes.
12   Q    When we talk about POTS or primary
13 ovarian insufficiency or chronic regional pain
14 syndrome or chronic fatigue syndrome or fibromyalgia
15 today, you understand that those are medical
16 syndromes that are diagnosed by medical
17 professionals; right?
18   A    Yes.
19   Q    Have you ever been involved in assessing
20 individual cases in a chart review as part of a
21 epidemiologic study or a single-generation study?
22   A    No, I have not.
23   Q    If chart review was "porm" -- performed
24 as part of an epidemiologic study or chart --
25 withdrawn.

Case 3:22-md-03036-KDB    Document 2393-3    Filed 01/06/25    Page 7 of 77
Gardent Technologies, Inc.
877-370-3377              A Veritext Division              www.veritext.com

1     If chart review was performed as part of
2 an epidemiologic study or a signal generation study
3 that you were involved in, you would have deferred
4 to the physicians involved in that chart review; is
5 that fair?
6     A    Whoever is the PI would select the
7 physicians to do the short review.
8     Q    And as we discussed, that's never been
9 you; correct?
10     A    I have never been the one who selected
11 the short reviewers.
12     Q    Have you had any formal medical training
13 at all?
14     A    I have never had any formal training in
15 the -- like, for a physician or medicinal.
16     Q    In connection with this litigation that
17 we're having this deposition about, do you remember
18 who contacted you first?
19     A    From the company, it was, I believe,
20 Attorney Baum.
21     Q    And which company are you talking about?
22     A    Is it something-and-Baum?
23         MR. BAUM:  Wisner Baum.
24     A    Wisner Baum.  Yeah.  Sorry.
25

1 BY MR. TOMASELLI:
2     Q    Just making sure that there wasn't some
3 other company that I didn't under- -- that I didn't
4 know about.
5         So in connection with this litigation,
6 you were first contacted by Mr. Baum; right?
7     A    Yes.
8     Q    When was that?
9     A    In June.
10     Q    June of this year?
11     A    2024.
12     Q    And do you know how Mr. Baum got your
13 name?
14     A    I think you should ask him that.
15     Q    Did you agree to work with Mr. Baum when
16 you were contacted in June of 2024?
17     A    I agreed in June.  Yeah.
18     Q    Was it in connection with the first
19 conversation you had?
20     A    I think there were a few conversations
21 before it was agreed on.  I don't remember exactly.
22     Q    Do you consider yourself an expert in the
23 safety of Gardasil?
24     A    I know a lot about that.
25     Q    Yeah.  And my question is:  Do you

1 consider yourself an expert in the safety of
2 Gardasil?
3     A    Yes.
4     Q    I don't know any -- everything about it,
5 but I know a lots.  I would say I would be an expert
6 on it.
7     Q    Are you an expert in whether the
8 epidemiologic data available today shows that
9 Gardasil causes POTS or POI?
10     A    I have not read all the data, so I can't
11 give a definite view on that.  And I haven't been
12 asked to do so as part of this litigation.
13     Q    Are you an expert in whether the
14 epidemiologic data available today shows that
15 Gardasil causes chronic fatigue syndrome or
16 fibromyalgia?
17     A    The same answer to that question.
18     Q    You charge $400 an hour for your time; is
19 that right?
20     A    Yes.
21     Q    As of today, you have one invoice dated
22 October the 24th; is that right?
23     A    Yes.
24     Q    That was for time from June 27 through
25 September the 30th of 2024; correct?

1     A    Yes.
2     Q    You charged approximately 82 hours during
3 that time period; is that right?
4     A    Yes.
5     Q    And your total invoice as of that invoice
6 is just at $33,000; is that right?
7     A    Something around that number.
8     Q    You were paid a 4,000-dollar retainer;
9 correct?
10     A    Yes.
11     Q    Have you been paid for the balance of
12 that?
13     A    No.
14     Q    Do you expect to be paid for the balance
15 of that?
16     A    Yes.
17     Q    Do you know when?
18     A    No.
19     Q    How much more time have you put into this
20 case, if any, from September the 30th to today?
21     A    Maybe around 30 hours.
22     Q    And is that, again, at -- at $400 an
23 hour?
24     A    Yes.
25         Sorry.

Case 3:22-md-03036-KDB     Document 239-3     Filed 01/06/25     Page 8 of 77
877-370-3377                    Gallant Technologies                A Veritext Division                www.veritext.com

1    Q    No problem.
2        In connection with your testimony today,
3 will you be compensated for your time?
4    A    Yes.  I believe so.
5    Q    And is it, again, at the rate of $400 an
6 hour?
7    A    Yes.
8    Q    Is it true that you've never been
9 employed by a company that manufactures vaccines?
10    A    Correct.
11    Q    And is it true that you've never worked
12 as an employee in any pharmaceutical company as part
13 of their pharmacovigilance department?
14    A    Correct.
15    Q    You've never worked at a pharmaceutical
16 company at all; right?
17    A    Correct.
18    Q    Have you ever been employed as an
19 employee by any governmental health or regulatory
20 authority?
21    A    Yes.
22    Q    Which one?
23    A    So when I was serving on the advisory
24 committee, I was technically a FDA employee --
25 federal employee.

1    Q    When you were serving on the FDA's Drug
2 Safety and Risk Management Advisory Committee, you
3 were considered a FDA employee?
4    A    Yes.
5    Q    Okay.  Any other?
6    A    So NIH is not a regulatory agency, but
7 I've been employed by NIH.  So I don't -- I don't
8 think that qualifies to your criteria.  But...
9    Q    Oh, fair enough.
10        So in terms of a governmental health
11 organization, you have been employed by the NI- --
12 the NIH and the National Cancer Institute
13 specifically?
14    A    Yes.
15        Also, one year by the National In- --
16 National Institute of Neuro- -- Neurologically [sic]
17 and -- Disorders and Stroke -- NINDS
18    Q    Okay.  The National Institute of Health's
19 division regarding stroke and neurologic disorders?
20    A    Yes.
21    Q    Okay.
22        (Whereupon, Exhibit MK 1, Expert
23        report of Dr. Kulldorff, was marked
24        for identification.)
25

1 BY MR. TOMASELLI:
2    Q    Dr. Kulldorff, I'm going to hand you what
3 I've marked as Exhibit 1, which is your expert
4 report in this matter; is that correct?
5    A    Yes.
6    Q    It's dated September the 9th, 2024;
7 right?
8    A    I believe so.  Yes.
9    Q    You have no other expert report in this
10 litigation; is that right?
11        SECRETARY:  Did you --
12    A    Correct.
13        SECRETARY:  -- want to also -- a
14    copy also?
15        MR. BAUM:  Hold on a second.
16        COURT REPORTER:  Watch your
17    microphone.
18        MR. BAUM:  Off the record.  Let's go
19    off the record.
20        THE VIDEOGRAPHER:  The time is
21    9:22 a.m., and we're off the record.
22        (Whereupon, there was a recess taken
23        from 9:22 a.m. to 9:24 a.m.)
24        THE VIDEOGRAPHER:  The time is
25    9:24 a.m., and we are on the record.

1        MR. TOMASELLI:  Thank you.
2 BY MR. TOMASELLI:
3    Q    After a very short break, Dr. Kulldorff,
4 are you ready to proceed?
5    A    Yes.
6    Q    Great.
7        We just marked as Exhibit 1 your expert
8 report in this litigation; fair?
9    A    Yes.
10    Q    Looks like you brought a copy of it with
11 you today; right?
12    A    Yes.
13    Q    Okay.  You have no other expert report in
14 this litigation; right?
15    A    Correct.
16    Q    Okay.  Is there anything you need to
17 correct or modify in your expert report that's
18 Exhibit 1 as you sit here today?
19    A    There were a couple of grammar typos.
20 But I don't think I have to correct them, so I think
21 it's okay.  I could stand by what's in there.
22    Q    Fair enough.  We'll -- we'll excuse the
23 grammar typos.
24        But other than that, any substantive
25 changes?

Case 3:22-md-03036-KDB    Document 239-3    Filed 01/06/25    Page 9 of 77
877-370-3377                Golkow Technologies                www.veritext.com
A Veritext Division

1    A    No.
2    Q    Fair enough.
3         All the opinions that you intend to offer
4    in this case are contained within that expert
5    report; right?
6    A    Well, if you have other questions -- if
7    other questions are given to me, I'll ask -- I'll
8    answer whatever questions are given to me.
9    Q    Right.
10        But as you sit here today, the ex- -- the
11   expert opinions that you intend to offer are
12   contained in the report?
13   A    Well, if you ask me about other things, I
14   will try my best to answer anything you ask me.
15   Q    Right.
16        But since you can't understand or
17   anticipate -- withdrawn.
18        Since you can't anticipate what I'm going
19   to ask you, in terms of what you were prepared to
20   testify about in this case, that's contained within
21   your report; right?
22   A    Well, I would answer any questions that
23   anybody asks me, whether it's you or somebody else.
24   Q    Fair enough.
25        Do you -- as you sit here today, do you

1    have other opinions that you plan to offer at trial
2    in this case that are not in that report?
3    A    Not me, personally.  I don't know what
4    plans you have or my attorney has.
5    Q    That's fine.
6         But in terms of you, personally --
7    A    I --
8    Q    -- as you sit here -- let me finish my
9    question.  Sorry.  Withdrawn.
10        As you -- for you, personally, and as you
11   sit here today, right now, you don't have any other
12   opinions that you plan to offer in this case, other
13   than the ones that are in your report?
14   A    Correct.
15   Q    Okay.  Did -- other than any lawyers, did
16   anybody else help you write your report?
17   A    No.  I wrote it.
18   Q    And on page two of your report, you
19   state, "In writing this report, I take the same
20   scientific approach that I've used for decades in
21   detection and evaluating potential vaccine safety
22   problems."
23        Right?
24   A    On page two?
25        Oh, that's on page three.

1    Q    Well, that's why you couldn't find it.
2         On page three -- withdrawn.
3         Dr. Kulldorff, on page three of your
4    report, you state "In writing this report, I take
5    the same scientific approach that I've used for
6    decades in detection and evaluating potential
7    vaccine safety problems."
8         Do you see that?
9    A    Yes.
10   Q    And that's true?
11   A    Yes.
12   Q    Okay.  Now, in reading your expert
13   report, it appears to me that you focused in on
14   three particular areas.
15        One of those, you analyzed Merck's
16   responses to the EMA's questions in connection with
17   the Article 20 procedure in 2015; is that right?
18   A    Correct.
19   Q    The second major topic was that you
20   evaluated the Chao study that was published in 2012;
21   is that right?
22   A    Correct.
23   Q    And the third major area is that you
24   evaluated Lucija Tomljenovic's disproportionate --
25   -ality -- disproportionality analysis related to

1    POTS and primary ovarian insufficiency that was
2    generated in 2024; is that right?
3    A    Correct.
4    Q    And I apologize that I don't exactly know
5    how to say her name.
6         But if I say Ms. Tomljnenovic; is that
7    okay?
8    A    My ability to pronounce it correctly is
9    about the same level as yours.  So don't ask me.
10   Q    Okay.  So I think we're on the same page;
11   fair?
12   A    Correct.
13   Q    Okay.  And it's okay to call her analysis
14   a disproportionality analysis; right?
15   A    Yes.
16   Q    Now, we'll get into these a little bit
17   more.
18        But of all the issues that you addressed
19   in your expert report, they are related to data
20   pertaining to Gardasil that were published or became
21   available after January of 2011; correct?
22   A    Some of it uses data before that year, I
23   think.
24   Q    Some of the data that went into the
25   analyses were from prior to 2011.

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 10 of 77
Golkow Technologies
A Veritext Division
877-370-3377                                              www.veritext.com

1    A    Yes.
2    Q    But the analysis that you analyzed and
3 that you talked about in your expert report -- the
4 Chao publication, the Article 20 procedure, and
5 Dr. Chung (phonetic) -- Tomljenovic's
6 disproportionality analysis -- those were published,
7 and -- and those analyses came after January of
8 2011; right?
9    A    Yes.
10        The analysis were done after that date.
11 Yeah.
12    Q    Okay.
13    A    Sorry for misunderstanding you.
14    Q    No.  That's probably my -- my fault on
15 the question.  I appreciate the clarification.
16        Withdrawn.
17        Obviously you saw Ms. Tomljenovic's
18 written expert report before you submitted your
19 expert report; is that right?
20    A    I saw parts of her expert report.
21    Q    And did you read all the entirety of her
22 expert report?
23        Or did you just focus on the
24 disproportionality part?
25    A    I only saw part four of her report.

1    Q    Okay.  Do you know how far in advance you
2 received part four of Ms. Tomljenovic's report
3 before your expert report was due?
4        MR. BAUM:  Just objection.  Vague.
5 BY MR. TOMASELLI:
6    Q    Withdrawn.
7        Dr. Kulldorff, your report is from
8 September of 2024; right?
9    A    Yes.
10    Q    And my question is:  How far in advance
11 of September, 2024, did you look at the
12 disproportionality analysis?
13    A    So I saw some of the analysis in July.  I
14 saw other parts of the analysis in August.
15    Q    Did the analysis change between July and
16 August?
17    A    None of the analysis that I saw in July
18 changed any substantial or anything I noticed for
19 later.
20        But there were additional analysis done
21 that -- that I saw in August that I had not seen in
22 July.
23    Q    In terms of Ms. Tomljenovic's
24 disproportionality analysis related to POTS, you
25 saw, basically, one iteration of that analysis;

1 correct?
2        MR. BAUM:  Objection.  Vague.
3    A    What -- what do you mean by "one
4 iteration"?
5 BY MR. TOMASELLI:
6    Q    Well, my question is simply:  Did -- did
7 that analysis change over time, based on the
8 parameters, based on the inputs, based on searching?
9        And so my question to you is:  Did you
10 see, essentially, one disproportionality analysis
11 from her?
12        Or did you see an analysis that evolved
13 over time?
14    A    Well, she did many analysis by gender, by
15 age for different outcomes.  And so -- and in the
16 part four of her report, there's a lot of different
17 analysis.  And I only saw part of those analysis in
18 July.
19        And then, when she ran more of those
20 different analysis, I saw additional ones in August.
21    Q    I understand.  So let me see if I have
22 this right.
23        In terms of your -- your review of
24 Ms. Tomljenovic's disproportionality analysis, you
25 saw part of the analysis in July which included

1 POTS; correct?
2    A    So some of the analysis in July was for
3 POTS.  Yes.
4    Q    And you reviewed additional analyses in
5 August of this year; right?
6    A    Correct.
7    Q    My question is:  In terms of, for
8 example, a POTS analysis that you saw in July, did
9 it change in August?
10    A    Not the -- the -- the analysis that I saw
11 in July did have any substantial change as for --
12        (Whereupon, the court reporter
13        requests clarification.)
14    A    -- did not have any substantial changes
15 for what I saw in August.
16        But I don't -- I don't remember exactly
17 which ones was one.  But let's say I think she
18 focused on the females, maybe, in July, and maybe I
19 didn't see the male until August.
20        But I don't remember exactly which ones I
21 saw in July versus August.  But there were
22 additional analysis that she did for both the
23 females and males and different age groups and --
24 and different time periods --
25

Case 3:22-md-03036-KDB    Document 289-1    Filed 01/06/25    Page 11 of 77
Gmilson Technologies
A Veritext Division
877-370-3377                                                                    www.veritext.com

1  Q   Okay.
2  A   -- and so on.
3  Q   And so in terms of what you saw -- say it
4  was an analysis of females for POTS -- a
5  disproportionality analysis for females for POTS,
6  whatever you saw in -- in July, that analysis for
7  females did not change in August?
8  A   Correct.
9      Unless there was an additional for a
10 different age group or for different time periods.
11 Because she did some of the time per-- -- she did
12 different time periods.
13 Q   Right.
14 A   So some of those time periods I didn't
15 see in July. And then, if you did a different time
16 periods, the -- ones I saw in July didn't
17 change.
18     But then, there was a different that was
19 for -- in August for a different time period. And
20 of course, the estimates are somewhat different.
21 Q   Right.
22     Dr. Kulldorff, was, in your mind,
23 Dr. Tomljenovic's disproportionality analyses
24 prespecified?
25     MR. BAUM:  Objection.  Vague.

1  A   I think you have to ask her that
2  question.
3  BY MR. TOMASELLI:
4  Q   Okay.  You don't know, one way or the
5  other, whether the disproportionality analyses you
6  reviewed in July and August were all prespecified?
7  A   You'd have to ask her that question.
8  I --
9  Q   You don't --
10 A   -- don't know.
11 Q   -- know one way or the other?
12 A   I don't know.
13 Q   Do you understand, Dr. Kulldorff, that
14 Ms. Tomljenovic is not a physician?
15 A   My guess is that she's not.  But I -- I
16 mean, you'll have to ask her about her -- her own
17 credentials.
18 Q   You did not investigate her credentials?
19 A   No.
20 Q   Had you ever heard of Ms. Tomljenovic or
21 encountered her in your professional work prior to
22 this interaction in 2024?
23 A   I had never had any communication with
24 her prior to this. I may have seen some papers by
25 her, but I don't remember if I have or not.

1  Q   You don't have a specific recollection of
2  whether you talked to her or encountered any of her
3  literature prior to the summer of 2024?
4  A   No.
5      I have never talked to her or
6  communicated with her in any manner before -- before
7  the summer of '24, that I know.
8  Q   In terms of her research or publications
9  you're not aware, as you sit here today, whether you
10 were aware of those publications or her research
11 prior to the summer of 2024; is that right?
12 A   So I might have encountered some of them.
13 But yeah, I don't remember all of the papers.
14     I mean, I read so many papers.  I don't
15 remember exactly who -- who wrote what.
16 Q   Totally understandable.
17     And I guess, I -- my only question is:
18 You don't have a specific recollection of reading
19 any of her papers or research prior to the summer of
20 2024?
21 A   I might have recollection of the papers
22 without realizing that she -- her -- her name was on
23 it.
24 Q   Okay.  Again, you have not investigated
25 her credentials, so do you -- you don't know whether

1  she has any formal training in statistics or
2  advanced degrees in statistics or any of her bona
3  fides, so to speak?
4  A   I don't think she has a Ph.D. in
5  statistics.
6  Q   Do you know if she's ever had any formal
7  training in statistics?
8  A   Most scientists have had, so I assume she
9  has.  But I don't know the nature of it.
10 Q   Did you talk with Ms. Tomljenovic about
11 her disproportionality analysis before it was
12 complete?
13 A   Yes.
14 Q   And did you meet in person?
15 A   No.
16 Q   Did you always talk to her over the phone
17 or Zoom?
18 A   We -- I talked with her with Zoom -- on
19 Zoom.
20 Q   And did you offer her any advice in terms
21 of her disproportionality analyses?
22 A   Yes.
23 Q   And what advice was that?
24 A   To consider age as a potential
25 confounder.

11 (Pages 38 - 41)

Case 3:22-md-03036-KDB   Document 789-1   Filed 01/06/25   Page 12 of 77
Gilson Technologies
A Veritext Division
877-370-3377                                                    www.veritext.com

1    Q    What else?
2    A    I think that was it.  At least, that was
3  the only major things.
4         And she -- yeah.
5    Q    In terms of the advice that you remember
6  giving her in the summer of 2024, your
7  recollection's that you talked to her about
8  considering age as a potential confounder; is that
9  right?
10   A    Yes.
11   Q    And as you sit here today, you don't
12  recall any other specific advice that you gave her?
13   A    There was no other major advice.  I might
14  have -- I don't remember if I did some other minor
15  things.
16   Q    And did you have e-mail communications
17  directly between you and her alone?
18   A    You mean, only the two of us?
19   Q    That's correct.
20   A    Only things that were also cc'd to the
21  attorneys.
22   Q    So your communications with
23  Ms. Tomljenovic always included a lawyer?
24   A    I think they were always cc'd on
25  everything.

1    Q    Did she ever tell you why she performed
2  the disproportionality analysis in her expert
3  report?
4    A    I don't know if she specifically told me.
5  But it's obviously to determine whether there's a
6  relationship between Gardasil and these outcomes.
7    Q    A disproportionate analysis between
8  Gardasil and certain outcomes; correct?
9    A    Well, the ultimate goal is to know if
10  there is a relationship -- a causal relationship.
11  That's the goal of doing this analysis.
12   Q    Okay.  Did Ms. Tomljenovic -- well,
13  withdrawn.
14        Did you ever talk with Dr. Brinth about
15  Ms. Tomljenovic's disproportionality analysis?
16   A    No.
17   Q    Do you know that Ms. Tomljenovic sat for
18  a deposition, like you are doing today, that -- last
19  week?
20   A    Yes.
21   Q    And were you provided the transcript of
22  that deposition?
23   A    I don't think so, and I have not read it.
24   Q    Were you -- withdrawn.
25        Do you know what she said on any topic

1  last week during her deposition?
2    A    There was some discussions with my
3  attorney --
4         MR. BAUM:  Okay.  So objection.
5         You're starting to walk into
6         protected communications.
7  BY MR. TOMASELLI:
8    Q    Have you learned anything about what
9  Ms. Tomljenovic said last week from anyone, other
10  than an attorney?
11   A    No.
12   Q    Do you know any other experts that are
13  consulting for the plaintiffs, besides
14  Ms. Tomljenovic?
15   A    You mean, if I know the names; if I know
16  them personally; or if I have communicated with
17  them?
18   Q    All of those.
19   A    So there is one.  His name -- he's a
20  physician, I think, here in Boston.  The -- the name
21  is escaping me now.
22   Q    Anybody else?
23   A    And then, there is Peter Gøtzsche, who --
24  who I have met.  He's a -- he's a very good
25  scientist.

1         I don't think I know of the other ones.
2         They might have been mentioned at some
3  point to me, or they might have popped up on a --
4  on a -- on a -- on an e-mail that was sent out to
5  everybody, but I don't remember.
6    Q    Do you recall reviewing or analyzing any
7  expert report, other than Ms. Tomljenovic's?
8    A    I did not.
9    Q    Did you talk with Peter Gøtzsche about
10  his testimony or his report?
11   A    No.
12   Q    Do you know of any other biostatistician
13  that has worked with plaintiff's counsel with
14  respect to the Gardasil litigation?
15   A    No.
16   Q    You're the only biostatistician, that you
17  know of, that's been hired by the plaintiffs; is
18  that correct?
19   A    I don't know of -- of -- of others.
20  So...
21   Q    And that's my --
22   A    If -- yeah.
23   Q    -- question.
24   A    If then -- if they -- yeah.
25        (Whereupon, Exhibit MK 2,

Case 3:22-md-03036-KDB    Document 289-1    Filed 01/06/25    Page 13 of 77
Golsan Technologies
A Veritext Division
877-370-3377                                                                 www.veritext.com

1          Materials-Considered List, was marked
2          for identification.)
3 BY MR. TOMASELLI:
4     Q    I marked as Exhibit 2 what was provided
5 to us.
6          And it's generally called a
7 materials-considered list.  Do you see that, sir?
8     A    Yes.
9     Q    Did you prepare that?
10     A    No.
11     Q    Is there another materials-considered
12 list, other than that one, for you?
13     A    There was an earlier version of this, I
14 think.
15     Q    Is that -- is that the most complete
16 version that -- that you're aware of?
17     A    Actually, yeah.  I -- I presume so.  I
18 haven't seen this particular version before.  So...
19     Q    Is -- and let me ask it this way.
20          Does Exhibit 2 need to be supplemented or
21 updated in any way, as far as you're aware?
22     A    Since I haven't seen this before -- I
23 haven't read it carefully, I can't -- I don't if --
24 I'm not aware of anything.  But...
25     Q    As you sit here today, you're not aware

1 of anything that is not contained on Exhibit 2 that
2 I should be aware of?
3     A    Well, I haven't even read it, so that
4 I -- obviously, I'm not aware of anything, since I
5 haven't read it.
6     Q    Well, take one minute or two to breeze
7 through it and see if -- see if I should be aware of
8 something else.
9     A    Okay.  And for clarification, it's things
10 that have been sent to me about this case.
11     Q    Well, materials that you considered in
12 the case.  Yes.
13          Or did you cite all of those materials in
14 your expert report, generally?
15     A    Yeah.  So if there's things that I cited
16 in my expert report that's not here, then, I
17 considered that, as well.
18     Q    Okay.  But are you primarily relying on
19 the materials that you cited in your expert report
20 over the ones in Exhibit 2?
21     A    So what I relied on in my expert report
22 are the ones that was cited there.
23     Q    Uh-huh.
24     A    Plus my general knowledge a- -- about
25 epidemiology, biostatistics, vaccines, Gardasil.

1          So that's what I relied on for the
2 report.
3     Q    Fair enough.
4          And -- and for sure, that you relied on
5 your education and your experience and your
6 publications --
7     A    Yeah.
8     Q    -- and the things that are in your expert
9 report.
10          What I'm trying to understand is if
11 there's additional materials that are not cited in
12 your expert report, are not on Exhibit 2 -- that
13 materials list -- that I should be aware of, 'cause
14 this is my chance to ask you about those?
15     A    Yeah.  I don't think there's anything
16 else you need to be aware of.
17     Q    Okay.
18          MR. BAUM:  Joe, I noticed that
19     the -- the Klein depo transcript is not
20     on here.  And I think he saw -- may have
21     seen that or portions of that.
22          MR. TOMASELLI:  Okay.
23          MR. BAUM:  And I'm not sure if the
24     Klen -- whether -- if the Klein depo had
25     been done at the time this was done.

1          MR. TOMASELLI:  Fair enough.
2          THE WITNESS:  Yeah.  I also think
3     the Chao deposition is probably missing
4     here.
5          MR. TOMASELLI:  You have Chao rough
6     on there.  But...
7          MR. BAUM:  Yeah.  That's at 12.
8 BY MR. TOMASELLI:
9     Q    Withdrawn.
10          Dr. Kulldorff, let me ask you just a
11 couple questions.
12     A    Yup.
13     Q    In connection with your work in this
14 case, you were provided a -- a few depositions of
15 Merck employees; is that right?
16     A    At least one.
17     Q    You did not cite any of their deposition
18 testimony in your expert report; is that correct?
19     A    That's correct.
20     Q    And you were provided -- that we just
21 talked about, you were provided the Chao and the
22 Klein (sp?) depositions from -- in connection with
23 your review of this case; right?
24     A    Correct.
25     Q    And you understand that those folks are

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 14 of 77
Ginkgo Technologies
877-370-3377                    A Veritext Division                    www.veritext.com

1 affiliated with Kaiser?

2   A   Yes.

3   Q   And you did not cite any of their

4 deposition testimony in your expert report; correct?

5   A   Correct.

6   Q   Do you understand that the authors of

7 Merck's Article 20 response have been deposed in

8 this case?

9       Did you know that?

10   A   Not -- not really.

11   Q   Your report, Exhibit 1, contains no

12 opinions about a person named Jennifer Robi; is that

13 right?

14   A   Correct.

15   Q   Do you know who she is?

16   A   I think she is a plaintiff.

17   Q   But you don't know anything else about

18 her; right?

19   A   Pretty much not.  No.

20       I assume she took a Gardasil vaccine or

21 something in her life.  Otherwise, she wouldn't be a

22 plaintiff.

23   Q   And --

24   A   But that's --

25       Go ahead.

1   Q   Other than that?

2   A   No.

3   Q   Okay.  Your report contains no analysis

4 or opinions regarding whether Gardasil or GARDASIL®9

5 actually causes POTS; correct?

6   A   I need to correct the previous statement.

7       I think I also know that she probably

8 lives in California.

9   Q   Okay.  So --

10   A   Because this case is -- is litigated in

11 California.  So that's probably al- -- also what I

12 know about her.

13   Q   All right.  So let me --

14   A   So sorry for correct -- oh.

15   Q   No.  No.  Totally fine.  I just don't

16 want to talk over you.

17   A   Okay.

18   Q   Withdrawn.

19       The things that you know about Jennifer

20 Robi are that she probably took Gardasil at some

21 point in her life and she lives in California;

22 correct?

23   A   Correct.  Yeah.

24   Q   Other than that, do you know anything

25 about Jennifer Robi?

1   A   No.

2   Q   Your report contains no opinions about

3 Jennifer Robi; correct?

4   A   Correct.

5   Q   Your report contains no analysis or

6 opinions regarding whether Gardasil or GARDASIL®9

7 actually causes POTS; correct?

8       MR. BAUM:  Objection.  Vague.

9       MR. TOMASELLI:  You can answer.

10   A   It doesn't contain -- con- -- contain any

11 definite opinion of whether it does or does not.

12 But it contains information that's highly relevant

13 to that question.

14       And that's necessary -- that is very

15 important in making that determination.

16   Q   Let me ask it this way and see if we can

17 agree.

18       Withdrawn.

19       Dr. Kulldorff, your expert report

20 contains some information regarding Gardasil and

21 POTS.

22       For example, the Article 20 analysis in

23 2015 dealt with POTS, as well as Ms. Tomljenovic's

24 disproportionality analysis deals with POTS;

25 correct?

1   A   Correct.

2   Q   Your report contains no analysis or

3 opinion regarding the ultimate question of whether

4 Gardasil or GARDASIL®9 actually causes POTS;

5 correct?

6       MR. BAUM:  Objection.  Vague and

7       mischaracterizes what he just said.

8       MR. TOMASELLI:  You can answer.

9   A   It does not contain a definite conclusion

10 of whether Gardasil causes POTS or POI or CRPS.

11       I was not asked to provide such an

12 opinion.  I have not read the complete literature

13 that's necessary to -- to provide such an opinion.

14       So my report does not contain a definite

15 conclusion on that question.

16   Q   And that's what I was asking,

17 Dr. Kulldorff, is that I've read your expert report.

18       And I was trying to confirm that your

19 expert report contains no conclusion or opinion

20 regarding whether Gardasil or GARDASIL®9 causes

21 POTS; right?

22       We agree on that?

23   A   So you're just repeating what I said,

24 or --

25   Q   I'm trying to.

14 (Pages 50 - 53)

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 15 of 77
Gilson Technologies
A Veritext Division
877-370-3377                                        www.veritext.com

1 A  Oh, yes.
2 Q  I'm trying to make sure we are on the
3 same page as one another.
4 A  Well, if what you just said repeated what
5 I said, then, that's correct.
6 Q  Okay.  Your report contains no conclusion
7 regarding an opinion as to whether Gardasil causes
8 primary ovarian insufficiency; right?
9 A  So this answer's the same as for POTS.
10 Q  Okay.  Does your report contain a
11 conclusion as to your opinion as to whether Gardasil
12 causes POTS?
13 A  I have not offered any such opinion in
14 there -- or in my report.
15 Q  Do you offer such an opinion regarding
16 POI?
17 A  The report does not do that.
18 Q  Does your report offer a conclusion
19 regarding CRPS or chronic fatigue syndrome or
20 fibromyalgia?
21 A  The report does not offer such
22 conclusions.
23 Q  Does your report contain a analysis of
24 causes or risk factors that are -- that lead to the
25 development of POTS or primary ovarian insufficiency

1 or chronic fatigue syndrome or chronic regional pain
2 syndrome or fibromyalgia?
3 A  It contains information about potential
4 risk factors.
5 Q  Okay.  Does your report attempt to detail
6 all the causes or risk factors for those conditions?
7 A  It does not.
8 Q  Does your report contain any analysis or
9 opinions regarding whether Gardasil or GARDASIL®9 is
10 an efficacia vaccine?
11 A  The report does not discuss efficacy at
12 all.
13 Q  Your report contains no systemic analyses
14 of GARDASIL®9 or Gardasil clinical trials; correct?
15 A  The report does not contain any
16 discussion of the clinical trials for Gardasil.BY
17 MR. TOMASELLI: Your report contains no analysis or
18 conclusion or opinion regarding the risk-benefit
19 profile of Gardasil or GARDASIL®9; correct?
20 A  That is correct.BY MR. TOMASELLI: Your
21 report contains no analysis of any antibody levels
22 related to the Gardasil vaccine; correct?
23 A  That is correct.
24 Q  Your report contains no analysis of
25 potential mechanisms of potential harm with respect

1 to the Gardasil vaccine; correct?  Mechanism?
2 A  I believe that's correct.  The -- the
3 Merck report I think might have discussed the
4 mechanisms, but I don't go into that part of the
5 Merck report.
6 Q  And that's my -- and that's my question,
7 Dr. Kulldorff, is that -- that you in your expert
8 report provide no analysis or opinions regarding any
9 potential mechanism of harm with respect to
10 Gardasil; correct?
11 A  That is correct.
12 Q  Your report contains no analysis of
13 preclinical data or animal data or toxicology data
14 related to Gardasil; correct?
15 A  That is correct.
16 Q  Your report contains no opinions as to
17 the components or ingredients of Gardasil; correct?
18 A  That's correct.
19 Q  You are not an expert in the components
20 or ingredients of Gardasil; correct?
21 A  That's very much correct.
22 Q  Your report contains no opinions as to
23 whether Merck complied with U.S. law related to the
24 manufacture or distribution of Gardasil; correct?
25 A  That is correct.

1 Q  You are not a -- you are not an expert in
2 U.S. laws or regulations related to vaccines sold in
3 the United States; right?
4 A  I know a little bit about those things
5 but I'm not an attorney and I would say that you
6 have to be an attorney to be an expert on those
7 legal matters.
8 Q  Does your expert report contain any
9 opinions about Cervarix or any other HPV vaccine?
10 A  I don't think it does.
11 Q  Does your report contain an analysis of
12 anything the FDA, the CDC, the Health and Human
13 Services Center, does your opinion contain any
14 report regarding their analysis of whether Gardasil
15 causes POTS or POI?
16 A  Yes.
17 Q  It does?  Where?
18 A  I think the Arana study, wasn't that by
19 CDC?
20 Q  It was.
21 And what was the conclusion of the Arana
22 study, as best you are aware?
23 A  So the main thing of that study is what
24 they were looking at the specific -- they were
25 looking at the VAERS data and they were looking at

Case 3:22-md-03036-KDB    Document 289-8  Filed 01/06/25    Page 16 of 77
Golson v Biologics
877-370-3377                        A Veritext Division                        www.veritext.com

1 the specific --
2          (Whereupon, the court reporter
3          requests clarification.)
4    A    The VAERS, V-A-E-R-S.
5          MR. TOMASELLI:  All caps.
6          THE WITNESS:  Vaccine --
7          MR. TOMASELLI:  V-A-E-R-S.
8          THE WITNESS:  Vaccine Adverse Events
9    Reporting System.
10 BY MR. TOMASELLI:
11   Q    Are you aware of any other data
12 pertaining to the FDA or CDC or Health and Human
13 Services review of whether Gardasil causes POTS?
14   A    Yes.
15   Q    Which one?
16   A    There have been other papers by CDC
17 personnel.  Like, for example, Shimabukuro have a
18 paper on the VAERS data.
19   Q    With respect to Gardasil?
20   A    Correct.
21   Q    And what was the conclusion of the CDC
22 and FDA -- -A authors in that paper?
23   A    Well, I would -- I will have to correct.
24 So -- so they -- no, I don't have to correct.
25 Sorry.

1    Q    Okay.
2    A    You can remove that.
3    Q    You can keep talking.
4    A    So they did a data mining analysis of
5 Gardasil.
6          I have written myself papers together
7 with CDC and FDA employees on Gardasil, so I'm
8 obviously aware of those papers, articles.
9    Q    Your report, Dr. Kulldorff, does not
10 discuss your own papers related to the safety of
11 Gardasil; correct?
12   A    That is correct.
13   Q    In your report -- and we'll talk about
14 this a little bit more -- but you talk about the
15 Chao 2012 publication; correct?
16   A    I think it was 2012, yes -- yes.
17   Q    Your expert report does not contain an
18 analysis of all the post marketing studies, whether
19 they be case reports, case series, cohort,
20 self-controlled case series, ecological data, your
21 report does not contain a complete analysis of the
22 post marketing data related to Gardasil and POTS or
23 POI; correct?
24   A    Correct, yeah.
25   Q    Now, my understanding is you've worked in

1 the field of vaccine safety monitoring for a couple
2 of decades; correct?
3    A    Yes.
4    Q    You've consulted and worked with
5 physicians, scientists, and statisticians both at
6 the FDA and the CDC; correct?
7    A    Correct.
8    Q    There are a variety of ways that vaccines
9 are monitored in the United States and around the
10 world; correct?
11   A    Yes.
12   Q    We'll talk more about these in -- in more
13 detail, but as a general matter, first of all,
14 manufacturers monitor safety through randomized
15 clinical trials, post marketing events that are
16 reported to them, as well as post marketing studies;
17 correct?
18   A    Correct.
19   Q    And the FDA and the CDC have a few
20 components of their monitoring systems as well;
21 right?
22   A    Yes.
23   Q    For example, one you just mentioned was
24 the VAERS spontaneous reporting system; correct?
25   A    Correct.

1    Q    VAERS is Vaccine Adverse Event Reporting
2 System and is a all capped V-A-E-R-S; right?
3    A    Yes.
4    Q    And if we talk about VAERS, we are
5 talking the same language; right?
6    A    I hope so.
7    Q    And in terms of another way that the FDA
8 and CDC monitor vaccine safety is through the
9 Vaccine Safety Datalink?
10   A    Correct.
11   Q    And my understanding is that's a linked
12 population database with managed care institutions
13 where active and even realtime monitoring can take
14 place; right?
15   A    Yes.
16   Q    You, in fact, were involved in developing
17 and implementing statistical methods used by the VSD
18 project to evaluate vaccine safety; right?
19   A    Yes.
20   Q    In fact, I think you've said in the past
21 that the CDC's VSD system is the world's pre-eminent
22 vaccine safety surveillance system?
23   A    I think so, yeah.
24   Q    Do you believe that?
25   A    Yes.

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 17 of 77
877-370-3377                    Golkow Technologies                    www.veritext.com
                               A Veritext Division

1    Q    The FDA and CDC also use the Clinical
2  Immunization Safety Assessment Center, CISA,
3  C-I-S-A; right?
4    A    Yes.
5    Q    And that's an expert collaboration that
6  conducts individual clinical vaccine safety
7  assessments and research; right?
8    A    I believe so.
9    Q    And there's also another initiative by
10 the FDA called the Sentinel system?
11   A    Yes.
12   Q    And is that a population database system
13 similar to the -- the VSD?
14   A    It's similar.  There are some
15 differences.
16   Q    Fair enough.
17       And the PRISM, P-R-I-S-M, the
18 Post-Licensure Rapid Immunization Safety Monitoring,
19 is the vaccine component of the FDA Sentinel system;
20 right?
21   A    That's not per- -- completely correct,
22 no.
23   Q    How would you -- how would you describe
24 the PRISM in terms of the safe -- the Sentinel
25 system?

1    A    PRISM was a precursor to the Sentinel
2  system built on similar ideas as to the VSD but with
3  some important differences.
4        And it was specifically set up, I think,
5  for one of the influenza vaccines.  That then sort
6  of merged or developed into Sentinel.
7        And I don't think PRISM as prog- -- as an
8  independent program exists anymore.  So Sentinel
9  then expanded to also do drugs.
10   Q    So --
11   A    So sort of PRISM kind of ended and then
12 Sentinel became a bigger thing that doesn't --
13 didn't -- it wasn't just one particular vaccine, but
14 it was multiple vaccines and most importantly, a --
15 a large number of drugs also.
16   Q    Okay.  If I understand correctly then,
17 the FDA Sentinel system absorbed the PRISM system --
18 PRISM system and right now the Sentinel system is
19 used not only to monitor for vaccine safety but also
20 for pharmaceutical drug safety; correct?
21   A    So Sentinel right now is used for drugs.
22 I don't know if it's still used for -- for vaccines
23 or not.
24   Q    All right.  There are also other ways to
25 monitor vaccine safety, such as through formal

1  epidemiologic studies; correct?
2    A    Correct.
3    Q    Those can be different types of
4  epidemiologic studies, such as case-controlled
5  studies or cohort studies or self-controlled case
6  series studies; right?
7    A    Yes.  Others as well.
8    Q    And when you say other ways to do formal
9  epidemiologic studies, what -- what did you have in
10 mind there?
11   A    There are other self-controlled methods,
12 there are data mining methods.
13   Q    Okay.  Would you agree that POTS and
14 POI -- and you understand when I say "POI" --
15   A    Yes.
16   Q    -- I'm talking about Primary Ovarian
17 Insufficiency?
18   A    Yeah.
19   Q    So withdrawn.
20       Do you agree that POTS and POI were
21 diagnosed prior to the marketing of Gardasil?
22   A    I believe that's the case, but I'm not a
23 physician, I'm not an expert in these two things, so
24 it's better to ask other people about it.
25   Q    With all your work in the biostatistical

1  field and the vaccine safety with respect to
2  Gardasil, you know that POTS and POI were diagnosed
3  prior to Gardasil; right?
4    A    I believe it was, yes.
5    Q    And the same is true for chronic fatigue
6  syndrome, fibromyalgia, and other autoimmune
7  diseases; right?
8    A    Correct.
9    Q    POTS and POI occur and are diagnosed in
10 unvaccinated individuals; correct?
11   A    I believe so, yes.
12   Q    And the same, again, is true for chronic
13 fatigue syndrome, fibromyalgia, and other autoimmune
14 diseases; right?
15   A    So there are very few unvaccinated
16 individuals in -- in the world right now, but --
17 so -- but it certainly I think could be diagnosed in
18 unvaccinated individuals.
19   Q    Well, when we talk about POTS or POI or
20 chronic fatigue syndrome, fibromyalgia, other
21 autoimmune diseases, those do occur in individuals
22 who are unvaccinated with Gardasil; right?
23   A    Yes, yeah.
24   Q    Adverse events of all types can happen in
25 groups that are unvaccinated as well as unvaccinated

17 (Pages 62 - 65)

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 18 of 77
Golson Biologicals
A Veritext Division
877-370-3377                                                    www.veritext.com

1 with Gardasil; right?
2    A   Correct, yeah.
3    Q   When large numbers of people are
4 vaccinated, as with HPV vaccination, events in
5 temporal proximity to vaccination are actually
6 expected to occur; correct?
7    A   Yes.
8    Q   For example, I think I saw a paper that
9 you wrote with respect to looking at the occurrence
10 of optic neuritis after HPV vaccination; do you
11 remember that?
12    A   I remember that paper, yes.
13    Q   And temporal associations with events
14 such as optic neuritis will always occur.
15        But that temporal association alone does
16 not prove causality; correct?
17    A   Yes.  Because there is somebody who is
18 diagnosed with something after -- after a vaccine
19 doesn't prove anything.
20        But then, you have methods, for
21 example -- self-control methods -- where you can
22 evaluate that.  And those methods can prove
23 causality and has been used to prove causality
24 in the -- in -- in other -- other situations.
25    Q   Sure.  And let me separate those two

1 for -- for a minute.
2        So on the first point, you agree that
3 temporal associations with events will always occur,
4 but temporal association alone does not prove
5 causality; right?
6    A   Well, it depends on what you mean with
7 "temporal association."
8        Because if -- if, for example, the
9 measles vaccines, there is a temporal association,
10 it's, like, in the sense that there's more febrile
11 seizures after the measles vaccine --
12        (Whereupon, the court reporter
13        requests clarification.)
14        THE WITNESS:  Febrile seizures.
15        MR. TOMASELLI:  Febrile seizures --
16        THE WITNESS:  Okay.
17        MR. TOMASELLI:  -- I think is what
18 you were saying.
19        THE WITNESS:  Sorry for my bad --
20        MR. TOMASELLI:  That's okay.
21    A   So there is a temporal association in the
22 sense that there's more seizures seven to ten days
23 after the vaccine than there are in other time
24 intervals.  And that can be used to prove causation.
25        But the fact that there's one case of

1 seizures "X" number of days after vaccines, cannot
2 be used to prove causation.
3        MR. TOMASELLI:  I'm going to hand
4        you what I've marked as Exhibit 4, which
5        is a paper with the first author of S- --
6        MR. BAUM:  What was Exhibit 3?
7        MR. TOMASELLI:  Oh.  Withdrawn.
8        Let's do this first then.
9        (Whereupon, Exhibit MK 3, Rule 26
10        Expert Disclosure for Martin
11        Kulldorff, was marked for
12        identification.)
13        MR. TOMASELLI:  Marking as Exhibit 3
14        a Rule 26 expert disclosure for you,
15        Dr. Martin Kulldorff.
16 BY MR. TOMASELLI:
17    Q   And in this disclosure, there's an
18 Exhibit A that has a curriculum vitae that has your
19 name on it; right?
20    A   Yes, it does.
21    Q   And is this curriculum vitae for you
22 reasonably accurate and up-to-date?
23    A   Well, it's dated a year ago, so I guess
24 it's not completely up-to-date.
25    Q   Well, this is the one that was provided

1 to us.
2        So do you have a curriculum vitae that is
3 more up-to-date?
4    A   I do but I haven't provided that to my
5 attorney.
6    Q   Why not?
7    A   I wasn't asked to provide it, I guess.
8 This is the probably one that was most up-to-date in
9 June when it was requested.
10    Q   All right.  And are there significant
11 updates that you would make to this curriculum vitae
12 as you sit here today?
13    A   No, there are a few more publications.
14    Q   Fair enough.
15        Other than a few more publications that
16 have come out since the date of this curriculum
17 vitae, otherwise it is reasonably up-to-date and
18 accurate?
19    A   I think so.
20    Q   All right.
21    A   I think you should be happy with it.
22        (Whereupon, Exhibit MK 4, Publication
23        by Author Sridhar Published in 2017,
24        was marked for identification.)
25

18 (Pages 66 - 69)

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 19 of 77
Gilson Technologies
A Veritext Division
877-370-3377                                          www.veritext.com

1 BY MR. TOMASELLI:
2     Q    Exhibit 4 is a publication that is by
3 first author of Sridhar, S-r-i-d-h-a-r, that was
4 published in 2017; correct?
5     A    So -- oh, there it is.
6        2017; correct, yes.
7     Q    And you are a coauthor of this paper;
8 right?
9     A    Yes.
10     Q    Authored with folks with the U.S. FDA,
11 Harvard, Johns Hopkins; correct?
12     A    FDA and Johns Hopkins. I was the only
13 one I think from Harvard on this thing. So there's
14 no coauthors from Harvard.
15     Q    All right. If you turn to page two,
16 above figure one. So turn to page two.
17        Above figure one on the left do you see a
18 paragraph that says, "Although temporal
19 associations."
20        Do you see that?
21     A    Correct, yeah.
22     Q    You -- you write, "Although temporal
23 associations of adverse events with vaccination will
24 always occur, temporal associations alone do not
25 prove causality"?

1     A    Correct.
2     Q    Do you see that?
3     A    Yeah.
4        MR. BAUM: Objection.
5 BY MR. TOMASELLI:
6     Q    Do you stand by that?
7     A    Yes. And that means temporal association
8 that a particular person has an event. Now, that's
9 what that sentence means.
10        Now, if you have a situation where you
11 have information of -- from hundreds of people, for
12 example, and you see that they all had a stroke or
13 whatever, and there were two people in the first
14 week after vaccination and then 90 people in the
15 second week, and three week -- three people in the
16 third week, and two people in the fourth week and so
17 on, that is a form of temporal association of
18 multiple people and that can be used to prove
19 causation.
20     Q    Okay. In terms of a -- in terms of a
21 single patient though, adverse events with
22 vaccination will always occur and that temporal
23 association just between that individual and the
24 vaccination, that alone does not prove causality?
25     A    Correct.

1     Q    Okay.
2     A    And that's very -- that's very important
3 because -- and that's why we have systems like the
4 VSD and that we do proper studies.
5     Q    Okay. And in terms of adverse events
6 such as POTS or POI or chronic fatigue syndrome,
7 just because a single individual is vaccinated and
8 then temporally is diagnosed with POTS or POI, that
9 does -- that alone does not prove causality; true?
10     A    That one alone -- one person alone cannot
11 prove causality.
12     Q    You then go on to say, in the same spot
13 we were looking, "Because HPV vaccines are
14 administered to young females who are more likely to
15 develop autoimmune diseases irrespective of
16 vaccination, these events could occur by chance
17 alone."
18        Do you see that?
19     A    Yes.
20     Q    And that's true?
21     A    Yes. And probably some will occur by
22 chance alone.
23     Q    Young females, as you say here, are more
24 likely to develop autoimmune disease irrespective of
25 vaccination, just because of the time of life;

1 right?
2     A    Yes. And most diseases have a different
3 risk or age curve.
4     Q    Young females are more likely to develop
5 POTS irrespective of vaccination, too; correct?
6     A    I don't know what the age curve is for
7 POTS, but there is sort of an age curve.
8     Q    But you would expect too that young
9 females do develop POTS irrespective of vaccination;
10 right?
11     A    Some could do that.
12     Q    And the same is true with respect to POI.
13        In fact, POI is a condition of young
14 females, irrespective of vaccination?
15     A    That can happen also irrespective of
16 vaccination.
17     Q    Autoimmune diseases, POTS, primary
18 ovarian insufficiency, can occur by chance alone;
19 correct?
20     A    It can occur irrespectively of vaccine,
21 so it's by chance alone in terms of the vaccine.
22        But there could be some other reason
23 that's triggering it that's not due to chance but
24 some other exposure.
25     Q    Fair enough.

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 20 of 77
Gilmson Technologies
877-370-3377                  A Veritext Division                  www.veritext.com

1	But in terms of --
2	A	So usually there's some reason for it,
3	it's not just out of the blue. There's usually some
4	reason of one type or the other.
5	Q	In terms of -- in terms of vaccination in
6	an adverse event, the fact that an adverse event
7	occurs temporally after vaccination can happen by
8	chance alone?
9	A	That can happen by chance alone.
10	Q	Now, outside of being hired in this case,
11	I think you've mentioned previously you've analyzed
12	data and published medical articles on the safety of
13	Gardasil specifically; right?
14	A	Correct.
15	Q	You've published these articles with
16	colleagues from FDA, CDC, Harvard, Vanderbilt, Johns
17	Hopkins, and other academic institutions; right?
18	A	All those for sure. Vanderbilt probably
19	for sure.
20	I don't remember exactly all the
21	locations, so -- but that's probably true since you
22	looked up.
23	Q	You -- when you've published papers in
24	your analyses, you were focused on public safety and
25	providing an accurate view of the data related to

1	the safety of Gardasil; right?
2	A	Correct.
3	Q	When you coauthored those papers, did you
4	find that your coauthors were also interested in and
5	focused on patient safety?
6	A	That's the whole purpose of doing the
7	studies.
8	Q	So yes?
9	A	Yes.
10	Q	When you authored those papers, did you
11	find that your coauthors were interested in
12	providing an accurate view of the data related to
13	the safety of Gardasil?
14	A	So most of my colleagues for sure, one
15	hundred percent. There are some colleagues I would
16	not maybe say that for.
17	Q	With respect --
18	A	But --
19	Q	-- to --
20	A	But the question is then is that respect
21	to Gardasil.
22	So I would have to look up exactly who my
23	coauthors are on the Gardasil papers to see if -- if
24	that question is about any of them.
25	Q	Fair enough, Dr. Kulldorff.

1	My question was supposed to be Gardasil
2	specific --
3	A	Okay.
4	Q	-- so withdrawn.
5	In -- in connection as you sit here
6	today, with respect to Gardasil specifically, when
7	you authored papers did you find that your coauthors
8	were also interested in providing an accurate view
9	of the data related to the safety of Gardasil?
10	A	So those coauthors that I interacted with
11	directly, yes. There will -- might also be
12	coauthors that I didn't really interact with that
13	closely and therefore I can't really judge them on
14	the matter.
15	Q	As you sit here today, you are not aware
16	of a coauthor that -- that you published with that
17	was not concerned about the safety of Gardasil at
18	all; right?
19	A	For Gardasil, I have -- I have to look
20	up -- of those I know who were on the papers, that's
21	correct.
22	Q	Okay.
23	A	I would have to look up the authors to
24	see if any of those who are -- who are maybe not so
25	much hundred percent, if they are on those papers or

1	not.
2	(Whereupon, Exhibit MK 5, Paper
3	Authored by Gee Published in 2011,
4	was marked for identification.)
5	BY MR. TOMASELLI:
6	Q	I'm marking as Exhibit 5 a paper with a
7	first author of Gee, Julian Gee, G-e-e, that was
8	published in 2011; do you see that?
9	A	Yes.
10	Q	And you are a coauthor of this paper;
11	right?
12	A	Correct.
13	Q	These coauthors, like you, cared about
14	getting the analysis correct; right?
15	A	For this particular paper or in general?
16	Q	Yes, for this particular paper?
17	A	What I know, I have no -- I have no
18	knowledge to the opposite.
19	Q	Do you remember this study?
20	A	Yes.
21	Q	How did this study come about, sir?
22	Like, what -- what was the reason for this study?
23	A	So just hold on a second.
24	So in the Vaccine Safety Datalink, we
25	pioneered what's called rapid cycle analysis where

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 21 of 77
Gilson Biotechnologies
877-370-3377                       A Veritext Division                       www.veritext.com

1 we used sequential statistical methods. So using
2 VSD data for -- on a weekly basis.
3       So when there is a new vaccine, we would
4 get weekly reports of who got the vaccines and were
5 there any adverse reactions -- or adverse events
6 of -- on the particular list of concern.
7       So we set up this system and that's
8 what's then used every time there was a new vaccine
9 coming out on the market.
10       So we had done this for previous vaccines
11 and -- and then when Gardasil came on the market as
12 a new product, we evaluated that with the rapid
13 cycle analysis with weekly analysis.
14       And the point is that if there's a
15 problem, we wanted to detect that as soon as
16 possible. So we don't want to wait a year or two or
17 so on. We want to, sort of, look at it
18 completely -- very completely.
19       But then you had to have special
20 statistical methods to take into account the fact
21 that you were looking at it repeatedly so you won't
22 get too many false positives.
23       So we developed that system and I was an
24 integral part in that development of the system.
25 And then that was used for when the new vaccine came

1 on the market.
2       Q    And when you say that part of what you
3 did was to get data every week on -- on a vaccine
4 and you said "we," who is we?
5       A    So I was part of the Vaccine Safety
6 Datalink at the time with coauthors who were also
7 part of the Vaccine Safety Datalink. Not everybody
8 in VSD, but many people, so --
9       Q    Would that include people at the FDA and
10 at CDC?
11       A    At CDC, yes.
12       Q    And so --
13       A    For example, Eric Weintraub here.
14       Q    And so in terms of people at CDC, they
15 are getting weekly information regarding the safety
16 of Gardasil and other vaccines?
17       A    Yeah. So when there's a new vaccine,
18 like Gardasil, usually we monitor for maybe a couple
19 of years with weekly analysis.
20       Q    In your publication here on the first
21 page, on the right-hand column about five lines
22 down, do you see that it says, "Pre-licensure
23 clinical trials have shown no evidence for any major
24 safety problems."
25       Do you see that?

1       A    Correct, yes.
2       Q    That was correct at the time in 2011 when
3 published; right?
4       A    Correct.
5       Q    Do you recall saying a similar statement
6 in 2016 in a paper with Dr. Yih?
7       A    I don't recall it, but I might have --
8 might very well have.
9       Q    There's a person that you worked with and
10 mentored named Katherine Yih, Y-i-h?
11       A    Yes.
12       Q    Is that how you say that?
13       A    Yih.
14       Q    Yih. So like Y-e-e but Y-i-h?
15       A    Y-i-h, Yih.
16       Q    Okay. I just want to make sure I say it
17 right, that's all.
18       A    Okay.
19       Q    Or as best I can.
20           (Whereupon, Exhibit MK 6, Paper
21           Published by Katherine Yih in 2016,
22           was marked for identification.)
23 BY MR. TOMASELLI:
24       Q    I'm going to hand you what I've marked as
25 Exhibit 6, which is a paper by -- with a first

1 author of Dr. Yih, Y-i-h, and it was published in
2 2016; is that right?
3       A    It was published in 2016 and it was made
4 available online 2015.
5       Q    And if you turn to -- well, withdrawn.
6       This was an evaluation that you were
7 involved in; right? You were coauthor?
8       A    Yes.
9       Q    And it was an evaluation of venous
10 thromboembolism after Gardasil vaccination; correct?
11       A    Correct.
12       Q    If you turn over to page two, top left,
13 about four lines down, do you see that it says, "No
14 safety issues were identified in pre-licensure
15 studies involving approximately 21,000 subjects age
16 nine to 26 years."
17       Do you see that?
18       A    Correct.
19       Q    And that was correct as of 2016; right?
20       A    Yes.
21       Q    And you go on to say in the next
22 paragraph, "Post licensure surveillance identified a
23 possible increased risk of venous thromboembolism
24 after Gardasil vaccination in the first 2.5 years of
25 passive surveillance in the VAERS database. VTE" --

Case 3:22-md-03036-KDB    Document 289-1    Filed 01/06/25    Page 22 of 77
Gilson v. Bio-Technologies
A Veritext Division
877-370-3377                                                                    www.veritext.com

1 or that's venous thromboembolism -- "was reported
2 more frequently following Gardasil than expected
3 using other vaccines for comparison."
4     Do you see that?
5 A   Yes.
6 Q   And the cite, number three, for that is a
7 publication by Slade in 2009; is that right?
8 A   Yes.
9 Q   And Slade, as you know, is a
10 disproportionality analysis performed by FDA and CDC
11 related to the early data from VAERS pertaining to
12 Gardasil; right?
13 A   Yeah, so I don't actually remember that
14 paper very well. I have not read that recently.
15 Q   Fair enough.
16 A   So I don't want to, sort of, say anything
17 about what it contained or not.
18 Q   That's fine. We'll -- we'll take a look
19 at it.
20     You say in section 2.2 at the bottom
21 left, "A self-controlled risk interval design was
22 used. This design uses only vaccinated cases
23 occurring in a pre-specified risk or comparison
24 interval and it controls for all potential time in
25 variant confounders," and then you go on to -- to

1 list a few of those.
2     Do you see that?
3 A   Yeah.
4 Q   What is a self-controlled case series or
5 risk interval analysis? How does that work?
6 A   So a self-controlled risk interval.
7     So you have people who got the vaccine on
8 day zero -- we define it as day zero. And then you
9 might look for days post that, so let's say you can
10 look for day one to 28.
11     And then you can see are there -- how
12 many seizures, for example, occur in day one to
13 seven versus how many seizures occur day eight to
14 28.
15     If the null hypothesis is true that
16 there's no relationship between the vaccine and
17 seizures, you will expect to have about the same
18 number of seizures in each of those 28 days, which
19 means you will expect to have about three times as
20 many in the control window eight to 28 versus the
21 risk window one to seven.
22     So you can then look to see, well, how
23 many cases were there in one to seven and how many
24 were there two to 28.
25     So let's say there were ten cases in this

1 data day one through 27 and 30 on day eight to 28.
2 Well, that's what you would expect by chance. So
3 then you'd say, Well, from this analysis then
4 there's no evidence of an excess risk.
5     There could still be because maybe the
6 risk is all those 28 days and then subsequent risk,
7 much less. But from this analysis, there's no
8 evidence of that.
9     On the other hand, if you find 30 cases
10 in day one to seven and only ten on day eight to 28,
11 you will start thinking, Hmm, that's strange because
12 if another poss- -- if it doesn't have anything do
13 with the vaccine, you would expect it to be sort of
14 evenly distributed and it's not.
15     And -- so then you would say, Okay, this
16 is maybe evidence to say that something is going on
17 with this vaccine. Now --
18     (Whereupon, the court reporter
19     requests clarification.)
20 A   -- some evidence that something goes only
21 with these vaccines.
22     Now they -- so what is an advantage of
23 the self-controlled method is that it adjusts for
24 any between person confounding.
25     So when you compare people that are

1 vaccinated to unvaccinated, they can be confounding
2 because they might be different for some reasons.
3 But this is self-controlled because you can't
4 compare the same person to the same person.
5     So there can still be various biases, as
6 in all observational studies, but they are of a
7 different nature than, for example, a cohort study
8 or case-control study.
9 BY MR. TOMASELLI:
10 Q   Okay.
11 A   So they have different -- self-control
12 method has certain strengths that these others don't
13 have, but they can also be potentially biases.
14     One is, for example, maybe you find that
15 there is more seizures but it's not due to the
16 vaccine you are studying; they had -- took another
17 vaccine on the same day and it's this other vaccine
18 that is causing the seizures.
19 Q   I understand.
20 A   So it could be confounding or other
21 types.
22 Q   So stated simply maybe, different
23 epidemiologic designs have different benefits and
24 different limitations; fair?
25 A   Correct.

Case 3:22-md-03036-KDB   Document 289-3   Filed 01/06/25   Page 23 of 77
877-370-3377           Golkow Technologies          www.veritext.com
A Veritext Division

1 Q   Okay.
2 A   Very much so.
3 Q   If you go to page 175 of your paper --
4 and tell me when you are there?
5 A   Yes.
6 Q   The -- in the middle of the page, right
7 column, there's a paragraph that starts, "None of
8 the three co-primary analyses."
9      Do you see that?  It's about five lines
10 down.
11 A   Okay.
12 Q   On the right.
13      Do you see that?
14 A   Yeah.
15 Q   All right.  It says -- your paper says --
16 withdrawn.
17      Your paper says, "None of the three
18 co-primary analysis demonstrated any association
19 between Gardisil and venus thromboembolism
20 regardless of dose number or risk interval table
21 three."
22      Do you see that?
23 A   Correct.
24 Q   And if we look at table three, we turn
25 over one page, table three is at the bottom of the

1 next page; right?
2 A   Yes.
3 Q   And if we just take the first analysis,
4 so "Analysis with all definite VTE cases with no
5 adjustment for contraceptive use," and we just look
6 at the first row after that, which is, "Dose one
7 with days in risk interval one to 28."
8      Do you see that row, sir?
9 A   Yes.
10 Q   And the relative risk is calculated to be
11 0.60 -- 0.60 with a 95 percent confidence interval
12 of 0.15 to 2.27?
13 A   Correct.
14 Q   Is that right?
15 A   Yeah.
16 Q   And does that mean that -- that point 60,
17 does that mean there's a 40 percent reduction of
18 risk on Gardasil?
19 A   Not necessarily because we have a
20 confidence interval between 0.15 and 2.27.
21 Q   Okay.
22 A   So the -- we have 95 percent confidence
23 that it's somewhere between 0.15 and 2.27.
24 Q   And is it pretty typical for researchers
25 such as yourself when there's a 95 percent

1 confidence interval that includes the number one,
2 which this one does, 1.0, that -- that you refer to
3 that as not statistically significant?
4 A   That's tradition.
5 Q   Okay.
6 A   For better or worse.
7 Q   And -- and then if -- if the interval
8 does not include one, the tradition is to say that
9 it is statistically significant; right?
10 A   That's the tradition, yeah.
11 Q   If -- if the data here is not
12 statistically significant, would you agree that
13 statistically no association was demonstrated?
14 A   There was no statistical significant
15 relationship.
16 Q   Right.
17 A   That's slightly different than what you
18 said.
19 Q   Okay.  So if it's not statistically
20 significant, there's no significant association
21 demonstrated; right?
22 A   No, that's not the same thing.
23 Q   What did you say?
24 A   There was no statistically significant
25 relationship.

1 Q   If it's not statistically significant,
2 would you agree that there's no evidence of a
3 decreased risk or increased risk?
4      MR. BAUM:  Objection.  Vague.
5 BY MR. TOMASELLI:
6 Q   You can answer.
7 A   There's no statistically significant
8 evidence for it.
9 Q   There's no statistical -- withdrawn.
10      When the -- when this result, this point
11 six that has a confidence interval that spans one,
12 if that's not statistically significant, there's no
13 evidence of a decreased risk or an increased risk;
14 is that right?
15      MR. BAUM:  Objection.
16 A   No, that's not the same thing.
17 BY MR. TOMASELLI:
18 Q   Okay.  What would you say?
19 A   So I -- I'm sorry for being difficult
20 here.
21 Q   You are not being difficult.
22      I just want to know when a lower bound
23 and an upper bound span one in the 95 percent
24 confidence interval, does that provide evidence of
25 risk or not?

Case 3:22-md-03036-KDB   Document 789-3   Filed 01/06/25   Page 24 of 77
Gilson v. Technologies
A Veritext Division
877-370-3377                                                    www.veritext.com

1  A  So I have to distinguish between
2  statistical significance and clinical significance.
3       So for example, you could have a result
4  that is statistically significant but it's not
5  clinically significant.
6  Q  Okay.
7  A  If --
8  Q  And let's -- and if it helps, let me --
9  let me try a different question.
10  A  Okay.
11  Q  I want to separate those two.
12       So I think what you said is that it is
13  possible to have a statistically significant result
14  that is not clinically meaningful; right?
15  A  Correct.
16  Q  In terms of a statistics and not --
17  setting the clinical question to the side, so in
18  terms of statistics.
19       When your confidence interval spans one
20  and it's not statistically significant, there's not
21  evidence for an increased risk; right?
22       MR. BAUM:  Objection.  Vague.
23  A  Well, there is no statistically
24  significant evidence for increased risk.
25

1  BY MR. TOMASELLI:
2  Q  The reason that we have -- well,
3  withdrawn.
4       In terms of a risk ratio or relative
5  risk, just as an example, that is 1.82, with a
6  95 percent confidence interval from .68 to 4.89,
7  that's not statistically significant result;
8  correct?
9       And it's not -- it's not in this paper.
10  A  Okay.  That's not statistically
11  significant for a risk ratio.
12  Q  And in terms of a risk ratio that is not
13  statistically significant, you would agree that that
14  is not evidence of a statistically significant
15  relationship; correct?
16  A  Correct.
17  Q  The reason that we have -- and we pay
18  them well, I'm sure -- statisticians like yourself,
19  is because when we compare two groups of people and
20  you say -- say, there's a hundred in each group and
21  we are looking at events that occur -- there may be
22  five events in one group and three events in
23  another -- we can agree that five and three are
24  different in terms of numerical, right, they're --
25  they're -- they're different in numbers; right?

1  A  Uh-huh.
2  Q  Is that a yes?
3  A  Yes.
4  Q  Okay.  And the reason we have
5  statisticians, of course, is to try to determine or
6  help us determine whether that five and three are
7  actually different.
8       We know they are different in numbers but
9  are they actually different in terms of risks in the
10  population; right?
11  A  Yeah.  So we want to determine whether
12  that could potentially be as to chance or not.
13       Because there will always be some -- if
14  you compare two groups, it will rarely be the same
15  exact numbers, so there will typically be a little
16  bit more, one than others, which happened by chance.
17       If you flip a coin ten times, you will
18  most often not get five and five; you will get four,
19  six, or three or seven, just by the chance.
20       So the purpose of statistics is to
21  determine if what we see, that could be plausibly
22  due to just chance because if it's not plausible due
23  to chance, then that's evidence that there's
24  something else that's causing it and not chance.
25  That could be causal or it could be confounding.

1  Q  If the confidence interval -- the
2  95 percent confidence interval includes one, any --
3  any difference in the numbers themselves could be
4  simply due to chance?
5  A  And that is correct, yeah.
6  Q  Okay.
7       MR. TOMASELLI:  It takes dexterity.
8       (Whereupon, Exhibit MK 7, Publication
9       by Katherine Yih Published in 2018,
10       was marked for identification.)
11       MR. TOMASELLI:  Withdrawn.
12  BY MR. TOMASELLI:
13  Q  I'm handing you is what I've marked as
14  Exhibit Number 7, which is a publication by Dr. Yih
15  from 2018; is that right?
16  A  Yeah, it was published in 2018.
17  Q  And you are a coauthor of this paper; is
18  that correct?
19  A  Correct.
20  Q  You authored this paper with coauthors
21  from Harvard; correct?
22  A  From Harvard and from FDA and, I believe,
23  also -- yeah, Harvard and FDA.
24  Q  And are the coauthors on this paper with
25  you, are they competent?

Case 3:22-md-03036-KDB  Document 289-3  Filed 01/06/25  Page 25 of 77
Golson Technologies
877-370-3377  A Veritext Division  www.veritext.com

1    A    They are competent in their respective
2  areas.
3    Q    But --
4    A    But they are not all competent in, for
5  example, epidemiology or in, for example,
6  biostatistics, etc.
7    Q    Everybody -- everybody is a team player
8  on this publication and --
9    A    That is true.
10    Q    -- just like you are not an expert on all
11  things physician- or clinical-related when you
12  publish with clinicians; right?
13    A    Correct.  Yeah.
14    Q    All right.  Like you, all of these
15  people, as best you know, they care about public
16  health and safety; right?
17    A    I hope so.
18    Q    They care about getting the analysis
19  correct?
20    A    I hope so.
21    Q    This paper used a methodology called a
22  temporal -- or tree-temporal scans statistic; right?
23    A    Yes.
24    Q    The way I under- -- well, withdrawn.
25        You actually developed that methodology

1  as a way of studying vaccine safety; right?
2    A    I developed the methodology, not
3  specifically for vaccine safety, but for vaccine and
4  drug safety, occupational safety, etc.
5    Q    When we talk about the TreeScan, you have
6  to think of it actually as an upside down tree; is
7  that right?
8    A    Sort of, yeah.
9    Q    They're general health groupings that
10  then go into even smaller health groupings that go
11  into more specific diagnoses; right?
12    A    Yes, you read it correctly.
13    Q    And in this paper, for example, you were
14  able to look at over 7,000 outcome categories and
15  over 600 time intervals and -- so -- so with more
16  than 4.8 million potential clusters to evaluate;
17  right?
18    A    That sounds right.  I haven't checked the
19  exact number, but that sounds right.
20    Q    Tree scanning is a method, again, that
21  you helped develop that can analyze thousands of
22  potential outcomes in multiple different time
23  windows; right?
24    A    That is correct.
25    Q    You, in this analysis, had a lower bound

1  of nine year olds; is that right?
2    A    I don't remember.
3    Q    You can take a look at the abstract and
4  confirm it, if you'd like.
5    A    So that is correct.
6    Q    Now, you talked a little bit earlier
7  about the advantages or how a self-controlled
8  analysis works; right?
9    A    Correct.
10    Q    Would -- is -- is that -- do those also
11  apply to this paper?
12    A    Correct.
13    Q    Would you agree that your TreeScan method
14  has a very high power to detect -- to detect rare
15  events?
16    A    Not necessarily, no.
17    Q    Do you consider your TreeScan method to
18  be a -- a method of signal detection?
19    A    Yes.
20    Q    Would you agree that not all signals
21  represent true excess risk?
22    A    That is correct.
23    Q    If a signal is detected in any analysis,
24  you would suggest that that be followed up with more
25  formal epidemiological investigations, true?

1    A    Other epidemiological investigations,
2  that's true.
3    Q    Did you say "other" --
4    A    Other.
5    Q    -- epidemiologic investigations?
6    A    Correct, yes.
7    Q    Okay.
8    A    I think this is a formal investigation.
9  So I'm sorry for just picking the words.
10    Q    Let's take a look at the first page of
11  this paper, if we can?
12    A    Okay.
13    Q    In the -- where -- where you start in the
14  introduction.
15        Do you see where you say, "Despite the
16  cancer-preventing promise of HPV vaccines and
17  national recommendations for routine HPV vaccination
18  of females and males at age 11 and 12 years, HPV
19  vaccine coverage in the United States lags behind
20  that of other adolescent vaccines more than a decade
21  after the first HPV vaccine was licensed."
22        Do you see that?
23    A    Yes.
24    Q    You go on to say, "One reason for this
25  persistent concern" -- sorry, withdrawn.

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 26 of 77
Gilson v Biologics
877-370-3377                                A Veritext Division                          www.veritext.com

1    You go on to say, "One reason for this is
2 persistent concern about the safety of HPV vaccines
3 on the part of parents and the public."
4         Do you see that?
5    A    Yes.
6    Q    And then you go on to say, "The
7 scientific literature generally does not bear out
8 these worries."
9         Do you see that?
10   A    Yes.
11   Q    And that was true as of this time;
12 correct?
13   A    I don't know if that was true, actually.
14   Q    Well, you're a coauthor; right?
15   A    Yeah.
16   Q    You go on to say after that sentence, "A
17 substantial body of published evidence has
18 accumulated regarding the safety of quadrivalent
19 Gardasil, Merck and Co., White House Station, New
20 Jersey..." And then, you cite five through 15.
21        And then, you say, "...which constituted
22 93 percent of all HPV vaccine doses distributed in
23 the United States through September of 2015," with
24 a -- with a cite number 16. And you say, "...with
25 no confirmed safety problems identified to date,

1 other than syncope and skin infections," and you
2 cite number five.
3         Do you see that, sir?
4    A    Yes.
5    Q    All right. Now, you have citations in
6 your publication for a variety of these
7 propositions; right?
8    A    Correct.
9    Q    So, for example, when you say there's a
10 substantial body of published evidence, you actually
11 cite ten or 11 publications there; correct?
12   A    I think. Yes.
13   Q    The first one that you cite is footnote
14 five, the Klein paper; correct?
15   A    Correct.
16   Q    Number six is the Chao paper; correct?
17   A    Correct.
18   Q    Let me just -- sorry, you'll -- you just
19 have to wait until I finish my question; okay?
20        Sorry about that.
21        Withdrawn.
22        The footnote six is the Chao paper;
23 correct?
24   A    Correct.
25   Q    Footnote seven is the Arnheim Dahlström

1 201 paper; correct?
2    A    Correct.
3    Q    Number eight is the Grimaldi-Bensouda
4 publication from 2014; correct?
5    A    Correct.
6    Q    Number nine -- footnote nine is
7 Langer-Gould from 2014; correct?
8    A    Correct.
9    Q    Number 10 is Scheller from 2015; correct?
10   A    Correct.
11   Q    Number 11 is Naleway from 2016; correct?
12   A    Correct.
13   Q    Number 12 is the Yih, Y-i-h, paper that
14 we just looked at from 2016; right?
15   A    Correct.
16   Q    Number 13 is Grimaldi-Bensouda from 2017;
17 correct?
18   A    Correct.
19   Q    Number 14 is Feiring, F-e-i-r-i-n-g, from
20 2017; correct?
21   A    Correct.
22   Q    And number 15 is the Miranda study from
23 2017; right?
24   A    Correct.
25   Q    And those are the papers that you all

1 cited when you said that the scientific literature
2 does not bear out concern for safety of HPV
3 vaccines; correct?
4    A    They were cited for the sentence "A
5 substantial body of published evidence has
6 accumulated regarding the safety of quadrivalent
7 Gardasil."
8         That's -- they are cited for that
9 particular thing.
10   Q    And you go on to say "with no confirmed
11 safety problems identified to date, other than
12 syncope and skin infections."
13   A    That's correct.
14   Q    Correct?
15        So I just want to, if I can, mark these
16 papers, just to make sure we have them correct;
17 okay?
18   A    Okay.
19        (Whereupon, Exhibit MK 8, Klein
20        Paper, was marked for
21        identification.)
22 BY MR. TOMASELLI:
23   Q    I'm handing you Exhibit 8, which is the
24 Klein paper.
25        Is that true?

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 27 of 77
877-370-3377                    Golkow Technologies                    www.veritext.com
A Veritext Division

1    A   Yes.
2    Q   And that's the Klein paper that you
3 referenced in your article; right?
4    A   Correct.
5        (Whereupon, Exhibit MK 9, Chao Paper,
6        was marked for identification.)
7 BY MR. TOMASELLI:
8    Q   Exhibit nine is the Chao paper referenced
9 in your paper; correct?
10   A   Correct.
11   Q   That's also the paper that you referenced
12 in your expert report; right?
13   A   Correct.
14       (Whereupon, Exhibit MK 10, Arnheim
15       Dahlström Paper, was marked for
16       identification.)
17 BY MR. TOMASELLI:
18   Q   Exhibit 10 is the Arnheim Dahlström paper
19 that is referenced in your Exhibit 7; correct?
20   A   Correct.
21       (Whereupon, MK 11, Grimaldi-Bensouda
22       2014 Paper, was marked for
23       identification.)
24 BY MR. TOMASELLI:
25   Q   Exhibit 11 is the Grimaldi-Bensouda 2014

1 paper that is referenced in your paper; correct?
2    A   Correct.
3       There are two of those. That's the first
4 one of them.
5    Q   In fact, there are three.
6       Are you aware --
7    A   You've got --
8    Q   -- of that?
9    A   -- three of them?
10   Q   Oh, withdrawn.
11      There are two papers --
12   A   By Grimaldi- --
13   Q   -- by the --
14   A   -- Bensouda.
15   Q   -- name of Grimaldi-Bensouda in your Yih
16 2018 paper?
17   A   I had two of them cited. Yeah.
18   Q   Okay.
19      (Whereupon, Exhibit MK 12,
20      Langer-Gould Paper, was marked for
21      identification.)
22 BY MR. TOMASELLI:
23   Q   Exhibit No. 12 is the Langer-Gould paper
24 that you referenced in Yih 2018; correct?
25   A   Correct.

1       (Whereupon, Exhibit MK 13, Scheller
2       2015 Paper, was marked for
3       identification.)
4 BY MR. TOMASELLI:
5    Q   Exhibit 13 is the Scheller paper from
6 2015 that is referenced in Yih 2018; right?
7    A   Correct.
8       (Whereupon, Exhibit MK 14, Naleway
9       Paper, was marked for
10      identification.)
11 BY MR. TOMASELLI:
12   Q   Exhibit 14 is the Naleway paper that is
13 in your publication; is that right?
14   A   Correct.
15      (Whereupon, Exhibit MK 15,
16      Grimaldi-Bensouda 2017 Paper, was
17      marked for identification.)
18 BY MR. TOMASELLI:
19   Q   And as you noted, Exhibit 15 is a paper
20 by Grimaldi-Bensouda --
21      MR. BAUM: Oops.
22      MR. TOMASELLI: Sorry.
23 BY MR. TOMASELLI:
24   Q   -- that is from 2017; correct?
25   A   Yes.

1    Q   And that is referenced in your Yih 2018
2 paper; right?
3    A   Yeah.
4       (Whereupon, Exhibit MK 16, Feiring
5       Paper, was marked for
6       identification.)
7 BY MR. TOMASELLI:
8    Q   Number -- Exhibit No. 16 is the Feiring
9 paper that is referenced in Yih 2018; correct?
10   A   Correct.
11      (Whereupon, Exhibit MK 17, Miranda
12      Paper, was marked for
13      identification.)
14 BY MR. TOMASELLI:
15   Q   And Exhibit 17 is the Miranda paper that
16 is referenced in the Yih 2018 paper; correct?
17   A   Correct.
18   Q   And in terms of the paper that you cited
19 for the same sentence where you talk about vaccine
20 doses distributed, that was a -- a paper at footnote
21 16 that is from Sukamaran, S-u-k-a-m-a-r-a-n, from
22 an ACIP meeting from 2015; is that right?
23   A   That is correct.
24      (Whereupon, Exhibit MK 18, Dr.
25      Sukumaran's Paper Regarding HPV

Case 3:22-md-03036-KDB   Document 289-3   Filed 01/06/25   Page 28 of 77
Girlson v2Technologies
877-370-3377            A Veritext Division            www.veritext.com

1       Vaccine Safety, was marked for
2       identification.)
3 BY MR. TOMASELLI:
4   Q   And to save a few trees, Exhibit 18 is
5 the report that you cited from Dr. Sukumaran
6 regarding HPV vaccine safety. It starts on page 69
7 of page 18 [sic]; right?
8       MR. BAUM: Exhibit 18?
9       MR. TOMASELLI: Yes.
10   A   What started where?
11 BY MR. TOMASELLI:
12   Q   Sorry.
13       If you turn to page 69 --
14   A   Oh okay.
15   Q   -- of Exhibit 18, can you confirm that
16 that is the Dr. Sukumaran that you referenced in
17 footnote 16 of the Lee [sic] 2018 paper?
18   A   Yes.
19   Q   Great.
20       (Whereupon, the court reporter
21       requests clarification.)
22       COURT REPORTER: Lee or Yih?
23       MR. TOMASELLI: Yih. Yih.
24       COURT REPORTER: Okay.
25

1 BY MR. TOMASELLI:
2   Q   Again, by my count you -- you cited about
3 11 or 12 publications related to the safety of
4 Gardasil vaccine in your Yih 2018 paper -- right? --
5 in that introduction?
6   A   There was at least 11. There were
7 probably more in the -- there are -- I think there
8 are more in the paper probably.
9   Q   That's a good point.
10       The -- each of those papers cites other
11 papers, as well; right?
12   A   Of course they do. Yes.
13   Q   Yeah. The -- if you dropped any one of
14 those papers from that citation in the introduction,
15 the -- the proposition would still hold true; right?
16       MR. BAUM: Objection. Vague.
17   A   Well, this has a substantial point. I
18 mean, there's more than those 11 papers on Gardasil.
19       But you don't want to cite too many
20 papers. So I don't know what the definition of
21 "substantial" is. So...
22 BY MR. TOMASELLI:
23   Q   Well, and my simple question is: You
24 could have cited nine, 10, 11, 12 --
25   A   Sure.

1   Q   -- 13?
2   A   Sure.
3   Q   Any one of those papers could drop out,
4 and it still holds what you said in the paper;
5 correct?
6   A   Correct.
7   Q   All right. In -- in this paper, this Yih
8 2018 paper, you say -- lost my spot. Apologize.
9       Oh. Withdrawn.
10       So the -- the first page again --
11 sorry -- of the Yih 2018 paper, the very, very end
12 of the first page, sir...
13   A   Let's see if I can find that.
14       So end of the first page?
15   Q   Yes, sir.
16   A   Yup.
17   Q   It says, "More open-ended studies
18 addressing HPV vaccine safety more generally..."
19 And then, it turns over --
20   A   Where does --
21   Q   -- to --
22   A   -- it say that?
23   Q   Are you in Yih 2018?
24       MR. BAUM: Should be this one.
25

1 BY MR. TOMASELLI:
2   Q   Exhibit 7.
3   A   Oh, I was -- oh, I was -- I was looking
4 at Julianne Gee. Sorry. Not Yih -- Katherine Yih.
5 Sorry.
6       Yeah. So Yih -- Katherine Yih two
7 thousand --
8   Q   -- -18. So it's Exhibit 7. I think you
9 still may have the wrong one.
10   A   Oh, that's the -- the TreeScan paper.
11 Yeah. Okay.
12   Q   The TreeScan paper. Yeah. Okay.
13       Withdrawn.
14       Dr. Kulldorff, at the very bottom of this
15 2018 paper, do you see where the last line says,
16 "More open-ended" --
17   A   Okay.
18   Q   -- "studies addressing HPV vaccination
19 more generally without prespecifying income --
20 outcomes of concern have been fewer and have been
21 somewhat limited in sample size, [number five]
22 [sic], or have tended to rely on spontaneous
23 reports" -- and you cite 17 and 18 -- "the
24 interpre- -- "the interpretability of which is
25 hampered by lack of control groups and denominators,

Case 3:22-md-03036-KDB   Document 289-3  Filed 01/06/25  Page 29 of 77
Gardasil Technologies
877-370-3377               A Veritext Division           www.veritext.com

1 underreporting, and reporting biases."
2     Do you see that?
3   A   Correct.
4   Q   And in terms of the interpretation of --
5 well, withdrawn.
6     In terms of the last part of that
7 sentence where the interpretability is hampered, you
8 cite three papers there, 19 through 21; correct?
9   A   Correct.
10   Q   The paper by -- on number 19, is
11 Shimabukuro 2015; right?
12   A   Yes.
13   Q   And the cite number 20, is a paper by
14 Varricchio, V-a-r-r-i-c-c-h-i-o, from 2004; correct?
15   A   Correct.
16   Q   And then you also cite a paper by
17 Iskander; right?
18   A   Correct.
19   Q   My understanding, based on what I've
20 read, is -- is you cite these papers fairly
21 frequently for the limitations of spontaneous
22 adverse event reporting databases; is that right?
23   A   I don't remember.
24   Q   Okay.
25   A   Yes or not.

1     (Whereupon, Exhibit MK 19, Varricchio
2     Paper, was marked for
3     identification.)
4 BY MR. TOMASELLI:
5   Q   I'm going to hand you what I've marked as
6 Exhibit 19, which is the Varricchio paper.
7     Do you see that?
8   A   Correct. Yes.
9   Q   And that is the paper that you cited in
10 Yih 2018; correct?
11   A   Yes.
12   Q   Now, you've obviously seen this paper
13 before -- Varricchio 2004?
14   A   I don't remember.
15   Q   Okay. Well, let's read it.
16     If you take a look at the abstract, four
17 lines down, there's a statement that says "its
18 primary function."
19     Do you see that?
20   A   Correct.
21   Q   And by "its" they're talking about the --
22 the VAERS database that's maintained by the FDA and
23 the CDC; correct?
24   A   Correct.
25   Q   And it says, "Its primary function" --

1 that is, the VAERS database -- "is to detect early
2 warning signals and generate hypotheses about
3 possible new vaccine adverse events or changes in
4 frequency of known ones."
5     Do you see that?
6   A   Yes.
7   Q   Do you agree with that?
8   A   That's certainly a function of it.
9   Q   And if you move to the right-hand side of
10 the paper in the abstract, about five lines down, do
11 you see that it says "VAERS data contains strong
12 biases."
13     Do you see that?
14   A   Yes.
15   Q   It says, "VAERS data contains strong
16 biases. Incidence rates and relative risks of
17 specific adverse events cannot be calculated."
18     Do you see that?
19   A   I see that.
20   Q   And that's true?
21   A   That's true if you try to, for example,
22 do -- of certain expected ratios. So -- because
23 they are both underreporting and overreporting in
24 the spontaneous reports.
25     So if you, for example, try to take

1 background rates from a different study to see what
2 is the background rate for stroke, for example,
3 like, how many strokes are there in this -- in -- in
4 the -- in the VAERS data.
5     Those are not really comparable. So you
6 cannot then calculate specific risks because of
7 that. Because you're comparing apples and oranges,
8 essentially.
9   Q   Fair enough.
10     And --
11   A   And that's one of the things that I
12 mentioned in my report, contrary to Merck response
13 to the -- to EMA, that they were doing -- trying to
14 use spontaneous reports to do this of certain
15 expecteds.
16     And I think I's a futile thing to do.
17 You can't do it good, so you shouldn't do it -- do
18 it at all.
19   Q   Okay. But in terms of what -- what --
20 what's written here, that VAERS cannot be used to
21 calculate incidence rates and relative risks of
22 specific adverse events, that's true?
23   A   So incidence rates, like, based on the
24 population?
25   Q   Yes.

Case 3:22-md-03036-KDB    Document 289-3   Filed 01/06/25    Page 30 of 77
Gilson Biologics
877-370-3377      A Veritext Division      www.veritext.com

1    A    Or relative risk --
2    Q    Yes.
3    A    -- based on the population where you have
4  a -- background rates, for example?
5    Q    Yes, sir?
6    A    It should -- can -- you can just do it,
7  but it's going to be -- so, like, technically, you
8  could try to do it, and people have tried to do it.
9        But those are not reliable.  And I think
10  they should not be calculated.
11    Q    We'll -- we'll come to that in a second.
12        A couple lines down in the abstract, it
13  says, "Signal" -- "signals detected in VAERS should
14  be subjected to further clinical and descriptive
15  epidemiologic analysis.  Confirmation in a
16  controlled study is usually required."
17        Do you see that?
18    A    Correct.
19    Q    And that is correct; true?
20    A    Yeah.  There are some exceptions.
21        For example, with the COVID vaccine,
22  there was -- the VAERS picked up a -- a -- a signal
23  of anaphylaxis.  And I think that was sufficient to
24  determine using the -- the VAERS data.
25        So there are -- there are situations

1  where VAERS data, by itself, can be used.
2  Anaphylaxis, which is a rare but well-established
3  adverse reactions to the COVID vaccine is one
4  example of that.
5    Q    If you turn over to the second page, do
6  you see a part that says "Description of VAERS"?
7    A    Yup.
8    Q    It says, "VAERS is a passive surveillance
9  or spontaneous reporting system."
10        Do you see that?
11    A    Correct.
12    Q    That is true; right?
13    A    Yes.
14    Q    It's not the only passive surveillance
15  system for adverse events and vaccines around the
16  world; right?
17    A    Almost every country has one.
18    Q    Yeah.  I mean, VigiBase is one; right?
19        It's run by the WHO; correct?
20    A    So VigiBase is solely global where they
21  collect from many different countries.
22    Q    Right.
23        VAERS reports, actually, go into
24  VigiBase; correct?
25    A    I think so.  Yeah.

1    Q    And EudraVigilance is another spontaneous
2  reporting system; correct?
3    A    Yes.  So I think the European countries
4  have their own systems.
5    Q    When we -- can you turn over to the third
6  page?
7        And do you see a part that says "Pitfalls
8  of VAERS"?
9    A    Okay.
10    Q    Again, you've obviously read this paper
11  before; right?
12    A    I don't remember if I have or not.
13    Q    Okay.  Fine.
14        Under "Pitfalls of VAERS," it says,
15  "Several articles have been published since 2000
16  based on publicly available VAERS data."
17    A    Yes.
18    Q    And then, it says, "These papers
19  frequently fail to acknowledge important limitations
20  of the system.  In several cases, despite citing
21  references that clearly outline the weaknesses of
22  passive surveillance systems, some authors
23  apparently have chosen to ignore them."
24        Do you see that?
25    A    Yes.

1    Q    And they cite 32, 33, and 34.
2    A    Yeah.
3    Q    Correct?
4    A    Yes.
5    Q    Who are the authors of those papers?
6    A    The first one is Guyer and Guyer.  The
7  second one is Guyer and Guyer.  And surprise,
8  surprise, the third one is Guyer and Guyer.
9    Q    And are you aware that Guyer and Guyer
10  have published on Gardasil?
11    A    I think so.  Yes.
12    Q    And you've never cited their work at all
13  ever.  Correct?
14    A    I don't remember having done so, but I
15  might have.  I don't know.
16    Q    When you further come down in the same
17  area that we were just looking at, it says, "When
18  these drawbacks of VAERS are taken into account..."
19    A    Oh, let me just find the place, again.
20    Q    Sorry.  It's right where we were.
21        It says, "When these drawbacks of VAERS
22  are taken into account, many of the conclusions of
23  these studies appear unsupportable."
24        Do you see that?
25    A    Yes.  I see that.

Case 3:22-md-03036-KDB    Document 239-3    Filed 01/06/25    Page 31 of 77
Gilson Technologies
A Veritext Division
877-370-3377                                                    www.veritext.com

1    Q    Further down, about seven lines up, do
2 you see "Instructions to health care providers..."?
3    A    Is that on the same page?
4    Q    Yes, sir.
5    A    Further up you said?
6    Q    It's about eight lines from the bottom.
7    A    Oh, okay.
8    Q    It says, "Instructions to Health Care
9 procedures and consumers regarding reporting state
10 clearly that VAERS is an" -- "is interested in
11 receiving reports, even if causal relation to
12 vaccination is uncertain, consistent with the
13 purpose of VAERS in generating, not testing
14 hypotheses."
15         Do you see that?
16    A    Yes.
17    Q    And that is true, that VAERS and analyses
18 that are done out of VAERS, generally, are for
19 signal generation for generating hypotheses, not
20 testing them; right?
21    A    I think that most used for -- for
22 generating hypothesis.  But they can also be used as
23 part of the evidence for -- for hypothesis.
24         They, sort of, go into the -- the whole
25 mosaic of you -- you, typically, don't have only one

1 study.  So you have, like, when you evaluate the
2 safety of a vaccine, you have, like, a whole mosaic
3 or, like -- like a big jigsaw puzzle, since you have
4 so many pieces.
5    Q    For sure.
6    A    And -- and --
7    Q    And the --
8    A    -- the -- and --
9    Q    -- piece --
10    A    -- and the VAERS is one piece of that.
11    Q    Right.
12    A    Even if it's -- even if it's
13 signal-generating, it's still a piece of the
14 evidence, because that -- that evidence can be
15 stronger or weaker -- weaker.
16         And once you look into it in more detail,
17 things might be stronger or weaker as you look into
18 the VAERS data more -- more carefully.
19    Q    It's fair, though, that databases like
20 VAERS and analyses out of databases like VAERS are
21 hypothesis-generating, like these authors said, not
22 hypothesis testing; right?
23    A    That's typically how they're used.  But
24 they could be used, also, as evidence of causality.
25    Q    In terms of anaphylaxis?

1    A    That was one example.
2    Q    VAERS adverse event database is
3 hypothesis-generating for events that are -- occur
4 in the background by chance; right?
5         MR. BAUM:  Objection.  Vague.
6    A    Well, for all events, it can happen in
7 background by chance.
8         So I don't see -- I mean, so I don't see
9 distinguishing between that.  That's the case for
10 all events.
11 BY MR. TOMASELLI:
12    Q    If you go to the bottom of page 290, the
13 very bottom right, you see the paragraph that starts
14 "Attempts to use" --
15    A    On left or right?
16    Q    The -- the bottom right.
17    A    Okay.
18    Q    Do you see a paragraph that starts --
19    A    Yup.
20    Q    -- "attempts to use..."?
21         Do you see where I am?
22    A    Yeah.
23    Q    Great.
24         It says, "Attempts to use the VAERS data
25 to calculate internal relative risks of specific

1 adverse events for a vaccine using reports for
2 another vaccine as control group raise a fifth
3 methodologic issue.  Relative risks represent a
4 ratio of incidence rates.  And incidence rates
5 cannot be calculated from VAERS data as previously
6 discussed."
7         Do you see that?
8    A    Yeah.
9    Q    You agree with that; right?
10    A    No.
11    Q    And again, these are -- the authors here
12 are from the FDA and the CDC; right?
13    A    Yes.  They are CDC and FDA.
14         So it's correct that incidence rates
15 cannot be calculated from VAERS data.  That is
16 correct.
17    Q    Okay.  Do you --
18    A    But relative risk represents a ratio of
19 incidence rates is not necessarily true.  That may
20 or may not be true, depending on the data.
21         But the second part is true:  "incidence
22 rates cannot be calculated from VAERS data as
23 previously discussed."
24         That's true.  The --
25    Q    The --

31 (Pages 118 - 121)

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 32 of 77
Gurlson v Biologicals
A Veritext Division
877-370-3377                                                                    www.veritext.com

1    A    -- second part of that sentence is true.
2    Q    And the next sentence, "Relative
3 reporting rates might be calculated. But elevated
4 relative reporting rates calculated from VAERS data
5 may be spurious, regardless of the results of
6 statistical significance testing."
7        Correct?
8    A    That is correct.
9    Q    If you go down to the next paragraph,
10 read with me: "Comparisons of reported adverse
11 events between vaccines may also be faulty because
12 vaccines given within particular age ranges are
13 sometimes associated with adverse events that follow
14 background risk of illness in that age group. For
15 example, ages at which health care providers are
16 vaccinated against hep-" -- "hepatitis B are within
17 the age" -- I'm sorry -- "within the range when
18 multiple sclerosis and related demyelinating
19 diseases are most likely to be diagnosed."
20        Do you see that?
21    A    Correct.
22    Q    And that's true; right?
23    A    So age is one of the potential
24 confounders when you look at VAERS data.
25    Q    And if --

1    A    Ant that's, sort of, expressed here quite
2 nicely, I think.
3    Q    Yeah. And if we go down in that same
4 column to the end of that paragraph and the
5 beginning of the next one, do you see "relative
6 reporting rates"?
7    A    Yes.
8    Q    It says, "Relative reporting rates from
9 VAERS should not be confused with" --
10        (Whereupon, the court reporter
11        requests clarification.)
12        MR. TOMASELLI: Yes.
13 BY MR. TOMASELLI:
14    Q    Sorry. Withdrawn.
15        The document states, "Relative reporting
16 rates from VAERS should not be confused with data
17 mining methods that attempt to identify adverse
18 events reported more commonly after one vaccine or a
19 group of vaccines than others."
20        Do you see that?
21    A    Yes.
22    Q    The document goes on to say, "Three data
23 mining methods are being applied increasingly to
24 medical product safety data are the proportional
25 reporting rate" -- "ratio, the PRR; empiric

1 Bayesian" -- B-a-y-e-s-i-a-n -- "and neural network
2 approaches."
3        Do you see that?
4    A    Correct. Yeah. I see that.
5    Q    And then, if you go down further, it
6 says, "An event with a higher proportion for the
7 study vaccine than for other vaccines might be
8 considered a signal and require further study. For
9 other methods" -- sorry.
10        It then goes on to say, "The other
11 methods calculate a similar measure of
12 disproportionality."
13        Do you see that?
14    A    Yes. I see that.
15    Q    And so if we go down to the last three
16 lines of the paragraph, it says, "Just as with
17 relative reporting rate interpretation, PRR and
18 other data mining statistics can be biased by
19 differences in usage and reporting of adverse
20 events. Thus, elevated data mining statistics do
21 not necessarily reflect a causal relationship
22 between a vaccine and an adverse event."
23        Do you see that?
24    A    I see that.
25    Q    And then, it goes on to say, "PRR and

1 other data maining statistics should not be
2 interpreted or presented as relative risks of
3 specific vaccine adverse events."
4        Do you see that?
5    A    Yes.
6    Q    "Such statistics should be used only as a
7 hypothesis generation tool and are evaluated in the
8 same manner as other hypotheses generated by VAERS."
9        Do you see that?
10    A    I see that.
11    Q    Do you agree with that?
12    A    Not all of it. No. A lot of it, I agree
13 with. Not all of it.
14    Q    Do you agree that disproportionality
15 methods are signal generation methods?
16    A    They are used for signal generations and
17 are an important tool for signal generation.
18    Q    Say that again?
19    A    They are an -- are an important tool for
20 signal generation.
21    Q    I think we're on the same page.
22        Disproportionality analyses are an
23 important tool for signal generation, but they are
24 signal generation methods; correct?
25    A    They cannot -- they should also be used

32 (Pages 122 - 125)

Case 3:22-md-03036-KDB    Document 289-1    Filed 01/06/25    Page 33 of 77
877-370-3377                Girlson Technologies        Page 33 of 77
                           A Veritext Division              www.veritext.com

1 as part of the evaluation. So they're not only
2 signal generations tools. They can also be used for
3 part of es- -- establishing a causal relationship.
4     And in rare cases, like the one I gave
5 you for anaphylaxis, they can, by themself, be used.
6 But most of the times you use it, you need
7 additional data, also.
8     Q    Do you agree that disproportionality
9 statistics can be biased by differences in usage and
10 reporting rates?
11     A    For example, there could be issues of age
12 so that -- so I -- I agree with that. Because you
13 could have age that if -- if the vaccine is given in
14 a particular age group, and then, the comparative
15 vaccine is a different age group, or they have a
16 different age distribution, and then, the -- the
17 outcome of interest also has some kind of an age
18 curve, then, they can bias it in either directions,
19 depending on how those age curves are.
20         (Whereupon, Exhibit MK 20,
21         Shimabukuro 2015 Paper, was marked
22         for identification.)
23 BY MR. TOMASELLI:
24     Q    I'm handing you what I've marked as
25 Exhibit 20, which is a paper by Shimabukuro,

1 S-h-i-m-a-b-u-k-u-r-o, from 2015; do you see that?
2     A    Yes.
3     Q    This is a -- another one of the papers
4 that you cited in Yih 2018 for limitations of
5 spontaneous reports; correct?
6     A    I think that was one of them. Yeah.
7         Let me ask -- make sure they're on -- or
8 I -- I mean, I trust you. If you say so, I trust
9 you. So -- or do you want me to confirm it?
10     Q    I mean, we -- I thought we went over
11 them, and so I was just confirming.
12         But if you want to make sure that
13 Shimabukuro is number 19, that's great.
14     A    And this was in the Yih paper of 2018?
15     Q    That's correct.
16         MR. BAUM: Is that -- is that
17 Exhibit 7?
18         MR. TOMASELLI: That's correct.
19         THE WITNESS: Oh, it's Exhibit 7?
20         Oh, okay.
21         Oh, here it is.
22     A    Yes. That's cited in the Yih paper from
23 2018.
24 BY MR. TOMASELLI:
25     Q    Okay. And so Exhibit 20 is indeed the

1 Shimabukuro paper; right?
2     A    Yes.
3     Q    And I'd like you to turn to page 4401,
4 section 6.2, "Disproportionality Analysis"?
5     A    Correct. Yeah.
6     Q    Five lines down, do you see that it says,
7 "VAERS lacks information on total number of
8 individuals vaccinated and total number who
9 experience an adverse event, as well as incidence of
10 adverse events in unvaccinated individuals."
11         Do you see that?
12     A    That is correct. And that's true.
13     Q    Okay. And then, toward the bottom of
14 that column, the last paragraph starts,
15 "Disproportionality analyses complements..."
16         Do you see that?
17     A    Okay. Yes.
18     Q    It says, "Disproportionality analyses
19 complements clinical reviews and other analyses to
20 identify adverse events that may be more frequently
21 associated with a particular vaccine."
22         Do you see that?
23     A    Yes.
24     Q    And that's true; right?
25     A    Yeah. I think that's true.

1         And I think it's an important --
2 important part of that -- a very important
3 compliment.
4     Q    The next sentence states, "A result that
5 exceeds a prespecified statistical alerting
6 threshold might warrant further evaluation, such as
7 clinical review of reports, but does not
8 definitively demonstrate a true increased incidence
9 of an adverse event, a Causal association, or a
10 safety problem."
11         Do you see that?
12     A    Yes.
13     Q    And that is true, that just because you
14 have disproportionality of reporting, that does not
15 mean that there is a safety problem; correct?
16     A    There could be various biases confounding
17 that has to be take -- taken into account when
18 doing, sort of, a -- a evaluation of everything.
19     Q    When the VAERS system showed
20 disproportionality of venous thromboembolism events,
21 you've had several papers investigating that signal;
22 right?
23     A    Correct.
24     Q    A signal of disproportionality does not
25 mean that adverse events are occurring more often

33 (Pages 126 - 129)

Case 3:22-md-03036-KDB    Document 289-1   Filed 01/06/25    Page 34 of 77
Coron v. Biologics, et al.
877-370-3377                    A Veritext Division                    www.veritext.com

1 than what would be expected in an unvaccinated
2 population; right?
3    A   That might be the true. Yes. Correct.
4    Q   Your -- your -- your venous
5 thromboembolism analysis showed that to be the
6 case -- right? -- that you can have
7 disproportionality reporting, and yet, there not be
8 a situation where that event is occurring more than
9 in an unvaccinated population; right?
10    A   So the VTE, I think, is a perfect example
11 of how things should have been done -- should -- how
12 things should be do -- done. You have --
13    Q   Can you answer my question first, and
14 then, you can say that?
15       So my question, first, is that: Just a
16 simple finding of disproportionality in VAERS does
17 not mean that there's actually an increased risk in
18 an unvaccinated population; right?
19    A   Correct. It doesn't necessarily mean
20 that.
21    Q   And then, tell me why your VTE example is
22 a perfect example as you stated.
23    A   So I think it's a very good example.
24 There was a concern. And when Gardasil came out, I
25 think that was the first major concern about the

1 vaccine.
2       And it was then evaluated in different
3 manners. It was evaluated using the -- I think, the
4 rapid cycle analysis. And there was nothing
5 statistically significant. But there was some --
6 maybe something there, so we wouldn't exclude it.
7       And then, we have the subsequent paper
8 that I wrote -- that -- what I was a co- -- coauthor
9 on. And I think there were other publications, as
10 well.
11       And I think it's a perfect example where
12 there was a concern, both in terms of the data, but
13 also, in terms of the public, in terms of parents.
14 And by doing proper studies -- there was very solid
15 proper studies -- those concerns were laid to rest.
16       And I think it's a -- it -- it was --
17 this is the way that vaccine safety science should
18 operate. You have various methods to -- to take
19 potential problems. And then, you do very good
20 studies to either confirm those problems or put them
21 to rest with good, solid statistical methods.
22       So from my perspective, the Gardasil and
23 the VTE is a success story for vaccine safety
24 research. A lot of effort went into it, a lot of
25 good studies, good scientists was doing it. And I

1 think that was a -- a good example of -- of how --
2 how it should be done when you -- when you have a --
3 vaccine safety.
4       And it's an example that, if you care
5 about vaccines, I think it's very important to do
6 so. Whatever you find, it's very important to do
7 so. Because if you find nothing, you want to have
8 solid evidence that there's not a problem.
9       There are other cases where we have --
10 find problems with a vaccine. And then, that's
11 important to fig- -- to -- to -- to find, also,
12 whether you want to withdraw the vaccine, like
13 RotaShield, or whether you want to keep it on the
14 market, like with RotaTeq.
15       It's -- it's important to know what's
16 going on with the vaccine and to very solidly and
17 well doing that. So that is, I think, my
18 disappointment with Gardasil and POTS, that those
19 solid studies hasn't been made.
20    Q   Well, in fairness, we talked earlier, you
21 have actually not reviewed all of the studies
22 related to Gardasil and POTS in your expert report;
23 right?
24    A   Correct.
25    Q   Okay. And so working off of this example

1 of VTE -- well, withdrawn.
2       A signal of disproportionality in
3 reporting does not mean that there's actually an
4 association of increased risk with the vaccine;
5 correct?
6    A   Correct.
7       You have to explore that.
8    Q   A signal of disproportionality does not
9 mean that the vaccine in question actually causes
10 the event; right?
11       MR. BAUM: Objection. Vague.
12    A   So -- so -- so in some cases like
13 anaphylaxis, I think, that was the -- that was
14 enough.
15       But in other cases, there is a signal,
16 and it might not be true -- it might not be causal.
17 So you -- you have to judge this from time to time.
18 BY MR. TOMASELLI:
19    Q   That's my point --
20    A   Yeah.
21    Q   -- is -- that -- that's my simple point
22 is that a signal disproportionality, by itself,
23 doesn't mean --
24    A   It doesn't automatically. Correct.
25    Q   -- does not mean that the vaccine

Case 3:22-md-03036-KDB    Document 289-3  Filed 01/06/25   Page 35 of 77
877-370-3377          Golson Technologies
A Veritext Division           www.veritext.com

1  causes the event; right?
2      A    Doesn't automatically mean that.
3  Correct.
4      Q    A signal of disproportionality in
5  reporting actually doesn't mean, by itself, that
6  there's a safety problem at all; right?
7      A    For -- in some cases, by itself, it could
8  mean that.  But not automatically.  Yes.
9          Because there's a signal doesn't
10 automatically mean that there is a causal problem.
11 But there are situations where such a signal, by
12 itself, is enough to establish causal relationship.
13 And I gave the example of anaphylaxis and the COVID
14 vaccine, for example.
15     Q    Yeah.  And -- and that is the -- that is
16 the example that you've been giving a lot, is that
17 there are times where an event is so immediate and
18 so rare that -- that you can judge that.
19         But in terms of other things, that's --
20 that's actually not true; right?
21         Other events, it's not true?
22     A    Sometimes, it's true.  Most of the time,
23 it's not.
24     Q    All right.  Most of the time?
25     A    Most of the time, it is -- is not a --

1  you -- you have to do further investigation.  You
2  have to have complementary -- complementary in- --
3  information.
4      Q    Let me see if we can agree on this.
5          Withdrawn.
6          Most of the time, a signal of
7  disproportionality in reporting does not mean
8  there's a safety problem at all.
9          It needs to be further investigated?
10     A    Correct.
11     Q    Okay.
12     A    Finally, we agree.
13         MR. TOMASELLI:  Do you want to take
14 a break?
15         I -- I just -- I mean --
16         MR. BAUM:  It's been a while.  We
17 could probably do a break.
18         MR. TOMASELLI:  You want a break?
19         I just -- I've, kind of, had you
20 sitting in there.  I'd --
21         THE WITNESS:  At -- at --
22         MR. TOMASELLI:  -- I mean --
23         THE WITNESS:  -- at -- at --
24         MR. TOMASELLI:  -- I'm happy --
25         THE WITNESS:  -- at some --

1          MR. TOMASELLI:  -- to go.
2          THE WITNESS:  -- point.  But --
3          MR. TOMASELLI:  But it's --
4          THE WITNESS:  -- if you --
5          MR. TOMASELLI:  -- totally up --
6          THE WITNESS:  -- want to --
7          MR. TOMASELLI:  -- to you.
8          THE WITNESS:  -- go a little bit
9  more, that's fine.  But we can always
10 take a break now -- whatever it, sort of,
11 suits -- fits you with your -- it's --
12 it's good to, sort of, to keep the
13 logical things together.
14         MR. TOMASELLI:  Sounds good.
15         COURT REPORTER:  Could we take a
16 break now?
17         MR. TOMASELLI:  Yeah.  Sure.
18         THE VIDEOGRAPHER:  The time is 11:30
19 a.m.  And we're off the record.
20         (Whereupon, there was a recess taken
21         from 11:29 p.m. to 11:46 a.m.)
22         THE VIDEOGRAPHER:  The time is
23 11:46 a.m. and we are on the record.
24 BY MR. TOMASELLI:
25     Q    Are you ready to proceed --

1      A    Yes.
2      Q    -- Dr. Kulldorff?
3      A    Thank you.
4      Q    Great.
5          The exhibit that you got there in front
6  of you, the Shimabukuro 2015 paper, if you can turn
7  to the next page, there's a section number eight
8  that says, "What are the limitations of VAERS?"
9          Do you see that?
10     A    Yes.
11     Q    It says, "Like all spontaneous public
12 health reporting system, VAERS has limitations,
13 VAERS is subject to reporting bias, including
14 underreporting of adverse events, especially common
15 and mild ones, and stimulating reporting, which is
16 elevated reporting that might occur in response to
17 intense media attention and increased public
18 awareness, such as during the 2009 [sic] H1N1
19 pandemic influenza vaccine -- vaccination program."
20         Do you see that?
21     A    Yes, I see that.
22     Q    It is true that a limitation of VAERS is
23 that there can be stimulated reporting, such as
24 elevated reporting, when there's intense media
25 attention around a vaccine; right?

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 36 of 77
877-370-3377                    Golkow Technologies                    www.veritext.com
                               A Veritext Division

1    A    That is true.
2    Q    That's called reporting bias?
3    A    That can generate reporting bias, yes.
4    Q    Sorry.  I -- can you say that again?
5    A    That can create reporting bias, yeah.
6    Q    Okay.  And I think you said in your
7  report, "with VAERS data, one must always be
8  concerned with reporting bias."
9         Is that right?
10   A    Correct.
11   Q    What is reporting bias, in your words?
12   A    If some people are more prone to -- so --
13  so with spontaneous reports, they are reported
14  spontaneously by a physician, a nurse, a patient, a
15  parent, or etc.  So who, then, actually reports
16  something?
17        So if something happens, some people
18  report it and some people will not report it.
19        So reporting bias is if there are
20  different tendencies or different probabilities or
21  different likelihood of it being reported under
22  certain set of circumstances versus another.
23        For example, it might be more likely to
24  report it for one vaccine versus for another
25  vaccine.  It could be -- it can be more likely

1  reported one year versus another year.  This can
2  create certain biases also.
3    Q    Is it -- is it true that if there's
4  something in the world, whatever that is, that makes
5  people more likely to report events to VAERS
6  regarding one vaccine versus another vaccine, that's
7  a reporting bias?
8    A    That can create a reporting bias.
9    Q    Okay.  And, for example, newspapers, TV
10  coverage, internet, social media, those are -- those
11  all could be sources of reporting bias; right?
12   A    They could cause the reporting bias.
13        So one example, for example, is the COVID
14  vaccine.  There was a lot of discussions about that.
15  So then maybe the reporting for the COVID vaccine is
16  different from other vaccines.
17        So that's why maybe you want to exclude
18  the COVID vaccine if you study some other vaccine,
19  because the COVID might be some special -- they must
20  sort of operate differently.  So you can be
21  concerned about that.
22   Q    Well, notoriety of any kind, good or
23  bad --
24   A    It could be --
25   Q    -- related to a vaccine can create

1  reporting bias; true?
2    A    Different things can create reporting
3  bias.  If --
4    Q    We are in agreement?
5    A    Yes.
6    Q    And does reporting bias matter in
7  disproportionality analyses?
8    A    It can, yes.
9    Q    And how --
10   A    And I think that is listed in my report.
11  Actually, I mentioned it in my report.
12   Q    Right.  And how can disproportionality of
13  reporting or reporting bias affect a
14  disproportionality analysis?
15   A    It can change the reporting odds ratios
16  or the proportional reporting ratio --
17        (Whereupon, the court reporter
18        requests clarification.)
19  BY MR. TOMASELLI:
20   Q    You've got to slow down.  Sorry.
21   A    Sorry.
22        It can affect the -- the estimates of the
23  reporting odds ratios or the proportion of reporting
24  ratios, whichever one it's using, either up or down.
25   Q    And in your report when you discussed

1  Dr. -- I'm sorry.  Withdrawn.
2        In your report, when you discussed
3  Ms. Tomljenovic's disproportional analysis, you said
4  that it's more difficult to judge reporting bias; is
5  that true?
6    A    I don't have exact -- my wording, so what
7  page is that on?
8    Q    Twenty-five.
9    A    Because I know I talked about it and
10  wrote about it.
11        Yeah.  So I said that in the -- for
12  the -- for the Gardasil and the POTS and the POI
13  analysis that Dr. Tomljenovic did, there might be
14  bias because of -- it could be because of age.  But
15  since the -- the -- the reporting odds ratios are so
16  large for POTS and POI, they were probably changed a
17  little bit, yes, for age but it's not -- I think
18  it's unlikely that they were changed a lot and go
19  away.
20   Q    Okay.  We are not talking about age --
21   A    But --
22   Q    -- we are talking --
23   A    But --
24   Q    -- about --
25   A    Yes.

Case 3:22-md-03036-KDB    Document 289-1   Filed 01/06/25    Page 37 of 77
Gilson v. Technologies
877-370-3377                                                  A Veritext Division                          www.veritext.com

1  Q    -- reporting bias; right?
2  A    But -- but then I think for -- for
3  reporting bias, that's more difficult to judge than
4  age.
5  Q    So --
6  A    Age is more easy to understand than --
7  than the reporting bias.  So the reporting bias is
8  more difficult to get a grip on than the age bias --
9  the potential age bias.
10  Q    And that was my question to you.
11  A    Yeah.
12  Q    Is that you admitted in your report that
13  it's more difficult to judge the reporting bias for
14  disproportionality analysis?
15  A    Compared to age, yes.
16  Q    And to be clear, as part of your work in
17  this case, you did not undertake a search of any
18  kind to see if there was reporting bias with
19  Gardasil; right?
20  A    I talked about the reporting bias -- so I
21  didn't do any research on my own of any kind in this
22  analysis.  I talked about the reporting bias and
23  I -- I mentioned that I think it was a good idea
24  for -- what Tomljenovic did is to -- to -- with the
25  smaller sample size on the earlier data before there

1  were any media attention for these things.
2       So by doing that small -- you get smaller
3  sample size, you get much wider confidence interval,
4  but you still see the same tendency of results, the
5  same axis in those smaller samples from the -- early
6  on.  And I think that was a very important, you can
7  call it a sensitivity analysis, that Dr. Tomljenovic
8  did.
9  Q    Your assumption, in looking at her
10  analysis is that prior to 2013, there was not
11  reporting bias with respect to Gardasil; correct?
12  A    There can still be some reporting bias
13  for a variety of reasons.  But the major concern, I
14  think, with the reporting bias if you have major
15  media attention or other type of public attention to
16  the things.
17  Q    And that's my question to you, is that
18  you did not undertake any analysis in this case or
19  in your expert report to see what the media
20  attention actually was around Gardasil at any -- at
21  any time?
22  A    I -- I did not mention that particularly
23  in this report of -- that.
24  Q    If we go back to Shimabukuro 2015, same
25  page, right-hand column this time.  So below the two

1  by two contingency table.
2       Do you see where I am?
3  A    Yeah.
4  Q    About five or six lines down, it starts
5  "because VAERS data do not."
6       Do you see --
7  A    Okay.
8  Q    -- that?
9       Do you see that?
10  A    Yes.
11  Q    The statement is, "Because VAERS data do
12  not include an unvaccinated comparison group..."
13       Now, that's true, right?  VAERS data do
14  not include an unvaccinated comparison group?
15  A    That is true.
16  Q    Okay.  It goes on to say, "Because VAERS
17  data do not include an unvaccinated comparison
18  group, it is not possible to calculate and compare
19  rates of adverse events in vaccinated versus
20  unvaccinated individuals and determine if
21  vaccination is associated with an increased risk of
22  an adverse event."
23       Do you see that?
24  A    Yeah, I see that.  Yes.
25  Q    And that is indisputably a true

1  statement; right?
2  A    No.
3  Q    So the -- there are three parts of that
4  sentence:  "Because VAERS data do not include an
5  unvaccinated comparison group," that is true.
6       The second part:  "It is not possible to
7  calculate and compare rates of adverse events in
8  vaccinated versus unvaccinated individuals" -- that
9  is also true -- "and determine if vaccination is
10  associated with an increased risk of an adverse
11  events [sic]," that is sometimes true and
12  sometimes -- sometimes you can and sometimes you
13  cannot.
14  Q    Well, if that question of an association
15  of an increased risk over an unvaccinated
16  population, that is true; right?
17       MR. BAUM:  Objection.
18       You --
19  A    No.  You -- it's true that it's not a
20  comp- -- it's not possible -- it's -- it's not
21  possible to calculate and compare rates of adverse
22  events in vaccinated versus unvaccinated individuals
23  because in VAERS data -- so people try to do that
24  using these observed or expected, that Merck did in
25  their -- in their response to EMA, but in my view

37 (Pages 142 - 145)

Case 3:22-md-03036-KDB    Document 289-1    Filed 01/06/25    Page 38 of 77
877-370-3377                                                                     www.veritext.com
Golson Technologies
A Veritext Division

1 that's not possible to do because those background
2 rates are so uncertain.
3    But you can do the disproportionality
4 analysis of various types, whether it's reporting
5 odds ratios or pro- -- or proportional reporting
6 ratios or the empirical Bayes gamma-Poisson
7 shrinkage, you --
8    (Whereupon, the court reporter
9    requests clarification.)
10    THE WITNESS: Sorry. Pardon?
11 A    -- the empirical Bayes gamma-Poisson
12 shrinkage.
13    So using those, you can -- that you --
14 you can help determine if vaccination is associated
15 with an increased risk of an adverse -- adverse
16 event.
17 BY MR. TOMASELLI:
18 Q    VAERS -- VAERS reports -- the VAERS
19 database does not contain unvaccinated individuals;
20 right?
21 A    That is correct.
22 Q    All right.
23 A    Everybody has been vaccinated.
24 Q    The next page of Shimabukuro 2015, page
25 4403, left side, the paragraph above "Closing

1 thoughts."
2    Are you with me?
3 A    Yes.
4    MR. BAUM: Do you mean the paragraph
5    above -- above it? Like, "The relatively
6    rapid"?
7    MR. TOMASELLI: That's where I was
8    going.
9    MR. BAUM: Okay.
10    MR. TOMASELLI: Withdrawn.
11 BY MR. TOMASELLI:
12 Q    That paragraph states, "The relatively
13 rapid increase in numbers of reports to VAERS
14 following the introduction and initial uptake of a
15 new vaccine, an expected occurrence has been
16 misinterpreted as an -- as actual increases in the
17 incidence of adverse events and vaccine-related
18 risk.
19    Do you see that?
20 A    Yes.
21 Q    It goes on to say, "This has been the
22 case where VAERS reports following quadrivalent
23 human papillomavirus [HPV4] [sic] vaccination..."
24    That's Gardasil, right?
25 A    That is Gardasil.

1 Q    "...which as expected, increased as
2 uptake of Gardasil [sic] vaccine increased following
3 licensure in 2006."
4    Do you see that?
5 A    Yes, I see that.
6 Q    "However, post-licensure epidemiologic
7 studies have consistently demonstrated the safety of
8 Gardasil [sic]."
9    Do you see that?
10 A    I see that.
11 Q    They cite 45 through 51 for that;
12 correct?
13 A    Correct.
14 Q    And -- and then it goes on to say,
15 "...confirming the limitations of passive
16 surveillance systems like VAERS."
17    Do you see that?
18 A    Yes, I see that.
19 Q    All right. And in terms of the cites 45
20 through 51, where the authors say that they
21 consistently demonstrate the safety of Gardasil
22 vaccine, 49 -- 45 through 51, those sites are a lot
23 of the same papers that you cited in Yih, 2018;
24 correct?
25 A    Yes.

1 Q    One of those is Gee, 2011; right?
2 A    Yes.
3 Q    One of those is Chao, 2012; right?
4 A    Yes.
5 Q    One of those is Klein, 2012; right?
6 A    Yes.
7 Q    And then, of course, we have papers from
8 Arnheim-Dahlström, Grimaldi-Bensouda, and Scheller;
9 right?
10 A    Yes.
11 Q    Okay. If we come back to your Yih, 2018
12 publication, there's a discussion section on page
13 1274.
14 A    Oh, let's see. Is this the one?
15 Q    Tell me when you are there?
16 A    Okay. I have that paper now.
17 Q    Great.
18 A    Which page?
19 Q    1274, discussion.
20 A    Yes.
21 Q    In the last sentence of the first full --
22 the second full paragraph, you say, "In view of the
23 statistical power, the fact that only two categories
24 of adverse events were found from more than 7,000
25 leaves and branches of the hierarchical tree,

38 (Pages 146 - 149)

Case 3:22-md-03036-KDB    Document 289-3 Filed 01/06/25    Page 39 of 77
877-370-3377    Golkow Technologies    Page 39 of 77
A Veritext Division    www.veritext.com

1 neither one of which was unexpected, provides
2 reassurance about both the vaccine," that's
3 Gardasil, "and the TreeScan conditional temporal
4 TreeScan method."
5      Do you see that?
6 A   Yes.  I --
7 Q   And --
8 A   -- see that.
9 Q   -- and you agree with that, right?
10 A   Yes, I agree with that.
11 Q   Okay.  And then it goes on to say, "Three
12 adverse events that have drawn the attention of
13 public health authorities in relation to" -- for
14 HPV, "are complex regional pain syndrome, POTS, and
15 Guillain-Barre syndrome."
16      Right?
17 A   That is correct.
18      And we make a very important point here
19 and that is that, for example, CRPS and POTS, those
20 are not easily defined using the ICD system.  So
21 any -- any epidemiological study, including this
22 paper, that are sort of based on the ICD -- ICD
23 codes, whether it's ICD-9 or ICD-10 codes, will have
24 a hard time picking up things about these systems.
25      So, for example, it says that POTS is the

1 heterogenous and potentially debilitating autoimmune
2 disorder whose symptoms can include dizziness --
3      (Whereupon, the court reporter
4          requests clarification.)
5 A   POTS is a heterogenous and potentially
6 debilitating autoimmune disorder whose symptoms can
7 include dizziness, nausea, fatigue, palpitations,
8 weakness, sweating, and sleeping disorder.
9 BY MR. TOMASELLI:
10 Q   Okay.  Let me just stop you there.
11      First it says autonomic disorder --
12 correct? -- not autoimmune disorder; right?
13 A   Autonomic.  Yes.  Correct.
14 Q   Okay.
15 A   I'm sorry.  That was my fault.
16 Q   No problem.  No worries.
17      Secondly, you can confirm that your
18 TreeScan of those 7,000 leaves and branches does
19 include things like dizziness, fatigue,
20 palpitations, tachycardia, weakness, sweating, and
21 sleeping disorder; correct?
22 A   At least some of them.
23 Q   Okay.  And it is true that this study
24 does provide some evidence -- right? -- related to
25 POTS and CRPS and other disorders; correct?

1 A   No.  I think what we are pointing out
2 here is that it provides evidence for many other
3 outcomes, but we have -- for these three -- for
4 these particular ones, it does not because the tree
5 doesn't fit in with -- neither the tree nor the ICD
6 codes fits in with -- with the definitions.  These
7 are syndromes that are more fussily, sort of,
8 defined, in the sense that they can affect different
9 parts of the -- of the body.
10      So that's where VAERS data has an
11 advantage over electronic health records or
12 insurance claims data, which is what this is based
13 on, in the sense that when you have a spontaneous
14 report it can actually define things much more
15 flexibly.  Because whatever you feel, whatever
16 strange things or whatever combination of symptoms
17 you have, you can write that down in the VAERS
18 report or you -- your physician do it.
19      So it's very -- flexibility of how you
20 can define symptoms.  When you -- once you are based
21 on ICD codes, there are certain categories.  And for
22 some things, like stroke for example, that's a very
23 good category, it's very obvious.  It's not a
24 problem.
25      Seizures is a little bit of fuss in it

1 but it's not -- you can have febrile seizures and
2 other seizures.
3      But for POTS and CRPS, what we are
4 pointing out in the paper here, me and my coauthors,
5 is that there is less clarity or less correspondence
6 between ICD codes and -- and these two syndromes.
7 So whenever you use then electronic health records
8 or insurance claims data, that are biased based on
9 these codes, it gets much more difficult compared to
10 a VAERS data where you can actually -- the -- where
11 people can define them as they want.
12      So that means also that, for example,
13 the -- the papers that has been using electronic
14 health records, not just this one, because --
15      (Whereupon, the court reporter
16          requests clarification.)
17 A   Using electronic health records or
18 insurance claims data, and not just this -- this
19 paper that I wrote or other people I wrote -- papers
20 I wrote but also, for example, some of the Danish
21 work.  To really get to the bottom of POTS, you have
22 to do short reviews.
23      You can still identify --
24      (Whereupon, the court reporter
25          requests clarification.)

Case 3:22-md-03036-KDB   Document 289-8   Filed 01/06/25   Page 40 of 77
877-370-3377                    Conley Technologies                    www.veritext.com
A Veritext Division

1    A    Short review, medical short review.
2         So you can still -- you can
3    still identify sort of potential cases of CRPS or
4    POTS or POI.
5         But then to get -- to get the sort of the
6    right definition, you have to do medical short
7    review if you use these electronic health records --
8    BY MR. TOMASELLI:
9    Q    Okay.
10   A    -- to actually get to the precise --
11   precise definition and actually sort of do a proper
12   evaluation of what was found using those spontaneous
13   reports.
14   Q    Okay.  Couple things on --
15   A    Yeah.
16   Q    -- on spontaneous reports.  Number one,
17   they do not all come from physicians; correct?
18   A    Correct.
19   Q    And very simply, the spontaneous reports
20   that are in Ms. Tomljenovic's analysis were not
21   medically reviewed; correct?
22        MR. BAUM:  Objection.  Can you --
23        it's Dr. Tomljenovic.  Right?
24        MR. TOMASELLI:  I don't know that
25        she has -- does she?  Is she a doctor?

1         MR. BAUM:  She's got a Ph.D.
2         MR. TOMASELLI:  Okay.  I don't know
3    how she prefers to be called.
4         Would you like me to call her
5    doctor?
6         MR. BAUM:  Yeah.
7         MR. TOMASELLI:  Okay.  Withdrawn.
8    BY MR. TOMASELLI:
9    Q    In Dr. Tomljenovic's analysis, she nor
10   you did a medical review of those cases; correct?
11   A    She did not do a medical review of the
12   cases.
13   Q    And neither did you?
14   A    Of course not.
15   Q    Okay.  And in terms of people who have
16   looked at POTS cases in the spontaneous adverse
17   event world, there are some people who have done
18   clinical reviews of those cases; correct?
19        Just -- it's a yes or no, do you know?
20   A    What do you mean by clinical review?
21   Q    Well, I'm talking about doctors looking
22   at the spontaneous adverse event reports.  Do you
23   recall that that's occurred?
24   A    So there have been -- done clinical
25   reviews, but I'm not aware of doing medical short

1    review, which is different.
2    Q    Okay.  In terms of doctors looking at the
3    cases of POTS, that's occurred in the medical
4    literature; correct?
5    A    So they have, on some of the papers on
6    spontaneous reports for POTS and Gardasil, done a
7    clinical review of the VAERS --
8    Q    That's --
9    A    -- report --
10   Q    That's what we are talking about?
11   A    -- but --
12        No.
13        But they have not done medical short
14   reviews going to the medical shorts.  That I have
15   not seen.
16   Q    They looked at the medical records that
17   were available.
18   A    They looked at the VAERS reports.
19   Q    No.  They looked -- and the medical
20   records that were available.  Aren't you aware of
21   that?
22   A    I'm not aware of that, no.
23   Q    Okay.  So you don't know what the Arana
24   publication and the Shimabukuro publication did?
25   You don't know what records they had available to

1    use?
2    A    They did clinical reviews of the VAERS
3    reports.  They do not mention doing short review,
4    medical short review.
5    Q    Well, you -- did you look at the Wodi
6    paper, for example, in POI where the FDA and CDC
7    looked at all the information that was available
8    including medical records?  Did you not look at
9    that?
10   A    I looked at the ones for POTS for Arana
11   and Shimabukuro, and they did not medical short
12   review.  They don't mention medical short review in
13   those papers.
14   Q    Okay.  Down here in -- in Yih 2018,
15   bottom left, five lines up you say, "In 2015, the
16   European medicines agency pharmacovigilance risk
17   assessment committee completed a detailed scientific
18   review and concluded that the evidence did not
19   support a causal link between HPV vaccines and CRPS
20   or POTS."
21        Do you see that?
22   A    I see that.
23   Q    You cited number 35 there; correct?
24   A    Correct.
25   Q    And that is the EMA PRAC's assessment

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 41 of 77
Golkow Technologies
A Veritext Division
877-370-3377                                                      www.veritext.com

1  report; correct?
2     A     That is correct.
3            (Whereupon, Exhibit MK 21, November
4            2015 EMA PRAC Assessment Report, was
5            marked for identification.)
6  BY MR. TOMASELLI:
7     Q     Exhibit 21 is the November 2015 EMA PRAC
8  assessment report that you cited in Yih 2018;
9  correct?
10    A     That is correct.
11    Q     And have you read that report, cover to
12 cover, before?
13    A     I have read the report.
14    Q     Is it in your materials reviewed list or
15 your expert report?
16    A     It might be.
17    Q     But you've read --
18    A     It's not --
19    Q     -- the whole thing?
20    A     It's not in my expert report.  It's not
21 cited in my expert report.
22    Q     Okay.  But you've read the whole thing,
23 all 40-some pages of it; correct?
24    A     I read, certainly, large parts of it.
25    Q     All right.  And you called this EMA PRAC

1  assessment report a detailed scientific review;
2  correct?
3            MR. BAUM:  Objection.  Vague.
4  BY MR. TOMASELLI:
5     Q     I'm just reading your words, Doctor.
6     A     That's what I wrote in the paper,
7  "detailed scientific review."
8     Q     Okay.  And you also wrote in the paper
9  that that EMA assessment report did not support a
10 causal link between HPV vaccines and CRPS or POTS;
11 correct?
12    A     I wrote that "they concluded."  So the
13 EMA concluded that the evidence did not support or
14 cast a link between HPV vaccines and CRPS and POTS.
15 That is what -- that's correct, they did not
16 conclude that.
17    Q     The EMA concluded that?
18    A     They -- the EMA did not concluded that --
19 so I wrote what the EMA concluded.
20    Q     That's right.
21    A     And I also -- and then we wrote, and this
22 is both me and my coauthors, "yet doubts and
23 concerns persists."  And we referenced the papers by
24 Rebecca Chandler and Tom Jefferson.
25    Q     Right.

1     A     So we say that they concluded that the
2  evidence didn't support -- which is in their
3  conclusions -- but then we say, "yet doubts and
4  concerns persist."
5     Q     Okay.
6     A     And then we cite the work of Rebecca
7  Chandler and Tom Jefferson.
8            And I agree that doubts and concerns
9  persist, so I am in agreement here, not with EMA --
10 and that's -- this is the -- I'm in agreement with
11 Rebecca Chandler and Tom Jefferson, that there were
12 still doubts persisting.
13           And I will give you a very -- example of
14 it here.  When they discussed the work by Rebecca
15 Chandler and the Uppsala Monitoring Centre, which
16 should be somewhere here in --
17    Q     Okay.  Let --
18    A     -- this report --
19    Q     Hold on.
20           Let me -- let me --
21    A     -- it says on page --
22    Q     We got to --
23    A     -- twenty-six --
24    Q     Okay.  We got to --
25    A     -- and 27, it discusses the report.

1            And it says, The second analysis" -- and
2  this here they are doing a disproportionality
3  analysis.
4            It says, "The second analysis compare
5  45,876 worldwide HPV vaccine reports against 79,678
6  worldwide reports for all other vaccines combined
7  and received for females between the age of nine and
8  25."
9            If you then go down -- this is page 27.
10           If you go down to the second last
11 paragraph on this page, it says "POTS has been
12 reported 82 times for HPV vaccine and one time for
13 other vaccines."
14           So that is 82 times out of 45,000, versus
15 one time out of 79,000.  So this is a -- a huge
16 concern.  These are a disproportionality of more
17 than a hundred.
18           And then what they do is they say, Well,
19 this is 0.2 percent versus 0.0 percent.  That sounds
20 almost the same.
21    Q     Not to me.
22    A     0.2 or 0.0, but this is actually a huge
23 difference in the reporting ratios.
24    Q     Okay.  So let's --
25    A     So this is --

41 (Pages 158 - 161)

Case 3:22-md-03036-KDB     Document 289-3     Filed 01/06/25     Page 42 of 77
Gilson v. Bionogies
A Veritext Division
877-370-3377                                                        www.veritext.com

1    Q    We need to go question and answer here.
2  So let me -- believe me, I'll give you a chance to
3  talk about that, okay?
4    A    Okay.  Thank you.
5    Q    Okay.  So I think what you are saying is
6  that you've read the EMA's November 2015 assessment
7  report related to whether HPV vaccines are
8  associated with POTS; correct?
9    A    I read that report, yes.
10    Q    And part of that report --
11    A    Most of it.
12    Q    Part of that report discusses a
13  disproportionality analyses that the Uppsala
14  Monitoring senator [sic] for WHO performed for the
15  Danish Health Authority; correct?
16    A    They performed it.  I don't know if they
17  performed it for the Danish Health Authority or for
18  someone else.
19    Q    Okay.
20    A    They do these things on their own for
21  a --
22    Q    Okay.
23    A    -- so I don't know who they performed it
24  for.
25    Q    And regardless, the EMA had this

1  disproportionality analysis that was done in
2  connection with the Article 20 procedure in 2015;
3  right?
4    A    What did you ask?
5    Q    The EMA and the PRAC members and
6  everybody associated with the Article 20 procedure
7  had this disproportionality analysis during the
8  procedure; right?
9    A    Yes.  They are citing it so they must
10  have had it.
11    Q    Okay.  And so the -- the PRAC members,
12  the rapporteurs, the corapporteurs, the EMA itself,
13  the Scientific Advisory Group, they all had access
14  to that disproportionality analysis related to POTS
15  and POTS-like symptoms; right?
16    A    Whoever wrote this report had it.  I
17  don't know exactly who wrote this report, if they
18  are all those people that you mentioned or not.
19    Q    Well, all those people were provided the
20  report --
21    A    Okay.
22    Q    -- and so they must have had access to
23  it.
24    A    Okay.  Good.
25    Q    Okay.  And -- and so there was already in

1  2015, in connection with the Article 20, there was
2  already a report related to disproportionality of
3  POTS and POTS-like symptoms that was available for
4  people to review; true?
5    A    That is very true.
6    Q    Okay.  And then all you are saying in Yih
7  2018, is that while -- withdrawn.
8        In Yih 2018, you quoted the EMA, is that
9  they concluded based on their analysis of the data
10  that there was -- that the evidence did not support
11  a causal link between HPV vaccines and POTS; right?
12  That's what they said?
13    A    That's what EMA said.
14    Q    And you go on to say that there are some
15  other papers and other authors that continue with
16  concerns after that report; fair?
17    A    Correct.
18    Q    Okay.  One of those -- see, we have to do
19  this question and answer.  I'm trying to let you
20  answer but we got to do it -- we can't ramble on
21  for -- for hours and hours or our court reporter is
22  going to kill us.  Okay?
23        So withdrawn.
24        (Whereupon, Exhibit MK 22, Rebecca
25        Chandler Paper, was marked for

1        identification.)
2  BY MR. TOMASELLI:
3    Q    One of the reports that you cited there
4  was Exhibit 22, which I've marked, Chandler 2017.
5        Do you see that?
6    A    Yes.
7    Q    And that is indeed the paper you cited in
8  Yih 2018 as continuing potential concerns over HPV
9  vaccination and POTS-like symptoms; right?
10    A    That was one of three papers that we
11  cited on that.
12    Q    Okay.  Well, the other paper is a like
13  a -- a letter to the editor, an opinion piece by
14  Chandler; right?
15    A    There is one other piece by Chandler and
16  then there's one by Tom Jefferson --
17    Q    Right.
18    A    -- which...
19    Q    And to be clear, the Tom Jefferson paper
20  is a review, it's not original data; right?
21    A    I will have to look up the -- the exact
22  papers to -- to refresh.  I haven't read them in
23  quite some time.
24    Q    Okay.  At least one of the papers is
25  Exhibit 22 that I've handed you which is Chandler

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 43 of 77
Gardasil Technologies
A Veritext Division
877-370-3377                                                    www.veritext.com

1 2017; right?

2 A Yes.

3 Q You can confirm that Chandler 2017 is a

4 particular type of disproportionality analysis that

5 is a proportional reporting ratio; right?

6 A Yes. They use proportional reporting

7 ratios.

8 Q And like other proportional reporting

9 ratios and disproportionality analysis, this was a

10 signal generation paper; correct?

11 A You'll have to ask Dr. Chandler and her

12 colleagues.

13 Q Did you read this paper?

14 A I have read it.

15 Q Okay. If you -- do you -- do you agree

16 that based on this "papel" -- based on this paper, a

17 causal association between HPV vaccination and these

18 adverse event symptoms remains uncertain?

19 A I agree with the conclusion made by

20 Dr. Chandler and her colleagues where she writes on

21 page 89, using this particular paper, "A causal

22 association between these AEs and HPV vaccination

23 remain uncertain" --

24          (Whereupon, the court reporter

25          requests clarification.)

1 A -- "these AEs" -- A-E-s -- "and HPV

2 vaccination remain uncertain; however, given the

3 medical seriousness of this safety concern, we

4 believe that a more definitive study of the findings

5 presented here is essential to assure continued

6 confidence in the HPV vaccine."

7          So I agree with their assessment.

8 Q Okay. So you also agree with the part of

9 their assessment that a causal association remains

10 uncertain?

11 A Based on this -- on this particular

12 paper.

13 Q Right. Have you ever reviewed the EMA's

14 analysis of the Chandler paper?

15 A They -- you mean different from what they

16 wrote in their -- in their report that you -- that

17 was Exhibit 21?

18 Q Well, Exhibit 21, the assessment report,

19 deals with a disproportionality analysis from the

20 WHO Uppsala spontaneous database. The Chandler

21 publication is actually slightly different.

22          Did you know that?

23 A I know they are not identical because

24 this does a classed analysis so this is a specific

25 thing. They did other disproportionality analysis

1 that was done, I think, by Rebecca Chandler who

2 works at the Uppsala Monitoring Centre.

3 Q Okay.

4 A But this was a specific thing that they

5 did a specific classed analysis. So they had done

6 disproportionality analysis before this paper,

7 actually.

8 Q Right. And so my simple point, maybe

9 very inarticulately put forth to you, but --

10 withdrawn.

11          My simple point is simply that there are

12 two different disproportionality analyses that we

13 are talking about, one that was done in connection

14 with the 2015 Article 20, and one that was published

15 in Chandler 2017.

16          Correct?

17 A Yeah. So they were not -- there were two

18 different analysis that they did.

19 Q Right. But they both dealt with POTS and

20 POTS-like symptoms; correct?

21 A I believe so, yes.

22 Q Okay.

23          (Whereupon, Exhibit MK 23, European

24          Medicines Agency PRAC PSUR Assessment

25          Report, dated January 2017, was

1          marked for identification.)

2 BY MR. TOMASELLI:

3 Q Exhibit 23 is a document dated

4 January 2017 from the European Medicines Agency

5 called PRAC, PSUR assessment report.

6          Do you see that?

7 A Yes.

8 Q Have you ever seen this before?

9 A I don't think I've read this one, no.

10 Q Okay. If you turn to page 16 of 29 --

11 tell me when you are there?

12 A Yeah.

13 Q Do you see there's a box with -- language

14 in a box?

15 A Yeah.

16 Q And are you familiar with that there are

17 rapporteur's within the EMA and PRAC that go through

18 various data and give their thoughts about it?

19 A I'm not -- I'm much more familiar with

20 the FDA system than the EMA system --

21 Q Okay.

22 A -- so I -- I -- I'm certainly not an

23 expert on the EMA system --

24 Q And --

25 A -- and those things.

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 44 of 77
Gilson v. Biologics, Inc.
A Veritext Division
877-370-3377                                                        www.veritext.com

1  Q   Okay. That -- that was part of actually
2  what I was going to ask you, is whether you are
3  familiar that -- with the fact that there is the
4  EMA, and how the PRAC is associated with the EMA,
5  and how the CHMP is associated with the EMA, and how
6  rapporteurs are associated with the EMA, and how the
7  Scientific Advisory Group is -- is affiliated with
8  the EMA; that's not something you are familiar with?
9  A   That's not my area of expertise.
10  Q   Okay. If we read the first paragraph of
11  this box, it says, "Rapporteur assessment comment:
12  Both of these papers were identified and assessed as
13  late-breaking information by the Gardasil Rapporteur
14  in the PSUSA for Gardasil, which is running
15  concurrently with the procedure for Gardasil 9."
16     Do you see where I am?
17  A   Yes.
18  Q   Then says, "Although the analysis of
19  VigiBase in this paper by Chandler, et al., was
20  different to the analysis from the Uppsala
21  Monitoring Centre that was considered in the Article
22  20 referral in 2015..."
23     Do you see where I am?
24  A   Yup.
25  Q   And it's true that Chandler did use the

1  VigiBase spontaneous database for her analysis;
2  right?
3  A   I think so for both papers, I believe.
4  Q   Yeah. It says, "Although the VigiBase
5  data from Chandler was different from the article 20
6  database analysis, the same general limitations
7  apply."
8     Do you see that?
9  A   Yes, I see that.
10  Q   And it says, "Data-mining these
11  non-specific symptoms does not strengthen the safety
12  signal nor does it inform the causality assessment.
13  We therefore agree with the Gardasil Rapporteur's
14  assessment, i.e. that the previous PRAC conclusion
15  that there was no evidence that the HPV vaccines
16  caused POTS or CRPS remains unchanged and that this
17  publication," Chandler, "does not result in any new
18  safety concerns regarding Gardasil 9."
19     Do you see that?
20  A   I see that.
21  Q   Okay. And you've never seen this
22  document before; right?
23  A   I don't think so.
24  Q   Okay. In terms of Yih 2018, if we go
25  back to that publication we have been talking about

1  today, you do see on the first page that there's an
2  abstract of the paper; right?
3  A   Meaning of the -- of the -- of the Yih
4  2018 paper?
5  Q   Yes.
6  A   Yes, I see that there.
7  Q   And abstracts are short summaries of the
8  key points of the article?
9  A   That's one purpose of them, yes.
10  Q   Okay. At least to give the author -- I'm
11  sorry. Withdrawn.
12     The purpose of an abstract is at least to
13  give the reader a flavor for what the paper is
14  about?
15  A   Yeah. And that way they can get some
16  information from it and they can decide whether they
17  want to read the full paper or not.
18  Q   Okay.
19  A   So it's very helpful to have those
20  abstracts.
21  Q   And the conclusion of the abstract, the
22  last sentence, says, "Considering the thousands of
23  potential short term adverse events and hundreds of
24  potential risk intervals were evaluated, these
25  findings add significantly to the growing safety

1  record of Gardasil."
2  A   Yes.
3  Q   Do you see that?
4  A   Yeah.
5  Q   And you agree with that?
6  A   Yeah. I'm very proud of having done
7  the -- help out with this paper.
8  Q   It is true that in the 2018 Yih paper,
9  you never suggested that there was a safety concern
10  with Gardasil; correct?
11  A   We do say, "yet doubts and concerns
12  persist." We mention that --
13  Q   You --
14  A   -- for particular -- for particular --
15  these things between CRPS and POTS.
16  Q   You never -- will you agree -- withdrawn.
17     Dr. Kulldorff, would you agree that in
18  your paper, Yih 2018, you provided no evidence from
19  a data perspective that Gardasil was associated with
20  the development of POTS?
21  A   Correct.
22  Q   Okay. Would you also agree that that is
23  true for POI and fibromyalgia and chronic fatigue
24  syndrome?
25  A   That is true that this paper does not

44 (Pages 170 - 173)

Case 3:22-md-03036-KDB   Document 789-3   Filed 01/06/25   Page 45 of 77
Conlson v Biologiced
A Veritext Division
877-370-3377                                          www.veritext.com

1  include any evidence that Gardasil causes any of
2  these things, neither does it necessarily contradict
3  it. Certainly not for CRPS and POTS, as explained
4  here by me and my coauthors.
5      Q    Right. And I'm not saying one way or the
6  other -- withdrawn.
7          We can agree your Yih 2018 paper does not
8  provide any evidence for an increased risk of POTS
9  or POI for Gardasil; correct?
10     A    That is true.
11     Q    Okay. Now Yih 2018, Exhibit 7 that we've
12 been talking about, deals with Gardasil 4; correct?
13     A    It does.
14          There's a subsequent paper on GARDASIL®9,
15 actually, that uses a similar methodology.
16     Q    We are on the same page, Doctor.
17     A    I guess you have that as an exhibit.
18          (Whereupon, Exhibit MK 24, Paper by
19          Yih, 2021, American Journal of
20          Epidemiology, was marked for
21          identification.)
22 BY MR. TOMASELLI:
23     Q    Doctor, I've marked as Exhibit 24, a
24 paper by Yih from 2021, that was published in the
25 American Journal of Epidemiology; correct?

1      A    Yes, it was.
2      Q    You are a coauthor; right?
3      A    Yes.
4      Q    Again, all of your authors are interested
5  in public safety and health; correct?
6      A    These are my three coauthors, are
7  excellent sci-- -- excellent people. Two of them
8  are -- are scientists, excellent scientists.
9      Q    Partly because you trained them; right?
10     A    Well, I'll refrain from responding to
11 that question.
12     Q    Well, Dr. Kulldorff, Dr. Yih and
13 Dr. Maro, you certainly mentored them; right?
14     A    Yes.
15     Q    They are excellent physician -- I mean,
16 they are excellent -- withdrawn.
17          Both Dr. Yih and Dr. Maro are excellent
18 scientists; correct?
19     A    Yes.
20          And Inna Deshevsky is an excellent person
21 but she's not a scientist.
22     Q    Now, at the bottom of page one of Yih
23 2021, which is Exhibit 24, do you see where you say,
24 "A number of well-designed studies have investigated
25 possible associations between HPV vaccination and

1  certain health outcomes and not found any
2  associations"?
3          Do you see that?
4      A    Correct.
5      Q    And you actually go on to cite six
6  different publications with respect to that
7  statement; right?
8      A    Yes.
9      Q    And they are the Scheller paper, the
10 Naleway paper, the Yih 2016 paper, the
11 Grimaldi-Bensouda 2017 paper, the Feiring paper, and
12 the Miranda paper; correct?
13     A    Correct.
14     Q    And again, you used the self-controlled
15 temporal TreeScan method here; correct?
16     A    I -- I believe so, yes. Let me make sure
17 that --
18     Q    Sure?
19     A    -- just --
20          Yes.
21     Q    Here again, you scanned for tens of
22 thousands of issues and multiple different time
23 frames; right?
24     A    Many issues and many time frames.
25     Q    And the time frames even went up to one

1  year out; correct?
2      A    Yeah. So the previous paper I think we
3  looked eight weeks -- up to eight weeks. Here we
4  looked further. I think -- what is it, a year or
5  so?
6      Q    I think you can read in the abstract, if
7  it helps you?
8      A    Yeah, to one year.
9      Q    And why is it you went up to a year for
10 the time period of the window of latency that you're
11 looking at?
12     A    To extend the -- the analysis.
13          So when you look at vaccine safety,
14 whatever you do, there are certain limitation what
15 you are looking at. It could be based on the
16 outcomes or based on when things happened.
17          So we wanted to look for adverse event
18 that doesn't only happen very soon, within a few
19 weeks after the vaccine, but also able to detect
20 things -- if they happened several months after
21 vaccination. So we wanted to sort of extend the net
22 or the coverage that we are doing in this paper.
23     Q    And like your 2018 paper, is this
24 TreeScan paper a method of generating a signal,
25 potentially, if there's an issue?

Case 3:22-md-03036-KDB    Document 289-1    Filed 01/06/25    Page 46 of 77
Gardasil Biologics
877-370-3377                              A Veritext Division                    www.veritext.com

1     A     It's a data-mining methods, so it's used
2  for a signal -- to -- find out if there's a
3  signal somewhere, yeah.
4     Q     Do you -- do you believe that these
5  hierarchical TreeScan methods of generating a signal
6  are more in depth than, for example, a case report?
7  a single case report?
8     A     Yes.
9     Q     Would you say the same thing about a
10  series of patients, a case series?  Instead of one
11  individual, several individuals?
12     A     Well, that depends.  So I can't say
13  anything conclusive one way or the other there.
14     Q     Do you think your TreeScan method is more
15  capable of generating a hypothesis about a vaccine
16  safety issue than a case series?
17     A     No, they compliment each other.
18        So I think both are very valid for doing
19  those things.  I mean, the case here is just a more
20  old-time established way of doing things.  So this
21  is sort of a additional -- a -- complementary to do
22  it in a different way that sometimes can detect
23  things that would not be detected by a case series.
24     Q     A case series -- withdrawn.
25        Case series have been published in the

1  literature over a very long time about whether an
2  intervention is related to an event; right?
3     A     Well, you -- you can report you had five
4  people, they all had this drug or vaccine and they
5  all experienced this outcome.
6     Q     I thought I understood you to say that
7  that was a long-standing way of raising a
8  hypothesis?
9     A     It is.  Yes.
10     Q     Okay.  And in terms of raising a
11  hypothesis about adverse events, your tree-scanning
12  method that looks at a number of adverse events over
13  a number of windows is a more sophisticated way of
14  looking for those signals?
15     A     From a methodological point of view it's
16  a more sophisticated way, yes.
17     Q     Okay.  Otherwise we wouldn't have a job;
18  right?
19        I mean --
20     A     No, yeah.  I --
21     Q     -- your methods are -- your methods are
22  worth something; right?
23     A     I hope so.
24     Q     Now, in your abstract of the 2021 paper,
25  the very last sentence says, "Considering the broad

1  scope of the evaluation and the high statistical
2  power, the findings of no specific serious adverse
3  events should provide reassurance about this
4  vaccine's safety."
5        Do you sea that, sir?
6     A     Yes, I see that.
7     Q     And you agreed with that when it was
8  published in 2021; correct?
9     A     I did, yes.
10     Q     And would you also agree that this Yih
11  2021 paper did not provide any evidence for the fact
12  that Gardasil is associated with an increased risk
13  of POTS?
14     A     That is true.  When we wrote this thing
15  about that, "provide reassurance about this
16  vaccine's safety," I think that is very true because
17  we looked at so many things that nobody else had
18  looked at.
19        At the same time, in the discussion, me
20  and my coauthor, we write that "We might have missed
21  true adverse reactions if they did not show strong
22  clustering in time or in the diagnosis tree."
23        This is page 1258, left column, second
24  paragraph from the left -- from the bottom.
25        "Not all plausible vaccine-associated

1  syndromes affect just one system of the body.  For
2  instance, postural orthostatic tachycardia syndrome
3  (POTS) is a heterogenous and potentially delib--
4  debilitating autonomic disorder whose symptoms can
5  include dizziness, nausea, fatigue, palpitations,
6  weakness, sweating, and sleeping disorder.
7        "A case series of POTS occurring after
8  HPV4 vaccination in Denmark raised concern about a
9  possible association.
10        "Although there is an ICD-10 code for
11  orthostatic hypotension (I95.1), some POTS cases
12  might be coded as neurological, gastrointestinal, or
13  other kinds of conditions and thus be less
14  detectable as a cluster in the ICD-10 diagnosis
15  tree."
16        So again, this refers to the thing that
17  if you use these ICD-10 codes that we used, as well
18  as others had used in Denmark and -- and Finland and
19  so on, there's a weakness there of finding, in
20  particular, POTS and other ill-defined or -- or more
21  broadly-defined syndromes.
22        So we sort of pointed that out in this
23  paper, that even though we cast a net very widely,
24  and that provide additional assurance that it
25  doesn't cause X or Y that nobody had thought about

46 (Pages 178 - 181)

Case 3:22-md-03036-KDB    Document 29-3    Filed 01/06/25    Page 47 of 77
Cirksena v. Technologies
877-370-3377                        A Veritext Division                    www.veritext.com

1 before, we would not expect this method to have the
2 ability to detect a problem in POTS because it
3 doesn't fit in with these ICD codes.
4 Q   Well, you say -- well, first of all --
5 withdrawn.
6       In terms of the case series that you
7 mention here about raising concern, that's the
8 Brinth and Melson case series from Denmark; correct?
9 A   Let me just check this number 22.
10       Brinth, yes.
11 Q   And you can confirm that since you've
12 read it in detail, the EMA's assessment report from
13 2015 also considers the Brinth and Melson case
14 series; correct?
15 A   So when we talked about it before, we
16 talked about the Uppsala Monitoring Centre, which --
17 Q   That's right.
18 A   -- is different from the Brinth.  But I
19 think they also -- they also considered the Brinth
20 work, yes.
21 Q   Yeah.  In the 42 --
22 A   Yes.
23 Q   -- pages --
24 A   -- they --
25 Q   -- they did --

1 A   -- they mentioned that also.  We haven't
2 discussed that before, but they do mention that,
3 yes.
4 Q   Okay.  And again, Brinth's case series is
5 the same thing as -- as -- that -- that Dr. Melson.
6 They were together in that -- in that center in --
7 in Denmark; are you aware of that?
8 A   I think they were looking at the same
9 things but I have read --
10       (Whereupon, there was an
11       interruption.)
12 A   I have looked at both of them and I think
13 they are the same, but I can't say that under oath.
14 BY MR. TOMASELLI:
15 Q   Do you need to get that?
16 A   (The witness shakes head.)
17 Q   You -- you say in this paper, and you
18 read to me, that -- that these conditions, like CRPS
19 and POTS, would be less detectable than -- than
20 others, not not detectable; right?
21 A   Yes.
22 Q   So again, this paper, Yih 2021, does not
23 provide any evidence for the fact that Gardasil is
24 associated with an increased risk of POTS --
25 A   Correct.

1 Q   -- true?
2 A   Yes.
3 Q   And the same is true for POI and -- and
4 fibromyalgia; correct?
5 A   Correct.
6 Q   Now, again, in this 2021 paper, you did
7 not suggest that there was a serious safety concern
8 with respect to POTS, you just noted that it was a
9 limitation of the paper; correct?
10 A   We noticed that there has been concern
11 about these things and that, as a limitation we do
12 just of the paper but other methods, we do not
13 expect to pick it up because of the -- the -- the
14 wide variety of how this syndrome is defined.
15 Q   And did you follow up with that concern
16 in doing any other research yourself with Dr. Yih or
17 Dr. Maro in whether Gardasil caused POTS?
18 A   No.
19 Q   Okay.  Let's talk a little more about the
20 Article 20 procedure that you discussed in your
21 expert report; okay?
22 A   That sounds good.
23 Q   You do not dispute, of course, that the
24 EMA and the Pharmacovigilance Risk Assessment
25 Committee, the PRAC, you don't dispute that they are

1 experts in public safety and -- and have the safety
2 of the public in the forefront of their mind, do
3 you?
4 A   I have actually no idea who they are.  I
5 don't know the names of them.
6 Q   Okay.  You don't --
7 A   So I -- I don't want to preview -- to
8 have any opinion on that because I don't know who
9 they are.
10       It may be public, their names, but I
11 don't think I have seen it.  Or if I have seen it, I
12 don't remember it.
13       THE WITNESS:  It is 12:45 now.
14       MR. BAUM:  It is?
15       THE WITNESS:  If you want to finish
16 something, we can do that, probably.
17       MR. TOMASELLI:  Yeah.  Let's --
18 let's just do two minutes.
19       THE WITNESS:  Okay.  Good.
20       MR. TOMASELLI:  And then -- I
21 just --
22       THE WITNESS:  Okay.
23       MR. TOMASELLI:  -- want to clear one
24 thing up --
25       THE WITNESS:  Perfect.

47 (Pages 182 - 185)

Case 3:22-md-03036-KDB   Document 289-3 Filed 01/06/25   Page 48 of 77
Gilson Technologies
A Veritext Division
877-370-3377                                                    www.veritext.com

1       MR. TOMASELLI: -- that you didn't
2 know or didn't --
3     THE WITNESS: Okay.
4     MR. TOMASELLI: Withdrawn.
5     (Whereupon, Exhibit MK 25, Report
6     From Danish Health and Medicines
7     Authority for Consideration by the
8     EMA and Rapporteurs, was marked for
9     identification.)
10 BY MR. TOMASELLI:
11   Q   I'm handing you what I've marked as
12 Exhibit 25, which is a -- sorry -- which is a
13 "Report from the Danish Health and Medicines
14 Authority for consideration by the EMA and
15 rapporteurs..."
16     Do you see that?
17   A   Yes.
18   Q   And do you see that it's dated April of
19 2015?
20   A   Yes.
21   Q   Okay. And if you can confirm on page 19
22 that there is a, you know, 20-page appendix or so
23 that relates to information from the Uppsala
24 Monitoring senator [sic] regarding spontaneous cases
25 in the VigiBase database; right?

1   A   Page 19?
2   Q   Eighteen. Sorry.
3   A   Okay. Appendix two.
4     Okay. Yes.
5   Q   Yeah. So does this -- again, I think you
6 were questioning whether the Danish health and --
7 the Danish Health and Medicine's Authority
8 commissioned the Uppsala Monitoring senator --
9 Center's disproportionality analyses. And I was
10 just trying to show you that, indeed, that's --
11 that's who did it.
12   A   Okay. Yeah, I -- I wasn't aware of who
13 commissioned it or who, so...
14   Q   Okay. But in -- in any event, if this
15 was provided in April of 2015, would you agree that
16 the EMA obviously had this analysis before they put
17 it into their assessment report? Fair?
18   A   That makes sense, yes.
19   Q   Okay.
20     MR. TOMASELLI: Why don't we go
21     ahead and take your -- your lunch
22     break.
23     THE WITNESS: Okay.
24     THE VIDEOGRAPHER: The time is
25     12:46 p.m. and we are off the record.

1     (Whereupon, there was a recess taken
2     from 12:46 p.m. to 1:37 p.m.)
3     THE VIDEOGRAPHER: The time is
4     1:37 p.m. and we are on the record.
5 BY MR. TOMASELLI:
6   Q   All right. Dr. Kulldorff, are you
7 prepared to continue with your deposition?
8   A   Yes.
9   Q   Great.
10     Exhibit 21, which is right on the top
11 there, is the EMA assessment report from November
12 '15; right?
13   A   Yes.
14   Q   And you reviewed this; right?
15   A   Yes.
16   Q   If you turn to the third page, do you see
17 there's a section on background information?
18   A   Uh-huh.
19   Q   And going to the, actually, the last
20 paragraph and working back up, the very last
21 paragraph says on July 9, 2015, the European
22 Commission triggered a procedure under Article 20
23 for this; right?
24   A   Yup.
25   Q   So the Article 20 procedure was initiated

1 in -- in July of -- of 2015; right?
2   A   Correct.
3   Q   And if we go up a few paragraphs, do you
4 see a paragraph that starts, "Routine
5 surveillance"?
6   A   Yes.
7   Q   Three lines down, very end, there's a
8 sentence that startings -- or sorry, the fourth --
9 four lines down, there's a sentence that starts --
10 withdrawn.
11     Four lines down there's a sentence that
12 starts, "These syndromes have been reviewed
13 repeatedly since 2013 by the PRAC within routine
14 safety follow-up measures [sic] and a relationship
15 with HPV vaccines has not been concluded in these
16 previous procedures."
17     Do you see that?
18   A   Yes.
19   Q   Did you know that the EMA and PRAC had
20 been looking at this issue for a couple years before
21 then?
22   A   No. But I assume that EMA, just like the
23 FDA, would consider all types of adverse events
24 because this -- they have to do that, basically, for
25 every product --

Case 3:22-md-03036-KDB   Document 289-3   Filed 01/06/25   Page 49 of 77
Gibson Technologies
A Veritext Division
877-370-3377                            www.veritext.com

1  Q   You had --
2  A   -- in some way or another.
3  Q   Fair enough.
4      But you didn't know that they were
5  particularly focused in on --
6  A   No.
7  Q   -- POTS for the -- for two years prior to
8  the Article 20?
9  A   No.
10  Q   Okay.  And I take it from that you did
11  not review, for example, all of the back and forth
12  between Merck and the EMA and PRAC in the two years
13  prior to the Article 20?
14  A   I only reviewed the Merck response to the
15  Article 20 that was provided to me.  Yes.
16  Q   Fair enough.
17      And in the very next paragraph or, sorry,
18  two paragraphs later, it says "These syndromes" --
19  that is POTS and CRPS -- "have been known for a long
20  time before the introduction of the HPV vaccines."
21      Do you see that?
22  A   I see that.
23  Q   And we talked about that earlier; right?
24  A   Yes, we did.
25  Q   Okay.  Your report -- actually, one other

1  thing while we are in this document, will you turn
2  over to page seven, please?
3      Do you see there's a box?
4  A   Yes.
5  Q   Okay.  The paragraph below that box,
6  there is a sentence that starts about five lines
7  down that says, "It is estimated."
8      Do you see that sir?
9  A   Yes.
10  Q   It says, "It is estimated that at least
11  150 girls and young women per million may develop
12  POTS each year."
13      Do you see that?
14  A   Yes, I see that.
15  Q   And that was part of your review when you
16  reviewed this report; correct?  This assessment
17  report?
18  A   Yes.  I -- well, I didn't review this
19  report.  I reviewed the report that Merck sent to
20  EMA.
21  Q   Okay.  Well --
22  A   This is the -- this report is what the
23  EMA wrote.  I had -- I didn't review this for the --
24  my report.
25  Q   Not for your expert report in this case

1  but you were aware of it, because we talked about it
2  earlier, that, you know, you knew --
3  A   I have read this.
4  Q   Fair enough.
5      And in terms of your written report in
6  this litigation, it's true that your report contains
7  no analysis or opinions related to the EMA's
8  conclusions; correct?  Related to the Article 20?
9  A   Well, what they wrote here is related to
10  the Merck report.  And so in that sense, my -- my
11  comments on the Merck report is, therefore, at least
12  indirectly also related to this because it's on the
13  same topic.
14  Q   Okay.
15  A   But I didn't really -- I didn't respond
16  or try to respond to specific things in this report.
17  That was not my task.
18  Q   Perfect.
19      And same question:  Your report -- expert
20  report in this case doesn't contain any opinions
21  regarding what the Scientific Advisory Group said or
22  any of the rapporteurs or corapporteurs said about
23  these issues related to HPV vaccination and POTS;
24  correct?
25  A   Correct.

1      My report was just about what Merck sent
2  to the EMA, and also, I guess, the questions that --
3  based on the questions that EMA had sent to Merck.
4      (Whereupon, Exhibit MK 26, Merck
5      Report Reviewed in Connection with
6      the Article 20 Procedure, was marked
7      for identification.)
8  BY MR. TOMASELLI:
9  Q   And in terms of that Merck report that
10  you discussed and that you reviewed, is Exhibit 26
11  the Merck report that you reviewed in connection
12  with the Article 20 procedure?
13  A   Yes.
14  Q   And we can agree that very specific
15  questions were asked of Merck by the EMA in regards
16  to that procedure; correct?
17  A   Yes.
18  Q   And in terms of one of the questions they
19  asked was to review the clinical trial database for
20  cases of POTS; right?
21  A   Yes.
22  Q   You remember that; yes?
23  A   Yes.
24  Q   And in fact, you would agree that Merck
25  did a careful review of the POTS cases that occurred

Case 3:22-md-03036-KDB   Document 289-1  Filed 01/06/25   Page 50 of 77
Corlson Biotechnologies
877-370-3377                    A Veritext Division                www.veritext.com

1 as part of the clinical trials; right?
2          MR. BAUM: Objection.
3          Mischaracterizes what his report says.
4 BY MR. TOMASELLI:
5    Q    Dr. Kulldorff, just so you have -- my
6 question is you would agree that Merck did a careful
7 review of the CRPS and POTS cases that occurred as
8 part of the clinical trials?
9          MR. BAUM: And I object to the
10          degree that it calls for him to know what
11          was in Merck's minds relative to whether
12          or not they were careful.
13 BY MR. TOMASELLI:
14    Q    You can answer.
15          MR. BAUM: Calls for speculation.
16    A    Are you citing anything from my report?
17 BY MR. TOMASELLI:
18    Q    Do you agree?
19    A    So they did review all the individual
20 cases and I have no complaints about the way they
21 did that. I do have a complaints about how they
22 interpret some of that.
23          For example, it was incorrect, I think
24 of -- of -- to write in the MAH that the incidence
25 of cases suggestive of POTS was found to be

1 extremely low. I think that is incorrect.
2    Q    Why is --
3    A    It's also --
4    Q    -- that?
5    A    Because incidence is not a total number
6 of cases, it's the proportion -- it's the number of
7 cases divided by the number of people exposed. So
8 if you have a clinical trial which, let's say a
9 thousand people, even if you have two cases, that is
10 one out of 50 as the point estimate. That's not a
11 low number of a serious adverse reaction.
12          On the other hand, if you have two, that
13 could be maybe by chance. So if the sample size is
14 very low, there was no evidence in the clinical
15 trial for a causal link to -- to POTS.
16          But if the point estimate isn't low, you
17 shouldn't say that the incidence of the cases
18 associated with POTS was found to be extremely low.
19 Now, I could look up here exactly what was the
20 numbers because I don't report -- have that in my
21 report, but I think that was wrong.
22    Q    Let me ask -- let me ask you this,
23 Doctor. Did you -- do you agree that Merck has done
24 a careful review of the CRPS and POTS cases that
25 occurred as part of the clinical trials?

1          MR. BAUM: Objection. Calls for
2          speculation.
3 BY MR. TOMASELLI:
4    Q    Yes? No?
5          THE WITNESS: Should I answer or
6          not?
7 BY MR. TOMASELLI:
8    Q    Yes, you can answer.
9    A    Okay. So they looked at everybody who
10 had POTS in the clinical trials and they carefully
11 looked at the -- at the records for those people.
12 So that, I think, they -- that was done properly.
13          What was not done properly was when they
14 made conclusions and saying that the incidence of
15 these cases suggestive of POTS was found to be
16 extremely lower, or when it said that the incidence
17 was similar between the 9vHPV and placebo groups, or
18 it was also, I think, misleading to state that this
19 assessment does not suggest an association between
20 HPV vaccination and POTS.
21          There wasn't proof of such association
22 because the sample size was very small. But one
23 thing that clinical -- I mean, if you see in a -- in
24 a clinical trial, if you see a big effect --
25    Q    So this is -- my question was very

1 simple.
2    A    Okay.
3    Q    So let's try it again; okay?
4          So turn to page five of your report. And
5 do you see there's a section PRAC question number
6 two?
7    A    Oh, okay. Yeah.
8    Q    Do you see that?
9    A    Yeah.
10    Q    Okay. And you say in your report, "Merck
11 [sic] has done a careful review of the CRPS and POTS
12 cases that occurred as part of the clinical trials."
13          Do you see that?
14    A    I see that now, yes.
15    Q    You wrote that?
16    A    Yes.
17    Q    You stand by that?
18    A    Yes.
19    Q    Okay. In terms of the incidence of POTS
20 in the clinical trials, can you turn to page 13
21 of -- of this large --
22    A    Okay.
23    Q    -- report, Exhibit 26?
24    A    Okay.
25    Q    Now, in terms of the line of POTS, you

Case 3:22-md-03036-KDB     Document 289-1     Filed 01/06/25     Page 51 of 77
Gilson v. Technologies     Inc.
877-370-3377          A Veritext Division          www.veritext.com

1 can see that there are two cases in 15,801 people;
2 correct?
3    A   Yes.
4    Q   Now, those people were actually in the
5 trial for a long -- a long time; right?
6    A   I don't remember how long they were in
7 the trial, but they were in the trial.
8    Q   Well, you can see that the person-years
9 of follow up is much greater than the actual number
10 of people; correct?
11    A   Yeah. So they should have average have
12 been there for more than two years.
13    Q   Right. And so the rate, when you use
14 person-years of follow up, is 0.5 per ten thousand
15 patient years; correct?
16    A   Yes.
17    Q   And that -- if we are doing easy math,
18 that is 50 per one hundred thousand; right?
19        I'm sorry. Withdrawn.
20        If we are doing -- maybe the math is not
21 so easy. Sorry. Withdrawn.
22        In terms of 0.5 per ten thousand
23 person-years, that equates to five per hundred
24 thousand patient-years; correct?
25    A   It's five per hundred thousand, yes.

1    Q   And that's 50 per million; correct?
2    A   Yeah.
3    Q   Okay. Now, if we can go back to
4 Exhibit 20, which is Shimabukuro 2015. Tell me --
5 tell me when you've got that back up.
6        We've looked at it a bit. It's
7 Exhibit 20.
8        I suspect it's more on the top because we
9 talked about it fairly recently.
10    A   Is it this one --
11    Q   No.
12    A   No.
13        Maybe this one here.
14    Q   Oh.
15    A   This one here, yeah.
16    Q   Wrong pile.
17    A   Thank you for your patience.
18    Q   That's okay. You've got -- withdrawn.
19        You've got Shimabukuro 2015 in front of
20 you; correct?
21    A   Yes.
22    Q   If you can turn to page 4401, there's a
23 section 6.1 at the bottom left.
24    A   Okay.
25    Q   Do you see that?

1    A   Yeah.
2    Q   One sentence in it says, "CDC and FDA
3 physicians, epidemiologists and statisticians assess
4 numbers of reports, types of reports based on
5 serious and non-serious status, the most common
6 adverse events, current versus historical data, and
7 reporting trends over time such as comparisons of
8 influenza vaccine reports across multiple
9 consecutive influenza seasons."
10        Do you see that?
11    A   Yes.
12    Q   Is it true that CDC and FDA have
13 physicians?
14    A   Yes.
15    Q   Is it true that they have
16 epidemiologists?
17    A   Yes.
18    Q   Is it true they have statisticians, like
19 yourself?
20    A   They have statisticians.
21    Q   I guess you are an individual, aren't
22 you?
23        Withdrawn.
24        The very next sentence says, "Analysis
25 also includes evaluation of reporting rates of

1 adverse events in the context of vaccine doses
2 distributed for use in the U.S. marketplace."
3        Do you see that?
4    A   Yes.
5    Q   So one of the things that the CDC and the
6 FDA do, is they look at reporting rates that come in
7 and then compare them to doses distributed; right?
8    A   Okay.
9    Q   Is that right?
10        That's what they say.
11    A   Uh-huh.
12    Q   You agree that's what they say; right?
13    A   Yes.
14    Q   Then it says, "Vaccine doses distributed
15 provides a proxy measure of number persons" -- I'm
16 sorry -- "of persons vaccinated. Reporting rates
17 enable comparison with background rates of adverse
18 events from the literature or other sources, but
19 they must be interpreted cautiously since vaccine
20 doses distributed might not all be administered."
21        Do you see that?
22    A   Yes.
23    Q   You agree with that?
24    A   Very much so.
25    Q   Okay. Thought we would.

51 (Pages 198 - 201)

Case 3:22-md-03036-KDB   Document 289-3   Filed 01/06/25   Page 52 of 77
Grifols Technologies
A Veritext Division
877-370-3377                               www.veritext.com

1    A    This also other reason is that sometimes
2  people get more than one dose so then you don't know
3  how many people were exposed because you don't know
4  how many got one dose, versus two of the doses, and
5  so on.
6    Q    And in terms of the EMA -- I'm sorry.
7  Withdrawn.
8         In terms of the analysis that you
9  performed of Merck's responses to the EMA, you had
10  some discussion about their observed versus expected
11  analysis.
12    A    Yes.
13    Q    Correct?
14    A    I did.
15    Q    And can you confirm that the -- the EMA
16  actually asked Merck to conduct the observed versus
17  expected analysis?
18    A    I think they did.  I don't remember if
19  they specified it during using spontaneous reports.
20    Q    If you look --
21    A    Because you can -- but maybe -- maybe.  I
22  don't remember if they did that specifically or
23  not --
24    Q    Yeah.
25    A    -- so I have to look -- I could have to

1  look that up.
2    Q    If you look at page 130 of that report,
3  and tell me when you are there?
4    A    Yeah.
5    Q    Is there a PRAC question three or is my
6  page numbering off?
7         Do you see PRAC question three, 1.3 on
8  page 130?  Yes?
9    A    Yes.
10    Q    And do you see that question from the
11  PRAC says, "The MAHs," that's Merck; right?
12    A    Yeah.
13    Q    "Merck [sic] should provide an analysis
14  of the observed number of post-marketing cases of
15  CRPS and POTS in association with their [HPV]
16  vaccine in comparison to those expected in the
17  target population, stratified by region, if
18  available."
19         Do you see that?
20    A    Yes.
21    Q    I read that correctly; right?
22    A    Yup.
23    Q    And that's the question that PRAC -- that
24  PRAC asked; correct?
25    A    Yes.

1    Q    Now, you had some criticisms, I thought,
2  in your report about the background rate that Merck
3  chose in connection with looking at POTS -- the POTS
4  background rate.
5         Did -- did you have criticisms of that?
6    A    I have a criticism of those background
7  rates.  In terms of Merck choosing it, I have to
8  give credit to the Merck that there wasn't really
9  anything good to choose between.
10    Q    Well --
11    A    So I can't really blame Merck for --
12  for -- when there's nothing good available to pick,
13  so I can't really blame Merck for doing that.
14    Q    And my -- and my simple question to you
15  is going to be:  To be clear, in your expert report
16  you did not cite a different background rate for
17  POTS that should have been used in 2015.
18         Fair?
19    A    I'm not aware of anything there.
20         So what I would have done is --
21    Q    Well, let me ask -- let -- let me get
22  those two not quite in the same thing because I need
23  a -- I'll ask you that.
24         But first of all -- so withdrawn.
25         You agree that in your expert report you

1  did not cite a different background rate for POTS
2  that Merck should have used; correct?
3    A    That is correct.
4    Q    And then you wanted to say what you would
5  have done.  And so I want to give you the
6  opportunity to say that.
7    A    Thank you.
8         So it doesn't say in the question that
9  they have to use spontaneous report data.  Because I
10  think, even if some other bit of background rate had
11  been available, it's hopeless to do any good
12  analysis use comparing spontaneous report with
13  background rates.
14         So what would have been better to do
15  would have been to go to, for example, to Kaiser.
16  And from that data set, you can get -- instead of
17  using spontaneous reports, you can get the number of
18  POTS or CRPS after vaccine in the Kaiser data, and
19  then compare that to background rates also from the
20  Kaiser data.
21         And then you can use exactly the same
22  definitions.  You can compare apples to apples
23  instead of apples to oranges.  So that would be what
24  I -- how I would have responded to this PRAC
25  question number three.

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 53 of 77
Gardasil v9 Biologics
877-370-3377                              A Veritext Division                         www.veritext.com

1    Q   In connection with your expert report in
2  this case, on page eight, you state -- right above
3  question number five -- you state that Merck states
4  that there's no epidemiologic evidence for an
5  association between HPV vaccine and CRPS or POTS.
6        And then you go on to say, "yet there
7  were not proper studies at that time to evaluate
8  this association from an epidemiologic standpoint."
9        Do you see that, sir?
10  A   Yes.
11    Q   And the time frame we are talking about
12  here is 2015; correct?
13  A   Yes.
14    Q   And what -- what are proper studies in
15  your mind here?
16  A   There were no studies based on electronic
17  health records or health insurance claims data that
18  used medical short reviews to determine if the --
19  the -- the -- the proper definitions of the POTS.
20  So the studies that had been done, which -- which
21  raise sort of the major concerns about this, was
22  the -- the Chandler study or the Uppsala Monitoring
23  Centre studies, etc., where -- which had raised
24  these concerns.
25        So there was no proper studies that had,

1  sort of, evaluate that hypothesis that -- that the
2  Uppsala Monitoring Centre had come up with.
3    Q   Was your Yih 2018 publication a proper
4  study?
5  A   It's a very proper study.  I think it's a
6  very good study.  But it's not a study to look at
7  POTS or CRPS.
8        But you can have a very good study for
9  looking at, for example, does Gardasil cause stroke,
10  finding that there's no stroke.  That can be
11  excellent, fantastic, really good study but it has
12  nothing to say about POTS or CRPS.
13    Q   There's, obviously, ICD-10 codes and
14  ICD-9 codes for a variety of autoimmune diseases;
15  right?
16  A   Yes.
17    Q   And neither of your publications, Yih
18  2018 or Yih 2021, provide any evidence for an
19  increased risk of Gardasil for any autoimmune
20  condition; correct?
21  A   I think --
22        MR. BAUM:  Objection.  Vague.
23  BY MR. TOMASELLI:
24    Q   Go ahead.  You can answer.
25  A   I think it was -- none of them were for

1  autoimmune diseases, but I would have to check just
2  to make sure.
3        There wasn't --
4    Q   Okay.
5  A   There wasn't many things showing up.
6        (Whereupon, Exhibit MK 27, Minutes
7        and Responses to PRAC from the SAG
8        Vaccines Meeting on HPV Vaccines
9        (Article 20 Referral), was marked for
10        identification.)
11  BY MR. TOMASELLI:
12    Q   Okay.  Exhibit 27 is a document dated
13  November of 2015 that is titled, "Minutes and
14  Responses to PRAC from the SAG Vaccines meeting on
15  HPV vaccines (Article 20 referral)"
16        Do you see that, sir?
17  A   Yes.
18    Q   Have you ever seen these minutes from the
19  Scientific Advisory Committee from the Article 20?
20  A   No, I don't think I have.
21    Q   Okay.  If you can turn to page four of
22  six, and tell me when you are there?
23  A   Okay.  Hold on a second.
24        Which page did you say?
25    Q   Four of six.

1  A   Okay.
2    Q   And if you look just about in the dead
3  middle of the page do you see a paragraph that
4  starts, "The observed/expected"?
5  A   Yes.
6    Q   That paragraph states, "The
7  observed/expected (O/E) analysis conducted by the
8  [MAH]..." -- Manufacturer Authorization Holders,
9  which is Merck, right? -- "...in the frame of the
10  referral, and thoroughly assessed by the
11  Rapporteurs, seems to be as robust as it could be,
12  given the difficulties with the type of data
13  gathered and the assumptions made."
14        Do you see that?
15  A   Yes.
16    Q   And if you go to the very last sentence
17  of the paragraph, it says, "However it was noted
18  that the O/E analysis [sic] covered a range of
19  scenarios taking into account uncertainties in both
20  the [sic] numerator and denominator, and the most
21  plausible scenarios showed no excess of POTS or CRPS
22  cases above the background rate considering the
23  situation in individual countries (e.g. completeness
24  of -- completeness and quality [of] reporting.)"
25        Do you see that, sir?

Case 3:22-md-03036-KDB   Document 289-1   Filed 01/06/25   Page 54 of 77
877-370-3377                     Genus Technologies                     www.veritext.com
                                 A Veritext Division

1    A    Yes, I see that.
2    Q    And to be clear, you've not seen these
3  minutes before; right?
4    A    I have not.
5    Q    And if you turn back to the first page of
6  this document, do you see that there's a list of
7  participants with respect to this Scientific
8  Advisory Group?
9    A    Yes.
10    Q    And you can go and count them up, but
11  there's, you know, over 30 people that are involved
12  in this -- in this review; right?
13    A    Yeah.  I mean, approximately, yes.
14    Q    Yeah.  And do you know any of the
15  Scientific Advisory Group vaccine core members or
16  additional experts or the PRAC rapporteurs and
17  assessors?  Do you know any of these people?
18    A    Do you know mean if I know them
19  personally?  I met them?  Or if I've communicated
20  with them or if I know of them?
21    Q    Well, just start with that you know them
22  personally?
23    A    I think I have met Hanna Nohynek, maybe.
24  But that would be the only one who I think I might
25  have met personally.  And I'm not a hundred percent

1  sure.
2        She's from Finland.
3    Q    Okay.  Now, you're aware -- again, we
4  looked at the report, the assessment report, but
5  that was from November of 2015; right?
6    A    This one is from November 2015, yes.
7    Q    And are you aware, after November of
8  2015, whether any member state of the European Union
9  asked Merck to redo any of the analyses in Article
10  20?  Are you aware of that or not?
11    A    I know there was some concerns about this
12  review from some people in Denmark but I don't know
13  if there was a formal request from the Danish
14  authorities or not.
15    Q    Well, that's my question.  Do you know
16  whether the Danish Health Authority ever asked Merck
17  to redo any analysis related to the Article 20
18  procedure?
19    A    I don't know.
20    Q    Okay.  Do you know whether the EMA or any
21  of the scientific Advisory Group members ever asked
22  Merck to redo any analysis?
23    A    I'm not aware of any such request.
24    Q    Oh, you might be in luck.  I can't find
25  it.

1        All right.  Well, later.
2    A    Do you want to take a break so you can
3  find it?
4    Q    No.  We got plenty to do.
5        So -- withdrawn.
6        I want to talk about Dr. Tomljenovic's
7  disproportionality analysis, if we can --
8    A    Okay.
9    Q    -- for a little bit; okay?
10        Now, she analyzed the VAERS data set;
11  right?
12    A    I believe so, yeah.
13    Q    And it looks like that she, based on your
14  report, that she looked at different time periods.
15  For example, some of her analyses were up to 2015
16  and some of them went up through today, 2024?
17    A    Yup.
18    Q    And did you make any effort to understand
19  the number of Gardasil doses that had been
20  distributed at either of those times, 2015 or 2024?
21    A    I don't think that's relevant for the
22  disproportionality analysis.
23    Q    Okay.  And in terms of the
24  disproportionality analysis, it looked like there
25  were about 60 cases of POTS through 2015, and maybe

1  less than a 400 overall for 2024; correct?
2    A    I would have to look to confirm or not,
3  but I don't -- I won't dispute it.
4    Q    There was no clinical review of the cases
5  that -- that were identified by her search; correct?
6    A    That's correct.
7    Q    That is, no physician came in behind and
8  said, You know, I've taken a look at this report and
9  it either meets or doesn't meet the diagnostic
10  criteria for POTS or some other disease.  No one did
11  that.
12    A    Well -- well, clinical review is when you
13  look at the specific VAERS report from a particular
14  patient and you say, Okay, does this fulfill the
15  criteria for POTS or not?
16        That's the clinical review of the VAERS
17  reports.
18    Q    Okay.  And no one did that with respect
19  to her analysis; correct?
20    A    That is my understanding, that that
21  wasn't done as part of this analysis, which is sort
22  of consistent with the -- the disproportionality
23  reporting done by CDC, who didn't do that either for
24  their disproportionality analysis.
25        (Whereupon, Exhibit MK 29, Paper by

54 (Pages 210 - 213)

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 55 of 77
Gilson v. Biologics    A Veritext Division    www.veritext.com
877-370-3377

1        Arana, 2017, was marked for
2        identification.)
3 BY MR. TOMASELLI:
4    Q    Well, you mentioned, Dr. Kulldorff,
5 earlier today that you were aware of the FDA and
6 CDC's analysis of POTS in 2017 that was -- that was
7 performed; correct?
8    A    Which paper is that?
9    Q    I'm handing you what I've marked as
10 Exhibit number 29, which is a paper by Arana and
11 others --
12        MR. BAUM:  This -- it --
13        MR. TOMASELLI:  It should be 2017.
14    Did I hand you 2017?
15        MR. BAUM:  No.  No.  No.  I -- I got
16    the --
17        THE WITNESS:  This looks like 2017.
18        MR. BAUM:  You've been
19    characterizing it as a CDC study, but is
20    it actually sponsored and conducted by
21    the CDC?
22 BY MR. TOMASELLI:
23    Q    Withdrawn.
24        Dr. Kulldorff, I've handed you Exhibit
25 Number 29, which is a paper that was published in

1 2017, by the first author of Arana; correct?
2    A    Yes, you have.
3    Q    And in connection with Jorge Arana, he
4 was affiliated with the CDC at this time; correct?
5    A    Yes.  I think all authors are either from
6 the CDC or FDA.  They do have a disclaimer that the
7 findings and conclusions in this report are those of
8 the authors and do not necessarily represent the
9 official positions of the CDC or the FDA.
10    Q    They put that in every one of their
11 papers, basically; correct?
12    A    Pretty much.
13    Q    Yeah.  And this person with the FDA, this
14 Adamma Mba-Jonas?
15    A    Yes.
16    Q    Do you see that name?
17    A    Yes.
18    Q    That's A-d-a-m-m-a, and then last name,
19 M-b-a, dash, J-o-n-a-s.
20        Correct?
21    A    Yes.
22    Q    You've published with her.
23    A    Yes.
24    Q    She's a good researcher; right?
25    A    I haven't worked closely with her,

1 actually.
2    Q    Okay.  In this paper from 2017 with
3 Arana, they actually did an analysis of the VAERS
4 database for POTS; correct?
5    A    Yes.  This was specifically regarding
6 POTS.
7    Q    This is the article that you were aware
8 of that we talked about earlier; right?
9    A    Yes.  So I cite this in my report.
10    Q    Okay.  And if we go to page two, right
11 column, do you see, "Review of POTS reports..."?
12    A    Yes.
13    Q    It says, "CDC and FDA physicians reviewed
14 POTS reports following HPV vaccination (and medical
15 records if available) identified in the initial
16 VAERS database search."
17        Do you see that?
18    A    Yes.
19    Q    So you can confirm that, at least as
20 reported in this article, the physician reviewers
21 did review not only the reports but medical records
22 if they were available?
23    A    Okay.  Yes.
24        So I must have been wrong before then
25 because I guess they did it for some of them but not

1 for all of them.
2    Q    And the conclusion of this paper, if you
3 go to the very last statement on the last page --
4 and tell me when you are there.  582, the very last
5 page?
6    A    Yes.
7    Q    The very last sentence of these people
8 that work at the CDC and the FDA state that, "Our
9 safety review did not detect any unusual or
10 unexpected patterns of reporting for POTS following
11 HPV vaccination."
12        Do you see that?
13    A    I see that.
14    Q    Okay.
15    A    So --
16    Q    Well --
17    A    -- one thing --
18    Q    -- let me --
19    A    -- that's important with this paper is
20 that they did two things.  They did the reviews of
21 the things, and then they also did something called
22 empirical-based data mining.  So that's the
23 disproportionality analysis.
24        And it's my understanding that for the
25 empirical-based data mining, they did not use any

1 clinical reviews. That would have been wrong to do
2 it because they did clinical reviews of the post
3 cases following the Gardasil vaccines, but to do
4 a -- to do empirical-based data mining, they would
5 have to then do it also on all the other
6 vaccinations, the control group for other vaccines.
7        So therefore, when they did the
8 empirical-based data mining, they could not utilize
9 the -- the clinical review they did, and they have
10 to do that on the data that was not reviewed.
11        So it's my understanding -- it's not a
12 hundred percent clear what they did in the paper --
13 but it's my understanding that they -- for the
14 disproportionality analysis, using this
15 empirical-based data mining, they did not do that
16 clinical review.
17        Also, one complaint I have about this
18 paper is that they are specific -- they are
19 evaluating a specific hypothesis, which is POTS
20 after Gardasil. Data mining is something you use if
21 you don't have a prespecified hypothesis, you are
22 looking for hundreds of thousands of different
23 things, and data mining is very good for that.
24        But if you -- in that -- like in this
25 case, you have a very specific hypothesis, you

1 should never use data mining approach because then
2 you are over compensating for multiple testing
3 that's not there. So that's sort of an artificial
4 way of not finding things.
5        So they should not have used data mining
6 methods that adjust for the multiple testing, which
7 they did. They should have just sort of reported it
8 more straight.
9     Q    Dr. Kulldorff, in terms of
10 Dr. Tomljenovic's disproportionality analysis, did
11 you -- did you assess the adequacy of the terms that
12 she used to query the database?
13     A    Of the who?
14     Q    The disproportionality analysis --
15     A    Yeah.
16     Q    -- that you reviewed for
17 Dr. Tomljenovic --
18     A    Okay.
19     Q    -- did you assess yourself the adequacy
20 of the -- of the terms used to query the database?
21     A    No. That's not my expertise because I
22 don't have the clinical expertise to do that.
23     Q    And --
24     A    I just asserted that they were -- they
25 used the same for those who got the Gardasil vaccine

1 and those who got the other vaccine because that's
2 critical that you do it identical.
3        Even if it's a little bit off somewhere,
4 the key thing is that you do it the same for both
5 groups so you are comparing apples to apples.
6     Q    Did you ever rerun her searches in the
7 VAERS database?
8     A    No.
9     Q    Have you ever personally queried the
10 VAERS database or run searches in it?
11     A    No.
12     Q    Did you verify her counts or the events
13 that make up her counts?
14     A    No.
15     Q    Is Dr. Tomljenovic's disproportionality
16 analysis, that you are aware, either published or
17 peer reviewed other than by you?
18     A    It's not published. I did a peer review
19 of it.
20     Q    You are -- you are not vouching for her
21 as a researcher generally, are you?
22        For example, you are vouching for the
23 analysis that she did in her 2024 report but you are
24 not vouching just generally as her as a researcher;
25 correct?

1     A    I -- I was asked to evaluate this
2 particular report, her expert report, but only even
3 part of it, which is the proportional reporting or
4 the reporting odds ratios in section four of her
5 report. So that is what I did.
6     Q    Good point.
7     A    And --
8     Q    You did not attempt to verify her whole
9 expert report; correct?
10     A    Correct.
11     Q    Okay.
12     A    I haven't even read the whole of it,
13 so...
14     Q    And you are not aware, one way or the
15 other, whether she's had multiple publications
16 withdrawn from the medical literature; right? You
17 don't know one way or the other?
18     A    No.
19     Q    Okay. And we -- well, let me ask you
20 this -- withdrawn.
21        Prior to ever reviewing her report
22 related to disproportionality of POTS or POI, did
23 you search the medical literature to see if previous
24 disproportionality analyses related to POTS or POI
25 or those types of symptoms were performed?

56 (Pages 218 - 221)

1     A    I looked at other -- I was aware of some
2 of those before. Like the Rebecca Chandler, I've
3 been aware of that work since it came out, more or
4 less.
5          And I looked for others. And, for
6 example, the Arana paper was one of them --
7     Q    So --
8     A    -- that I found.
9     Q    Okay. So -- and -- and -- I think we
10 talked about earlier that the -- the EMA has a
11 disproportionality analysis in their assessment
12 report in 2015; right?
13    A    That's the one from Uppsala Monitoring
14 Centre?
15    Q    That's right.
16    A    I don't think they did some on their own,
17 do they?
18    Q    Say again?
19    A    They -- they talk about the one from
20 Uppsala Monitoring Centre.
21    Q    So let me try again.
22          In terms of disproportionality analyses
23 that were performed we agree that the Uppsala
24 Monitoring senator -- Centre had one that they
25 provided the EMA, that the EMA reviewed in 2015;

1 right? We've looked at that?
2     A    Yes.
3     Q    Okay. And then we have the Chandler,
4 excuse me, publication that you talked about; right?
5 Yes?
6     A    The one with the cluster thing?
7     Q    That's right.
8     A    Yeah. And there's, I think, at least one
9 other one, also.
10    Q    And you just mentioned Arana is --
11    A    Yeah.
12    Q    -- a disproportionality analysis;
13 correct?
14          Yes?
15    A    Yes.
16    Q    And I saw in your materials considered
17 list a publication by Bunaldo (phonetic) in 2019.
18          Does that ring a bell?
19    A    Which number is that?
20    Q    Forty-five.
21    A    "Safety profile of human papilloma virus
22 vaccines," which one is that? Which paper is that?
23 Who is the author?
24    Q    You conveniently left them off so I'm
25 asking you. Just -- you didn't prepare that, did

1 you?
2     A    I didn't prepare that so --
3     Q    Okay. Do you remember a paper Bunaldo
4 2019?
5     A    Bunaldo?
6     Q    Yes. If you don't, you don't.
7     A    There was a Maldonado (phonetic), I
8 think. But that's a different one, no?
9     Q    It's different.
10    A    Well, there's a -- and then there's the
11 Shimabukuro's, with the -- with the
12 disproportionality analysis --
13    Q    Okay.
14    A    -- for --
15    Q    So try to --
16    A    -- for Gardasil.
17    Q    -- shortcut this a little bit.
18          We can agree -- withdrawn.
19          We can agree that there were four or five
20 separate disproportionality analyses related to POTS
21 or POTS-like symptoms that were published in the
22 medical literature prior to you taking a look at
23 Dr. Tomljenovic's disproportionality analysis;
24 right?
25    A    There was a number of them on Gardasil,

1 and some of those dealt with POTS. And others --
2 the others I think did not deal with POTS.
3     Q    Can we also agree that there were also
4 disproportionality an-- -- disproportionality
5 analyses related to POI in the medical literature
6 published and peer reviewed prior to you taking a
7 look at her disproportionality analysis in 2024?
8     A    I believe so, yeah.
9          MR. TOMASELLI:  My colleague is
10         earning his money over here, doing a
11         great job.
12          All right. Withdrawn.
13          (Whereupon, Exhibit MK 28, Article by
14          Patricia Wodi, was marked for
15          identification.)
16 BY MR. TOMASELLI:
17    Q    Exhibit 28 -- sorry, I skipped 28
18 earlier -- but Exhibit 28 is an article by Patricia
19 Wodi, W-o-d-i.
20          Do you see that?
21    A    Yes.
22    Q    Okay. And these authors are also, some
23 of them, affiliated with the CDC and the FDA;
24 correct?
25    A    Yes.

Case 3:22-md-03036-KDB    Document 289-9   Filed 01/06/25    Page 58 of 77
Gardasil Technologies
877-370-3377                    A Veritext Division                    www.veritext.com

1    Q    And have -- have you seen this -- this
2  paper before?
3    A    I have, yes.
4    Q    Okay.  So you're aware that the FDA and
5  the CDC have analyzed disproportionality of
6  reporting relating to POI prior to your review of
7  Dr. Tomljenovic's analysis; correct?
8    A    Yes.
9         And it says here, on page five, "Data
10  mining.
11        "There were three vaccine-event pairs
12  reported at least twice as often as expected among
13  female or unknown sex with all three reported
14  following HPV vaccination (Gardasil).  We observed
15  disproportionate reporting for the PTs Amenorrhea,
16  Premature Menopause, and Infertility Female."
17        So this seems that there was some kind of
18  axis that they observed here that were somewhat
19  related to POI here.
20    Q    Exactly, sir.
21        The --
22    A    But it doesn't say, actually -- it -- it
23  doesn't -- I don't think it gives actual number,
24  like the point estimates or the confidence
25  intervals, they just have these two sentences on

1  data mining.
2         And -- and that's the disproportionality
3  analysis that they did.
4    Q    Okay.  So a couple things.  Number one,
5  this is a disproportionality analysis in VAERS;
6  right?
7    A    This was VAERS data, yes.
8    Q    And it relates to POI as well as other
9  preferred terms that are -- that -- that are similar
10  in terms of POI or that could reflect potentially
11  POI; right?
12    A    Some relationship to it, yes.
13    Q    Yeah.  And under clinical review of
14  reports, under 2.2 on page two, 2.2 page two, you
15  can see that they say, "Each report (including any
16  available medical records) was manually reviewed by
17  CDC physicians."
18        Do you see that?
19    A    Correct.
20    Q    And then below -- if you go below in that
21  same column, right above "Data mining," do you see,
22  "An FDA physician"?
23        Do you see that?  My simple question is
24  are you with me?
25    A    Yes.  I'm on the location in that

1  paragraph, yes.
2    Q    Okay.  And that paragraph says, "An FDA
3  physician who is board-certified in gynecology
4  conducted an independent review of all POI cases
5  identified by CDC physicians to adjudicate if each
6  POI case was a 'Confirmed POI,' 'Possible POI, or
7  'Not POI,' using the guidelines above."
8         Do you see that?
9    A    Yes.
10    Q    And as you mentioned earlier, they did
11  find -- withdrawn.
12        As you mentioned earlier, the FDA
13  observed -- I'm sorry.  Withdrawn.
14        As you noted earlier, the Wodi authors
15  observed disproportionate reporting for the
16  preferred terms of amenorrhea, premature menopause,
17  and infertility female; correct?
18    A    Correct.
19    Q    Now, did you also see where they
20  discussed a study by Gong that is a data mining
21  analysis?
22    A    Where is that?
23    Q    So if you go to the page 1620, bottom
24  right -- or is there not page --
25    A    I have --

1    Q    -- numbers on --
2    A    -- I have --
3    Q    -- them?
4    A    -- pages one and so on.
5    Q    All right.  Let me just see.  Sorry.
6  Apologies.
7         Yup.  Bottom right of the page I'm
8  handing you, Dr. Kulldorff.
9    A    Thank you.
10        MR. BAUM:  What's -- what is the
11        page number on the bottom right?
12        THE WITNESS:  Five.
13        MR. TOMASELLI:  Sorry, Michael.
14        MR. BAUM:  It's okay.
15        MR. TOMASELLI:  I've got a different
16        copy.
17        MR. BAUM:  Oh.
18        MR. TOMASELLI:  So it's --
19        MR. BAUM:  Okay.
20        MR. TOMASELLI:  -- probably --
21  BY MR. TOMASELLI:
22    Q    Withdrawn --
23        In the bottom right-hand column of this
24  paper, the last five lines of the pa- -- of this
25  column say, "Similar to the study by Gong, et al.,

58 (Pages 226 - 229)

1 data mining in our study observed disproportionate
2 reporting of POI related [to preferred terms] [sic]
3 in VAERS compared to other vaccines."
4 　　　Do you see that?
5 　A　Yes.
6 　Q　Were you aware of the Gong paper?
7 　A　I don't believe I read the Gong paper.
8 　Q　Okay. They go on to say, "However,
9 compared to Gong, et al., our study included
10 clinical review of VAERS report and medical records
11 if available."
12 　　　Do you see that?
13 　A　Yes.
14 　Q　And if you go to the next page at the
15 top -- well, I should probably start on the page
16 before. It says "although" on the page before.
17 　　　"Although majority of reports identified
18 in our study noted receipt of HPV vaccines (with or
19 without other vaccines) [sic], clinical review
20 determined that the AEs contained in most reports
21 were either pregnancy-related, (such as amenorrhea
22 dur-) [sic]" -- "(due to pregnancy) [sic], hearsay
23 reports, or also noted the presence of other
24 conditions that cause symptoms similar to POI such
25 as pituitary pathology and polycystic ovary

1 syndrome."
2 　　　Do you see that?
3 　A　Yes.
4 　Q　And that's not news to you, that, of
5 course -- if a physician looks at a report of
6 amenorrhea or menstrual a- -- "aregularity," it
7 actually could be just that the person is pregnant;
8 right?
9 　A　Well, I'm not a physician, so I'm not
10 going to give you any clinical reviews.
11 　Q　Okay. You're aware that, just from
12 having daughters and whatever, that girls, you know,
13 have amenorrhea when they're pregnant; right?
14 　A　Well, my daughter hasn't been pregnant
15 yet. She's eight years old.
16 　Q　Okay.
17 　A　So...
18 　Q　Well, you've had a daughter.
19 　　　So do you have any other experience that
20 would lend a hand there?
21 　　　All right. Withdrawn.
22 　　　Would you agree that, just as a general
23 standpoint, clinical review can identify issues
24 within the reports that suggest, Okay, this is --
25 this is not a case of premature infertility or

1 primary ovarian insufficiency; the person is just
2 pregnant?
3 　A　So a -- a clinical review can determine
4 that some of the cases may be unrelated to the
5 vaccine under study.
6 　　　At the same time, when you do the
7 disproportionality analysis -- which I did here, the
8 data mining -- either you have to do that clinical
9 review on everybody -- both those with the Gardasil
10 vaccine and other vaccines, or you do it on neither.
11 　　　My understanding here is not explicitly
12 stated. But my understanding here is that when they
13 did the data mining, they did not use the clinical
14 reviews. Because they did the clinical reviews on
15 the people with Gardasil. They didn't do the
16 clinical review on the comparison group of other
17 vaccines.
18 　　　So when you do that disproportionality
19 analysis then, then, you -- then, you can have some
20 sort of false positive in the sense that they are
21 clearly due to something else. And you will have
22 that in both groups. So that, sort of, cancels each
23 other out when you do the disproportionality
24 analysis.
25 　　　(Whereupon, Exhibit MK 30, Paper by

1 　　　Tatang, was marked for
2 　　　identification.)
3 BY MR. TOMASELLI:
4 　Q　Dr. Kulldorff, I'm going to hand you what
5 I've marked as Exhibit 30, which is a paper by
6 Tatang, T-a-t-a-n-g, in 2021; do you see that?
7 　A　Yes.
8 　Q　Have you seen this paper before?
9 　A　I believe I have. Yes.
10 　Q　Okay. And so this is another paper that
11 was in the medical literature discussing
12 disproportionality of reporting for POI prior to you
13 undertaking an analysis of Dr. Tomljenovic's
14 disproportionality --
15 　A　Yes.
16 　Q　-- analysis?
17 　　　Okay. By the way, do you -- if you turn
18 to -- if you turn to the third to last page --
19 　A　The --
20 　Q　-- right above the "Conclusion" --
21 　A　Okay.
22 　Q　-- you see there's a paragraph above the
23 conclusion, sir?
24 　A　Yes.
25 　Q　It says, "Finally, VAERS cannot be used

59 (Pages 230 - 233)

Case 3:22-md-03036-KDB　　Document 239-9　Filed 01/06/25　Page 60 of 77
Gilson v. Biologics
877-370-3377　　A Veritext Division　　www.veritext.com

1 to determine whether a vaccine caused an AE as it
2 could be due to chance, confounders, or bias."
3         Do you see that?
4     A   Yes.
5     Q   That's what the authors of Tatang said?
6     A   Yup.
7     Q   Correct?
8     A   Yup.
9     Q   "Therefore" -- they go on to say,
10 "Therefore, this study only generated the hypothesis
11 that there may be a signal of disproportionate
12 reporting for POF events and HPV vaccine that
13 warrants further investigation."
14         Do you see that?
15    A   Yes.
16    Q   Okay.  So similar to POTS and POTS-like
17 symptoms, there were numerous disproportionality
18 reports in the medical literature that were
19 peer-reviewed prior to you undertaking your analysis
20 of Dr. Tomljenovic's disproportionality analysis;
21 correct?
22    A   Correct.
23    Q   We talked about reporting bias before.
24         And do you agree that parental concerns
25 can be a source of reporting bias?

1     A   Parental concerns, when you have media
2 attention to something, that could generate
3 reporting bias or create bor-- reporting bias.
4     Q   News --
5     A   Yeah.
6     Q   -- news coverage of potential adverse
7 events, or otherwise, can re-- can create a
8 reporting bias; correct?
9     A   It can create re-- the people sending
10 in reports which then generate the reporting bias,
11 yes.
12         And that's not just parents.  I think
13 physicians are also prone to -- to -- to do that.
14 So --
15    Q   Fair.
16    A   -- I don't --
17    Q   Yeah.
18    A   -- I don't want to just blame the -- the
19 parents.
20    Q   No.  And I didn't want to --
21    A   Yeah.
22    Q   -- either.
23         I -- I -- I was -- I -- I was really just
24 getting to the point that that reporting bias,
25 ultimately, can come, number one, from a variety of

1 sources; and number two, can be reported by a number
2 of people?
3     A   Yes.
4     Q   Okay.  Now, based on your experiences,
5 conversations around vaccine recommendations and
6 mandates can generate a significant amount of
7 publicity; true?
8     A   Yes.
9         (Whereupon, Exhibit MK 31, Article by
10        Slade, et al., was marked for
11        identification.)
12 BY MR. TOMASELLI:
13    Q   Dr. Kulldorff, I'm handing you Exhibit
14 31, which is a article by Slade and others from
15 2009; do you see that?
16    A   Yes.
17        (Whereupon, there was a discussion
18        off the record.)
19 BY MR. TOMASELLI:
20    Q   These are, again, authors affiliated with
21 the CDC and FDA; true?
22    A   I -- several of those names, I recognize
23 as CDC or FDA agents.  Yes.
24    Q   And this is an analysis of the VAERS
25 database from June of '06 through December of '08,

1 the first two and a half years of marketing of
2 Gardasil; correct?
3     A   That looks light it.  Yeah.
4     Q   If you turn to page 756, and tell me when
5 you are there.
6     A   Yeah.
7     Q   They -- there's a three-column page here.
8         And in the middle column toward the
9 bottom, do you see that it says, "Although VAERS
10 shares inherent limitations of all passive
11 surveillance systems, it is national in scope and
12 can provide important signals that may require
13 further attention."
14         Do you see that?
15    A   Correct.
16    Q   All right.  And it goes on to say, "In
17 addition, data limitations include underreporting,
18 inconsistency in the quality and completeness of
19 reported data, stimulated reporting due to excessive
20 [sic] news coverage, and reporting biases."
21         Do you see that?
22    A   Yes.
23    Q   And that's true; right?
24         That's what we've been talking about?
25    A   That they can be stimulated reporting due

Case 3:22-md-03036-KDB     Document 289-1 Filed 01/06/25     Page 61 of 77
877-370-3377                         Golkow Technologies                         www.veritext.com
                                     A Veritext Division

1 to excessive or due to news coverage and reporting
2 bias, I think that's true.
3       Whether you want to call it excessive or
4 not, that's a judgment call.
5  Q   Fair enough.
6       Do you see, then, the next sentence says,
7 "The VAERS reporting rate for [Gardasil] [sic] is
8 triple the rate for all other vaccines combined"?
9       Do you see that?
10  A   Yes.
11  Q   So just in the first two-and-a-half years
12 of the marketing of Gardasil, there were three times
13 the number of reports into VAERS compared to the
14 whole other vaccines combined; right?
15  A   Uh-huh.
16  Q   Okay. That -- that's a lot of reporting;
17 right?
18  A   Yeah.
19       So if there is an excess reporting like
20 that, that doesn't effect -- that doesn't
21 necessarily reflect the -- a -- a disproportionality
22 analysis, because that adjust for the fact if
23 reporting is high in general.
24       So the thing that -- to be care- --
25 careful about with reporting bias is, if there is

1 media attention on a specific outcome -- whether it
2 is VTE or POTS or whatever it is -- that is what
3 will create the reporting bias.
4       So a large volume or a low volume, in
5 itself, does not necessarily create the reporting
6 bias. It's if it's differential by the outcomes.
7  Q   I understand.
8       But it does suggest that there was a lot
9 of media attention or other attention that
10 stimulated reporting related to Gardasil; true?
11       MR. BAUM: Objection. Assumes facts
12       not in evidence. Speculation.
13  A   I don't know.
14 BY MR. TOMASELLI:
15  Q   You don't know.
16       (Whereupon, Exhibit MK 32, 2012
17       Article by Dr. Tomljenovic and Dr.
18       Shaw, was marked for identification.)
19 BY MR. TOMASELLI:
20  Q   I'm going to mark as Exhibit 32 an
21 article by Dr. Tomljenovic and Shaw from 2012.
22       Do you sew that?
23  A   Yes.
24  Q   Do you see in the introduction, the very
25 second sentence says, "Ever since its Fast Track

1 approval by the U.S. [Food and Drug Administration]
2 [sic] (FDA) [sic] in 2006, Merck's human papilloma
3 virus vaccine [(HPV)] [sic] Gardasil has been
4 sparking controversy."
5       Do you see that?
6  A   Yup. Yes.
7  Q   Are you aware what controversy that is?
8  A   I think one of the earlier issues were
9 the VTE, that there were hypothesis that they might
10 be causing VTE.
11  Q   What about -- what about that it affected
12 fertility?
13       Are you aware of that?
14  A   I don't remember that. I might have read
15 about that.
16  Q   Again, and --
17  A   The other --
18  Q   -- that is --
19  A   -- the other thing was --
20  Q   We talked earlier, you did not actually
21 look into all these issues related to reporting
22 bias. In your report, you said, It's difficult to
23 judge.
24       But I thought we agreed that you actually
25 didn't look into all of the reasons for potential

1 reporting bias; right?
2  A   I don't think I said exactly that thing.
3       I mean, another controversy -- early
4 controversy of the HPV vaccine was people who felt
5 that this was given to -- it's a sex- -- sexual --
6 it's -- it's for a sexually-transmitted virus.
7       And then, some people were upset that it
8 was given to their young girls who were not just
9 sexually active. So why would you give it to them?
10 So there was, sort of, the more moral
11 issues that some people were con- -- that was one
12 reason why this was, sort of, a -- a controversy of
13 this vaccine.
14       So that has nothing to do with potential
15 adverse reaction. It was just, sort of, the -- the
16 fact that it was for a sexual transmitted disease
17 and given to young girls, which, by the way, I don't
18 agree with that concern. So...
19  Q   'Cause it's not borne by the data; right?
20       You're aware there's five or six studies
21 showing that -- that the -- the -- the provision of
22 Gardasil vaccine has absolutely nothing to do with
23 sexual debut; correct?
24       You're aware of that data?
25  A   That's possible. I don't -- I have no

Case 3:22-md-03036-KDB   Document 289-3 Filed 01/06/25   Page 62 of 77
Gilson v. Bio-Technologies                                           
877-370-3377                       A Veritext Division               www.veritext.com

1 idea. But --
2     Q    The data on it?
3     A    -- but the point is that you want to give
4 the vaccine before -- before people are exposed to
5 the virus.
6     Q    Now, we agreed earlier that some of her
7 analyses include data up to 2024; correct?
8     A    Yes.
9     Q    That would necessarily include every
10 lawsuit alleging POTS in the country; right?
11         MR. BAUM: Objection. Assumes facts
12         not in evidence. Speculation.
13     A    I'm not quite sure what you mean by the
14 question.
15 BY MR. TOMASELLI:
16     Q    Well, I mean, manufacturers have to
17 report adverse events with their product.
18         And a lawsuit alleging POTS due to
19 Gardasil is an adverse event relating to their
20 product, and that gets into VAERS, doesn't it?
21     A    Yes. Merck is, by law, obliged to report
22 any things that they -- any- -- any of the things
23 that's reported to them, they have to report it to
24 VAERS by law. Yeah.
25     Q    Right.

1         And are you aware of any other vaccines
2 that -- where they're alleging POTS as a result of
3 the vaccine?
4     A    No.
5     Q    Now, some of Dr. Tomljenovic's analyses,
6 as you talked about, go down to age six; correct?
7     A    Yes.
8     Q    And you noted that the age confounding
9 is -- is a possibility with respect to that, because
10 Gardasil, obviously, was used in 11- or
11 12-year-olds, but at least, down to nine; right?
12     A    Yes.
13         So it's not just because of 6 to 8, which
14 I think Gardasil is not used for. It's also that
15 there's -- e- -- even if you do 9 to 18, say,
16 there's a certain distribution of when the vaccines
17 are given. And it's -- it's more at the younger age
18 versus the older age, I think.
19         Then, there's a different age
20 distribution in terms of the outcomes, whether it's
21 POTS or anything else. So those distribution will
22 not be identical.
23         And then, of course, you have the
24 comparison vaccines, which other vaccines, they have
25 a different age distribution than -- than -- than

1 Gardasil. So if the incidence is flat, it doesn't
2 matter what other age of -- for the two vaccines.
3         If the two vaccines are the same, it
4 doesn't matter what -- what the age distribution is
5 for the -- for the outcome. They, sort of, cancel
6 each other out.
7         But if all three of these are different,
8 you are going to have some bias. It can go in
9 either direction.
10     Q    Let me -- let me -- let me ask you this.
11     A    Yeah.
12     Q    Did you ever suggest to Dr. Tomljenovic
13 that she remove six-, seven-, and eight-year-olds
14 from her VAERS analysis?
15     A    So I suggested that she should not go all
16 the way from 6 to 20-something, because that gives
17 more.
18         Now, she -- what she said that she --
19 the -- the data wasn't available by age. So if you
20 had the exact age for each person, then, you can
21 actually do the reporting odds ratio adjusted for
22 age.
23     Q    Yeah.
24     A    And then, it doesn't matter if you
25 include 6-to-8 or not --

1     Q    Did you --
2     A    -- or what you include.
3     Q    -- did you know that the VAERS --
4 Dr. Kulldorff, did you know that the VAERS data can
5 be downloaded into CSV files?
6     A    I know that the VAERS data can be
7 downloaded.
8     Q    And into a --
9     A    Or --
10     Q    -- CSV file that can then be put into a
11 different program, and you can sort by age; right?
12     A    I don't know exactly what -- I don't know
13 what is the -- so -- so I don't know what is the
14 exact nature of the data that is being downloaded.
15     Q    That's my question.
16     A    Yeah.
17     Q    You don't -- you don't know the exact
18 nature of the data that's downloaded from VAERS to
19 know whether you could exclude six-, seven-, and
20 eight-year-olds; right?
21     A    I don't know.
22     Q    Okay. In any event, she didn't; right?
23     A    Correct.
24     Q    Okay. Now, her analysis also excluded
25 COVID vaccines; right?

62 (Pages 242 - 245)

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 63 of 77
877-370-3377                    Golison v. Biologics
                               A Veritext Division                    www.veritext.com

1    A    Yes.
2    Q    You're aware that -- again, based on your
3  experience -- that people have reported the
4  development of POTS and POI after COVID vaccines;
5  correct?
6    A    I know there has been the reports of --
7  there has been a fair amount of discussion about
8  COVID vaccines and various menstrual issues --
9    Q    Now --
10   A    -- that could be related to, maybe, POI.
11       POTS, I really don't know one way or the
12  other.
13   Q    Now, let's talk about the Chao study,
14  2012 --
15   A    Okay.
16   Q    -- for a minute; okay?
17       You obviously reviewed that study in
18  connection with your expert report.
19   A    Yes, I did.
20   Q    First off, Chao 2012 doesn't have an end
21  point in it related to POTS or POI; correct?
22   A    That is correct.
23   Q    Did you know that that study is known as
24  protocol 031?
25   A    I -- I haven't heard that number.

1    Q    You did not review any internal documents
2  from Merck or anyone else related to study 031 or
3  the Chao study; right?
4    A    So there were the depositions that
5  discussed the Chao study. And I read, not the whole
6  deposition, but I read parts of the depositions.
7    Q    Did you go back and review all the
8  exhibits that were discussed in those?
9    A    No.
10   Q    Okay. Do you know whether or not
11  there -- well, withdrawn.
12       Do you know that there's, like, a
13  thousand-page clinical study report that relates to
14  031?
15   A    No.
16   Q    Did you know that there was an interim
17  study report that the FDA requested that was
18  provided to them?
19   A    I've only read the final published paper.
20   Q    Again, in fairness, you have not reviewed
21  all the information that was provided by Kaiser or
22  Merck to the FDA related to 031 or the Chao study;
23  right?
24   A    Correct.
25   Q    Now, the Chao 2012 paper was just one

1  post-marketing study that evaluated whether Gardasil
2  was associated with the development of autoimmune
3  disease; correct?
4    A    Correct.
5    Q    Can you confirm that there are now dozens
6  of studies that have looked at whether Gardasil is
7  associated with the development of autoimmune
8  disease?
9    A    Yes.
10   Q    Some, but not all of those studies you
11  actually cited in your Yih 2018 and 2021
12  publications; true?
13   A    Probably true.
14   Q    Did you, in your research for this case,
15  review any public analyses by the FDA or its medical
16  officers related to the development of autoimmune
17  disease in Gardasil clinical trials?
18   A    You mean, scientific papers by FDA
19  personnel? Or...
20   Q    Ei- -- either scientific papers by FDA
21  personnel, analyses by medical officers that are
22  employed by the FDA, or any other statements by the
23  FDA.
24       I'm trying not to be restrictive here.
25   A    Autoimmune diseases specifically?

1    Q    Yes, sir.
2    A    And you said "FDA," not CDC?
3    Q    That's right.
4    A    I -- I -- I may have. I think some of
5  the -- I don't remember exactly which one had the
6  FDA authors versus -- versus, for example, CDC
7  authors.
8    Q    What's in your mind right now?
9    A    Well, the spontaneous report by the --
10  let me see if -- I think that we looked at that
11  paper. No?
12       Or did I cite it here?
13       Maybe I didn't cite that one in my paper.
14  But...
15       Well, the Shimabukuro paper on -- data
16  mining paper on spontaneous reports, that looked at
17  some autoimmune diseases, for example.
18   Q    Okay.
19   A    And I think there were some FDA authors
20  on that paper, but I would have to look up to make
21  sure.
22   Q    Okay. Any other --
23   A    I'm -- I -- I'm sorry I can't keep track
24  of -- of -- you probably keep track of all these
25  papers better than I do. So...

Case 3:22-md-03036-KDB    Document 289-1    Filed 01/06/25    Page 64 of 77
Gilson v Biotechnologies
A Veritext Division
877-370-3377                                                     www.veritext.com

1    Q    I understand.
2         Any other paper that's in your mind right
3    now when I ask that question?
4    A    There might --
5    Q    Are there --
6    A    -- have been other ones.  Yeah.
7    Q    Okay.  Do you -- did you ever see the
8    original protocol for study 031, the Chao study?
9    A    No.  I haven't read that.
10   Q    Do you understand that the Kaiser
11   entities actually performed the data analysis for
12   the Chao study?
13   A    Yeah.  I think it was Southern California
14   who did the analysis.
15   Q    Did you know that the
16   autoimmune-vaccinated versus -unvaccinated
17   comparison analysis was actually requested by the
18   Safety Review Committee for that publication?
19   A    Can you repeat that question?
20   Q    Sure.
21        Did you know that there was a Safety
22   Review Committee in Chao?
23   A    Yes.
24   Q    Okay.  Did you know that that -- well,
25   withdrawn.

1         Do you know who was on the Safety Review
2    Committee?
3    A    No.
4    Q    Do you know whether or not that they were
5    experts in vaccine safety analysis?
6    A    I don't know who they were, so I don't
7    know what their expertise was.
8    Q    Do you know if they were -- withdrawn.
9         Do you know if this SRC members were
10   employees of Merck?
11   A    I assume that was -- they were not, but I
12   can't promise that.
13        So since I'm under oath, I have to say I
14   don't know.
15   Q    Do you know that the comparison between
16   unvaccinated versus vaccinated was actually
17   requested by the SRC, the Safety Review Committee?
18   A    I know that there was some request
19   specific.  I forgot exactly the specifics of that
20   request.
21   Q    Did you understand, based on your review
22   of Chao, that the Safety Review Committee was
23   responsible for interpretation of the safety data?
24   A    I thought the authors were responsible
25   for the interpretation of the analysis.

1    Q    Well, they certainly interpreted --
2    interpreted their own analysis.
3         But in terms of whether there was a
4    signal for autoimmune disease, did you know that the
5    SRC actually weighed in on that?
6    A    You mean, in the paper?  Or --
7    Q    Yes, sir.
8         In the paper or any other time.
9    A    I just thought that -- well, I don't -- I
10   don't know if they weighed in on that or not.
11        I just figured that it's the authors of
12   the paper are responsible for whatever the
13   conclusions or interpretation they do.
14   Q    Did you also understand that the SRC, the
15   Safety Review Committee, came to the decision that
16   the autoimmune analysis did not suggest a signal
17   that Gardasil was associated with the development of
18   autoimmune disease?
19   A    I'm not aware what the opinion they had
20   on that.
21   Q    Now, as I read your report, you com- --
22   you claim that the -- withdrawn.
23        As I read your expert report, you claim
24   that there's no useful information that can be
25   derived from the main analysis or sensitivity

1    analysis number two; correct?
2    A    Sensitivity analysis number two, which
3    one was that?
4         That was --
5    Q    Sensitivity analysis two was based on the
6    original ICD-9 codes.  It was not all versus all.
7         There was imputation involved in
8    sensitivity analysis number two.
9         Tell you what --
10   A    Did you have the -- I -- I'm just going
11   to --
12   Q    Oh --
13   A    Do you have the -- I think I have --
14   you've already given me that.  But --
15   Q    Oh, I've already marked it.
16        MR. BAUM:  Yeah.
17   BY MR. TOMASELLI:
18   Q    That's right.
19   A    It's somewhere in this --
20   Q    Toward the bottom, probably.
21   A    Here it is.
22        MR. BAUM:  It's -- it's nine, if
23        that helps.
24        THE WITNESS:  Yeah.  Correct.
25   A    So I -- I -- I think that you're

Case 3:22-md-03036-KDB    Document 289-1    Filed 01/06/25    Page 65 of 77
877-370-3377                    Golson Technologies                    www.veritext.com
                                A Veritext Division

1 correct -- no useful information can be obtained
2 either from the main comparison or sensitivity
3 analysis number two.
4 BY MR. TOMASELLI:
5    Q    With respect to sensitivity analysis
6 number one, that was all identified cases versus all
7 identified cases -- right? -- with -- with no --
8    A    No medical --
9    Q    -- analysis --
10    A    -- struc- -- no medical structure, too.
11    Q    That's right.  Okay.
12         We agree often that?
13    A    Yes.
14    Q    All right.  And within Kaiser Southern
15 California, in terms of the populations, there were
16 over 500,000 people, total, in the vaccinated versus
17 unvaccinated group; fair?
18    A    If you say so.  I can check it, but I
19 trust you.
20    Q    If you look at the bottom of page 196,
21 the bottom right, can you confirm that the Kaiser
22 Permanente Southern California population that
23 sensitivity analysis one drew from was over 500,000
24 people?
25    A    Yes.  It's five hundred six -- 561,000

1 person-years.
2         So that's necessari- -- that necessarily
3 the -- it's not the same as persons.
4    Q    Well, if you look at just the -- the
5 statement, it says, At KPSC, there were 117,000
6 women with 87,000 accrued person-years and 412,000
7 eligible --
8    A    Unvaccinated.
9    Q    -- unvaccinated women --
10    A    Yeah.  Okay.  So there would be at
11 least -- so that's 412 plus 117.  That's more than
12 500.  So there would be more than 500 people in the
13 study.  Correct.
14    Q    500,000 people --
15    A    Yeah.
16    Q    -- in the --
17    A    Yeah.
18    Q    -- study?
19         What I said was correct?
20    A    Correct.  Yeah.
21    Q    All right.  And my understanding is that
22 potential autoimmune cases were identified in three
23 ways; one based on diagnosis codes, another based an
24 abnormal laboratory values, and another based on
25 pharmacy prescriptions that were given that might be

1 given in the context of an autoimmune disease;
2 right?
3    A    If you say so.
4    Q    Yeah.  Okay.  In terms of the vaccinated
5 girls, they were getting Gardasil; correct?
6    A    Yes.  I believe --
7    Q    And --
8    A    -- so.
9    Q    -- and at the time of -- of this study,
10 Gardasil was recommended in three doses; correct?
11    A    That is my understanding.
12    Q    So at time point one --
13    A    At -- at --
14    Q    -- and then --
15    A    -- some -- at --
16    Q    -- in --
17    A    -- some point, it went down to two doses.
18 But I forget exactly when that was.
19    Q    It wasn't -- it wasn't at -- at this
20 time; right?
21    A    Yup.  I -- I forget what it was.  So...
22    Q    In any event, whether it's two or three
23 doses, when the girls went to their doctor with --
24 to get a Gardasil vaccination, obviously, they went
25 to their doctor; right?

1    A    I hope so.
2    Q    Okay.  And the unvaccinated girls did not
3 necessarily go to their doctor to get a vaccination;
4 right?
5    A    They might have gone for some other
6 reasons.  But they certainly didn't go there for
7 the -- for the Gardasil vaccination.
8    Q    In terms of the Gardasil vaccination,
9 it's expected that they would be there two or three
10 times visiting their doctor over an unvaccinated
11 person that wasn't getting the Gardasil; correct?
12    A    Well, often, a vaccine is given out at
13 the -- the routine annual visit.
14         So you would expect that the first dose
15 is typically given on the -- on the annual visit,
16 whenever that is.  And then, they might schedule
17 extra visits for the second dose.
18    Q    And the third dose?
19    A    Yeah.
20    Q    Do you agree that the Chao paper was
21 peer-reviewed and published?
22    A    It was.
23    Q    Do you agree that the authors -- I mean,
24 you mentioned this earlier -- that the authors of
25 the Chao paper concluded that their own analysis did

Case 3:22-md-03036-KDB    Document 289-1    Filed 01/06/25    Page 66 of 77
Grünenthal Technologies
877-370-3377                                A Veritext Division                         www.veritext.com

1 not show a significant association between Gardasil
2 and autoimmune disease?
3    A    That's what this says.  Yes.
4    Q    And if you look at the last -- the last
5 sentence of the results on the first page --
6    A    In the abstract?
7    Q    Yes, sir.
8    A    Okay.
9    Q    Do you see where it says, "The SRC and
10 the investigators identified no autoimmune safety
11 concerns in this study"?
12   A    Yes.
13   Q    Do you see that?
14   A    Yeah.
15   Q    So we can agree both the authors and the
16 people on the SRC, at least, did not have any safety
17 concerns for at autoimmune disease as reported in
18 the Chao paper?
19   A    So they didn't identify anything;
20 correct.
21   Q    Okay.
22   A    And they are speaking 'cause -- not only
23 for themselves, but also for the SRC.
24        MS. VALOFF:  Counsel, this is Jo
25   Lynn Valoff.  I am an attorney for

1    Kaiser.
2         And I just want to correct the
3    assumption that there were 500,000 people
4    in the study.
5         Your reference to the bottom of page
6    196, if you look on the left side at the
7    bottom, it says, "Amongst the [hundred
8    eighty-nine six hundred twenty-nine]
9    [sic] women in the autoimmune
10   surveillance..."
11        So I -- I -- I don't think it was
12   500,000.  I do agree with your prior
13   reference that there was over 500,000
14   accrued person-years.
15        But there -- I do not believe there
16   were over 500,000 people in the study,
17   based on the reference at the bottom of
18   page 196 in the left column.
19        (Whereupon, Exhibit MK 33, Document
20        Entitled "FDA Information on Gardasil
21        -- Presence of DNA Fragments
22        Expected, No Safety Risk," was marked
23        for identification.)
24 BY MR. TOMASELLI:
25   Q    All right. Dr. Kulldorff, I'm handing

1 you Exhibit No. 33, which is a page from the FDA's
2 website entitled "FDA Information on Gardasil --
3 Presence of DNA Fragments Expected, No Safety Risk."
4        Do you see that?
5    A    Yes.
6    Q    Have you seen this before?
7    A    Not recently.
8         But this is an old document, so I don't
9 have any recollection of it.
10   Q    Is this something that if you saw it, it
11 would have been prior to the -- the publications
12 that we've been talking about earlier today?
13   A    It would have been, maybe, when it came
14 out.  But I don't have a recollection of it --
15   Q    Okay.
16   A    -- seeing it.
17   Q    Do you see the last bullet on the first
18 page?
19        It -- it says, "As it does with all
20 vaccines..."
21   A    Yes.
22   Q    Do you see that?
23        It -- it says, "As it does with all
24 vaccines, FDA continues to monitor the safety of
25 Gardasil.  For example, FDA recently evaluated the

1 results of a postmarketing [sic] study, which
2 included [a hundred and eighty-nine thousand six
3 hundred and twenty-nine females aged] [sic] 9 to 26
4 [years] [sic], 50% [sic] of whom were 9 to 15 of age
5 to assess the risk [of new onset] [sic] of
6 autoimmune diseases after vaccination with [sic]
7 Gardasil."
8        Do you see that?
9    A    Yes.
10   Q    And the FDA paper goes on and says,
11 "Examples of these types of diseases include
12 juvenile rheumatoid arthritis, lupus, multiple
13 sclerosis, etc."
14        Do you see that?
15   A    Yeah.
16   Q    And then, the FDA says, "The results of
17 this study showed that there is no elevated risk for
18 on-" -- "for onset of new autoimmune disease
19 associated with the use of Gardasil."
20        Do you see that?
21   A    Yeah.
22   Q    And then, on the back, it says in a
23 bullet, "FDA also continually reviews all reports of
24 the [VAERS] System after vaccination with Gardasil,
25 and there is no evidence of [an] [sic] unusual

Case 3:22-md-03036-KDB    Document 289-1    Filed 01/06/25    Page 67 of 77
Gilson Technologies
A Veritext Division
877-370-3377                                                    www.veritext.com

1 clinical patterns or high reporting rates of adverse
2 events, including autoimmune diseases."
3      Do you see that?
4    A    Yes.
5    Q    And then, it says, "One of FDA's highest
6 priorities is the protection of public health
7 through safe and effective vaccines. As it does
8 with all vaccines, FDA will continue to monitor the
9 safety of Gardasil."
10      Do you see that?
11    A    Yes.
12    Q    Is it true that one of the FDA's -- in
13 your working with people that are employed there, is
14 it true that one of the FDA's highest priorities is
15 the protection of public health?
16    A    It should be.
17    Q    And is it true that they continually
18 monitor the safety and efficacy of vaccines?
19    A    They continually monitor the safety of
20 all vaccines.
21    Q    Does that include Gardasil?
22    A    Yes.
23      Whether they con- -- they -- they do
24 monitor the efficacy of -- of at least some
25 vaccines. I don't know if they -- they continuously

1 monitor the safe -- the efficacy of vaccines. I
2 doubt it.
3    Q    Can you turn back to Exhibit 18, which is
4 Sukumaran 2015?
5    A    You said 18?
6    Q    Yes, 18. Sorry.
7      Did I say something else?
8    A    No, I was just --
9    Q    I think it was 18? It was the one with
10 the CDC picture on the front.
11          MR. BAUM: Looks like that.
12 BY MR. TOMASELLI:
13    Q    There you go.
14    A    Yeah.
15    Q    That's it. Sorry to make you flip
16 through all these. No other way to do it.
17      Okay. Withdrawn.
18      Do you have Exhibit 18 in front of you,
19 sir?
20    A    Yes.
21    Q    And we looked at page 69 of this ACIP
22 publication previously and it's got "Update on HPV
23 Vaccine Safety by Dr. Sukumaran."
24      Right?
25    A    Yeah.

1    Q    All right. And this is the summary
2 report of the ACIP meeting from -- from 2015; right?
3    A    I think it's the summary report to the
4 ACIP meeting.
5    Q    Okay. And on page 70, the third
6 paragraph, do you see that it says, "There have also
7 been concerns for potential associations with
8 autoimmune and neurologic disease following
9 Gardasil."
10      Do you see that?
11    A    Yes.
12    Q    And then it says, "No evidence for a
13 causal association has been observed between
14 Gardasil and autoimmune and neurologic conditions in
15 four large epidemiological studies."
16      Do you see that?
17    A    Yes.
18    Q    One of the studies -- one of the studies
19 that they cite is Chao; correct?
20    A    Yes.
21    Q    And the other three studies that they
22 cite at this time are Arnheim Dahlström,
23 Grimaldi-Bensouda, and Scheller; correct?
24    A    And Scheller, yeah, uh-huh. Yup.
25    Q    And, again, Dr. Sukumaran, he is -- he's

1 with the -- U.S. CDC in their immunization
2 safety office; right?
3    A    Yes.
4    Q    Okay. The -- well -- withdrawn.
5      In your expert report at page 24, at the
6 bottom you have a section called "Safety of the
7 Gardasil" --
8    A    Yup.
9    Q    -- "Vaccine."
10      Do you see that?
11    A    Yeah.
12    Q    And the first sentence there, you say,
13 "The Chao paper contributed nothing regarding
14 potential adverse reactions to the Gardasil vaccine
15 in either direction"?
16    A    Correct.
17    Q    And what do you mean by "in either
18 direction"?
19    A    It doesn't contribute anything in terms
20 of saying that there is a problem or that there is
21 not a problem.
22      If you have a study that is flawed,
23 fundamentally flawed, it provides no information and
24 you cannot use it, neither to claim that there is a
25 relationship or that there is not.

Case 3:22-md-03036-KDB     Document 289-3    Filed 01/06/25     Page 68 of 77
Gilson v. Biologics
877-370-3377                    A Veritext Division                    www.veritext.com

1 You have to sort of just put it aside and
2 say, well, this is useless --
3 Q Okay.
4 A -- and then focus on other studies that
5 can help you build this jigsaw puzzle with a piece
6 here and a piece there and a piece there.
7 But the shell paper is useless to build
8 that jigsaw puzzle to find out the safety profile of
9 the Gardasil vaccine.
10 Q And so I just want to make sure we are
11 clear too that it's not your opinion anywhere that
12 the Chao paper actually shows evidence of an
13 increased risk?
14 A It shows evidence of nothing.
15 Q Okay.
16 A No evidence of any kind.
17 Q In your -- in your report in this case, I
18 think we've discussed Merck's response with respect
19 to the Article 20 procedure, as well as the Chao
20 paper; correct?
21 A Say that again?
22 Q Yeah, so --
23 A I was --
24 Q -- with respect to your expert report in
25 this case in terms of the things that -- that Merck

1 had a -- had -- well, withdrawn.
2 You discussed the Chao paper in your
3 expert report?
4 A Yes.
5 Q Correct?
6 A Yup.
7 Q You also discussed Merck's response to
8 the Article 20 questions from the PRAC?
9 A Yeah.
10 Q Correct?
11 A Yeah.
12 Q Did you undertake an analysis to see if
13 Merck sponsored or participated in other studies
14 pertaining to the safety of Gardasil after
15 marketing?
16 A You mean that was not mentioned in their
17 report to the EMA?
18 Q Whether mentioned to the report in the
19 EMA or otherwise, did you yourself -- you,
20 Dr. Kulldorff, in -- in working on this litigation
21 say, you know what, I looked at two things, I wonder
22 if there's other things?
23 Did you ever think that to yourself?
24 A So I never did any search for looking at
25 particular studies that was authored by Merck.

1 I -- when I do my literature search, I
2 was not searching by authors, I was searching about
3 topic that was papers relevant in terms of the topic
4 of the paper.
5 Q Do you know if, for example, that first
6 Grimaldi-Bensouda 2014 paper was sponsored by
7 Merck --
8 A I don't know --
9 Q -- or a post marketing commitment?
10 A -- I don't know if it was or not.
11 Q Don't know?
12 Was the Klein 2012 paper sponsored by
13 Merck?
14 A Is that the paper that looked at short
15 reviews?
16 Q Hiccup codes, yup.
17 A I'm not hundred percent sure. It might
18 have been, but I'm not a hundred percent sure.
19 Q In terms of other analyses -- post
20 marketing analyses sponsored by Merck related to
21 autoimmune conditions, you have -- you have not
22 undertaken to find those and analyze those; right?
23 A I have not done any attempt to find
24 papers specifically authored by Merck or sponsored
25 by Merck.

1 Q For example, if there was a paper out
2 there related to autoimmune disease from a first
3 author of Hanson (phonetic), that's not something
4 that you've looked at?
5 A I don't think I've looked at the Hanson
6 paper.
7 Q Okay. And you haven't looked at a paper
8 from Seeger (phonetic) and others related to
9 potential development of autoimmune disease; right?
10 A I don't think I read that paper, at least
11 not recently.
12 MR. TOMASELLI: I'm going to mark as
13 Exhibit 34 -- is that right? Is that
14 right?
15 MR. BAUM: I think so.
16 MR. WEBER: Yes, 34.
17 MR. BAUM: Yeah.
18 (Whereupon, Exhibit MK 34, Fukushima
19 Paper, was marked for
20 identification.)
21 BY MR. TOMASELLI:
22 Q I'm going to mark as Exhibit 34 a paper
23 by Fukushima, F-u-k-u- --
24 A Yes.
25 Q -- -s-h-i-m-a, and 11 other Japanese

68 (Pages 266 - 269)

1 authors; correct?
2    A   This is by Fukushima from Japan and --
3 one, two, three, four, five, six -- yes, 11 others.
4    Q   And this is an analysis that you --
5 withdrawn.
6        This is a paper that you cited in your
7 written expert report; correct?
8    A   I did cite it, yes.
9    Q   This -- this paper was a survey study in
10 Japan to determine if girls who were unvaccinated
11 also reported diverse symptoms to their doctors;
12 correct?
13    A   That was a major thing of this to find
14 out if there were people not exposed to the vaccine
15 who also -- so basically if this condition was also
16 present in unvaccinated people -- or HPV
17 unvaccinated women.
18    Q   And in your expert report, you very
19 simply compared the prevalence of symptoms that
20 occurred in girls after vaccination versus
21 unvaccinated; true?
22    A   Well, I think that there was Fukushima
23 who compared that.
24    Q   Well, actually, you're the one who
25 compared them in your expert report; right?

1    A   I think it's in figure two.
2    Q   All right. Did -- now figure two shows
3 the prevalence of symptoms, but there's no actual
4 statistical comparison of them; correct?
5    A   Yeah, they did not -- Fukushima didn't do
6 any sort of proper analysis of, I think, anything in
7 this paper.
8    Q   Well, Fukushima, in fairness, said that
9 you should not compare the prevalence of -- of
10 symptoms between vaccinated and unvaccinated; true?
11    A   I don't remember --
12    Q   Okay.
13    A   -- if they -- what they -- how they
14 phrased that.
15    Q   Okay. So let's go to page 40 and see
16 if -- see if we can look at that?
17    A   Just give me a few seconds.
18    Q   Yeah, sure.
19    A   Okay.
20    Q   Do you see there's a discussion on
21 page 40?
22    A   Yes.
23    Q   And three paragraphs down, do you see
24 there's a statement that says, "In addition"?
25    A   Yes.

1    Q   It says, "In addition to the prevalence
2 of diverse symptoms among girls without a history of
3 HPV vaccination, group A, we estimated the
4 prevalence among vaccinated girls whose symptoms
5 occurred after vaccination, group C."
6        Do you see that?
7    A   Yes.
8    Q   And then the authors say, "However, these
9 estimates cannot directly" -- sorry, withdrawn.
10        The authors then go on to state,
11 "However, these estimates cannot be directly
12 compared between groups because suspension of the
13 proactive recommendation for HPV vaccination in
14 Japan led to a smaller vaccinated population among
15 girls aged 12 to 14 years, table five."
16        Do you see that?
17    A   Yes.
18    Q   Then if you keep going down in that
19 column, there's a last paragraph on the page,
20 left-hand side, do you see, that says, "There are
21 other reasons why"?
22        Do you see that?
23    A   Uh-huh.
24    Q   The Fukushima authors on -- continuing on
25 page 40, say, "There are other reasons why we cannot

1 compare prevalence between unvaccinated and
2 vaccinated girls."
3        Do you see that?
4    A   Uh-huh. Yes.
5    Q   On the right-side column on -- staying on
6 page 40, toward the bottom, second to last
7 paragraph, do you see it says, "Orthostatic
8 dysregulation"?
9    A   Yes.
10    Q   Then the next sentence says, "Our
11 findings were in line with the fact that POTS has
12 been infrequently evaluated as a possible adverse
13 event following HPV vaccination, 37 to 41, although
14 the majority of the reports found no significant
15 safety concern or supportive evidence for a causal
16 relationship"?
17    A   No, it said "frequently."
18        You meant -- you read it as
19 "infrequently."
20    Q   Oh, I'm sorry.
21    A   It says "infrequently."
22    Q   That's my bad. So withdrawn. I'll --
23 let's start again.
24        Do you see on page 40 where the Fukushima
25 authors state, "Our findings were in line with the

Case 3:22-md-03036-KDB    Document 289-13   Filed 01/06/25    Page 70 of 77
Golomlav Technologies
877-370-3377         A Veritext Division         www.veritext.com

1 fact that POTS has been frequently evaluated as a
2 possible adverse event following HPV vaccination, 37
3 to 41, although the majority of reports found no
4 significant safety concern or supportive evidence
5 for a causal relationship."
6          Do you see that?
7     A     Yes.
8     Q     And in terms of the footnotes 37 through
9 41, they support their statement with a variety of
10 cites, and 37 is the World Health Organization;
11 correct?
12    A     Yes.
13    Q     Thirty-eight is the Arana study?
14    A     Yes.
15    Q     Thirty-nine is the Philips 2018 study?
16    A     Yes.
17    Q     Number 40 is Ward 2019; correct?
18    A     Yes.
19    Q     Forty-one is Barboi, B-a-r-b-o-i, from
20 2020; correct?
21    A     Correct.
22    Q     If you turn to the first page of the
23 article in the abstract -- well, withdrawn.
24          First of all, just so we are clear,
25 the -- the Fukushima authors stated in their

1 publication that you shouldn't compare prevalence
2 between vaccinated and unvaccinated; correct?  We
3 just went over that?
4     A     They mention something of that.
5     Q     Yeah.  And even though the Fukushima
6 authors say in their paper that you shouldn't
7 compare prevalence, you actually did compare the
8 prevalence in your written expert report; correct?
9     A     I looked at figure two where they compare
10 the prevalence --
11    Q     Right?
12    A     -- in the vaccinated and unvaccinated and
13 I basically just used -- used that.
14    Q     Okay.  But you actually ascribed
15 differences to the numbers; right?
16    A     Yeah, so I just divided their 27.8 and
17 20.2 and then I -- which is about a 40 percent
18 difference there and there's about a threefold
19 difference between 5.3 and --
20          (Whereupon, the court reporter
21          requests clarification.)
22    A     -- threefold -- threefold difference
23 between 5.3 and 15.6 for more than ten.
24          So my point was that these are different
25 POTS-related symptoms and if you look at only a few

1 of them, then there's not much of a difference.  If
2 you look at many of them, there is a bigger
3 difference.
4          So in -- in a sense, I was comparing not
5 so much the vaccinated and unvaccinated, but I was
6 comparing the difference here to the difference here
7 at fewer doses versus the difference at many doses,
8 which is much higher in terms of the -- the -- the
9 magnitude of the number of times, 40 percent versus
10 three times.
11         MR. BAUM:  And, Doctor, do you mean
12 doses or -- or symptoms?
13         THE WITNESS:  These are symptoms.
14    A     So my point is that if you then do a
15 study of POTS, and you say they have one or two
16 symptoms of POTS, you might not see a difference
17 because it might potentially, and this is just sort
18 of a -- a descriptive things of POTS.
19         But if you then want to do a formal
20 study, which Fukushima doesn't do, maybe you need to
21 focus it on those who have many symptoms because
22 that is actually where you see the biggest relative
23 difference here in the Fukushima.
24         So that would be a sort of one plausible
25 things to moving forward to sort of focus in on

1 where they found a big difference in Fukushima.
2 But, I mean, they don't do a technical, formal
3 comparison of this.
4          And I think --
5 BY MR. TOMASELLI:
6     Q     Let me --
7     A     Yeah.
8     Q     -- ask you this, Dr. Kulldorff:  Are you
9 aware of data from Japan that did do a formal
10 analysis of multiple symptoms versus multiple
11 symptoms, did you look for that?
12    A     I have not did a literature search for
13 that, no.
14    Q     Okay.  Before we get there, if you'll
15 come back to the abstract with me real quick.
16         The conclusion of the authors states that
17 adolescent Japanese girls without HPV vaccination
18 also visited hospitals with diverse symptoms similar
19 to those following HPV vaccination; true?
20    A     Yeah, I think that was the main point of
21 the paper that they weren't sure that there were
22 girls who do -- who were not vaccinated with
23 Gardasil who also had these type of symptoms.
24    Q     Yeah.
25    A     So it's not something that is unique to

1 vaccinated girls.
2    Q    And the next sentence states, "Our
3 findings predict the medical demands for coincident
4 diverse symptoms, which are temporally associated
5 with but not caused by HPV vaccination of Japanese
6 adolescents."
7        Do you see that?
8    A    That was also in the --
9    Q    The last --
10   A    Yes.
11   Q    -- last line of the abstract?
12   A    I see that.
13   Q    Do you see that, sir?
14   A    I see that.
15   Q    That's what the Fukushima authors
16 concluded from their data; correct?
17   A    That was in the conclusion, yeah.
18   Q    And you said you weren't aware of studies
19 in Japan where multiple symptoms were investigated.
20        MR. TOMASELLI:  And so I want to
21        hand you Exhibit Number 35 --
22        (Whereupon, Exhibit MK 35, Suzuki and
23        Hokono Article, was marked for
24        identification.)
25   A    Thank you.

1 BY MR. TOMASELLI:
2    Q    -- which is an article from Suzuki and
3 Hosono, H-o-s-o-n-o, related to the Nagoya City
4 study.
5        Have you seen this before?
6    A    I have not.
7    Q    Okay.  If you can turn -- well, first of
8 all, this is a study investigating the potential
9 association between vaccine and reported symptoms in
10 Japan; true?
11   A    Let me read the abstract at least --
12   Q    Sure.
13   A    -- before you ask questions about it.
14   Q    You bet.
15   A    Okay.  I mean, I haven't read the whole
16 paper now --
17   Q    No.
18   A    -- but I at least glanced through it.
19   Q    Fair enough.
20        And hopefully, you know, if -- if you
21 need to read more, that's fine.  But -- withdrawn.
22        The -- the abstract states that about
23 30,000 girls in Nagoya City responded to this
24 survey; right?
25   A    Correct.

1    Q    And the authors state that, There is no
2 significant increase in the occurrence of any of
3 the 24 reported post-HPV vaccination symptoms was
4 found.
5        Do you see that?
6    A    Yes.  And then it continues.
7    Q    Right.
8    A    Showing some increase for some things.
9    Q    Right.  And it's -- because broken down
10 by a lot of different things and we can look at
11 that, but ultimately -- well, withdrawn.
12        The conclusion, the last sentence of the
13 abstract, states that these -- I'm sorry, the
14 results suggest no causal association between HPV
15 vaccines and reported symptoms; correct?
16   A    That's what it says.
17   Q    Now, in -- in the last paper, you were
18 talking about the occurrence of one or more symptoms
19 in girls; correct?
20   A    Correct.
21   Q    Now, if you turn to page 99, there is a
22 little bit of text between the -- between figure two
23 and table two; do you see that?
24   A    Yes.
25   Q    The authors state, "There was no

1 statistically significant association between any of
2 the 24 reported symptoms and school performance,
3 school activities, other than studying and job
4 hunting and employment, at" -- and then it -- then
5 it provides a -- a few confidence intervals.
6        Do you see where I am?
7    A    Yes.
8    Q    Okay.  The next sentence is the one I
9 want you to focus on, which states, "The odds ratios
10 for development of one or more symptoms," and then
11 it has a series of odds ratios, which include
12 greater than one, greater than three, greater than
13 four, and greater than nine, which is ten or more
14 symptoms, and notes that there was no significant
15 association between HPV vaccination and multiple
16 symptoms; correct?
17   A    That's what it says.
18   Q    Right.  And so if we looked at the last
19 one, for example, this idea of greater than nine, so
20 those girls that have ten or more symptoms, the odds
21 ratio was .76 and actually was statistically
22 significantly decreased in the vaccinated versus
23 unvaccinated; correct?
24   A    That's correct.
25   Q    All right.  So at least -- and I know you

71 (Pages 278 - 281)

Case 3:22-md-03036-KDB   Document 289-3 Filed 01/06/25   Page 72 of 77
Golson v. Technologies
877-370-3377          A Veritext Division          www.veritext.com

1  haven't looked at this study before, but at least
2  this appears to be a study that had formal analysis
3  of multiple symptoms between vaccinated and
4  unvaccinated; correct?
5      A   Yeah.  But I don't think these are the
6  same multiple symptoms because I think in the
7  Fukushima paper they look at various symptoms
8  related to POTS, while here some of them are related
9  to POTS but I don't think all of them are.
10     Q   Right.  Some of them?
11     A   So I think it's a -- I mean, a loss of
12  ability to remember fundamental kanji, for example.
13  I don't know how that's related --
14             (Whereupon, the court reporter
15             requests clarification.)
16             MR. TOMASELLI:  Kanji, k-a-n-j-i.
17     A   I don't know how that's related to POTS,
18  for example.  Or --
19  BY MR. TOMASELLI:
20     Q   Yeah, there's 24 different symptoms in
21  this paper; correct?
22     A   Yeah, so that's -- so that's very
23  different from trying to define sort of a similar
24  definition for POTS.  That's -- is just not includes
25  one or two things.  That could be more generally

1  caused by a lot of -- sort of commonly caused by a
2  lot of things.
3      Q   All right.
4      A   So I think these -- I mean, these 24
5  symptoms are not specifically POTS-related.  So I
6  don't think that's very much related to what
7  Fukushima is trying to do.
8      Q   The symptoms do include, Dr. Kulldorff,
9  things like headache, fatigue, poor endurance,
10  difficulty concentrating, dizziness, difficulty
11  falling asleep.
12             Do you see all those?
13     A   Yeah.  So what are the lists for the
14  inclusions in the --
15     Q   Yeah, if you look at --
16     A   -- Fukushi-- Fukushima.
17     Q   Table two -- table two, for example.
18     A   No, but I was thinking of the Fukushima.
19  They also have a list of the various symptoms
20  somewhere.
21     Q   So if you look at the abstract of
22  Fukushima, sir, in the methods, it says that,
23  "Eligible patients had to satisfy four criteria:  An
24  age criteria and at least one of four symptoms or
25  disorders: pain, sensory dysfunction, motor

1  dysfunction, autonomic dysfunction, and cognitive
2  impairment."
3             Do you see that?
4      A   Uh-huh.
5      Q   And those symptoms persist at least
6  three months; right?
7      A   Uh-huh.
8      Q   All right.  Is that a yes?
9      A   Yeah, I -- I see that, but I don't see
10  all the -- all the ten symptoms.  That should be
11  somewhere in the paper.  I forgot where that was.
12     Q   Okay.  Oh, by the way, while you are on
13  Fukushima, can you turn to table E7 -- E,
14  table seven?
15     A   What page is that on?
16     Q   Page ten of the supplemental materials.
17     A   Okay.  Thank you.
18             Yup.
19     Q   Do you see how they -- in the table,
20  there's five rows, no consideration, less than or
21  equal to a year, less than or equal to six months;
22  do you see that, sir?
23     A   Yes.
24     Q   The -- if you don't consider when
25  symptoms occurred at all in connection with

1  vaccination, the period prevalence was 27.8;
2  correct?
3      A   Yes.
4      Q   That -- that -- that actually matches up
5  with your figure two, 27.8?
6      A   Yes.
7      Q   And if you only, according to table E7,
8  look at symptoms that occurred within a year, first
9  symptom within a year of vaccination, that period
10  prevalence is 17.5?
11     A   Right.
12     Q   Correct?
13     A   Yeah.
14     Q   And that number is actually lower than
15  the never vaccinated; correct?  17.5 is --
16     A   Well, you have to --
17     Q   -- lower?
18     A   -- compare apples to apples here.
19     Q   Well, the --
20     A   You can't compare -- you have to compare
21  apples to apples, so --
22     Q   Okay.  All right.  You can set that one
23  aside.
24             If you can come back to your --
25     A   Yeah.

1  Q  -- materials considered list, which is
2  Exhibit 2 --
3        THE WITNESS:  If I can have break
4  within --
5        MR. TOMASELLI:  Oh, yeah.
6        THE WITNESS:  -- within ten minutes
7  or so.  I don't want a break necessarily
8  right now, but at some point within the
9  next ten, 15 minutes.
10        MR. TOMASELLI:  Let's do a break
11  right now.
12        THE WITNESS:  Okay.
13        THE VIDEOGRAPHER:  The time is
14  3:34 p.m. and we are off the record.
15        (Whereupon, there was a recess taken
16        from 3:34 p.m. to 3:49 p.m.)
17        THE VIDEOGRAPHER:  The time is
18  3:49 p.m. and we are on the record.
19  BY MR. TOMASELLI:
20  Q    Dr. Kulldorff, are you ready to proceed?
21  A    Yes.
22        (Whereupon, Exhibit MK 36, Invoice,
23        was marked for identification.)
24  BY MR. TOMASELLI:
25  Q    All right.  I'm going to mark as

1  Exhibit 36 the invoice that we were sent last night.
2        Is that a true and accurate copy of the
3  invoice that we talked about earlier today?
4  A    Yes, it is.
5  Q    All right.  If you can go back to
6  Exhibit 2 real fast, which is the considered list
7  that was provided to us with your report?
8  A    Yeah.
9  Q    And tell me when you got that?
10  A    I have that.
11  Q    You'll see that number -- number seven is
12  an article in the BMJ from Hviid?
13  A    Yeah.
14  Q    H-v-i-i-d 2020; right?
15  A    Hviid.
16  Q    Yes?
17  A    Yes.  Hviid.
18  Q    And obviously we talked about the
19  Arana 2017 article at number three; right?
20  A    Yes.
21  Q    You also have an article here, number
22  eight, Cameron, which is related to monitoring in
23  Scotland; do you see that?
24  A    I see that.
25  Q    And you have, for example, number 26,

1  "HPV Vaccine Safety and Effectiveness Data."
2        Do you see that?
3  A    I see that.
4  Q    Is that the CDC's website?
5  A    I have no idea --
6  Q    All right.
7  A    -- what it is.
8  Q    All right.  Number -- number 48, it's a
9  article related to adverse events with bivalent HPV
10  vaccination in Finland; do you see that?
11  A    The 49?  Or which one?
12  Q    Forty-eight, sir?
13  A    Forty-eight?  Yeah, I see that.
14  Q    And 49 is the supplement for that
15  article; is that right?
16  A    Yeah.  So 48, that's the Skufca article.
17  Q    Yeah.
18  A    Is it?  Is it?
19  Q    Yes.
20  A    Okay, yeah.
21  Q    And 51 is the Thompson article; right?
22  A    I'm not sure.
23  Q    Okay.  Some other -- well, do you know if
24  you cited the Yih 2015 -- 2016 article in this?
25  A    The Katherine E. or the --

1  Q    Yes, Katherine E.?
2  A    Is that.
3  Q    Number twenty-three?
4  A    I think that's listed here.
5  Q    Is it number 23?
6  A    Probably.  I would have to double-check
7  that the -- the -- the title is the same.
8  Q    And Gee 2017, is that number 25?
9  A    I don't know if that is it.
10  Q    Okay.  All right.  As part of the
11  80 hours or so working on this case, do you think
12  you read every one of the articles on Exhibit 2?
13  A    I did not read all of those articles, no.
14  Q    Do you agree that vaccines represent one
15  of the greatest achievements in medicine in public
16  health?
17  A    Yes.  Together with antibiotics and
18  anesthesia and sanitation.
19  Q    Do you agree that vaccine programs have
20  significantly decreased the number of cases of
21  vaccine-preventable diseases over the past century?
22  A    More than that -- longer than that, yes.
23  Q    Do you believe that vaccines are a vital
24  medical invention allowing people to obtain immunity
25  without the risk that comes from getting sick?

Case 3:22-md-03036-KDB   Document 289-1   Filed 01/06/25   Page 74 of 77
Grilson v. Biologica Filed
877-370-3377                        A Veritext Division                        www.veritext.com

1    A   Yes.
2    Q   And regardless of what anybody wants to
3 think about the COVID pandemic, you would agree that
4 the development of several vaccines against COVID
5 infection is one of the few scientific success
6 stories of the COVID pandemic; right?
7        MR. BAUM: Objection. Irrelevant
8    and speculative.
9    A   I think that the vaccines saved the lives
10 of a lot of older people in 2021.
11      (Whereupon, Exhibit MK 37, New
12      England Journal of Medicine article
13      from Salmon, was marked for
14      identification.)
15      MR. TOMASELLI: I'm just curious.
16 BY MR. TOMASELLI:
17    Q   I'm handing you what I've marked as
18 Exhibit 37, which is a publication in New Eng- --
19 New England Journal of Medicine from Salmon,
20 S-a-l-m-o-n, and Orenstein and others; do you see
21 that?
22    A   Yes, it came out this summer.
23    Q   Yeah. I'm just curious why -- why you
24 had this on your materials reviewed list?
25    A   Don't ask me, ask my attorney.

1    Q   Okay. In terms of the second page, the
2 chart of understanding the biologic mechanisms of
3 vaccine adverse reactions; do you see that?
4    A   Yup.
5    Q   You didn't -- you didn't have any --
6 you're -- you're not citing this for any particular
7 reason that you can recall?
8    A   I did not use this one for my report.
9    Q   Okay. And at least in terms of the table
10 here, there's no vaccine adverse reaction in it
11 related to Gardasil; true?
12    A   There's no Gardasil vaccine there in that
13 table.
14    Q   And there are vaccine adverse reactions
15 that are detailed after the marketing of Gardasil;
16 correct?
17    A   Yes. The last one I listed here is from
18 2024.
19    Q   Okay.
20      MR. TOMASELLI: Dr. Kulldorff, I
21    appreciate your indulgence of my
22    questions and I'll pass the witness.
23      THE WITNESS: Okay.
24      MR. BAUM: Let me take a -- like, a
25    five-minute break and come back but I'm

1 probably not going to be more than that.
2 Maybe one minute.
3      MR. TOMASELLI: Okay. Because I --
4      MR. BAUM: You want to get out of
5 here.
6      MR. TOMASELLI: Yeah.
7      THE VIDEOGRAPHER: The time is
8 3:55 p.m. and we are off the record.
9      (Whereupon, there was a recess taken
10      from 3:55 p.m. to 3:58 p.m.)
11      MR. BAUM: We have no questions.
12      MR. TOMASELLI: Thank you, again,
13 Dr. Kulldorff, for indulging me with my
14 questions and I hope you have a great
15 rest of your day.
16      THE WITNESS: Thank you. And enjoy
17 your trip back.
18      MR. TOMASELLI: Thank you.
19      THE WITNESS: Enjoy your daughter.
20      MR. TOMASELLI: Thank you.
21      THE WITNESS: And I hope they enjoy
22 you when you come home also.
23      MR. TOMASELLI: Thank you.
24      THE WITNESS: Thank you for doing
25 the deposition in a polite and friendly

1 manner.
2      MR. TOMASELLI: You're welcome.
3      THE WITNESS: It's always fun to
4 talk about science.
5      MR. TOMASELLI: Indeed.
6      THE WITNESS: It's sort of a
7 different way of doing it than with my
8 scientific colleagues, but science is so
9 much fun.
10      MR. TOMASELLI: I agree. Thank you,
11 sir.
12      (Whereupon, there was a discussion
13      off the record.)
14      COURT REPORTER: Attorney Baum, can
15 I ask if you would like to order a copy
16 of the transcript?
17      MR. BAUM: Yeah. Could I get a
18 rough?
19      COURT REPORTER: Sure thing.
20      MR. BAUM: I don't need the final
21 rushed but just the rough.
22      COURT REPORTER: Sure thing.
23      MS. VALOFF: And I would like a copy
24 of the transcript, please.
25      COURT REPORTER: Certainly. Thank

74 (Pages 290 - 293)

Case 3:22-md-03036-KDB   Document 289-1   Filed 01/06/25   Page 75 of 77
877-370-3377            Veritext Biologic Technologies           www.veritext.com
                         A Veritext Division

1    you.
2         Is there anyone else on Zoom?
3         (Thereupon, the deposition was
4         concluded at 4:01 p.m. EDT.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              C E R T I F I C A T E
2         I hereby certify that I am a Notary Public,
3    in and for the State of Connecticut, duly
4    commissioned and qualified to administer oaths.
5         I further certify that the deponent named in
6    the foregoing deposition was by me duly sworn, and
7    thereupon testified as appears in the foregoing
8    deposition; that said deposition was taken by me
9    stenographically in the presence of counsel and
10   reduced to typewriting under my direction, and the
11   foregoing is a true and accurate transcript of the
12   testimony.
13        I further certify that I am neither of
14   counsel nor attorney to any of the parties to said
15   suit, nor am I an employee of any party to said
16   suit, nor of any counsel in said suit, nor am I
17   interested in the outcome of said cause.
18        Witness my hand and seal as Notary Public
19   this 27th day of October, 2024.
20

21   _____
22            Clifford Edwards
23   Connecticut Notary Public No. SNPC.0129714
24   My commission expires:  9/30/2026
25

1              J U R A T
2
3         I have read the foregoing 295 pages and hereby
4    acknowledge the same to be a true and correct record
5    of the testimony.
6
7
8
9         _____
10              MARTIN KULLDORFF, Ph.D.
11
12   Subscribed and sworn to
13   _____.
14   Before me this _____ day of _____,
15   2024.
16
17
18
19
20   _____
21   Notary Public
22   My Commission Expires:
23
24
25

1              DEPOSITION ERRATA SHEET
2
3    Page No._____Line No._____ Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____ Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____ Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21
22
23   SIGNATURE:_____DATE:_____
24   NAME:  MARTIN KULLDORFF, Ph.D.
25

Case 3:22-md-03036-KDB     Document 289-3     Filed 01/06/25     Page 76 of 77
877-370-3377                    Golkow Technologies                    www.veritext.com
                                A Veritext Division

1      DEPOSITION ERRATA SHEET
2 Page No._____Line No._____ Change to:_____
3 _____
4 Reason for change:_____
5 Page No._____Line No._____Change to:_____
6 _____
7 Reason for change:_____
8 Page No._____Line No._____ Change to:_____
9 _____
10 Reason for change:_____
11 Page No._____Line No._____Change to:_____
12 _____
13 Reason for change:_____
14 Page No._____Line No._____ Change to:_____
15 _____
16 Reason for change:_____
17 Page No._____Line No._____Change to:_____
18 _____
19 Reason for change:_____
20
21
22
23 SIGNATURE:_____DATE:_____
24 NAME:  MARTIN KULLDORFF, Ph.D.
25

Case 3:22-md-03036-KDB    Document 289-3    Filed 01/06/25    Page 77 of 77
Golkow Technologies
877-370-3377                          A Veritext Division                    www.veritext.com