# *EXHIBIT 9*

1          UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF NORTH CAROLINA

3              CHARLOTTE DIVISION

4

5    IN RE:  GARDASIL         ) MDL No. 3036

     PRODUCTS LIABILITY       ) 3:22-md-03036-KDB

6    LITIGATION               )

                              )

7                             )

                              )

8    THIS DOCUMENT RELATES TO )

     ALL ACTIONS              )

9    _____ )

10

11

12          Video Deposition of LUCIJA

13   TOMLJENOVIC, PH.D., taken at Wisner Baum,

14   11111 Santa Monica Boulevard, Suite 1750,

15   Los Angeles, California, commencing at

16   9:04 a.m., on Friday, October 18, 2024,

17   reported stenographically by Lisa Moskowitz,

18   California CSR 10816, Certified Realtime

19   Reporter, Nevada CCR 991, Washington CCR

20   21001437, Illinois CSR 084.004982, RPR, CLR,

21   NCRA Realtime Systems Administrator.

22

23          GOLKOW, a Veritext Division

            877.370.3377 ph | 917.591.5672 fax

24

25

Golkow Technologies,
A Veritext Division
877-370-3377                                        www.veritext.com
Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 2 of 91

1 APPEARANCES:
2
3 On behalf of Plaintiffs:
4   WISNER BAUM LLP
    BY: MICHAEL L. BAUM
5     mbaum@wisnerbaum.com
    BY: BIJAN ESFANDIARI (via Zoom)
6     besfandiari@wisnerbaum.com
    11111 Santa Monica Boulevard
7   Suite 1750
    Santa Monica, California 90025
8   (310) 207-3233
9
10 On behalf of Merck Defendants:
11  GOLDMAN ISMAIL TOMASELLI BRENNAN &
    BAUM, LLP
12  BY: ALLYSON M. JULIEN
      ajulien@goldmanismail.com
13  BY: EMMA C. ROSS, M.D.
      eross@goldmanismail.com
14  200 South Wacker Drive
    22nd Floor
15  Chicago, Illinois 60606
    (312) 681-6000
16
17  and
18
    HUGHES HUBBARD & REED
19  BY: CHARLES COHEN
      charles.cohen@hugheshubbard.com
20  One Battery Park Plaza
    New York, New York 10004
21  (212) 837-6000
22
23
24
25

1 APPEARANCES (Continued):
2
3 For Defendants Robin Scanlon, M.D.,
    Southern California Permanente Medical
4 Group, and Kaiser Foundation Hospitals:
5   KELLY TROTTER & FRANZEN
    BY: SHELBY M. JONES (via Zoom)
6     smjones@kellytrotter.com
    111 West Ocean Boulevard
7   14th Floor
    Long Beach, California 90801
8   (562) 432-5855
9
10 ALSO PRESENT VIA ZOOM:
11  CINDY HALL
    SAM SCHOENBURG
12
13
    VIDEOGRAPHER:
14
    DAVID KIM,
15  GOLKOW TECHNOLOGIES
16
17
18
19
20
21
22
23
24
25

1        I N D E X
2 EXAMINATION OF              PAGE
3 LUCIJA TOMLJENOVIC
4    By Attorney Julien        8
5    By Attorney Baum         323
6
7
8    DEPOSITION EXHIBITS
9    (STENOGRAPHER'S NOTE:  All quotations
     from exhibits are reflected in the manner in
10   which they were read into the record and do
     not necessarily denote an exact quote from
11   the document.)
12 NUMBER      DESCRIPTION          PAGE
13 1    Expert Report in the Matter of   11
        the Gardasil Litigation
14
   2    Curriculum Vitae            11
15
   3    Bio of Alan Baxter          13
16
   4    Bio of Joab Chapman         13
17
   5    Documents produced by the    16
18       witness at deposition
19 6    Materials Considered List   16
20 7    Expert Report in the Matter of  16
        the Gardasil Litigation, dated
21      9/8/24, tabbed version
22 8    Invoices                    43
23 9    Video played during deposition  57
24
25

1    DEPOSITION EXHIBITS (Continued)
2 NUMBER      DESCRIPTION          PAGE
3 10   Transcript of video marked as   59
        Exhibit 9.  To be provided by
4       defendants after the
        deposition.
5
   11   Editorial:  The             128
6       Biochemistry/Toxicity of
        Aluminum
7
   12   Article with lead author    131
8       Lucija Tomljenovic
9 13   Article by Lucija Tomljenovic  137
10 14   Article with lead author    158
        Christopher Shaw
11
   15   FDA statement entitled FDA   163
12      Information on Gardasil
        Presence of DNA Fragments
13      Expected, No Safety Risk
14 16   CDC Wonder website printout   207
15 17   Article with lead author    197
        Wakaba Fukushima
16
   18   Article with lead author Lars  204
17      Jorgensen
18 19   Article with lead author Tom   212
        Shimabukuro
19
   20   Email Chain from Louise     239
20      Brinth, dated 1/16/23
21 21   Article with lead author A.   247
        Patricia Wodi
22
   22   Article with lead author    255
23      Collins Tatang
24 23   VAERS website printout      264
25

Case 3:22-md-03036-KDB    Document 2B9-10    Filed 01/06/25    Page 3 of 91
877-370-3377                  Golkow Technologies                www.veritext.com
                              A Veritext Division

1 DEPOSITION EXHIBITS (Continued)
2 NUMBER      DESCRIPTION          PAGE
3 24   Article by Lucija Tomljenovic   269
     and Christopher Shaw
4
  25   Article with lead author Jan   270
5     Eberth
6 26   VAERS Report Number 0285806-1   286
7 27   WHO 2012 Weekly            301
     Epidemiological Record, dated
8     7/27/12
9 28   Global Advisory Committee on   306
     Vaccine Safety Statement on
10    the Continued Safety of HPV
     Vaccination
11
  29   Three articles with lead      314
12    authors Tom Jefferson, Jason
     Glanz, and Sara Krauss
13
  30   Responsum to Assessment Report   316
14    on HPV-vaccines released by
     EMA November 26th, 2015
15
16
17
18
19     QUESTIONS NOT ANSWERED
20     PAGE   LINE
21       232    2
         241    4
22
23
24
25

1        FRIDAY, OCTOBER 18, 2024
2        LOS ANGELES, CALIFORNIA
3             9:04 A.M.
4
5     THE VIDEOGRAPHER:  We are now on
6 the record.  My name is David Kim.
7 I'm a videographer for Golkow
8 Litigation Services.  Today's date is
9 October 18, 2024, and the time is
10 9:04 a.m. Pacific time.  This video
11 deposition is being held in Los
12 Angeles, California, in the matter of
13 Gardasil products liability litigation
14 MDL number 3036.  The deponent is
15 Lucija Tomljenovic.
16    Counsel, please identify
17 yourselves for the video record.
18    ATTORNEY BAUM:  Michael Baum for
19 the plaintiffs.
20    ATTORNEY JULIEN:  Allyson Julien
21 on behalf of the Merck defendants.
22    ATTORNEY COHEN:  Charles Cohen
23 also on behalf of the Merck
24 defendants.
25    ATTORNEY ROSS:  Emma Ross also on

1 behalf of Merck.
2    ATTORNEY JONES:  Shelby Jones on
3 behalf of defendants Kaiser Foundation
4 Hospital, Southern California
5 Permanente Medical Group, and Dr.
6 Robin Scanlon.
7    THE VIDEOGRAPHER:  The court
8 reporter is Lisa Moskowitz, and she
9 will now swear in the witness.
10    THE CERTIFIED STENOGRAPHER:  I am
11 a California certified stenographic
12 reporter, and my CSR license number is
13 10816.
14
15        LUCIJA TOMLJENOVIC,
16        called as a witness,
17    was examined and testified as follows:
18
19        EXAMINATION
20 BY ATTORNEY JULIEN:
21    Q.  Good morning.  Can you please state
22 and spell your full name for the record.
23    A.  It's Lucija Tomljenovic.  That's
24 L-u-c-i-j-a T-o-m-l-j-e-n-o-v-i-c.
25    Q.  Dr. Tomljenovic, as you heard, my

1 name is Allyson Julien, and I represent
2 Merck in this litigation, and I'll be taking
3 your deposition today.  I just want to start
4 with a few ground rules.
5     At some point today, I'm sure I
6 will ask a question that's unclear or I may
7 use a term inappropriately or mispronounce
8 something.  If you ask me to stop or repeat
9 or rephrase the question, I'm happy to do
10 that.  Okay?
11    A.  Yes.  No nodding.
12    Q.  Another thing is we have to give
13 verbal responses.  I know we're used to
14 nodding or shaking our head, but I'll ask
15 that you give a verbal response to my
16 questions.  If you answer a question, I will
17 assume that you understood it.
18     Is that fair?
19    A.  Yes.
20    Q.  Is there any reason you cannot give
21 complete and accurate testimony today?
22    A.  I don't think so.
23    Q.  Do you understand that this is my
24 opportunity to ask you questions about you,
25 your opinions, and the bases for those

Case 3:22-md-03036-KDB   Document 289-10   Golkow Technologies   Filed 01/06/25   Page 4 of 91
877-370-3377              A Veritext Division              www.veritext.com

1 opinions?
2    A.  Yeah, I do.
3    Q.  Now, I see you brought some
4 materials with you today.
5        Can you please identify the
6 hard-copy materials that you brought with
7 you?
8    A.  Yeah, so it's my entire expert
9 witness report in five parts and my CV and
10 the appendices that I believe was submitted
11 to you by Wisner Baum.
12       There's only two things that wasn't
13 submitted just in case, because I anticipate
14 that I'll be asked questions about my
15 education, and there are certain things that
16 perhaps I didn't emphasize well enough.
17 It's just to do with one of my
18 co-supervisors, Ph.D. co-supervisor, who is
19 one of the experts in immune diseases.  It's
20 a short bio.  That's all I took just in
21 case.
22    Q.  Okay.  Can I mark your expert
23 report as Exhibit 1, if you don't mind
24 placing -- or I can put the sticker on
25 there.

1        (Exhibit Number 1 was marked for
2 identification.)
3        THE WITNESS:  I don't like to
4 commit people's credentials to my
5 memory.
6        ATTORNEY JULIEN:  And I will mark
7 your CV as Exhibit 2.
8        (Exhibit Number 2 was marked for
9 identification.)
10       THE WITNESS:  Sorry.  There is
11 another document.  Again, it's a short
12 bio of Joab Chapman, who is one of the
13 co-authors on a paper that I was
14 involved in the study.  I was the
15 co-author on.  The paper was initially
16 published in the Journal of Vaccine
17 and went through regular peer-review,
18 and then we were notified that it was
19 under retraction.
20       The story was that it was sent by
21 another -- for another round of review
22 by the editor-in-chief, Gregory
23 Poland, and there were some concerns
24 about methodology on the basis of
25 which the paper was then retracted.

1        But we republished it later in
2 another journal because, again, we
3 believe that the retraction was
4 unjustified.  The proper reason for
5 retraction is normally fraud or
6 plagiarism, and that was not the case.
7        And the reason why I, again, took
8 this bio is because, other than Yehuda
9 Shoenfeld, this is another senior
10 author on the paper who was -- he's
11 president-elect of the Israel
12 Neurological Association with over 200
13 publications.  So he would not put his
14 name on a paper that was so
15 methodologically flawed that we would
16 risk retraction.  We are of the
17 opinion the retraction was based for
18 other motives because the
19 editor-in-chief was Gregory Poland,
20 and he does have some conflicts of
21 interest with Merck.
22       But again, long story short,
23 that's why I brought this, his bio,
24 because I kind of expected you might
25 ask me a question or two about this,

1 the paper, so. . .
2 BY ATTORNEY JULIEN:
3    Q.  Okay.  We'll get to all those, but
4 I want to mark the two documents you brought
5 with you.
6    A.  Yeah.
7    Q.  I'm marking the -- it appears to be
8 a bio of Alan Baxter as Exhibit 3 to your
9 deposition.
10       (Exhibit Number 3 was marked for
11 identification.)
12 BY ATTORNEY JULIEN:
13   Q.  I'm marking a bio of a Dr. Joab,
14 J-o-a-b, Chapman as Exhibit 4 to your
15 deposition.
16       (Exhibit Number 4 was marked for
17 identification.)
18 BY ATTORNEY JULIEN:
19   Q.  Okay.  And then I understand that
20 you -- I see you have your laptop in front
21 of you today --
22   A.  Right.
23   Q.  -- at the deposition.
24       Why did you bring your laptop to
25 the deposition?

Case 3:22-md-03036-KDB    Document 289-10    Filed 01/06/25    Page 5 of 91
877-370-3377                          Gnilson v. Biologics                          www.veritext.com
                                      A Veritext Division

1    A.  So I made a selection of articles
2 that I expect, again, you might ask some
3 questions about.  Like mostly it's studies
4 that are used by Merck and the regulators as
5 support of Gardasil safety in terms of
6 autoimmune diseases and syndromes like POTS.
7    I have certain key things in those
8 articles highlighted.  If you hand me the
9 article and say, for example, this study
10 shows there's no problem, and then there are
11 things in the articles that I highlighted
12 where, in my opinion, there is a problem or
13 there is a limitation that does not allow
14 for such firm conclusions.
15    It's simply easy to identify it
16 rather than me having to read the whole
17 paper here to find those things because
18 there's quite a number of these articles.
19    Q.  Can you read the author -- can you
20 give a short -- I want to know what
21 specifically you have listed here.  So can
22 you read the titles or the author's name and
23 year so we know what specifically you
24 thought was important to mark today?
25    A.  For example, it's Arnheim Dahlstrom

1 2013 study.  And then there is the Gronland
2 2016 study.  And then there is a couple
3 number of studies by Anders Hviid.  The 2019
4 cluster analysis of serious adverse events
5 reported in Denmark and then there is Hviid
6 2018 HPV vaccine and the risk of autoimmune
7 and neurological diseases.
8    And then there's also Hviid 2020,
9 which is Association of qHPV and selected
10 syndromes with autonomic dysfunction.
11    Q.  Are there any others that you have
12 listed?
13    A.  There are.  There's a lot of -- I
14 think Emma's got them all.
15    ATTORNEY ROSS:  If I might make a
16 suggestion.  If you want to mark as an
17 exhibit all of those articles, I can
18 send them to Lisa, and we'll have
19 them.
20    ATTORNEY JULIEN:  Okay.  I will
21 mark the digital documents you brought
22 with you today collectively as
23 Exhibit 5 to your deposition.  We may
24 have some follow-up questions on those
25 a bit later once I've had a chance to

1 look at them.
2    (Exhibit Number 5 was marked for
3 identification.)
4 BY ATTORNEY JULIEN:
5    Q.  And so other than the hard-copy
6 materials and the studies that you mentioned
7 that you have on your computer, did you
8 bring anything else with you today?
9    A.  No.
10    ATTORNEY BAUM:  She also has her
11 materials considered and Rule 26
12 expert.
13    ATTORNEY JULIEN:  I will mark your
14 materials considered list as Exhibit 6
15 to your deposition.
16    (Exhibit Number 6 was marked for
17 identification.)
18 BY ATTORNEY JULIEN:
19    Q.  Okay.  Doctor, just for ease of
20 reference today, I know you already have a
21 hard copy there with you, but I'm going to
22 mark your expert report, a tabbed version of
23 it, as Exhibit 7 to your deposition.
24    (Exhibit Number 7 was marked for
25 identification.)

1 BY ATTORNEY JULIEN:
2    Q.  And the reason why I know you have,
3 I believe, seven different sections in the
4 report where the pagination restarts; so
5 that would be challenging for us to
6 negotiate through that today.
7    A.  Yes.
8    Q.  And do you see that I've marked
9 part 1, Q2, Q3 just to help us move through
10 the deposition today more easily?
11    A.  That's nice.
12    Q.  Now, does your expert report
13 accurately reflect your views with respect
14 to POTS -- and that's Postural Orthostatic
15 Tachycardia Syndrome; POI, Primary Ovarian
16 Insufficiency; autoimmunity; dysautonomia,
17 in Gardasil as of September, 2024?
18    A.  Yeah.
19    Q.  Are there any errors that you have
20 identified that need to be corrected in your
21 report as you sit here today?
22    A.  I did identify some, but they're
23 kind of, like, typos and some grammar,
24 things like that.  But nothing that would --
25 nothing that bears any influence on the

Case 3:22-md-03036-KDB     Document 289-10     Filed 01/06/25     Page 6 of 91
Gardasil - Confidential
877-370-3377                    A Veritext Division                    www.veritext.com

1 conclusions or the changes in meaning.
2    Q.  Are all of the opinions that you
3 intend to offer in this litigation included
4 in your expert report?
5    A.  Yeah.
6    Q.  Is it correct that you have no
7 opinions about Ms. Jennifer Robi
8 specifically in your expert report in this
9 litigation?
10    A.  In the expert witness report, no, I
11 don't.
12    Q.  Okay.  Are you drawing a
13 distinction between that and something else?
14    A.  Well, again, I know that I believe
15 I'm going to be one of the expert witnesses
16 in the Jennifer Robi case in January.
17    Q.  Okay.  You know, if you are called
18 to testify, will you testify about Ms. Robi
19 specifically?
20    A.  I think from what -- because we
21 haven't had detailed conversations about
22 that, but I think I'll be only testifying
23 generally, again, about POTS and menstrual
24 irregularities because I believe that's one
25 of her symptoms too.  I would not be going

1 through her medical records or anything.
2    Q.  Have you ever served as an expert
3 witness in litigation before?
4    A.  Well, I was asked to provide an
5 expert witness report in 2014, and that was
6 an Israeli law firm.  That was when I was in
7 Israel.  I don't know if anything came out
8 of it because I was never asked to be
9 deposed or anything.  So I just basically
10 handed in an expert witness report, and that
11 was pretty much it.  So, yeah, I don't think
12 it ever went further from there.
13    Q.  Did that expert report involve
14 Gardasil or HPV?
15    A.  Yeah, yeah, it did involve
16 Gardasil.  Or HPV.  HPV vaccines.  But I
17 believe it was Gardasil.
18    Q.  And have you -- strike that.
19       Is today your first time
20 testifying?
21    A.  Right, yeah.
22    Q.  I wanted to direct your attention
23 to your materials considered list, which I
24 marked as Exhibit 6.
25    A.  Right.  Okay.

1 include everything that you reviewed --
2    A.  Yes.
3    Q.  -- to prepare for -- to prepare for
4 your -- strike that.
5       Does it include all the materials
6 that you reviewed in offering your opinions
7 in this litigation?
8    ATTORNEY BAUM:  Objection.  Vague.
9 BY ATTORNEY JULIEN:
10    Q.  You can answer.
11    A.  Does it contain everything that I
12 relied on to provide the opinion in my
13 expert witness report; right?  That's the
14 question?
15    Q.  Yes.
16       Does it -- well, let me ask it
17 first:  Does it include everything that you
18 reviewed in offering your opinions in this
19 litigation?
20    A.  Yes.
21    Q.  Okay.  And does it also include
22 everything that you relied on in offering
23 your opinions in this litigation?
24    A.  Yes.

1    ATTORNEY JULIEN:  And just to go
2 back to the report that you mentioned
3 that you prepared in Israel, we'll be
4 making a request for that, Mr. Baum.
5    ATTORNEY BAUM:  I think the
6 request that you gave us didn't go
7 back that far.  It was ten years ago.
8    ATTORNEY JULIEN:  Okay.  We'll
9 take a look.
10    ATTORNEY BAUM:  If we can dig it
11 up, I'll consider getting it for you,
12 but I think that the request didn't go
13 back that far.
14    ATTORNEY JULIEN:  We'll take a
15 look.  Thank you.
16    ATTORNEY BAUM:  I think the
17 request only went back four years.
18    ATTORNEY ROSS:  I think we
19 requested anything at any time related
20 to an opinion with Gardasil --
21    (Clarification by the Certified
22 Stenographer.)
23    ATTORNEY JULIEN:  We'll talk about
24 it later.
25    ATTORNEY BAUM:  We'll sort it out.

Case 3:22-md-03036-KDB    Document 289-10 Filed 01/06/25    Page 7 of 91
Gibson v. Technologies
877-370-3377                 A Veritext Division                 www.veritext.com

1 BY ATTORNEY JULIEN:
2    Q. You worked with Dr. Louise Brinth
3 on portions of your report; is that correct?
4    A. I had discussions, yes, with her.
5    Q. Dr. Brinth is a medical doctor?
6    A. Yes.
7    Q. Do you consider her an expert in
8 POTS?
9    A. I do, because she's evaluated
10 hundreds and hundreds of patients with
11 dysautonomia in her career and chronic
12 fatigue syndrome. So yes, I do consider her
13 an expert.
14    Q. You do not have that clinical
15 expertise in --
16    A. No, I don't. I don't. I just --
17 well, I reviewed a lot of papers for many
18 years of being researching POTS, but I don't
19 pretend to be a medical doctor because I'm
20 not, which is why I wanted to pass by her.
21 And that's in my report to see if she had
22 any objections and corrections, and she
23 didn't have any.
24    Q. Did you rely on Dr. Brinth in
25 reaching your opinions in this case?

1    A. Well, I did rely because the
2 algorithm that we developed, that was our
3 joint work, it's not my sole work obviously;
4 so I -- but at that time, I reviewed a lot
5 of adverse events reports from VAERS.
6 You're probably familiar with that. You
7 know that VAERS also codes -- has a list of
8 preferred terms and MedDRA codes to describe
9 the adverse events.
10    So I reviewed hundreds of POTS
11 reports to see what are the most common
12 terms used to code for symptoms of POTS.
13 And then Louise with her clinical
14 experience -- also she suggest -- she
15 obviously identified other terms that would
16 be relevant.
17    So we made a joint list of terms
18 that we thought were relevant, and we tried
19 to reach a consensus of which should be
20 final included in our algorithm. So I did
21 rely on her.
22    Q. I'll be asking you some questions
23 about your disproportionality analysis in a
24 bit.
25    Is it your understanding that

1 Dr. Brinth is a plaintiff's expert in this
2 case?
3    ATTORNEY BAUM: I'm just going to
4    object. I think you already know
5    which experts we've identified for
6    this case, and she's not one of the
7    experts we identified for this case.
8    She did not give a report. She's a
9    consultant. To the degree that you
10    start moving into consulting issues,
11    I'm going to have to, like, curb those
12    questions.
13    ATTORNEY JULIEN: She just said
14    that she relied on her in reaching her
15    opinion. So I'll ask my question
16    again.
17 BY ATTORNEY JULIEN:
18    Q. Is it your understanding that
19 Dr. Brinth is a retained expert or
20 consultant in this case on behalf of the
21 plaintiffs?
22    ATTORNEY BAUM: Objection. Calls
23    for her to understand that
24    information. It would have been the
25    lawyers to do that. That's not her

1 job.
2    ATTORNEY JULIEN: Okay. That's
3    beyond the form. But I'll ask the
4    question again.
5 BY ATTORNEY JULIEN:
6    Q. Is it your understanding that
7 Dr. Brinth is a retained expert or
8 consultant in this litigation on behalf of
9 the plaintiffs?
10    A. So I can answer; right?
11    Q. This is not privileged.
12    Is that your understanding?
13    A. Yeah, yeah.
14    Q. Okay.
15    A. Just let me answer fully. She
16 is -- as I understand, she's a consultant,
17 but not the expert in the sense like I am.
18 She didn't provide any expert witness
19 report.
20    Q. Do you understand that she's being
21 paid by plaintiff lawyers in this case to
22 work with you?
23    A. I don't know that.
24    Q. If you go to page 6 of your report
25 under Q1, the first question, you say that

Case 3:22-md-03036-KDB    Document 289-10    Filed 01/06/25    Page 8 of 91
877-370-3377    Gnibum Baumgartner    www.veritext.com
A Veritext Division

1 Dr. Brinth reviewed and endorsed question 1
2 in your report; is that correct?
3 A. Yeah, yeah.
4 Q. So did you send her a draft of your
5 report before it was final?
6 A. Yeah, I sent -- send her a draft
7 before it was final. And she only --
8 ATTORNEY BAUM: Okay. Hold it.
9 I'm just going to object to the degree
10 you are now asking questions that are
11 not related to -- asking about
12 communications between people who
13 worked with us on the case and our
14 experts. I think the protocol says
15 you don't get to go there.
16 ATTORNEY JULIEN: Well,
17 Dr. Tomljenovic said that she relied
18 on Dr. Brinth, and she disclosed in
19 her report that Dr. Brinth reviewed
20 and endorsed question 1 of her report.
21 So I'm asking about that.
22 ATTORNEY BAUM: And that's the
23 limit to which I think you can go.
24 You can ask, you know, did she rely?
25 Yes. But to get all the

1 communications, I don't think you get
2 all those.
3 ATTORNEY JULIEN: Well, we can
4 have that discussion later.
5 BY ATTORNEY JULIEN:
6 Q. Did you exchange drafts of your
7 report with Dr. Brinth by email?
8 A. Yeah, yeah, I did.
9 Q. And to the extent that she sent any
10 edits to you, did she send those by email?
11 A. Yes.
12 Q. When did you first speak with
13 Dr. Brinth regarding the opinions that you
14 offer in this case?
15 A. Regarding the?
16 Q. Regarding the opinions that you
17 offer in this case?
18 A. Oh, opinions. Like specifically
19 after I was called to be an expert witness
20 or in general?
21 ATTORNEY BAUM: Again, you get to
22 get what did she rely upon and what
23 material she relied upon with respect
24 to Dr. Brinth. You don't get to have
25 all of her communications with

1 Dr. Brinth. So --
2 ATTORNEY JULIEN: I'm entitled to
3 ask when she first spoke with
4 Dr. Brinth. I didn't ask for the
5 substance of the communications.
6 You're saying I can't know when she
7 first spoke with Dr. Brinth?
8 THE WITNESS: I spoke with her
9 even before I got involved in this
10 litigation because we published on
11 POTS, and she published on POTS. So
12 we communicated even before she was
13 aware of my work and I was aware of
14 hers.
15 Obviously, when I got involved in
16 this case, we had further
17 communication because, again, I know
18 she's a clinician, and I like to
19 consult brains better than my own.
20 BY ATTORNEY JULIEN:
21 Q. Are you relying on any other expert
22 in this case for any opinion that you're
23 offering?
24 A. Not really. Not any of the experts
25 that are -- that are being deposed. I'm

1 relying only on -- I'm relying on the
2 research literature. Obviously that's in my
3 materials considered list.
4 Q. You have a Ph.D. in biochemistry;
5 correct?
6 A. Yeah.
7 Q. Would you describe yourself as a
8 biochemist by trade?
9 A. I would. That's my Ph.D., so . . .
10 Q. Are you a medical doctor?
11 A. I am not a medical doctor.
12 Q. You have never held a license to
13 practice medicine in any country; correct?
14 A. No.
15 Q. Let me reask it. There was a
16 double negative there. Have you ever held a
17 license to practice medicine in any country?
18 A. No, I haven't.
19 Q. Have you ever attended medical
20 school?
21 A. No, I have not attended medical
22 school.
23 Q. Do you have any medical training
24 whatsoever?
25 A. Formal medical training, no.

Case 3:22-md-03036-KDB    Document 289-10    Filed 01/06/25    Page 9 of 91
Golson v. Pologlogics
877-370-3377    A Veritext Division    www.veritext.com

1 Q. You are not a pathologist; correct?
2 A. No, I'm not a pathologist.
3 Q. You are not a cardiologist;
4 correct?
5 A. No, I'm not a cardiologist.
6 Q. You are not a gynecologist;
7 correct?
8 A. No.
9 Q. Are you a gynecologist?
10 A. No, I'm not a gynecologist.
11 Q. Are you an immunologist?
12 A. Again, part of the reason why I
13 brought this bio, my Ph.D. cosupervisor was
14 an immunologist, and he's a well-recognized
15 expert in autoimmune diseases. He was
16 working especially on diabetes when I was in
17 his lab. I spent over a year in Yehuda
18 Shoenfeld's lab working mainly on
19 Gardasil-related projects.
20     I have an extensive collaboration
21 with Yehuda. Because of the type of work I
22 do, which basically involves neurology and
23 immunology, that's all I've been reading and
24 researching about for the last over ten-plus
25 years, research literature -- scientific

1 research literature on immunology and
2 neurology because it's directly relevant to
3 my work.
4     Every basic scientist is trained to
5 understand basic science concepts. During
6 my Ph.D., I didn't attend medical school,
7 but we had -- we had courses in human
8 physiology and anatomy and histology. And
9 so you need to have some basic
10 understanding, and you get it during your
11 formal training to know how the human body
12 works.
13 Q. Are you a medical doctor with a
14 specialty in immunology?
15 A. No, I'm not.
16 Q. Are you a medical doctor with a
17 specialty in rheumatology?
18 A. No.
19 Q. Are you a medical doctor with a
20 specialty in neurology?
21 A. I am not.
22 Q. Have you ever diagnosed a patient
23 with POTS?
24 A. No, I have not.
25 Q. Have you ever treated a patient for

1 POTS?
2 A. No, I have not.
3 Q. Have you ever diagnosed a patient
4 with primary ovarian insufficiency, POI?
5 A. No, I have not.
6 Q. Have you ever treated a patient for
7 POI?
8 A. No.
9 Q. Have you ever diagnosed the cause
10 of someone's inflammation?
11 A. No, ma'am.
12 Q. Have you ever personally tested a
13 patient for inflammation?
14 A. No, I haven't.
15 Q. Have you ever personally reviewed
16 imaging related to anyone's inflammation?
17 A. No.
18 Q. Have you ever personally reviewed
19 test results related to anyone's
20 inflammation?
21 A. Test results, well, I've seen
22 medical records of plaintiffs that have --
23 obviously they have blood test results and
24 sometimes there are inflammatory markers
25 there, so . . .

1 Q. But you wouldn't be called on as a
2 medical professional --
3 A. No, of course, no.
4 Q. -- to interpret those results?
5 A. No.
6 Q. Have you ever treated a patient in
7 any capacity in your life?
8 A. No, I haven't.
9 Q. Have you ever diagnosed anyone with
10 any disease?
11 A. No.
12 Q. Have you ever diagnosed the cause
13 of anyone's disease?
14 A. No.
15 Q. Have you ever prescribed a vaccine
16 for a patient?
17 A. No.
18 Q. Have you ever personally performed
19 the diagnostic tests for POTS?
20 A. No.
21 Q. Have you ever personally performed
22 the diagnostic test for POI?
23 A. No, I haven't.
24 Q. Have you ever personally performed
25 the diagnostic test for chronic fatigue

1 syndrome?
2    A. No.
3    Q. And today for short, I'll call
4 chronic fatigue syndrome CFS, if that's
5 okay.
6    A. Yes.
7    Q. Have you ever -- strike that.
8       Have you ever personally performed
9 the diagnostic test for chronic regional
10 pain syndrome, or CRPS?
11    A. No, I haven't.
12    Q. Have you ever prescribed medication
13 for POTS, POI, CFS, or CRPS?
14    A. No.
15    Q. Have you ever prescribed any
16 medication to a patient in your life?
17    A. No, I haven't.
18    Q. Do you have any clinical experience
19 with patients?
20    A. No, I haven't.
21    Q. Do you consider yourself an expert
22 in the clinical presentation of POTS?
23    A. In the clinical presentation of
24 POTS?
25    Q. Correct.

1    A. Well, I understand obviously from
2 the literature how POTS is being diagnosed
3 and what are the requirements for the
4 diagnosis of POTS. So I don't know if that
5 answers the question, but obviously there
6 are diagnostic criteria for POTS, such as
7 tachycardia upon changing of position, lying
8 to standing, that has to be either over 30
9 or 40 beats per minute depending on one's
10 age.
11       If it's teenagers between 12 and
12 19 years of age, it's going to be 40 beats
13 per minute, and it's got to be without
14 orthostatic hypertension because if there's
15 orthostatic hypertension, that's an
16 exclusion criteria for POTS. It's not POTS.
17 It's orthostatic hypertension.
18       Obviously POTS is a syndrome that's
19 chronic; so people may have tachycardia upon
20 changing postures. But what distinguishes
21 POTS is the symptoms of orthostatic
22 intolerance need to be present for at least
23 three to six months.
24       There is some difference in the
25 expert literature. In the beginning, they

1 were saying six, but now there's some
2 reports that say it's three. In any case,
3 it's got to be a chronic condition. And
4 obviously there have to be -- there has to
5 be an exclusion of other reasons, other
6 possible causes of tachycardia such as
7 hyperthyroidism and deconditioning.
8    Q. And so just to clarify, you
9 consider yourself an expert in the clinical
10 presentation of POTS because you've read
11 literature about POTS; is that correct?
12    A. Again, I'm not a medical doctor,
13 so --
14    Q. So do you -- go ahead. Sorry.
15    A. I cannot say I'm an expert to the
16 same extent as Louise because I haven't
17 treated patients, so. . .
18    Q. That's why you consulted her in the
19 first place because you don't consider
20 yourself an expert in POTS; correct?
21       ATTORNEY BAUM: Objection.
22    Mischaracterizes her testimony.
23       THE WITNESS: I'm not a clinical
24    expert, but I've read -- I've read a
25    large amount of literature on POTS. I

1    have listened to many presentations of
2    POTS by experts; so it's a far cry to
3    say I know nothing about POTS.
4       But as I said, I don't pretend to
5    be a clinician because I'm clearly
6    not. I'm not an M.D. But it doesn't
7    mean I don't know anything about POTS
8    and that I wouldn't know from the
9    literature how to distinguish POTS
10    from multiple sclerosis.
11 BY ATTORNEY JULIEN:
12    Q. Have you ever been tasked with
13 determining whether anybody's POTS was
14 autoimmune in nature?
15    A. Have I ever been tasked to?
16    Q. Uh-huh.
17    A. No, not in particular, no.
18    Q. Have you ever worked for the U.S.
19 Food and Drug Administration, the FDA?
20    A. No.
21    Q. Have you ever worked for the
22 European Medicines Agency, the EMA?
23    A. No, I haven't.
24    Q. Have you ever worked for any
25 regulatory authority?

Case 3:22-md-03036-KDB    Document 239-10 Filed 01/06/25    Page 11 of 91
877-370-3377                    Golkow Technologies                    www.veritext.com
                              A Veritext Division

1   A. No.
2   Q. Have you ever worked for any public
3 health authority?
4   A. No.
5   Q. Did you have any responsibility for
6 the 2015 Article 20 proceeding that occurred
7 in the EMA?
8   A. No, not -- no, I wasn't involved in
9 that.
10   Q. Have you ever been involved in the
11 design of a clinical trial for a vaccine?
12   A. No.
13   Q. Have you ever served as a peer
14 reviewer on a scientific journal?
15   A. Yes, I have.
16   Q. Which journal?
17   A. Well, the latest was the
18 International Journal of Risk in Medicines
19 and Safety. I -- also Journal of
20 Alzheimer's Disease. And I know over the
21 years, I did -- I was sent papers to review,
22 but my memory doesn't go as far to tell you
23 which journals exactly.
24   Q. Can we take a look at your CV,
25 which we marked as Exhibit 2 to your

1 deposition.
2      Is your CV up to date and accurate?
3   A. I noticed that there's a missing
4 publication, and it's from my Ph.D. work.
5   Q. Do you have the title of that?
6 That's okay if you're not able.
7   A. I actually have it on my computer.
8   Q. You can take a look at a break, and
9 we can get the name of that.
10   A. Yes.
11   Q. Other than the missing publication,
12 anything else?
13   A. No. I know what the publication is
14 about.
15   Q. Are you currently affiliated with
16 any academic research institution?
17   A. Currently not.
18   Q. The last time you were affiliated
19 with an academy research institution was
20 2017?
21   A. Yeah, that would be 2017.
22   Q. And -- strike that.
23      You worked at Dr. Christopher
24 Shaw's research lab as a post-doctoral
25 research fellow at the Department of

1 Ophthalmology and Visual Sciences University
2 of British Columbia from December of 2010 to
3 May of 2017; is that correct?
4   A. Yes.
5   Q. In your role as a research fellow
6 at Dr. Shaw's lab, you coauthored a number
7 of publications with Dr. Shaw; right?
8   A. Yes.
9   Q. And you mentioned earlier that you
10 worked as a research fellow at the
11 Zabludowicz --
12   A. Zabludowicz Center, yes.
13   Q. -- Center for Autoimmune Diseases
14 at Shea Medical Center in Tel Aviv from 2013
15 through 2014?
16   A. Yes.
17   Q. And you worked as a research fellow
18 under the leadership of Dr. Yehuda
19 Shoenfeld, according to your report?
20   A. Yes.
21   Q. Are you aware that Dr. Shoenfeld is
22 a paid plaintiff's expert in this case just
23 like you?
24   A. Yes.
25   Q. You've only given two talks as an

1 invited speaker since 2015; is that correct?
2   A. Yeah, I believe so.
3   Q. Looks like you gave a talk as an
4 invited speaker in 2016?
5   A. And 2024.
6   Q. Okay. So you gave -- the last two
7 talks that you've given as an invited
8 speaker since 2015 were in 2016 and this
9 year in 2024; is that right?
10   A. Yes.
11   Q. And then according to your CV, you
12 have served as a research consultant for
13 Wisner Baum since November of 2021?
14   A. Correct.
15   Q. Do you still currently serve as a
16 research consultant for Wisner Baum?
17   A. Well, I'm an expert witness, and a
18 research consultant goes with it.
19   Q. And do you understand that Wisner
20 Baum is plaintiff's counsel in this case?
21 You're joined here by Mr. Baum himself;
22 right?
23   A. Right.
24   Q. Now, prior to November of 2021, did
25 you do any work for Wisner Baum?

11 (Pages 38 - 41)

1    A. Prior to November, 2021, no.
2    Q. So just to clarify, do you
3 understand that you are currently a research
4 consultant for Wisner Baum, as you sit here
5 today?
6    A. Yes.
7    Q. And I assume that you were being
8 paid by Wisner Baum for your work as a
9 research consultant?
10    A. Well, only since July because,
11 again, as you've seen from my CV, I was
12 initially hired by CHD because Robert
13 Kennedy is a co-counsel in this litigation.
14 So CHD was initially paying my salary up
15 until ending with June, 2024.
16    Q. Just to be clear, prior to July
17 of 2024, you had not received payment from
18 Wisner Baum; is that correct?
19    A. Yeah, no, I haven't. I still
20 haven't received payment because I only
21 submitted my invoices, like, few days ago.
22        ATTORNEY BAUM: Try to just answer
23    the question.
24 BY ATTORNEY JULIEN:
25    Q. While we're on that topic, I will

1 mark your invoices as Exhibit 8.
2        (Exhibit Number 8 was marked for
3    identification.)
4 BY ATTORNEY JULIEN:
5    Q. Doctor, I've marked your -- the
6 invoices that were produced to me yesterday
7 as Exhibit 8 to your deposition.
8        ATTORNEY BAUM: Which exhibit
9    number is this?
10        ATTORNEY JULIEN: 8.
11 BY ATTORNEY JULIEN:
12    Q. And your -- so just to be clear,
13 Exhibit 8 to your deposition, that is a
14 combination of three different invoices
15 that --
16    A. Yeah.
17    Q. -- you have, I guess, issued
18 related to your work as an expert?
19    A. Yes.
20    Q. And your disclosure indicates that
21 your hourly rate is $350 an hour?
22    A. Yes.
23    Q. Is that correct?
24    A. It is.
25    Q. You charge $350 an hour for your

1 work as a plaintiff's expert in this case?
2    A. Yes.
3    Q. Are you being paid $350 an hour to
4 testify here today?
5    A. I don't know. I haven't discussed
6 that.
7    Q. Would you be paid $350 an hour if
8 this matter were to go to trial and you had
9 to testify there?
10    A. And, again, I don't know because we
11 haven't discussed that at all.
12    Q. Exhibit 8 is a combination of three
13 different invoices.
14        They are all dated October 14,
15 2024; is that correct?
16    A. Yeah, because that's when I
17 submitted them.
18    Q. Okay. Invoice 1 is for the month
19 of July, and it totals $72,450; correct?
20    A. Yes.
21    Q. Invoice 2 is for the month of
22 August, 2024, and it totals $96,250;
23 correct?
24    A. Yes.
25    Q. And invoice 3 is for the month of

1 September, 2024 and totals $55,300; correct?
2    A. Correct.
3    Q. In sum, the produced -- strike
4 that.
5        In sum, your produced invoices
6 related to your work in this case total
7 $224,000; is that correct?
8    A. Correct.
9    Q. Going back to your CV, you have
10 also worked as a research consultant for the
11 Children's Health Defense since November
12 of 2021?
13    A. Correct. I have, but it was
14 exclusively related to the Gardasil
15 litigation because that's what I was hired
16 for.
17    Q. Prior to November of 2021, did you
18 do any work for Children's Health Defense?
19    A. No.
20    Q. Do you currently serve as a
21 research consultant for Children's Health
22 Defense, as you sit here today?
23    A. No, I don't.
24    Q. When did you stop working as a
25 research consultant for the Children's

Case 3:22-md-03036-KDB    Document 239-10 Filed 01/06/25    Page 13 of 91
Golkow Technologies
877-370-3377    A Veritext Division    www.veritext.com

1 Health Defense?
2    A. So that would be end of June.
3    Q. June, 2024?
4    A. June, 2024, yes.
5    Q. So from -- strike that.
6       From November, 2021 until June
7 of 2024, you served as a research consultant
8 for both Wisner Baum and the Children's
9 Health Defense?
10    A. Can you repeat that? Sorry.
11    Q. From November, 2021 --
12    A. Yeah.
13       ATTORNEY BAUM: Just --
14       ATTORNEY JULIEN: Yeah.
15       ATTORNEY BAUM: I think you're
16    misreading what her CV says.
17       ATTORNEY JULIEN: Oh, okay. I'll
18    reask the question.
19 BY ATTORNEY JULIEN:
20    Q. So from November of 2021 until June
21 of 2024, you served as a research consultant
22 for Wisner Baum and Children's Health
23 Defense?
24    A. Yeah, I don't think she's
25 misreading, but there is a slight inaccuracy

1 because --
2       ATTORNEY BAUM: Oh, okay.
3       THE WITNESS: Yeah, there is --
4 BY ATTORNEY JULIEN:
5    Q. Can you clarify?
6    A. Yeah, there is a slight inaccuracy
7 because I stopped working for Children's
8 Health Defense and stopped receiving salary
9 after June. So June, 2024 was my last
10 salary, and that's where I stopped working,
11 and I began working exclusively for Wisner
12 Baum.
13    Q. Okay. So let me reask and just
14 make sure this is clear.
15       ATTORNEY BAUM: Let me just --
16       THE WITNESS: So from --
17       ATTORNEY BAUM: -- clarify. She's
18    a little confused. She was retained
19    as an expert and became an expert
20    starting in that period of time, and
21    she began billing as an expert at that
22    point in time. She was not a salaried
23    employee.
24       ATTORNEY JULIEN: Okay.
25 ///

1 BY ATTORNEY JULIEN:
2    Q. So let me ask it this way: From
3 November of 2021 until June of 2024, you
4 served as a research consultant for the
5 Children's Health Defense?
6    A. And Wisner Baum, even though
7 Children's Health Defense was paying my
8 salary. But I was a research consultant for
9 Wisner Baum because, again, that's what I
10 was hired.
11    Q. And in June -- or excuse me.
12 Strike that.
13       In July of 2024 to the present, you
14 stopped being paid by the Children's Health
15 Defense and started being paid by Wisner
16 Baum as an expert in this case?
17    A. Correct.
18       ATTORNEY BAUM: That's actually
19    not just Wisner Baum. It's for the
20    litigation committee.
21 BY ATTORNEY JULIEN:
22    Q. You understand that Robert F.
23 Kennedy, Jr. is the founder of the
24 Children's Health Defense?
25    A. I do.

1    Q. And I assume you understand that
2 Robert F. Kennedy, Jr. is a plaintiff lawyer
3 in this case?
4    A. Yes.
5    Q. What -- what was your annual salary
6 for the Children's Health Defense?
7    A. Well, it was an hourly salary, and
8 I started at $25 per hour for the first
9 year, and then they increased it to $50 per
10 hour.
11    Q. How much would you estimate that
12 you received per year from the Children's
13 Health Defense from 2021 until you stopped
14 working for them this year?
15    A. I don't like guessing, but I was
16 normally working pretty much -- well,
17 40 hours a week. So it would be around 160,
18 170 hours per month. And when the salary
19 was increased, that was between 8- to $9,000
20 a month.
21    Q. Do you have invoices or
22 documentation showing your payments from the
23 Children's Health Defense?
24    A. Not invoices because the way it
25 worked is this online program, BambooHR. I

Case 3:22-md-03036-KDB    Document 239    Filed 01/06/25    Page 14 of 91
Golkow Technologies
A Veritext Division
877-370-3377    www.veritext.com

1 suppose you guys are familiar with it. It's
2 not just like -- Children's Health Defense
3 is not the only organization that uses it.
4      Basically, you have a password, and
5 you log your hours. And then every month,
6 it's submitted to their HR department and
7 then they pay you because obviously they
8 have your account details. But there's no
9 paperwork because everything was online.
10      Again, you log in, you log in your
11 hours, and put a description of work, what
12 you worked on, and it's autosubmitted at the
13 end of every month.
14      ATTORNEY JULIEN: We'll be asking
15      for a production of whatever
16      documentation she has or has access to
17      regarding her payments from the
18      Children's Health Defense.
19 BY ATTORNEY JULIEN:
20      Q. Has your work for Wisner Baum and
21 the Children's -- well, strike that.
22      Has your work for plaintiff's
23 counsel and the Children's Health Defense
24 been your only source of income since 2021?
25      A. Yeah.

1      Q. Doctor, is it fair you do not hold
2 conventional views that are aligned with
3 mainstream -- strike that.
4      Is it fair to say you hold
5 unconventional views that are not aligned
6 with the mainstream scientific community?
7      ATTORNEY BAUM: Objection. Vague,
8      misstating.
9      THE WITNESS: Well, I hold some
10      views that a lot of scientists don't
11      agree with, but then there's a lot of
12      scientists that do agree with them.
13      And they are very well-backed by
14      research literature.
15      But there is certain politics and
16      financial interests involved to
17      suppress this kind of research. And
18      there is, in my opinion, science has
19      almost become like a religion because
20      you're not allowed to challenge
21      certain things because they're so
22      widely accepted, even though they're
23      not very well established.
24      And here is one example that I can
25      well identify with where a colleague,

1      again, who works in the same field,
2      emailed me to tell me that his
3      research paper has -- well, he
4      submitted it for publication, and it
5      was outright rejected by the editor
6      under -- this was the explanation.
7      This paper is inadmissible because it
8      questions the safety of vaccines.
9      Which is pretty ridiculous because
10      it's, like, so we are not allowing any
11      research that is critical of vaccines.
12      That's the reason. We're not
13      going to read the paper, see whether
14      it's scientifically sound, whether the
15      conclusions are supported by the data.
16      We just don't want to admit anything
17      that's critical of vaccines.
18      Again, to me, that's not science.
19      That's like a cult religion. I have
20      to also give a background why I came
21      to my views.
22      ATTORNEY BAUM: I'm just going to
23      stop you there. Try to answer just
24      the question she's asked.
25      THE WITNESS: Okay.

1      ATTORNEY BAUM: She'll get there.
2 ///
3 BY ATTORNEY JULIEN:
4      Q. Doctor, do you believe in
5 evolution?
6      ATTORNEY BAUM: Objection.
7      Irrelevant.
8      THE WITNESS: I believe in
9      microevolution, speciation.
10 BY ATTORNEY JULIEN:
11      Q. You believe in -- sorry,
12 speciation? Is that what you said?
13      A. I actually worked in a
14 developmental evolutionary -- the short for
15 it is evol/devel app, so evolution and
16 development. That was my Ph.D. work.
17      It's a publication that I haven't
18 put on my CV, but basically my research
19 supervisor -- he actually was interested --
20 he was researching specifically corals
21 because the university I graduated from is a
22 marine biology-centered university.
23      But what he found is that there's a
24 lot of genes that corals share in common
25 with higher species, including vertebrates.

14 (Pages 50 - 53)

Case 3:22-md-03036-KDB    Document 239-11  Filed 01/06/25    Page 15 of 91
877-370-3377                Gowda v. Technologies               www.veritext.com
                           A Veritext Division

1  What we were doing, and that's the paper
2  that was published, is these genes were
3  involved in development.  So one of the
4  experiments that we have done is we
5  identified the same set of genes in flies
6  that are responsible for head development,
7  and we were engineering mutant flies that do
8  not express the gene.
9        The result of it is that the fly
10  didn't develop the head properly.  And we
11  were able to rescue that mutant by
12  transferring genes from corals, the same
13  homologous genes in corals and expressing it
14  in flies, and that would rescue the mutant
15  phenotype.
16        So this shows that there is common
17  building blocks across most phyla, and it
18  supports -- again, supports certain --
19  again, certain common pathways across all
20  phyla.
21    Q.  Doctor, you have called evolution
22  pseudoscience; correct?
23        ATTORNEY BAUM:  Objection.  If you
24    have a reference that you're referring
25    to, please provide the piece of paper.

1  BY ATTORNEY JULIEN:
2    Q.  You have called evolution
3  pseudoscience; correct?
4        ATTORNEY BAUM:  Objection.  Do you
5    have a piece of paper that you're
6    referring to?
7        ATTORNEY JULIEN:  I am able to ask
8    the questions I want to ask.  Thank
9    you.  That's not a form objection.
10  BY ATTORNEY JULIEN:
11    Q.  Have you called evolution
12  pseudoscience?
13    A.  Can you tell me where does that
14  come from?  Because I don't remember
15  everything I said.  I'm not saying I didn't
16  say it, but I would like to see the whole
17  context.
18        ATTORNEY JULIEN:  Can we go off
19    the record for a moment?
20        THE VIDEOGRAPHER:  We are now
21    going off the record, and the time is
22    9:56 a.m.
23        (Recess taken from 9:56 a.m. to
24    9:59 a.m.)
25        THE VIDEOGRAPHER:  We are now

1  going back on the record, and the time
2  is 9:59 a.m.
3        ATTORNEY BAUM:  Okay.  I just want
4    to lodge a couple of objections.  It
5    sounds like you're getting ready to,
6    number one, play some things that are
7    not part of her reliance materials.
8        Number two, you are asking
9    questions about things that are not
10    related to her opinions.  It looks
11    like you're trying to go into what
12    looks like religious beliefs, which
13    are objectionable under Federal Rule
14    of Evidence 610 and California Rule of
15    Evidence 789.
16        I'm going to direct her not to
17    answer any questions that relate to
18    this line of questioning.
19        ATTORNEY JULIEN:  Okay.  So we'll
20    just plan to bring you back,
21    Dr. Tomljenovic, to ask you about your
22    publicly available statements about
23    evolution.  But I am going to mark
24    this video as Exhibit 9 to your
25    deposition.

1        (Exhibit Number 9 was marked for
2    identification.)
3  BY ATTORNEY JULIEN:
4    Q.  This is, again, a publicly
5  available video interview that you gave.
6        ATTORNEY BAUM:  Again, I object to
7    any questioning that doesn't relate to
8    her opinions in this case.
9        ATTORNEY JULIEN:  Let me restart
10    it.  I think you were talking when it
11    was playing.
12        (Video played.)
13        THE WITNESS:  Yeah, I remember
14    that.
15        ATTORNEY BAUM:  I'm going to
16    object to this line of questioning.
17    It's outside the scope of her opinions
18    and is a violation of the Federal
19    Rules of Evidence under 610 and
20    California Evidence Code 789.
21        ATTORNEY JULIEN:  And I believe
22    this is relevant.  It is absolutely
23    relevant for purposes of the judge and
24    jury to hear her views on accepted
25    science, and it goes to the

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 16 of 91
Golkow Technologies,
877-370-3377                   A Veritext Division                   www.veritext.com

1 reliability of her assessment here.
2 So I'm going to ask my questions.
3 BY ATTORNEY JULIEN:
4 Q. If he instructs you not to answer,
5 that's fine, and we will just plan to bring
6 you back, again, to ask you these questions
7 that, again, go directly to the
8 believability of your opinions.
9 You have called evolution
10 pseudoscience; correct?
11 ATTORNEY BAUM: Objection. You're
12 asking and directing a line of
13 questioning that's related to
14 religious opinions and are outside the
15 scope of her opinions and reliance
16 materials in this case.
17 THE WITNESS: And I -- yeah, I
18 don't know if I can -- if we can have
19 a confer because, again, I was
20 expecting this. So it's not that I'm
21 unprepared to answer, so. . .
22 BY ATTORNEY JULIEN:
23 Q. You were expecting it, Doctor,
24 because you --
25 ATTORNEY BAUM: Let's take a break

1 and let me have a conference with her.
2 THE VIDEOGRAPHER: We are now
3 going off the record, and the time is
4 10:03 a.m.
5 (Recess taken from a.m. to
6 10:19 a.m.)
7 THE VIDEOGRAPHER: We are now
8 going back on the record, and the time
9 is 10:19 a.m.
10 BY ATTORNEY JULIEN:
11 Q. Dr. Tomljenovic, the video that I
12 marked as Exhibit 9, that was you in that
13 video; correct?
14 A. Yeah, it was. It was me.
15 ATTORNEY JULIEN: I would like to
16 create a placeholder Exhibit 10. We
17 will create a transcript of that video
18 to be sent at a later time.
19 (Exhibit Number 10 was marked for
20 identification.)
21 BY ATTORNEY JULIEN:
22 Q. Just to create the clear record,
23 you have described evolution as
24 pseudoscience; correct?
25 ATTORNEY BAUM: Objection. You

1 are starting, again, to go off into --
2 ATTORNEY JULIEN: You can state
3 the same objection as before just to
4 save time.
5 ATTORNEY BAUM: Same objection.
6 BY ATTORNEY JULIEN:
7 Q. You have described evolution as a
8 fable?
9 ATTORNEY BAUM: Objection. Same
10 objection.
11 BY ATTORNEY JULIEN:
12 Q. You have called evolution a lie?
13 ATTORNEY BAUM: Objection. That,
14 again, is not calling for opinions
15 related to her -- this case and is
16 invading areas that are potentially
17 religious beliefs.
18 THE WITNESS: They are not
19 potentially. Just religion.
20 ATTORNEY JULIEN: Just for the
21 record, we disagree. We reserve our
22 right to bring Dr. Tomljenovic back
23 and ask her about such questions at
24 trial, and we believe that this goes
25 directly to the reliability of her

1 scientific opinions in this case.
2 ///
3 BY ATTORNEY JULIEN:
4 Q. Doctor, you have identified 34
5 research articles that you've authored or
6 coauthored in your CV, which we marked as
7 Exhibit 6 to your deposition.
8 A. Right.
9 Q. And I think you mentioned there
10 might be a few others from when you were
11 still a student?
12 A. Yeah.
13 Q. Now, 20 of the 34 research articles
14 that you disclosed in your CV include notes
15 of support or funding by the Dwoskin Family
16 Foundation.
17 A. Uh-huh.
18 Q. Is that correct?
19 A. Yes.
20 Q. And two of your 34 articles
21 disclose or -- strike that.
22 Two of your 34 articles disclose
23 support or funding for your work by the
24 Children's Medical Safety Research Institute
25 or CMSRI.

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 17 of 91
877-370-3377    Gudunu v. Technologies
A Veritext Division    www.veritext.com

1     A.  Yes.
2     Q.  And you know that CMSRI was founded
3  and funded by Claire Dwoskin?
4     A.  Yes.
5     Q.  Doing a little math, about
6  two-thirds of your research articles have
7  been funded by the Dwoskin family or
8  organizations affiliated with it?
9     A.  Correct.
10    Q.  How much would you estimate that
11  you received over the years in funding for
12  your research from the Dwoskin Family
13  Foundation or affiliated organizations?
14    A.  I really don't know.  I think I had
15  those figures somewhere, but I cannot
16  estimate because I'm just probably going to
17  be off.
18    Q.  Would you say it's hundreds of
19  thousands?
20    A.  Well, it is definitely hundreds of
21  thousands.  It would be probably over half
22  a million because, I mean, research costs
23  money.
24    Q.  So you would say that you have
25  received over half a million dollars in

1  funding for your research from the Dwoskin
2  Family Foundation and organizations
3  affiliated with the Dwoskin family; is that
4  right?
5     ATTORNEY BAUM:  Objection.  Vague.
6     THE WITNESS:  I'm not certain, but
7     I think this is -- I don't think I'm
8     wrong on that because, again, I know
9     how much research costs and how much
10    it costs just to run a lab for a year
11    with a post-doc and research tech.  I
12    don't know --
13    ATTORNEY BAUM:  Is your question
14    has she personally received or what
15    the research received?
16    THE WITNESS:  I have not
17    personally received.  My salary was
18    about between 42- and $50,000 per
19    year, which is standard salary for
20    post-doc.
21  BY ATTORNEY JULIEN:
22    Q.  Do you have documentation anywhere
23  of the funding that you, your research lab,
24  received from the Dwoskin family or
25  affiliated organizations?  Do you have that

1  somewhere?
2     A.  I personally don't.
3     Q.  Do you have access to it?
4     A.  Not really because that was kind of
5  the responsibility or -- of my supervisor,
6  Chris Shaw.
7     Q.  Christopher Shaw?
8     A.  Yeah.
9     Q.  Was 2011 the first time that you
10  accepted research funding from the Dwoskin
11  family?
12    A.  Yeah.
13    Q.  When was the last time you accepted
14  research funding from the Dwoskin family?
15    A.  I can't --
16    ATTORNEY BAUM:  Objection.  Vague.
17    Are you asking for her personally or
18    for the --
19    ATTORNEY JULIEN:  You can object
20    vague.
21    ATTORNEY BAUM:  -- or for the
22    employer, her employers received the
23    funding?
24    ATTORNEY JULIEN:  I'm going to
25    leave my question as it stands.

1  BY ATTORNEY JULIEN:
2     Q.  Are you aware --
3     ATTORNEY BAUM:  What's the
4     definition of you?
5     ATTORNEY JULIEN:  Thank you.
6  BY ATTORNEY JULIEN:
7     Q.  Are you aware that Claire Dwoskin
8  once called vaccines a Holocaust of poison
9  on our children's brains?
10    ATTORNEY BAUM:  Objection.
11    Irrelevant.
12    THE WITNESS:  No.
13  BY ATTORNEY JULIEN:
14    Q.  Do you agree with Claire Dwoskin
15  that vaccines are a Holocaust of poison on
16  our children's brains?
17    (Unreportable simultaneous
18    speaking interrupted by the Certified
19    Stenographer.)
20    ATTORNEY BAUM:  Objection.  You're
21    starting, again, to wander into
22    religious beliefs as opposed to the
23    scientific opinions that are
24    presented.
25  ///

17 (Pages 62 - 65)

Case 3:22-md-03036-KDB     Document 239-11  Filed 01/06/25     Page 18 of 91
877-370-3377                Gardasil Technologies            www.veritext.com
                            A Veritext Division

BY ATTORNEY JULIEN:

Q. You can answer the question.

A. Yeah, well, I don't agree because, I mean, Holocaust is -- I agree that the second world war was perpetrated on the Jews was a Holocaust because it's, like, termination. You lead someone into a gas chamber, I mean, they're not going to come out alive. And to call vaccines a Holocaust, well, that's not true, because that would imply that every single vaccine kills someone, and that's clearly not the case.

Q. Was today the first time that you heard that Claire Dwoskin said that?

A. Today. I've never heard that before.

Q. Doctor, you agree that, even under your theory, not all POTS is autoimmune in nature?

A. Yeah, no, definitely not all POTS is autoimmune.

Q. I know you're not a medical doctor, but you would agree that there are a number of recognized triggers of POTS including

concussion, infection, and pregnancy?

A. Correct. That's also what I wrote in my report.

Q. The exact cause of POTS is not known; correct?

A. The exact cause like trigger or -- there's different forms of POTS, like hyperadrenergic, neuropathic, hypovolemic. And so there are mechanisms that are proposed to explain these different types of POTS.

Q. Is POTS a signature disease of Gardasil?

A. A signature disease of Gardasil?

Q. Let me ask it differently. I'll strike that.

POTS existed before Gardasil came on the market in 2006; correct?

A. Oh, yeah, absolutely.

Q. A person can develop POTS who has never received Gardasil; correct?

A. Yeah, I'll just -- yeah.

Q. There is no objective test that determines that a person's POTS was caused by Gardasil even under your theory; correct?

A. No, there is no objective test that would unequivocally prove --

Q. The -- I'm sorry.

A. Yeah, there's no test that would tell us this POTS was caused by Gardasil, no.

Q. The vast majority of those with POTS are females of child-bearing age?

A. Correct.

Q. POTS primarily affects females around puberty through child-bearing age?

A. Correct, that's the. . .

Q. The most common -- sorry.

A. Yeah, that's the age group that POTS is most prevalent in, that age group, and, yeah, females.

Q. The most common age of onset of POTS is 14 years old?

A. Around that. Puberty.

Q. POTS is difficult to diagnose, regardless of HPV vaccination status; correct?

A. It is difficult because it's a syndrome that's relatively recently been recognized, and there's not that many

specialist groups. The deal with POTS, though, it's -- primary care providers are -- generally, they have low awareness, and that's why a lot of POTS gets underdiagnosed and misdiagnosed.

Q. And you agree that POTS is difficult to diagnose, even under your theory, whether or not you received Gardasil; correct?

A. Well, if a person can get to a dysautonomia specialist that is familiar with POTS, or more than familiar, someone like Louise Brinth or someone like about Satish Raj, his group. They'll run a test, and it's not going to be hard to diagnose because these are specialists that know how to diagnose POTS, know how to exclude conditions that could -- alternative explanations for tachycardia.

But again, there's not that many groups. Because of that, it's generally difficult to diagnose because, again, surveys show -- one of the largest surveys -- there's been a couple of those, but the largest surveys shows huge

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 19 of 91
Golkow Technologies
A Veritext Division
877-370-3377    www.veritext.com

1 diagnostic delays and how patients have to
2 see multiple doctors before they finally get
3 a POTS diagnosis.
4      Once they get to a doctor that
5 actually knows about POTS, then they do
6 receive a diagnosis.
7    Q. Autoantibodies can identify
8 patients whose POTS is autoimmune?
9    A. Autoantibodies it's one strong
10 indication that POTS could be autoimmune or
11 it's more likely than not it's autoimmune,
12 especially if there is autoantibodies.
13 Again, receptors that have been implicated
14 in the pathogenesis of POTS.
15    Q. Can you clarify the first part of
16 your answer there? Did you say all one
17 strong indication?
18    A. Say that again.
19    Q. I was trying to clarify. I wanted
20 to just clarify your answer. So did you say
21 all one strong indication?
22    A. Yeah, I said that the presence of
23 autoantibodies, if they're autoantibodies
24 against receptors that have been implicated
25 in the pathogenesis of POTS, they are a

1 rather strong indicator that POTS could be
2 autoimmune.
3      ATTORNEY BAUM: I think the word
4   she said there was are.
5      ATTORNEY JULIEN: Thank you.
6 BY ATTORNEY JULIEN:
7    Q. Autoantibodies can be found in
8 healthy individuals as well; correct?
9    A. Yes, they can. But with POTS it's
10 not just the presence, it's the function of
11 these autoantibodies.
12    Q. Okay. So you agree that even if a
13 patient tests positive for an autoantibody
14 implicated in the pathogenesis of POTS, it's
15 not just the mere presence, but rather the
16 activity of autoantibodies that determines
17 their clinical relevance?
18    A. Exactly, yeah. That's why methods
19 that rely on ELISA cannot provide a good
20 answer because ELISA -- it cannot measure
21 the activity of the autoantibodies. It just
22 tells us autoantibodies are there, and
23 that's why one of the studies that employed
24 ELISA showed that while autoantibodies are
25 present in healthy people. So based on

1 ELISA, ELISA is not a -- it would not be a
2 clinically good method to evaluate
3 autoantibodies in POTS.
4      But studies that have used
5 functional assays -- well, such as Jesper
6 Mehlsen. Again, he was using an assay that
7 employs the cardiomyocytes; so he can
8 directly see the effect of these
9 autoantibodies on basically contraction of
10 heart cells.
11      So, again, that's a different
12 story. And his research found that those
13 that have suffered dysautonomia following
14 Gardasil vaccination have a higher
15 proportion, much higher proportion --
16 significantly higher proportion of these
17 autoantibodies compared to those that were
18 free of -- free of any symptoms related to
19 dysautonomia.
20    Q. Studies like Hall 2012 discussed in
21 your report found that the majority of
22 patients with POTS and all controls had
23 tested positive for the alpha1-adrenergic
24 receptors in autoantibodies; correct?
25    A. Yeah, and that's the whole study

1 that used the ELISA method. The authors
2 themselves said that their study does not
3 exclude the role of autoantibodies in POTS
4 because some of the coauthors of that paper
5 actually authored other papers dealing with
6 functional assays that found differences
7 between POTS and non-POTS patients. Again,
8 I've documented these in my report.
9    Q. Doctor, you agree that chronic
10 fatigue syndrome existed before Gardasil
11 came on the market in 2006?
12    A. Yeah, definitely.
13    Q. Do you agree that POI existed
14 before Gardasil came on the market in 2006?
15    A. Yes.
16    Q. There is -- strike that.
17      Young women will be diagnosed with
18 POI who have never received Gardasil;
19 correct?
20    A. Yes.
21    Q. Not all POI is autoimmune in
22 nature?
23    A. No.
24    Q. Let me state it this way: Is all
25 POI autoimmune in nature?

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 20 of 91
877-370-3377                    Golkow Technologies                    www.veritext.com
                              A Veritext Division

1    A.  No, not all POI is autoimmune in
2  nature.
3    Q.  Autoimmune disease existed before
4  Gardasil came on the market in 2006?
5    A.  Yeah, absolutely.
6    Q.  People will be diagnosed with
7  autoimmune disease who have never received
8  Gardasil; correct?
9    A.  Correct.
10    Q.  If we look at your report at
11  page 39 -- let me pull it up.
12    A.  Is that the part 1?
13    Q.  Yeah, let me see here.
14    A.  It's not part 1.  Yeah, it is.
15    Q.  I would like to direct you to
16  part -- I believe it's 2, part 2 of your
17  report, page 39.
18    A.  Yeah, so it's the conclusions;
19  right?
20    Q.  Yes.  You opine:  It is my opinion
21  to a reasonable degree of scientific
22  certainty that Gardasil vaccination is a
23  substantial factor and can be a catalyst for
24  the development of autoimmune diseases and
25  syndromes, including those that impair the

1  function of the autonomic nervous system
2  such as POTS in some susceptible
3  individuals.
4      Did I read that correctly?
5    A.  Yes.
6    Q.  Is it your opinion to a reasonable
7  degree of scientific certainty that Gardasil
8  causes POTS in some susceptible individuals?
9    A.  Yes.
10    Q.  Is it your opinion to a reasonable
11  degree of medical certainty that Gardasil
12  causes POI in some susceptible individuals?
13    A.  Yes.
14    Q.  In your report, you discuss
15  molecular mimicry of one potential mechanism
16  by which Gardasil caused dysautonomia,
17  including POTS, in certain predisposed and
18  vulnerable groups of individuals; is that
19  correct?
20    A.  Correct.
21    Q.  And the second mechanism you
22  claim -- strike that.
23      And the second mechanism by which
24  you claim Gardasil could cause dysautonomia,
25  including POTS, is a persistent and

1  excessive vaccine-induced system
2  inflammatory response; is that right?
3    A.  Yes.
4    Q.  Molecular mimicry is the theory
5  that some antigen, a virus, a bacteria, a
6  vaccine causes autoimmune disease because it
7  looks similar to the body to some human
8  protein?
9    A.  Correct.
10    Q.  Nothing about molecular mimicry is
11  specific to Gardasil; correct?
12    A.  No.
13    Q.  Is anything about molecular mimicry
14  specific to Gardasil?
15    A.  Well, again, just like with
16  autoimmunity, molecular mimicry concept
17  existed before Gardasil; so in that sense,
18  it is not specific to Gardasil.
19    Q.  Is anything about molecular mimicry
20  specific to vaccines?
21    A.  Again, not specific to vaccines.
22  Because it was -- again, the concept was
23  mainly developed in context of infections,
24  and then obviously by analogy -- because,
25  again, it relates to sequence homologies

1  between microbial antigens and human
2  self-antigens.
3      Since vaccines also contain
4  microbial antigens, it would be expected
5  that vaccine-like infections could cause
6  autoimmunity by molecular mimicry.  And
7  again, in certain susceptible individuals,
8  and certainly -- again, a criticism against
9  molecular mimicry is that if it was true,
10  then everyone should be autoimmune
11  because -- or have an autoimmune disease
12  because we have all been exposed to
13  infections.
14      But of course, molecular mimicry in
15  and of itself does not cause immune disease
16  because there are other factors such --
17  precisely hyperinflammatory response, and
18  that's why most models of molecular mimicry,
19  animal models, use adjuvants in addition to
20  a molecular mimic in order to create a
21  hyperinflammatory response that then creates
22  a fertile field for aberrant immune
23  reactions that can be autoreactive.
24    Q.  Doctor, if we go to part 2,
25  question 3 and 4 of your report, I'd like to

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 21 of 91
Golkow Technologies
A Veritext Division
877-370-3377                                                                    www.veritext.com

1 direct your attention to page 14.
2 A. -- part 2, page 14. Yes.
3 Q. You cite, if we look under
4 Section 2.1.4, you note -- you refer to the
5 Trost publication; right?
6 A. I'm sorry. Which one?
7 Q. Are you on page 14?
8 A. Yes.
9 Q. If we look at the paragraph under
10 Section 2.1.4 --
11 A. Right. Oh, Trost, yes.
12 Q. You refer to the Trost publication?
13 A. Uh-huh.
14 Q. And you say that the Trost -- the
15 observation of the Trost publication authors
16 plainly demonstrates that molecular mimicry
17 cannot possibly be the sole causal factor in
18 the pathogenesis of autoimmunity.
19 A. Yeah, that's what I just talked
20 about.
21 Q. Okay. Just to be clear, you agree
22 that molecular mimicry can't possibly be the
23 sole causal factor in the pathogenesis of
24 autoimmunity?
25 A. What I mean in and of itself, and

1 that's what I talked about before. Just the
2 presence of molecular mimic is not enough.
3 You need to have an adjuvant or something
4 that creates a hyperinflammatory response
5 because, otherwise, again, inflammation is
6 one of the factors that provides a fertile
7 field for autoreactivity for the development
8 of autoimmune reactions.
9 And there's also genetic
10 susceptibility because the way the immune
11 system works is that the antigens are
12 presented by antigen-presenting cells to T
13 cells, and this presentation occurs via
14 human leukocyte antigens. That's only
15 antigen-presenting cells. And so the
16 antigens is bound to -- and the human
17 leukocyte antigen is HLA abbreviated.
18 So the antigen binds to the HLA,
19 and then this is presented to T cells. And
20 there are certain -- epitope are generally
21 recognized by certain HLA molecules. So if
22 you don't have a special HLA molecule that
23 recognized that epitope, then there's no --
24 there won't be any T cell presentation. So,
25 again, you're not going to have an

1 autoimmune reaction.
2 And this is -- this is, again,
3 another piece of the puzzle why we believe
4 that at least in a proportion of
5 Gardasil-vaccinated individual, POTS is
6 autoimmune based on Jesper Mehlsen's finding
7 of HLA typing of those that have
8 dysautonomia following Gardasil vaccination
9 because he found that there is an
10 overrepresentation in these individuals of
11 HLA types that have been previously
12 associated with autoimmune disease.
13 And, again, these individuals ends
14 up harboring those autoantibodies against
15 GPCR receptors. So it's, again, another
16 piece of the puzzle that there is a
17 susceptible group.
18 Q. Okay. So just to break that down a
19 bit, under your theory, molecular mimicry is
20 not enough to induce autoimmune disease;
21 correct?
22 A. Yes. Simple presence of a
23 molecular mimic is not enough to induce
24 because then, again, everyone who would get
25 vaccinated in Gardasil would end up with

1 POTS, and that's clearly not the case.
2 Q. Under your mechanism theory, there
3 must be molecular mimicry, susceptibility,
4 and an adjuvant to induce autoimmunity in
5 humans?
6 A. Yes. Autoimmune diseases are
7 multifactorial so, yeah.
8 Q. In order to reach your opinions
9 regarding molecular mimicry, you searched
10 for amino acid peptide sequence matches
11 between Gardasil antigens and autonomic
12 nervous system receptors that you claim are
13 involved in POTS; is that correct?
14 A. Well, I'm not the only person that
15 claims. It's based on research literature
16 that's been produced by experts in
17 dysautonomia who have been studying these
18 autoantibodies in POTS patients for many
19 years.
20 Q. So let me ask it differently. Is
21 it your -- in order to reach your opinions
22 regarding molecular mimicry, you searched
23 for amino acid peptide sequence matches
24 between Gardasil antigens and autonomic
25 nervous system receptors that you understand

1  to be involved in POTS?
2      A. Correct.
3      Q. It is your opinion that there are
4  amino acid peptide sequence similarities
5  between Gardasil vaccine antigens and the
6  extracellular portions of the autonomic
7  nervous system receptors involved in POTS?
8      A. Correct.
9      Q. When we refer to the Gardasil
10 vaccine antigens, we're discussing the HPV
11 capsid proteins found in Gardasil?
12     A. Yes.
13     Q. The HPV capsid proteins found in
14 Gardasil are also found in wild-type HPV;
15 correct?
16     A. Correct.
17     Q. Can you point me to any study
18 anywhere in the world finding that natural
19 HPV infection increases the risk of POTS?
20     A. No. And I wouldn't expect it to
21 because the natural HPV infection or the
22 virus -- the HP virus has evolved mechanisms
23 by which it escapes the immune system which
24 is -- which is why, again, it can persist.
25 It doesn't evoke strong immune response as

1  opposed to vaccination.
2      And, again, the natural HP virus
3  does not come with an adjuvant. There's a
4  huge difference between a natural infection
5  and vaccination. Again, we see that by
6  Merck's own studies because Gardasil
7  injection raises a much higher level of
8  antibodies against HPV that persists long
9  term compared to natural infection.
10     So I absolutely did not expect to
11 see any autoimmunity with natural HPV
12 infection.
13     Q. Can you point me to any study
14 anywhere in the world finding that natural
15 HPV infection increases the risk of POI?
16     A. No, and, again, the same
17 explanation. It doesn't -- natural HPV
18 infection does not have the capacity to
19 provoke an exaggerated immune response that
20 persists long term. It just doesn't happen.
21     Q. Focusing on your theory of
22 molecular mimicry as a plausible mechanism
23 for POTS after HPV vaccination, you are not
24 talking about an overlap of the entire
25 protein structure; correct?

1      A. No, no.
2      Q. Is my -- let me rephrase.
3      Are you talking about an overlap of
4  the entire protein structure?
5      A. No. It's -- yeah, well. . .
6      Q. Are you talking about an overlap of
7  an entire polypeptide?
8      A. Well, again, as I explain in my
9  report, based on experimental research,
10 experimental research has identified kind of
11 the minimum sequence in terms of match and
12 length that's capable of producing
13 autoimmunity, and that's the research group
14 by Steinman, who, again, I consider --
15     Q. So I'll reask it. So in your
16 report, you are -- strike that.
17     Your molecular mimicry mechanism
18 theory describes at least five amino acid
19 identities in a sequence --
20     A. Yes.
21     Q. -- of up to --
22     A. From 10 to 12, and yes, they do not
23 have to be consecutive.
24     Q. And those are a fragment of a
25 single peptide; right?

1      A. Yes, yes.
2      Q. You reached your conclusion by
3  using a mathematical model on your computer
4  to compare the amino acid sequences in
5  autonomic receptors that you understand to
6  be involved in POTS with peptide sequences
7  found in HPV601, HPV11L1, HPV16L1, or
8  HPV18L1 Gardasil vaccine antigens; right?
9      A. Yeah. Well, these are
10 bioinformatics programs and sequence
11 alignment tools that are routinely used by
12 researchers for other purposes. And, again,
13 I've extensively used these programs during
14 my Ph.D.
15     And so it's -- again, it's standard
16 operating procedure. There's a variety of
17 algorithms in these sequence alignment
18 algorithms and, obviously, which one you
19 select depends on the purpose of what you're
20 trying to do.
21     So in my case, I was looking for
22 short peptide sequences and, therefore, the
23 most appropriate for that purpose was the
24 Blosum80 because it will look for short,
25 short peptide matches.

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 23 of 91
Golkow Technologies
A Veritext Division
877-370-3377                                                                www.veritext.com

1    Q. To test your hypothesis regarding
2 molecular mimicry, did you perform any tests
3 on a Petri dish?
4    A. I would like to but, again, as you
5 know, and that goes back to there is -- I
6 really would like to. If I would have the
7 money, that's what I would like to do.
8 Similar to what Steinman has done, you know,
9 synthesizing peptides and then well-testing
10 them in animals to see if they induce
11 autoantibodies that recognize these
12 adrenogenic receptors.
13    Q. To testify your hypothesis
14 regarding molecular mimicry, did you, or did
15 you not, perform any tests in a Petri dish?
16    A. No, I haven't.
17    Q. To test your hypothesis regarding
18 molecular mimicry, did you, or did you not,
19 perform any tests in an animal model?
20    A. No, I haven't.
21    Q. To test your hypothesis regarding
22 molecular mimicry, did you, or did you not,
23 conduct any studies of human outcomes in
24 human beings?
25    A. Well, that would be unethical.

1    Q. But you have not?
2    A. No.
3    Q. Now, when you conducted your
4 mathematical modeling regarding molecular
5 mimicry, did you find an overlap of ten
6 amino acids in a row between Gardasil and
7 any of the proteins that you understand to
8 be involved in POTS?
9    A. No, not ten in a row.
10    Q. How about nine?
11    A. No.
12    Q. How about eight?
13    A. No.
14    Q. How about seven?
15    A. No.
16    Q. How about six?
17    A. I don't think there were any six.
18    Q. Did you find five identical --
19    A. Actually, there might have been. I
20 have to look, but there are not consecutive.
21 And, again, because they're based on
22 experimental research, as I've documented,
23 you don't have to have six or seven or eight
24 or nine. It's enough to have five, and they
25 don't even have to be consecutive.

1    Q. Did you find five identical amino
2 acids in a row between Gardasil and the
3 human proteins that you understand to be
4 involved in POTS? Yes or no?
5    A. No. And, again, the research shows
6 that they don't have to be consecutive, and
7 that's experimentally verified.
8    Q. If we go to Table 14 -- so we're in
9 part 1, question 2, page 38. I'm thankful
10 for these tabs right now.
11    A. I am too.
12    Q. If you go to page 38, I would like
13 to ask you questions about the table you
14 have there. Part 1, question 2, page 38 of
15 your report includes Table 14.
16    Do you see that, Doctor?
17    A. Yeah.
18    Q. Table 14, you describe a summary of
19 Gardasil-antigen peptides that mimic
20 receptors implicated in the pathophysiology
21 of POTS.
22    Do you see that?
23    A. Yeah.
24    Q. You -- strike that.
25    As part of your analysis in this

1 case, you prepared the amino acid sequence
2 of Gardasil-antigen peptides with the
3 sodium-dependant norepinephrine transporter
4 or NET; correct?
5    A. Correct.
6    Q. You compare the amino acid sequence
7 of Gardasil-antigen peptides with the
8 alpha1-adrenoceptors?
9    A. Yes.
10    Q. You compared the amino acid
11 sequence of Gardasil-antigen peptides with
12 the alpha2-adrenoceptors?
13    A. Correct.
14    Q. You compared the amino acid
15 sequence of Gardasil-antigen peptide with
16 the beta1-adrenoceptors?
17    A. Correct.
18    Q. You compared the amino sequence of
19 Gardasil-antigen peptides with the M1
20 muscarenic receptor?
21    A. Correct.
22    Q. And you also compared it with M2,
23 M3, M4, and M5; is that right?
24    A. Not M4.
25    Q. I'm sorry. Let me reask.

Case 3:22-md-03036-KDB    Document 239-11    Filed 01/06/25    Page 24 of 91

1       You -- in reaching your molecular
2  mimicry opinions, you compared the amino
3  acid sequence of Gardasil-antigen peptides
4  with M1, M2, M3, M5 muscarenic receptors.
5    A. Correct.
6    Q. And you also compared the amino
7  acid sequence of Gardasil-antigen peptides
8  with AT1R?
9    A. Yes, angiotensin receptor.
10   Q. You did not -- strike that.
11      Did you compare Gardasil with any
12 other receptors in your report other than
13 those listed here in Table 14?
14   A. In my report?
15   Q. Correct.
16   A. No, only these listed here.
17   Q. Did you find 100 percent identical
18 overlap between any receptor peptide
19 sequences and the sequences of Gardasil
20 antigens?
21   A. No. And, again, that's irrelevant
22 for molecular mimicry because it doesn't
23 have to be 100 percent identity.
24   Q. Okay. Just to be clear, just yes
25 or no. And I understand your explanation.

1    A. Yes. I'm sorry, no, I didn't.
2       ATTORNEY BAUM: Hold it. Hold it.
3  You cannot cut her off from her
4  answers. Let her complete her answer.
5       ATTORNEY JULIEN: I don't believe
6  I cut her off. I was actually
7  planning to reask the question to get
8  a clear response.
9       ATTORNEY BAUM: She gave a clear
10 response.
11 BY ATTORNEY JULIEN:
12   Q. Yes or no, did you find 100 percent
13 identical overlap between any receptor
14 peptide sequences and the sequences of
15 Gardasil antigens?
16      ATTORNEY BAUM: Objection. Asked
17 and answered.
18      THE WITNESS: No, I didn't. And I
19 repeat, it's irrelevant. It doesn't
20 have to be, and that's why I went in
21 great length outlining Steinman's
22 research that show you do not need to
23 have 100 percent or consecutive
24 matches.
25      One of the really important

1  studies is not just in animal models,
2  but it's humans following narcolepsy.
3  Because here we have strong
4  epidemiological evidence that
5  Pandemrix was associated with
6  narcolepsy. And again, not all brands
7  of influenza vaccine. Just Pandemrix.
8       And -- and -- so -- so Steinman's
9  group was trying to figure out, well,
10 what makes Pandemrix different. And
11 narcolepsy has also been shown to
12 occur in certain individuals who
13 are -- obviously who had the influenza
14 vaccination -- sorry, influenza
15 infection. So it's both the influenza
16 vaccination and infection that were
17 associated with the development of
18 narcolepsy.
19      So molecular mimicry was kind of
20 an obvious place to look for. They
21 did find sequence match between
22 influenza nuclear protein and
23 hypocretin receptor 2, which has been
24 previously involved with the
25 pathogenesis of narcolepsy.

1       Again, they found a match. And by
2  no means it's a perfect match.
3  Actually, if you look at it, it looks
4  pretty bad at first sight. It's like
5  there is seven amino acid matches out
6  of 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,
7  12. So there's a lot of gaps. It's
8  not consecutive.
9       Yet, they found these individuals
10 that had narcolepsy and vaccinated
11 with Pandemrix, they actually had
12 antibodies that recognized both the
13 hypocretin receptor and the influenza
14 nuclear protein.
15      So the autoantibodies are
16 cross-reactive. So there was -- that
17 was pretty good evidence that
18 molecular mimicry was involved because
19 the immune response that targeted the
20 influenza nuclear protein also
21 targeted the hypocretin receptor.
22      To explain why it only happened
23 with Pandemrix, what was -- what they
24 found later is that Pandemrix
25 contained much higher amount of

24 (Pages 90 - 93)

Case 3:22-md-03036-KDB    Document 239-10 Filed 01/06/25    Page 25 of 91
877-370-3377                    Veritext Technologies            www.veritext.com
                                A Veritext Division

1  nuclear protein than other brands of
2  influenza vaccines. This is another
3  thing that I referred to in my expert
4  witness report; so the antigen dose
5  matters as well.
6     Gardasil vaccines do have much
7  higher antigen doses compared to other
8  vaccines that are routinely given to
9  that age group. This builds from his
10  work in animal models where, again, he
11  has pretty conclusively demonstrated
12  that you need only limited sequence
13  similarity. It doesn't have to be
14  consecutive to induce autoimmunities.
15     Done these studies in mice where
16  they had only very short sequence
17  matches, again, not consecutive, and
18  these peptides were able both to
19  stimulate T cells and induce
20  autoimmune encephalitis in mice.
21     So it's not just a theory that we
22  don't need to have 100 percent or
23  consecutive matches. It's
24  experimentally verified.
25 ///

1  BY ATTORNEY JULIEN:
2     Q. Doctor, you pointed to Pandemrix
3  as, I guess, an explanation for why you do
4  not actually have 100 percent overlap
5  between Gardasil and any receptor peptide.
6  Now, you know that Pandemrix is a live
7  vaccine; correct?
8     A. Yes.
9     Q. Pandemrix vaccinated against swine
10  flu, not HPV?
11     A. Yes.
12     Q. Pandemrix used AS03 as an adjuvant,
13  not AAHS like Gardasil?
14     A. Correct.
15     Q. And AS03 is not even an aluminum
16  adjuvant. It's an oil and water emulsion;
17  true?
18     A. Correct.
19     Q. And when it came to Pandemrix,
20  there was epidemiological data, I think you
21  said this, demonstrating that when
22  individuals who had and who had not been
23  vaccinated with Pandemrix were compared,
24  there was an increased risk of narcolepsy
25  noted in vaccinated individuals in many

1  countries; right?
2     A. Correct.
3     Q. Can you point me to a single study
4  in humans demonstrating that
5  Gardasil-induced HPV L1 antibodies bind to
6  any of the receptors identified in Table 2,
7  page 38 of your report? I'm sorry,
8  Table 14, page -- let me reask.
9     A. Yeah, yeah, can you reask?
10     Q. Sorry. Can you point me to a
11  single study in humans demonstrating that
12  Gardasil-induced HPV L1 antibodies bind to
13  any of the receptors identified in Table 14
14  of page 38 of your report?
15     A. Yeah, so there is no direct
16  evidence. But from Jesper Mehlsen's
17  research, there is evidence to show that
18  HPV-vaccinated individuals do have -- who
19  have dysautonomia symptoms have a higher
20  level of functional autoantibodies that
21  actually alter the activity of these
22  receptors compared to those patients without
23  symptoms.
24     Q. Can you point me to a single study
25  in humans demonstrating that

1  Gardasil-induced HPV L1 antibodies activate
2  or inhibit any of the receptors identified
3  in Table 14, page 38 of your report?
4     ATTORNEY BAUM: Objection. Asked
5  and answered.
6     THE WITNESS: Yeah. It's the same
7  Jesper Mehlsen study. Again, he
8  employed a functional assay that
9  showed that those that were vaccinated
10  and have dysautonomia symptoms have a
11  much higher proportion of these
12  autoantibodies than those without
13  symptoms.
14  BY ATTORNEY JULIEN:
15     Q. Are you referring to Mehlsen 2022?
16     A. Yeah, Mehlsen 2022.
17     Q. You know that Dr. Mehlsen did not
18  compare vaccinated individuals with
19  unvaccinated individuals in that study;
20  right?
21     A. Yes, he compared the vaccinated
22  with symptoms and vaccinated without
23  symptoms. And that's fine because, again,
24  that's the big question we are answering,
25  and we are not claiming that Gardasil will

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 26 of 91
877-370-3377                    Golkow Technologies                    www.veritext.com
                                A Veritext Division

1 cause POTS or any other disease in everyone
2 because clearly that's not the case.
3       So there is something that -- there
4 are susceptibility factors -- individual
5 susceptibility risk factors. Again, that's
6 also verified by Mehlsen's research when he
7 found an overrepresentation of certain HLA
8 types that were associated with autoimmunity
9 with those that developed symptoms.
10    Q. A study like Mehlsen 2022 where
11 both groups were vaccinated, that's not
12 going to tell you if there was a difference
13 between vaccinated individuals and
14 unvaccinated individuals; right?
15    A. No, no.
16    Q. Would you agree that your theory of
17 molecular mimicry between the Gardasil
18 antigens and the receptors implicated in the
19 pathophysiology of POTS as described in your
20 report is a hypothesis?
21    A. It's a reasonable hypothesis, yes.
22    Q. Molecular mimicry between Gardasil
23 and the POTS-related receptors identified in
24 your report have not been proven to occur in
25 humans; correct?

1    A. Yes, correct. And it doesn't have
2 to be conclusively established. It's
3 whether there's reasonable evidence that
4 this is likely to occur, and this is just
5 one piece of the puzzle that fits into the
6 picture.
7       ATTORNEY JULIEN: Can we take a
8    five-minute break?
9       ATTORNEY BAUM: Sure.
10       THE VIDEOGRAPHER: We are now
11    going off the record, and the time is
12    11:05 a.m.
13       (Recess taken from 11:05 a.m. to
14    11:19 a.m.)
15       THE VIDEOGRAPHER: We are now
16    going back on the record, and the time
17    is 11:19 a.m.
18 BY ATTORNEY JULIEN:
19    Q. Doctor, you consider those who have
20 a personal history of autoimmune disease to
21 be susceptible to developing autoimmunity
22 post-vaccination?
23    A. It's one group that, yeah.
24    Q. And another group that you consider
25 is those with a family history of autoimmune

1 disease. Do you consider those -- strike
2 that.
3       You consider those with a family
4 history of autoimmune disease to be
5 susceptible to developing autoimmunity
6 post-vaccination?
7    A. Correct.
8    Q. Are there any other groups that you
9 consider susceptible?
10    A. As explained in my witness report,
11 there are certain comorbidities --
12       ATTORNEY BAUM: Hold that thought.
13    I think there needs to be an unmuting
14    that needs to occur.
15       THE VIDEOGRAPHER: That's right.
16    Okay.
17       ATTORNEY JULIEN: I'll reask my
18    question.
19 BY ATTORNEY JULIEN:
20    Q. Other than those with a family
21 history of autoimmune disease and a personal
22 history of autoimmune disease, do you
23 consider any others groups to be susceptible
24 to developing autoimmunity post-vaccination?
25    A. Yes. It could be those that have

1 already experienced adverse -- certain types
2 of adverse events reactions to vaccinations,
3 and then those that are exposed to -- or
4 coexposed to other agents that have
5 immunostimulating properties, and that can
6 be infections and can be mold.
7       Then there are certain types of
8 comorbidities that are more specific to
9 the -- to injuries that are relevant for
10 this case such as Ehlers-Danlos syndrome
11 because it's known that a lot of
12 Ehlers-Danlos syndrome patients develop
13 POTS, but it's not every single one of them.
14       So, again, there has to be some
15 other factor that influences whether someone
16 will develop POTS who has Ehlers-Danlos
17 syndrome. And then also individuals who may
18 be exposed to or who are exposed to agents
19 that alter the permeability of blood-brain
20 barrier because a lot of -- someone can have
21 autoantibodies that target central nervous
22 system antigens, but if these autoantibodies
23 don't reach the brain, there's not going to
24 be an autoimmune reaction resulting in
25 neurological issues.

26 (Pages 98 - 101)

Case 3:22-md-03036-KDB    Document 239-10 Filed 01/06/25    Page 27 of 91
877-370-3377                    Golkow Technologies                    www.veritext.com
A Veritext Division

1       So something has to open the
2   blood-brain barrier, which is, again, why a
3   lot of experimental models of autoimmunity
4   that deal with inducing autoimmunity, a
5   neurological type of autoimmunity, such as
6   autoimmune encephalitis, they use pertussis
7   because pertussis is known to open the
8   blood-brain barrier.
9       So, again, translating this
10  scenario to humans, if someone is exposed to
11  factors that can open the blood-brain
12  barrier, and there could be physical trauma
13  like concussions. It could be exposure to
14  environmental toxins that are known to alter
15  the blood-brain barrier.
16      Including vaccinations, they can
17  potentially act as a blood-brain opener
18  because vaccines, such as those adjuvanted
19  in aluminum, I believe there is reasonable
20  evidence that in some individuals, that can
21  cause blood-brain barrier alterations
22  because aluminum has been shown in animal
23  models to greatly stimulate the microbial
24  cells and the astrocytes which do play a
25  role in controlling blood-brain barrier

1   permeability.
2       So yes, there are a number of those
3   personal factors that can be
4   individual-specific that can predispose
5   certain individuals to react adversely to
6   vaccinations.
7       Q. So I want to break that down a bit.
8   You agree that there are people with
9   Ehlers-Danlos syndrome who developed POTS
10  who have never received Gardasil; correct?
11      A. Yes, yes.
12      Q. And you agree that individuals who
13  have a concussion can develop POTS who have
14  never had Gardasil; right?
15      A. Correct.
16      Q. And when you refer to aluminum
17  impacting the blood-brain barrier, you're
18  referring to all aluminum -- right? -- not
19  the specific aluminum in Gardasil; correct?
20      A. Yes. I'm not saying AHHS does that
21  and other aluminum modulants don't.
22      Q. You believe that a major
23  limitation of epidemiology is that it is
24  unable to detect autoimmune manifestations
25  that are rare in the overall population, but

1   frequent in certain higher risks of
2   populations; is that correct?
3       A. Correct, correct. I'm sorry to
4   inject. It says your battery is running low
5   on this computer.
6       ATTORNEY JULIEN: Can we go off
7   the record?
8       THE VIDEOGRAPHER: We are now
9   going off the record, and the time is
10      a.m.
11      (Recess taken from 11:25 a.m. to
12  11:26 a.m.)
13      THE VIDEOGRAPHER: We are now
14  going back on the record, and the time
15  is 11:26 a.m.
16  BY ATTORNEY JULIEN:
17      Q. Doctor, you also refer to
18  certain -- actually, strike that.
19      As a researcher, wouldn't you want
20  to see a comparative cohort study that
21  specifically looked at what you consider to
22  be susceptible individuals and compare them
23  with unvaccinated individuals?
24      A. Can you repeat that again?
25      Q. Sure.

1       As a researcher, wouldn't you want
2   to see a comparative cohort study that
3   specifically looked at what you consider to
4   be susceptible individuals and compare them
5   with unvaccinated individuals?
6       A. Yeah, I would.
7       Q. You know that there have been
8   studies of individuals with a history of
9   autoimmune disease and those vaccinated
10  with -- strike that.
11      You know there have been studies of
12  individuals vaccinated with Gardasil with a
13  history of autoimmune disease, and those
14  individuals have been compared with
15  individuals who have not been vaccinated;
16  right?
17      ATTORNEY BAUM: Are you referring
18  to a particular paper you'd like to
19  show her?
20      ATTORNEY JULIEN: I am asking the
21  witness questions, and thank you, I
22  don't think that's a form objection.
23  So I'll ask my question again.
24  BY ATTORNEY JULIEN:
25      Q. You are aware there have been

27 (Pages 102 - 105)

Case 3:22-md-03036-KDB    Document 239-11    Filed 01/06/25    Page 28 of 91
Golkow Technologies
877-370-3377                    A Veritext Division                    www.veritext.com

1 studies of individuals with a history of
2 autoimmune disease vaccinated with Gardasil
3 compared with individuals who have not been
4 vaccinated with Gardasil; right?
5    A. Correct.
6    Q. And one of those studies is
7 Gronland 2016; correct?
8    A. Yes, correct.
9    Q. And you did not cite Gronland 2016
10 anywhere in your 338-page report; correct?
11    A. No, I haven't.
12    Q. You also did not include Gronland
13 2016 anywhere in your 1,200-plus entry MCL;
14 correct? Materials considered list?
15    A. I haven't.
16    Q. But you did think it was important
17 to bring Gronland 2016 with you today, but
18 you didn't think it was important to include
19 it in your report when you sat down to write
20 it?
21    A. No. That's -- that misrepresents
22 facts because I wasn't specifically tasked
23 to write criticism on every single study
24 that would be used by Merck to disprove our
25 claims. I believe that was the job of

1 Dr. Zizic.
2       I had a lot of things on my own to
3 deal with. I am perfectly able to state my
4 concerns about this study and why I don't
5 believe it supports the conclusions that are
6 being derived from it.
7    Q. Just to be clear, you didn't state
8 you were concerned regarding Gronland 2016
9 or any other comparative study that looked
10 at individuals with a history of
11 pre-existing autoimmune disease and compared
12 those with individuals who had not been
13 vaccinated; right?
14    A. Sorry. Can you restate it? I was
15 not concerned? I didn't quite get that
16 first part.
17    Q. You didn't state your concerns
18 anywhere in your report regarding Gronland
19 2016; correct?
20    A. No, not in my report, I haven't.
21    Q. As a -- as part of your preparation
22 for your opinions in this case, did you
23 actually investigate whether there had been
24 epidemiological studies performed looking
25 specifically at individuals vaccinated with

1 Gardasil with a personal history of
2 autoimmune disease?
3    A. Well, again, I was aware of those
4 studies, but as I said, I would have needed
5 another month or couple of weeks, if that
6 would have been my task, to go over each and
7 every one of them and state my objections to
8 them or what I thought were the limitations
9 that do not support the strong conclusions
10 that are being made from these studies.
11    Q. As part of your preparation of the
12 opinions in your report, did you look to see
13 if there were epidemiological studies
14 looking specifically at individuals
15 vaccinated with Gardasil with a family
16 history of autoimmune disease?
17    A. Well, again, the Gronland study.
18 And I -- that particular one I wasn't aware
19 before, but I was aware of other studies,
20 like Hviid and Arnheim Dahlstrom, that I was
21 long aware of.
22    Q. So to clarify, when did you first
23 become aware of Gronland 2016?
24    A. Gronland, probably in the last
25 couple of weeks.

1    Q. You became aware of Gronland 2016
2 after you served your expert report in this
3 case; correct?
4    A. Yeah, for Gronland, yes, that's the
5 one I haven't seen before.
6    Q. And I also did not see
7 Grimaldi-Bensouda 2014 anywhere in your
8 report or your materials considered list.
9 Did you consider that study in arriving at
10 your opinion?
11    A. Again, I didn't comment on it, but
12 I was aware of it. I already explained the
13 reasons why. I was brought fairly late as
14 an expert witness, and there were --
15       ATTORNEY BAUM: I just want to
16    object to the degree this is starting
17    to walk into communications with
18    counsel, which are protected.
19       ATTORNEY JULIEN: I certainly did
20    not ask her to share communications
21    with counsel. But let me make sure I
22    get a clear answer here.
23 BY ATTORNEY JULIEN:
24    Q. Did you cite Grimaldi-Bensouda 2014
25 anywhere in your report or your materials

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 29 of 91
877-370-3377                Golkow Technologies                www.veritext.com
                           A Veritext Division

1 considered list?
2    A. No, I haven't cited it, no.
3    Q. You were aware of Grimaldi-Bensouda
4 before you prepared your report, but you did
5 not actually address that study anywhere in
6 your report; correct?
7    A. No, I haven't, not in my report.
8    Q. And you also -- strike that.
9      Did you cite Liu, L-i-u, 2018
10 anywhere in your report or in your materials
11 considered list?
12    A. Can you repeat? L-u?
13    Q. Did you cite Liu, and it's spelled
14 L-i-u, 2018 anywhere in your report or in
15 your materials considered list?
16    A. No.
17    Q. You also did not cite Gronland 2017
18 anywhere in your materials list or in your
19 report; correct?
20    A. Correct.
21    Q. Just to be clear, you do not
22 mention epidemiological studies looking at
23 family history or personal history in
24 susceptible individuals in your report;
25 correct?

1    A. No. No, I don't.
2    Q. Instead of looking at those
3 published peer-reviewed, comparative studies
4 in the specific predisposed patients to
5 assess whether Gardasil can cause POTS or
6 autoimmune disease, you ignored those, and
7 you chose to cite case reports and case
8 series --
9    A. No, I didn't ignore those. Again,
10 I was aware of their existence. As I said,
11 there is divided work among the experts.
12 And if someone else was already going to go
13 through all these studies, then I thought,
14 well, I'm going to do things that I was told
15 to do and focus on, and I wasn't told to
16 focus on refuting or offering my critique on
17 every single one of these studies.
18 Otherwise, I would have done that.
19    Q. Just to be clear, you offered the
20 opinion in this case that to a reasonable
21 degree of scientific certainty, Gardasil is
22 a substantial factor in triggering POTS in
23 susceptible individuals. But again, you did
24 not actually cite or mention any
25 epidemiological studies looking at family

1 history or personal history in susceptible
2 individuals; correct?
3    A. Correct. And I don't believe those
4 studies invalidate the conclusions because
5 they have pretty severe limitations that do
6 not support the conclusions that are being
7 made such as Gronland, that didn't even
8 adjust for the use of immunosuppressive
9 medications, which is -- and the authors
10 acknowledge that.
11      That's a huge thing because even in
12 Merck's clinical trials, those individuals
13 who were taking immunosuppressive therapy
14 were excluded, and rightly so, because these
15 individuals are not going to have an optimal
16 immune response because of the
17 immunosuppression.
18      If you did not adjust at all for
19 the use of immunosuppressive drugs, then
20 your results are pretty much meaningless
21 because the immunosuppressive agents would
22 have an influence on the immuno response.
23 That's a big, big flaw in the study.
24      As opposed to, for example, one of
25 the case reports. I know it's a case report

1 that I cite, but it involves two patients
2 that had -- they were in long-term remission
3 from lupus. One was, like, 11 years
4 remission; so that patient was not under
5 immunosuppressive therapy, got vaccinated
6 with Gardasil. She experienced a big lupus
7 flare. If that patient had been under
8 active immunosuppression, it's very unlikely
9 they would have experienced lupus.
10    Q. All the criticism of Gronland 2016
11 that you just articulated here today, do
12 those appear anywhere in your expert report?
13    A. No, they don't.
14    Q. Now, instead of citing
15 epidemiological studies that looked at
16 specific predisposed patients to assess
17 whether Gardasil can trigger autoimmune
18 disease, you instead cited case reports and
19 case series; correct?
20    A. Correct.
21    Q. And a case report describes what
22 happens in an individual person?
23    A. Correct.
24    Q. For example, maybe that person got
25 Gardasil and sometime after that was

29 (Pages 110 - 113)

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 30 of 91
877-370-3377                 Century Technologies
A Veritext Division             www.veritext.com

1 diagnosed with POTS?
2   A. Correct.
3   Q. A case report has no control group
4 of people who did not get the vaccine?
5   A. Correct.
6   Q. Case reports do not prove
7 causation; correct?
8   A. Neither do the immunological
9 studies. They prove association, not
10 causation.
11   Q. Do case -- yes or no, do case
12 reports prove causation?
13   A. No. And, again, neither to
14 epidemiological studies in and of
15 themselves.
16   Q. Case reports are -- cannot --
17 strike that.
18    A case series describes what
19 happens to more than one person?
20   A. Correct.
21   Q. A case series does not include a
22 control group of people who did not get the
23 vaccine?
24   A. No.
25   Q. Case series do not prove causation;

1 correct?
2   A. Correct.
3   Q. We cannot draw conclusions about
4 how likely POTS is to happen to someone who
5 gets Gardasil versus someone who does not
6 get Gardasil based on case reports and case
7 series; correct?
8   ATTORNEY BAUM: By itself?
9   THE WITNESS: Correct, and that's
10 what I was going to answer, that case
11 reports are just a piece of the
12 evidence, a piece of the puzzle.
13   And, again, part of the -- well, a
14 big part of -- a portion of part 3 of
15 my report that cites, again, expert
16 pharmacovigilance -- pharmacovigilance
17 experts are like Rebecca Chandler,
18 like Ralph Ivor Edwards, who was the
19 director of the Uppsala Monitoring
20 Centre, which is the WHO collaborating
21 center. He was a director, and these
22 are his words that -- or both him and
23 Rebecca Chandler argue for -- their
24 thesis is that the current hierarchy
25 of evidence doesn't really serve

1 pharmacovigilance purposes all that
2 well.
3   It's outdated because it doesn't
4 capture individual susceptibility
5 factors, and that in order to assess
6 safety of a drug, you really need to
7 look at the totality of the evidence,
8 and that case reports are not to be
9 just dismissed as completely
10 irrelevant, all the more so since
11 before the advent of big data and
12 capacity to analyze big data, case
13 reports were the cornerstone of -- or
14 very important piece in the whole
15 pharmacovigilance process.
16 BY ATTORNEY JULIEN:
17   Q. Case reports are at the bottom of
18 the hierarchy of evidence; right?
19   A. Yes.
20   Q. And it's your opinion, Doctor, that
21 the hierarchy of evidence needs to be
22 abandoned in this case?
23   A. It needs to be updated. Again,
24 it's not just my opinion. This has been
25 stated by very highly qualified

1 pharmacovigilance experts like Ralph Ivor
2 Edwards and Rebecca Chandler, and Chandler
3 was an assessor for the EMEA.
4   Q. Is your opinion, Doctor -- and I
5 recognize your opinion is supported, but I'm
6 asking the opinion you're offering this
7 litigation --
8   A. Yes.
9   Q. -- is your opinion that the
10 hierarchy of evidence needs to be updated --
11 are you --
12   ATTORNEY BAUM: I'm getting ready
13 to stop her before she hears my
14 objection.
15   ATTORNEY JULIEN: Okay. I didn't
16 know what was happening. Strike that,
17 and I'll start a new question.
18 BY ATTORNEY JULIEN:
19   Q. It's your opinion, Doctor, that the
20 hierarchy of evidence needs to be updated in
21 this case?
22   ATTORNEY BAUM: That's okay.
23   THE WITNESS: Okay. Yeah.
24 BY ATTORNEY JULIEN:
25   Q. You also say in your report: While

Case 3:22-md-03036-KDB   Document 239-10 Filed 01/06/25   Page 31 of 91
877-370-3377      Golkow Technologies    www.veritext.com
A Veritext Division

1 epidemiology is well-suited to provide
2 evidence of statistical associations, it is
3 not designed to determine causality on an
4 individual level; i.e., epidemiology can
5 never answer the question whether a
6 particular vaccine administered to a
7 particular individual caused a particular
8 disease.
9    A. Correct.
10    Q. You cite nothing in support of that
11 sentence?
12    A. Well, that's actually from the
13 publication of Ralph Edwards and Rebecca
14 Chandler. Can you tell me the page?
15    Q. Oh, sure. Let's see here.
16    A. Because I can tell you exactly what
17 publication is that.
18    Q. It's page 34 -- excuse me. 14.
19    A. Yeah. Yes, I do see.
20    Q. Do you cite anything in support of
21 the sentence I just read?
22    A. There is a number of references,
23 and they all -- all the references on
24 page 15 relate to this whole paragraph. So
25 it would be 23, 40, 41, 86, and 139.

1       And this particular sentence:
2 Epidemiology alone can never answer the
3 question whether a particular vaccine
4 administered to a particular individual
5 caused a particular disease. Okay, I'll go
6 to the list of references.
7    Q. Do any of the authors of the
8 articles that you cite in support of the
9 next sentence -- so references 23, 40, 41,
10 86, and 139 -- do any of those authors say
11 that epidemiology alone can never answer the
12 question of causation?
13    A. This is, I believe, from
14 reference 40, Chandler, Edwards, Lindquist
15 comment on safety of human papillomavirus
16 vaccine and updated review drug safety.
17    Q. You believe that Dr. Chandler says
18 those words?
19    A. Yeah.
20    Q. We'll come back to that.
21       You offer a number of opinions
22 regarding the design and manufacture of
23 Gardasil; right?
24    A. Yeah.
25    Q. One of the opinions that you offer

1 about the design of Gardasil is related to
2 the virus-like particle VLP structure?
3    A. Correct.
4    Q. One of the opinions that you offer
5 related to the design of Gardasil is the
6 high antigen dose?
7    A. Correct.
8    Q. One of the opinions that you offer
9 related to Gardasil is the presence of
10 strong immunostimulatory and tissue-damaging
11 adjuvants; correct?
12    A. Correct.
13    Q. And another opinion that you offer
14 related to the manufacture -- strike that.
15       An opinion that you offer related
16 to the manufacture of Gardasil is the
17 presence of vaccine manufacturing product
18 residuals with immunostimulatory properties?
19    A. Correct.
20    Q. The FDA -- are you looking at
21 something on your computer?
22    A. It's okay.
23    Q. Okay.
24    A. The article, the Chandler article,
25 because I don't -- I know I have it, but we

1 can get to that later.
2    Q. Yeah.
3       The FDA approved Gardasil and
4 Gardasil 9 with AAHS as their aluminum
5 adjuvants. You know that; right?
6    A. Correct.
7    Q. The FDA also approved the design of
8 the Gardasil clinical trials that used AAHS
9 as the placebo; right?
10    A. Correct. The FDA did ask Merck to
11 include a placebo -- a proper
12 placebo-control trial that does not contain
13 aluminum, and that's why Merck ended up
14 doing protocol 18.
15       And I know that FDA requested a
16 greater number of individuals. I don't know
17 why Merck didn't end up doing that because
18 protocol 18 was a pretty small study.
19    Q. To clarify, I just want my question
20 answered.
21       Did the FDA approve the design of
22 the Gardasil clinical trials that used AAHS
23 as a placebo? Yes or no?
24    A. Yes, they have.
25    Q. Gardasil wasn't the first vaccine

31 (Pages 118 - 121)

Case 3:22-md-03036-KDB    Document 239-10 Filed 01/06/25    Page 32 of 91
877-370-3377                    Golkow Technologies                    www.veritext.com
                               A Veritext Division

1 with an aluminum adjuvant?
2    A. No, no, it wasn't.
3    Q. Gardasil and Gardasil 9 aren't the
4 only vaccines with an aluminum adjuvant
5 today; correct?
6    A. Correct.
7    Q. Gardasil and Gardasil 9 aren't even
8 the first vaccines to include AAHS; correct?
9    A. Correct.
10    Q. Aluminum salts, including hydroxide
11 and phosphate, are the most commonly used
12 vaccine adjuvants and were until recently
13 the only adjuvants licensed for use in the
14 United States; true?
15    A. Correct.
16    Q. You're at odds with the CDC when it
17 comes to the safety of aluminum adjuvants in
18 vaccines?
19    A. I and many other experts on -- who
20 have worked for a long time, even longer
21 than I have, obviously, on aluminum
22 adjuvants.
23    Q. CDC, to this day, says that
24 aluminum adjuvants have been used safely in
25 vaccines for decades.

1    Are you aware of that?
2    A. Yes, I am.
3    Q. And you disagree with the CDC?
4    A. Yes, I totally disagree with the
5 CDC.
6    Q. The CDC, to this day, says that
7 aluminum salts, such as aluminum hydroxide,
8 aluminum phosphates, and aluminum potassium
9 sulfate, have been used safely in vaccines
10 for more than 70 years.
11    You're aware of that?
12    A. Yes, and I --
13    Q. You also disagree with that?
14    A. I disagree --
15    ATTORNEY BAUM: You're cutting her
16 off and preventing her from explaining
17 her answer.
18    Go ahead and explain.
19    THE WITNESS: I disagree because
20 it's not based on solid research
21 evidence. Going back to the hierarchy
22 of evidence, the highest hierarchy --
23 the highest of the hierarchy of
24 evidence is randomized control trials.
25 Placebo-control trials. And most of

1 the vaccine trials actually use
2 aluminum as a placebo.
3    So, again, there is no data from
4 randomized control trials to
5 support -- demonstrating unequivocally
6 the safety of the aluminum adjuvant.
7 Then there's also lack of
8 epidemiological studies supporting
9 safety.
10    There's been only two reviews, two
11 big reviews, according -- well, to my
12 knowledge. One was by Jefferson
13 looking at the safety of adjuvants in
14 vaccines. Basically, they've
15 concluded that the evidence was of
16 very low quality. There was no
17 assessment of long-term outcomes. So,
18 again, what conclusions can you draw
19 from -- for poor quality evidence?
20    Then there was a recent review. I
21 cannot remember now whether it's 2022,
22 but it's in the last four years
23 looking more comprehensively, again,
24 at randomized control trials.
25    The researchers had to exclude

1 most larger randomized control trials,
2 which is phase 3 studies, precisely
3 because most of the big phase 3
4 studies use aluminum as a control arm.
5    So, again, there's no data from
6 randomized control studies. There is
7 no -- I shouldn't say zero, but there
8 is not much epidemiological data that
9 has looked into that, and this has
10 been acknowledged even by CDC
11 scientists that those studies would be
12 feasible, but they haven't been
13 conducted thus far.
14    So all we are left with is animal
15 model studies and -- animal model
16 studies and certain theoretical
17 modeling studies that actually suggest
18 that there is a reason for concern,
19 and that the safety of aluminum
20 adjuvants is not as firmly established
21 as it's claimed by various regulatory
22 authorities, including the U.S. CDC.
23    ATTORNEY BAUM: Just hold that
24 thought. I think there's people in
25 the waiting room.

Case 3:22-md-03036-KDB    Document 239-10   Filed 01/06/25    Page 33 of 91
877-370-3377                Goldman Technologies          www.veritext.com
A Veritext Division

BY ATTORNEY JULIEN:
   Q. Just to break down your view,
Doctor, you believe that there is no data
from randomized control trials on the safety
of aluminum?
      ATTORNEY BAUM: Objection.
   Mischaracterizes her testimony.
      THE WITNESS: I'm not saying there
   is zero data, but the data that exists
   is of very poor quality that does not
   allow the firm conclusions that are
   being made.
BY ATTORNEY JULIEN:
   Q. Doctor, do you believe that there
is no data from epidemiology on the safety
of aluminum in vaccines?
   A. And, again, I'm not saying there is
zero data because I don't claim I'm
omniscient, but there is no robust data.
Again, that has been acknowledged by CDC
scientist Glanz, et al., who again, I have
the paper, that have said that those
studies, even though feasible, have not been
conducted thus far.
      The only vaccine ingredient that

has been studied separately to a greater
extent is thimerosal, but not aluminum.
   Q. All of the epidemiological studies
that have looked at Gardasil and found no
safety concerns, no causation, those all
include AAHS -- right? -- as part of
Gardasil?
   A. Yes, correct.
   Q. Doctor, I want to ask you a few
questions --
   A. And, again, I believe that there --
and, again, I'm not the only one with that
opinion that there are certain pretty
significant limitations to those studies
that, again, do not allow those conclusions
to be made.
   Q. And there are also significant
limitations on case reports and case series
that you rely on; right?
   A. There is. There are.
   Q. You have previously published about
aluminum generally before you became a
retained expert in this case; right?
   A. Right.
   Q. Those publications, were they

specific to Gardasil?
   A. No, no, they were not. I mean,
there's a number of publications that dealt
with other aluminum adjuvants. Not -- well,
we cannot -- Merck's AAHS is a proprietary
adjuvant; so obviously we couldn't do any
study specifically on Merck's AAHS.
      (Exhibit Number 11 was marked for
   identification.)
BY ATTORNEY JULIEN:
   Q. Doctor, I'm handing you what has
been marked as Exhibit 11 to your
deposition. This is a publication about the
toxicity of aluminum generally; right?
   A. Uh-huh.
   Q. We're not talking about vaccines
specifically in this publication?
   A. Yeah.
   Q. I have marked as Exhibit 11 an
editorial entitled The Biochemistry/Toxicity
of Aluminum.
      Do you see that?
   A. Yes.
   Q. And you coauthored this editorial
with Christopher Shaw?

   A. Correct.
   Q. Let's look at what you wrote about
aluminum generally. You said: We live in
what one author of this hot topic issue has
correctly labeled, quote, the age of
aluminum. Aluminum, the third most abundant
element in the earth's crust and the most
abundant metal, is one of the most
remarkable elements in the periodic table.
      Did I read that part correctly?
   A. Yes.
   Q. Aluminum is the most abundant
element on earth; right?
   A. The third most abundant.
   Q. Excuse me. No, I thought you said
the most abundant -- strike that.
   A. The third most abundant in the
earth's crust.
   Q. So let's break that down. Aluminum
is the third most abundant element in the
earth's crust; correct?
   A. Yes.
   Q. And aluminum is the most abundant
metal on earth; right?
   A. Yeah, that's what the rest of it

Case 3:22-md-03036-KDB     Document 239-11     Filed 01/06/25     Page 34 of 91
877-370-3377                 Veritext Legal Solutions                 www.veritext.com
A Veritext Division

1 says, yeah.
2     Q. And you go on to the next -- if you
3 look at the next paragraph, you say: For
4 these reasons, aluminum currently finds its
5 way into virtually every aspect of our daily
6 lives.
7        Did I read that correctly?
8     A. Yeah.
9     Q. Do you still stand by that
10 statement in your 2011 publication?
11    A. Oh, yeah.
12    Q. I'd like to move on to the next
13 sentence, which reads -- or excuse me, let's
14 go two sentence down. Aluminum is found in
15 drinking water, as a food additive in
16 typical western diets, cosmetics,
17 pharmaceutical products, and because of its
18 ubiquity, it is increasingly found in our
19 bodies.
20        Did I read that correctly?
21    A. Correct.
22    Q. Do you still stand by this
23 statement in your publication?
24    A. Yes, I do.
25    Q. I'd like to read the last sentence

1 of the third paragraph in your publication.
2 It says: Instead, evidence clearly shows
3 that aluminum is toxic to plants, animals,
4 and humans.
5        Did I read that correctly?
6     A. Yes.
7     Q. Do you believe that aluminum is
8 toxic to plants, animals, and humans today?
9     A. Yes, because there is research
10 evidence that shows that's the case.
11       (Exhibit Number 12 was marked for
12    identification.)
13 BY ATTORNEY JULIEN:
14    Q. I'm handing you what has been
15 marked as Exhibit 12 to your deposition.
16    A. Yeah.
17    Q. Exhibit 12 is a book chapter
18 entitled: Autism Spectrum Disorders and
19 Aluminum Vaccine Adjuvants.
20        Do you see that?
21    A. Yeah.
22    Q. And you coauthored this book
23 chapter that I've marked as Exhibit 12;
24 correct?
25    A. Correct.

1     Q. I'd like to direct your attention
2 to page 1588. The header is: Aluminum
3 Adjuvants, a Toxicological Risk for a
4 Developing Brain.
5     A. 1588?
6     Q. Yes.
7     A. Uh-huh.
8     Q. I want to ask you about the third
9 sentence in the first paragraph. You
10 published the following statement: During
11 the last four decades, the number of
12 vaccinations required for preschool entry in
13 developed countries has significantly
14 increased; i.e., from less than 10 in the
15 late 1970s to greater than 30 in 2010,
16 Tomljenovic and Shaw, 2011B.
17    A. Correct.
18    Q. And this trend is likely to
19 continue as more vaccines are currently
20 being approved for use.
21        Did I read that correctly?
22    A. Yes.
23    Q. By the time children get to
24 preschool here in the United States, they
25 are required to have more than 30

1 vaccinations under the pediatric vaccine
2 schedule.
3     A. That's if you include the boosters.
4     Q. Then I'd like to direct your
5 attention to page 1590. I would like to
6 look at the last paragraph on this page with
7 you and specifically direct your attention
8 to the third sentence that starts: Yet, in
9 spite of these observations.
10       Do you see that?
11    A. Yes. Yes.
12    Q. You wrote the following in this
13 book chapter: Yet, in spite of these
14 observations, infants and children in most
15 developed countries routinely receive up to
16 18 aluminum-adjuvanted vaccines through
17 pediatric vaccination schedules.
18    A. Yeah, so that refers just to those
19 that were adjuvanted with aluminum whereas
20 the previous number referred to all other
21 vaccines. Well, aluminum and non-aluminum
22 adjuvanted.
23    Q. Is your understanding that infants
24 and children receive up to 18
25 aluminum-adjuvanted vaccines through

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 35 of 91
877-370-3377                Golkow Technologies                Page 35 of 91
                           A Veritext Division                www.veritext.com

1 pediatric vaccination schedules; is that
2 correct?
3    A. And, again, that would be based on
4 the table here. So, again, we refer -- we
5 would include the boosters because it's
6 relevant how many times you are obviously
7 exposed to an aluminum-adjuvanted vaccine
8 injection.
9    Q. And a booster for an
10 aluminum-adjuvanted vaccine obviously
11 includes aluminum adjuvant; right?
12    A. Right. Hepatitis B isn't just
13 given once. It's given several times.
14    Q. So I just want to make sure the
15 answer is clear. Is it your understanding
16 that infants and children receive up to 18
17 aluminum-adjuvanted vaccines through
18 pediatric vaccination schedules in the
19 United States?
20    ATTORNEY BAUM: Objection. Vague.
21    THE WITNESS: Yes, so it would be
22    vaccine injections, not like 18
23    different vaccine brands.
24 BY ATTORNEY JULIEN:
25    Q. I would like to direct your

1 attention to page 1602.
2    A. 1602, yes.
3    Q. I want to read the last sentence at
4 the very top, you know, the paragraph that
5 is running onto 1602. And it starts:
6 Hence, by the time.
7    Do you see that?
8    A. Uh-huh.
9    Q. You wrote: Hence, by the time
10 children are four to six years old, they
11 would have received a total of 126 antigenic
12 compounds under the U.S. vaccination
13 guidelines.
14    Did I read that correctly?
15    A. Correct. There's a reference to
16 Table 3. And, again, that's derived from
17 counting all the antigens in vaccines that
18 are present in vaccines.
19    Q. Is it your understanding that by
20 the time children are four to six years old,
21 they would have received a total of 126
22 antigenic compounds under the U.S.
23 vaccination guidelines?
24    A. Yes. That's from Table 3. If you
25 look at Table 3, which is at page 1589, and

1 then the two last rows towards the end.
2 Right here would be total bacterial
3 antigens, 90, and total live attenuated
4 viruses, 36.
5    Again, this is by looking through
6 all the manufacturer product sheets for the
7 vaccines and counting basically all the --
8 all the antigens in a particular vaccine.
9    Q. If you look at page 1602, you
10 say -- I want to direct your attention to
11 the -- it's the same page we were on, the
12 first full paragraph. I want to go about
13 halfway down.
14    Do you see the cite to Theoharides
15 and Zhang?
16    A. Yes, yes.
17    Q. I'd like to read the next sentence.
18 You wrote: Aluminum is known to harm the
19 BBB and can increase its permeability by
20 increasing the rate of transmembrane
21 diffusion and by selectively altering the
22 saturable transport systems.
23    Did I read that correctly?
24    A. Yes.
25    Q. BBB stands for the blood-brain

1 barrier?
2    A. Correct.
3    Q. You believe all aluminum harms the
4 blood-brain barrier; true?
5    A. No, not all. Obviously, it depends
6 on the form. It depends whether it's
7 injected or ingested. It depends on the
8 dose. It also does depend on individual
9 susceptibility factors because then everyone
10 would be walking around with a leaky
11 blood-brain barrier. So no, I don't believe
12 every aluminum exposure harms the
13 blood-brain barrier.
14    Q. Let me ask my question a little bit
15 differently. You believe that aluminum
16 generally can harm the blood-brain barrier?
17    A. Yes.
18    ATTORNEY BAUM: Hold on.
19 Objection. Mischaracterizes her
20 testimony.
21    ATTORNEY JULIEN: I would like to
22 mark Exhibit 13.
23    (Exhibit Number 13 was marked for
24 identification.)
25 ///

35 (Pages 134 - 137)

Case 3:22-md-03036-KDB   Document 239-10   Filed 01/06/25   Page 36 of 91
877-370-3377                 Golkow Technologies               www.veritext.com
A Veritext Division

1 BY ATTORNEY JULIEN:
2    Q. I'm handing you what has been
3 marked as Exhibit 13 to your deposition.
4    A. Yeah.
5    Q. This is a publication that you
6 authored entitled Aluminum and Alzheimer's
7 Disease After a Century of Controversy --
8 strike that.
9      Exhibit 13 is a publication that
10 you authored entitled Aluminum and
11 Alzheimer's Disease. After a Century of
12 Controversy, Is There a Plausible Link?
13      Do you recognize this document?
14    A. Yes.
15    Q. I would like to direct you to
16 Table 3, which is on page 577.
17    A. Okay. Yeah.
18    Q. You published Table 3 in your 2010
19 article in peer-reviewed literature?
20    A. Sorry. Can you say it again?
21    Q. Table 3 is part of your 2010
22 article, which was published in
23 peer-reviewed literature?
24    A. 2011 article.
25    Q. Oh, sorry.

1    A. That's this one.
2    Q. Apologies.
3    A. That's okay.
4    Q. Table 3 is part of your 2011
5 article, which was published in
6 peer-reviewed literature?
7    A. Correct.
8    Q. Table 3 is entitled Estimates of
9 Daily and Weekly Intakes of Aluminum in
10 Humans.
11      Do you see that?
12    A. Correct, yeah.
13    Q. According to your table in this
14 2011 publication, humans intake one to
15 ten milligrams per day of aluminum in
16 natural food and seven to seventy milligrams
17 per week of aluminum in natural food; is
18 that correct?
19    A. Correct.
20    Q. According to this table in your
21 2011 publication -- strike that.
22      Aluminum from food and water can be
23 absorbed into the body; right?
24    A. Correct.
25    Q. Was there a discussion of exposure

1 to aluminum in food and water in the
2 litigation report that you prepared?
3    A. Was there a discussion on
4 absorption from food or like --
5    Q. Did you discuss any of your prior
6 publications regarding exposure to aluminum
7 in food and water in the expert report that
8 you prepared in this litigation?
9    A. No, not in the expert report, no.
10    Q. How much dietary aluminum is
11 absorbed?
12    A. About 0.1 percent. And, again, I
13 have a reference for that because I don't
14 say anything without a reference.
15    Q. Okay. So it's your understanding
16 that 0.1 percent of dietary aluminum is
17 absorbed?
18    A. Correct.
19    Q. And the title of this article is
20 Aluminum and Alzheimer's Disease. After a
21 Century of Controversy, Is There a Plausible
22 Link?
23    A. Correct.
24    Q. Of course, for aluminum and food or
25 water to have any relevance at all to

1 Alzheimer's disease, it would have to be
2 absorbed into the gut and travel through the
3 blood to the brain?
4    A. Correct. Yeah. And part of the --
5 well, I cite here research studies. There
6 have been other research studies published
7 since, and in particular here, I cite the
8 work by Judy Walton that showed that she
9 used rats who were chronically fed low --
10 very low dose of aluminum equivalent to what
11 humans ingest in industrial countries
12 through food and water.
13      Some of these rats developed memory
14 impairments, and their brain histology
15 showed alterations that are pretty similar
16 to those found in Alzheimer's brains. So
17 that was to show that even in low-aluminum
18 exposure over long periods of time, there
19 could be problems.
20    Q. Is your understanding -- just to
21 break that down and clarify, is your
22 understanding based on your review of the
23 research that even in low exposures --
24 strike that.
25      Is it your understanding based on

Case 3:22-md-03036-KDB   Document 239-10   Filed 01/06/25   Page 37 of 91
877-370-3377       Golkow Technologies       www.veritext.com
A Veritext Division

1  your review of the research that low
2  aluminum exposure over long periods of time
3  can create clinical effects?
4      A.  Correct.  And that her work
5  inspired other researchers because, again,
6  one of the problems that I also personally
7  have with all of these animal model
8  studies -- partly I understand why it's
9  done, but they use unrealistic doses.  So
10 yeah, if you feed mice truckloads of
11 aluminum and they ended up with neurological
12 issues, well, so what?  How is that relevant
13 to me?
14      That's why I particularly value
15 Judy Walton's work because she did a study
16 that was realistic to human exposure, and
17 there were several other scientists that did
18 the same and also found neurological
19 effects.
20      Again, this is in animal models.
21 Even induction of peripheral neuropathy in
22 animals that had been -- and even -- what
23 Judy Walton did was over many months.  So
24 these rats were the equivalent of all the
25 people at the end of the experiment, but

1  these other studies have been done over a
2  period of 60 days; so it's not even that
3  long.  It's not through the entire lifespan.
4      Q.  If we look -- I want to direct your
5  attention back to Table 3 of your 2011
6  publication.  You wrote that:  Humans can be
7  exposed to 0.56 to 1.56 milligrams per week
8  of aluminum from water alone.  Right?
9      A.  Yes, yeah.  I see that, yeah.
10     Q.  It's also your opinion that there
11 is aluminum in tea, pancake mix, cheese,
12 tortillas, muffins, baby formula, just to
13 name a few?
14     A.  Coffee, yeah.
15     Q.  Coffee too?
16     If we -- strike that.
17     You also published that in
18 individuals -- happy to direct you to --
19 it's actually on the same page.
20     You wrote:  Individual intake in
21 urban societies can exceed 100 milligrams
22 per day.
23     A.  Where is that?
24     Q.  I'm looking at the bottom left
25 here.

1      A.  I see.  I see.
2      Q.  It says:  Although average
3  estimates -- do you see where that starts?
4      A.  Oh, yes, I do.
5      Q.  You wrote in this 2011 publication:
6  Although average estimates of total daily
7  intake vary between 2 and 25 milligrams of
8  aluminum per day, 14 to 175 milligrams per
9  week --
10     A.  Yes, yes.
11     Q.  -- individual intake in urban
12 societies can easily exceed 100 milligrams
13 per day, 700 milligrams per week due to a
14 widespread increase in the consumption of
15 processed convenience foods, which are
16 typically high in aluminum-containing
17 additives.
18     A.  Correct.
19     Q.  If we go to the other side of the
20 same page, I want to ask you about the last
21 sentence in the paragraph on the right side.
22 It says:  The take-home message.
23     Do you see that?
24     A.  That's on the same page, yes?
25     Q.  Yes.  Same page on the right side.

1      A.  Uh-huh.
2      Q.  You wrote:  The take-home message
3  is that a large proportion of people are
4  unwittingly consuming significantly more
5  aluminum than what is considered safe by the
6  expert food authorities.
7      Did I read that correctly?
8      A.  Again, I cannot find it, but I
9  recall the sentence.  The take-home -- oh, I
10 see, yeah.  I was looking at the last
11 paragraph.  Yeah, correct.
12     Q.  I would like to ask you about the
13 last paragraph which starts:  Of particular
14 concern, and I would like to direct your
15 attention to about halfway down where it
16 says:  According to the latest.
17     A.  Yes, according to, yes.
18     Q.  You wrote:  According to the latest
19 vaccination schedule, every child in the USA
20 will receive a total of five to
21 six milligrams of aluminum by the age of two
22 years, or up to 1.475 milligrams of aluminum
23 during a single visit to the pediatrician.
24     Did I read that correctly?
25     A.  Yes.

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 38 of 91
877-370-3377                    Golkow Technologies                    www.veritext.com
                               A Veritext Division

1    Q.  Each dose of Gardasil contains
2  225 micrograms of aluminum; correct?
3    A.  Correct.
4    Q.  Each dose of Gardasil 9 contains
5  500 micrograms of aluminum?
6    A.  Correct.
7    Q.  A microgram is 1,000th of a
8  milligram; correct?
9    A.  Correct.
10   Q.  225 micrograms is 0.225 milligrams?
11   A.  Correct.
12   Q.  500 micrograms is 0.5 milligrams?
13   A.  Correct.
14   Q.  One dose of Gardasil or Gardasil 9
15  is less than one week's intake of aluminum
16  in drinking water, according to your table?
17   A.  Correct.  But that's injectable
18  aluminum as opposed to the ones that is
19  ingested, and there's a huge difference in
20  absorption because pretty much everything
21  that is injected is -- obviously gets into
22  the body.
23       And the pharmacokinetics of
24  injected aluminum is vastly different than
25  ingested aluminum because most of the

1  ingested aluminum is secreted via the
2  kidneys, so in the urine.
3       Whereas that's not the case with
4  injected aluminum, and that's, again, the
5  great paradox that pharmacokinetics studies
6  are not required for vaccines.  They're not
7  required for vaccine adjuvants.  And it's
8  being claimed, again, by Merck and other
9  scientists that injected aluminum does
10  not -- does not -- is not a toxicological
11  risk because it's rapidly excreted.
12       Again, if it was rapidly excreted,
13  it would be a pretty lousy adjuvant.  But
14  the experimental data that does exist does
15  not support at all that it's rapidly
16  excreted.
17       In fact, one of the studies that
18  Merck appeals to frequently to support that
19  claim is studying rabbits by Flarend, et al.
20  It was published in 1997.  And the
21  researchers used a total of four rabbits,
22  and two of them were injected by aluminum --
23  with aluminum hydroxide, or more accurately,
24  oxyhydroxide, and two were injected with
25  aluminum phosphate, which is chemically

1  really aluminum hydroxyphosphate.
2       And what they found is that only
3  after 28 days -- that's the length of what
4  they monitored -- only 6 percent of the
5  injected hydroxide was excreted via the
6  urine and 22 of the phosphate.  So it means
7  that 78 percent of the phosphate and
8  94 percent of the hydroxide was retained.
9       So, again, that study does not
10  support rapid elimination of aluminum
11  adjuvants.
12       Again, it was in very limited.
13  It's very surprising why it wasn't followed
14  up by a larger study, including more
15  animals, but the research that has been
16  conducted by our colleagues from France and
17  also from Spain, both in mice and sheep,
18  shows that aluminum -- injected aluminum is
19  not rapidly excreted, and it's got different
20  pharmacokinetics.
21       The one that's normally absorbed
22  ends up in the systemic circulation in the
23  plasma.  That's not the case with the
24  adjuvant aluminum, that after injection gets
25  taken out by the macrophages, and then

1  macrophages take it up to the lymph nodes.
2  And from the lymph nodes, it actually
3  disseminates to other organs, including the
4  spleen and the brain where it can persist up
5  to six months following injection.
6       Even the original Flarend study
7  shows wide distribution of injected aluminum
8  in various organs.  Again, it's transported.
9  The problem of aluminum staying in the brain
10  for six months or more is that, again, it's
11  a neurotoxin.  It's a prooxidant.  It's a
12  proinflammatory, and having such a component
13  in the brain is not a good thing.
14       Most of the neurodegenerative
15  diseases have a component of
16  neuroinflammation -- and particularly
17  neuroinflammation.  Another problem with
18  having aluminum in the brain is it's
19  virtually impossible to get it out of the
20  brain.
21   Q.  Doctor, do you recall the question
22  that I asked you?
23   A.  Yeah, you asked -- you stated that
24  the dosing of aluminum in Gardasil was
25  basically much lower than the weekly intake.

Case 3:22-md-03036-KDB    Document 239-10  Filed 01/06/25    Page 39 of 91

1  And, again, that's another argument that's
2  frequently used, and it's completely
3  scientifically flawed in that while you
4  ingest more aluminum from food than you get
5  from vaccines.
6      But, again, that's why all this
7  long story, to show that you cannot -- you
8  cannot make extrapolation from ingested
9  aluminum to injected aluminum because they
10  behave very differently.
11      Q.  I want to direct your attention to
12  page 578 of the same publication.  Earlier,
13  did you testify that point -- excuse me, did
14  you testify that 0.1 percent of dietary
15  aluminum is absorbed?
16      A.  Around 0.1.
17      Q.  Let's take a look at what you wrote
18  in 2011.  If we look at page 578, you
19  said -- let's look at the first -- actually,
20  the second full sentence.  You say:  What
21  they fail to stress.  Do you see that?  578
22  on the right side, second full sentence.
23      A.  Okay.
24      Q.  You wrote:  What they fail to
25  stress is that unlike dietary aluminum, of

1  which only about .25 percent is absorbed
2  into systemic circulation, aluminum from
3  vaccines is absorbed in nearly 100 percent.
4      Did I read that correctly?
5      A.  I cannot find it but, yeah.
6      Q.  It's the second full sentence on
7  the right side of page 578.
8      A.  Again, I'm looking at the wrong
9  side.  What they fail info stress, yeah,
10  0.25.
11      Q.  So you previously published that
12  0.25 percent of dietary aluminum is absorbed
13  into systemic circulation; correct?
14      A.  Yeah.  I've recently --
15  that's an estimate and these can change and
16  I like to always -- I look to be up-to-date
17  with the literature.  So not long ago, I
18  reviewed -- well, I read a major review on
19  aluminum toxicology.
20      And from my memory, they state --
21  and these are expert toxicologists -- that
22  it's 0.1.  Again, I can check that because I
23  know the publication where it comes from.
24      Q.  Let's assume the number in your
25  2011 publication is correct.  Even if

1  .25 percent of -- is absorbed into someone's
2  blood, a person can easily be exposed to
3  multiple times more aluminum in a week from
4  just being alive on the planet than they
5  would be from Gardasil 9; right?
6      A.  Yeah.  And again, that's irrelevant
7  because you cannot compare.  It's comparing
8  apples and oranges because of everything
9  that I've just explained.  It's a totally
10  different ball game with injected aluminum.
11  That does not behave the same as injected
12  aluminum and don't get rid of that,
13  obviously.
14      Q.  And just to walk through the math,
15  you published in 2011 that individuals in
16  urban settings can be exposed to up to
17  100 milligrams of aluminum per day.  Then I
18  multiplied that by .0025, so .25 percent
19  times 7.  That's 1.75 milligrams of aluminum
20  in a single day; right?
21      A.  Right.
22      Q.  And also if we look at the number
23  that you say today, you say that it's .001
24  today, .1 percent?
25      A.  No, I didn't say --

1      Q.  Oh.
2      A.  And, again, research gets updated.
3  It's not like it's an order of magnitude
4  difference.  It's still the ballpark.
5      Q.  Now, food and aluminum -- strike
6  that.
7      Food is eaten on a daily basis, of
8  course.
9      A.  Correct.
10      Q.  And aluminum that's in cheese or
11  coffee or tea or all the other things you
12  list, an individual could be exposed to that
13  every day, every week, every month?
14      A.  Correct.
15      Q.  And you said in urban -- I want to
16  do the calculation here with your -- the
17  urban setting.  So just to refresh yourself,
18  you published in 2011 that a person in an
19  urban setting can easily be exposed to
20  100 milligrams of aluminum per day; right?
21      A.  Yeah.
22      Q.  And then if we multiplied that by
23  .1 percent absorption, that individual would
24  be exposed to .1 milligrams of aluminum
25  every day just by living in an urban

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 40 of 91
Gardasil Technologies
877-370-3377                          A Veritext Division                          www.veritext.com

1 setting; right?
2   A. Correct.
3   Q. If we multiply that by seven to get
4 a week, an individual in an urban setting
5 would be exposed to .7 milligrams of
6 aluminum just by living in an urban setting;
7 right?
8   A. Correct.
9   Q. And you agree that .7 milligrams of
10 aluminum per week, simply by living in an
11 urban setting, is less than the aluminum
12 adjuvant in Gardasil and Gardasil 9 in one
13 dose?
14   A. It is, but it's, again, completely
15 irrelevant to the arguments I have with
16 respect to the exposure of the -- exposure
17 to the aluminum adjuvant in Gardasil.
18   Q. And apologies. I misspoke there.
19 You agree that .7 milligrams of aluminum per
20 week simply by living in an urban setting is
21 more than the aluminum adjuvant exposure in
22 Gardasil and Gardasil 9?
23   A. Yeah, yeah.
24   Q. I know we're getting close to
25 lunchtime.

1   A. You said it, but I know that it's
2 more. I know that it's more.
3   Q. In your various publications, you
4 have linked aluminum to Alzheimer's disease
5 and autism; right?
6   A. Linked as a plausible cause. I'm
7 not saying it's definite because even the --
8 something that we've been criticized in our
9 2011 publication in the journal of -- in
10 organic biochemistry is kind of -- well, it
11 was stated well, this does not prove that
12 aluminum causes autism. We never stated
13 that. We said it's a plausible hypothesis
14 that requires further investigation. And we
15 elaborated why we believe it's a plausible
16 hypothesis.
17   Q. You believe that aluminum is a
18 plausible cause of autism?
19   A. It's a plausible suspect cause.
20 Again, I believe there has to be further
21 research on it.
22   Q. You believe that aluminum is a
23 plausible cause of Alzheimer's disease?
24   A. Yes, I do.
25   Q. I would like to direct your

1 attention to page 584 of the same
2 publication.
3   A. 584, yes.
4   Q. And I would like to direct your
5 attention to the paragraph just above brain
6 compartmentalization.
7   A. Yeah.
8   Q. I want to look specifically at the
9 second-to-last sentence.
10     Do you see that it starts: Because
11 of its high neurotoxic potential?
12   A. Yes, I do.
13   Q. You wrote in this 2011 publication:
14 Because of its high neurotoxic potential,
15 the factor that is of particular relevance
16 in regards to the risk for Alzheimer's
17 disease, AD, is that small amounts of
18 aluminum can access the brain continually to
19 a point at which neurotoxicity occurs. As
20 documented Tables 3 through 5, this
21 criterion is satisfied through dietary
22 aluminum intake.
23     Did I read that correctly?
24   A. Yeah.
25   Q. You believe that ingested aluminum

1 itself can cause clinical harm?
2   A. Yeah, that's what I explain when I
3 describe briefly the studies by Judy Walton.
4   Q. One more document to show you, and
5 then we can take a lunch break.
6     Can ingested aluminum cause
7 autoimmune disease? Sorry. Let me ask
8 thoroughly: Can ingested aluminum cause
9 autoimmune disease?
10   A. Ingested aluminum, whether it can
11 cause autoimmune disease? Well, from the
12 top of my head, I remember a paper, and it
13 was by an Israeli author, on aluminum --
14 ingested aluminum as a possible factor in --
15 I cannot remember now if it's Crohn's or
16 celiac, but one of the GI disorders. But I
17 haven't looked -- I haven't focused much my
18 research on ingested aluminum being a cause
19 of autoimmune disease. Not of late because
20 I've been -- I've shifted my focus to
21 vaccines.
22   Q. Did you consider data or
23 publications regarding whether ingested
24 aluminum can cause autoimmune disease in
25 reaching your opinions in this case?

Case 3:22-md-03036-KDB   Document 239-11 Filed 01/06/25   Page 41 of 91
Golkow Technologies
A Veritext Division
877-370-3377                                                www.veritext.com

1    A.  No, not in this case.  Again, I
2  cannot recall if I did before.
3    Q.  I'm handing you what has been
4  marked as Exhibit 14 to your deposition.
5    A.  But, yeah, definitely not in this
6  case.
7    Q.  Is Exhibit -- strike that.
8        Exhibit 14 is a review article
9  entitled Aluminum Induced Entropy in
10  Biological Systems, Implications For
11  Neurological Disease.
12        (Exhibit Number 14 was marked for
13    identification.)
14  BY ATTORNEY JULIEN:
15    Q.  Do you see that?
16    A.  Yes.
17    Q.  And you are one of the co-authors
18  of this publication?
19    A.  Yeah.
20    Q.  You wrote this paper with your
21  colleague Dr. Shaw?
22    A.  Well, and all the others that are
23  listed as authors like one, two, three,
24  four, five of them.
25    Q.  Okay.  I would like to direct your

1  attention to page 19 of this publication.
2    A.  Okay.  Yeah.
3    Q.  And I want to look at the
4  paragraph on the left side of the page.  I
5  want to look at the fourth sentence that
6  starts:  Of course.  Of course, the dose
7  response.
8        Do you see that?
9    A.  Yes, yes.
10    Q.  In this 2014 publication, you
11  wrote:  Of course, the dose response of
12  aluminum and its compounds must be
13  considered, but even at low doses,
14  especially with repeated exposures, aluminum
15  can have cumulative deleterious effects that
16  can be extreme and even fatal.  For that
17  reason, a repeated low-dose exposure may
18  prove more damaging than a single larger
19  dose.
20        Did I read that correctly?
21    A.  Yes.
22    Q.  Under your theory of this case, is
23  there an objective test to distinguish
24  aluminum from Gardasil in an individual's
25  body from all the other cumulative sources

1  of aluminum that he or she may encounter in
2  her life or his life?
3    A.  Well, one could do a mass spec to
4  be able to distinguish, but that's not
5  something that would be routinely done.
6    Q.  Did you do a mass spec to make any
7  determinations like that in reaching your
8  opinions in this case?
9    A.  No.
10    Q.  And your understanding is that a
11  mass spec test can distinguish aluminum in
12  someone's body from Gardasil versus the
13  aluminum from coffee, tea, cheese,
14  tortillas?
15    A.  Yeah, because AAHS is not found in
16  coffee, cheese, and tortillas.
17    Q.  But I'm just trying to understand.
18  You're saying that you can find AAHS
19  specifically in someone's body after they've
20  been vaccinated with Gardasil?  Is that your
21  opinion?
22    A.  You could.
23    Q.  Did you perform any tests like that
24  before reaching --
25    A.  No.

1    Q.  -- your opinions in this case?
2    A.  No.
3    Q.  Are you aware of any such study
4  where someone tried to distinguish the
5  aluminum in Gardasil in someone's body from
6  the cumulative sources that that person
7  encountered throughout their life?
8    A.  Not to my knowledge, no.  I don't
9  believe anyone has done that.
10        ATTORNEY JULIEN:  Okay.  We can
11    take a lunch break now.  Thank you.
12        THE VIDEOGRAPHER:  We are now
13    going off the record, and the time is
14    12:32 p.m.
15        (Recess taken from 12:32 p.m. to
16    1:45 p.m.)
17        THE VIDEOGRAPHER:  We are now
18    going back on the record, and the time
19    is 1:45 p.m.
20  BY ATTORNEY JULIEN:
21    Q.  Dr. Tomljenovic, we just took a
22  break for lunch.
23        Are you okay to proceed?
24    A.  Yes.
25    Q.  When the FDA approved Gardasil and

Case 3:22-md-03036-KDB    Document 239-11  Filed 01/06/25    Page 42 of 91
877-370-3377                Golkow Technologies                www.veritext.com
                           A Veritext Division

1 Gardasil 9, it approved its VLP-based
2 structure as well; right?
3    A. Yes.
4    Q. When the FDA approved Gardasil, it
5 approved the 120 micrograms of VLPs present
6 in Gardasil?
7    A. Correct.
8       ATTORNEY BAUM: I just want to
9    object. You may be asking her for
10    regulatory opinions that are outside
11    the scope of her opinions.
12 BY ATTORNEY JULIEN:
13    Q. When the FDA approved Gardasil 9,
14 it approved the 270 micrograms of VLPs
15 present in Gardasil 9; right?
16    A. Correct. But the FDA has approved
17 many drugs that have been subsequently
18 recalled for safety issues, so . . .
19    Q. Gardasil is still FDA approved to
20 this day; right?
21    A. Yes, it is.
22    Q. Are you aware of a single country
23 in the world where Gardasil has been
24 withdrawn?
25    A. No.

1    Q. Same for Gardasil 9?
2    A. Yeah.
3    Q. You wrote in your 2024 expert
4 report that the clinical significance of HPV
5 L1 DNA fragments in Gardasil cannot be
6 definitively ascertained at present;
7 correct?
8    A. Yeah, it cannot be definitively
9 asserted. It doesn't mean that there is no
10 reasonable hypothesis why it would not
11 have -- or reasonable -- reasonable evidence
12 to suggest that it might have or that it
13 probably has a clinical effect.
14    Q. And just to clarify, you wrote in
15 September of 2024 in your expert report:
16 The clinical significance of HPV L1 DNA
17 fragments in Gardasil cannot be definitively
18 ascertained at present.
19    A. Correct.
20       ATTORNEY JULIEN: I'd like to mark
21    as 15.
22       (Exhibit Number 15 was marked for
23    identification.)
24 BY ATTORNEY JULIEN:
25    Q. Doctor, I'm handing you what's been

1 marked as Exhibit 15 to your deposition.
2 And it is the FDA's statement entitled FDA
3 Information on Gardasil Presence of DNA
4 Fragments Expected, No Safety Risk.
5    Do you see that?
6    A. Correct. I do see that.
7    Q. Did you refer to or cite this FDA
8 statement anywhere in your report or your
9 MCL?
10    A. I haven't cited this document, no.
11    Q. I would like to direct you to the
12 Key Facts section of this document.
13    Do you see that?
14    A. Right.
15    Q. The first bullet point reads --
16 strike that.
17    The first bullet point of the FDA
18 statement reads: Gardasil does contain
19 recombinant HPV L1 specific DNA fragments,
20 but these are not contaminates.
21    Did I read that correctly?
22    A. Yes.
23    Q. And if we move to the third bullet
24 point, the FDA states: Since the early
25 development of Gardasil, FDA and the

1 manufacturer Merck & Co., Inc., have known
2 that after purification of the vaccine,
3 small quantities of residual recombinant HPV
4 L1 specific DNA fragments remain in the
5 vaccine.
6    Did I read that correctly?
7    A. Yes.
8    Q. I'd like to go back to the first
9 bullet point, the third sentence. It
10 reads -- the FDA statement reads: The
11 presence of these DNA fragments is expected,
12 is not a risk to vaccine recipients and is
13 not a safety factor.
14    Did I read that correctly?
15    A. Yes.
16    Q. And you disagree with the FDA;
17 right?
18    A. Yes, I do disagree with the FDA.
19    Q. Can you point me -- go ahead.
20    A. Yeah, especially, again, what
21 they're saying here is a speculation. For
22 example, in the third bullet point when they
23 say: Since the early development of
24 Gardasil, FDA and the manufacturer Merck
25 have known that after purification of the

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 43 of 91
877-370-3377    Golkow Technologies    www.veritext.com
A Veritext Division

1 vaccine, small quantity of residual
2 recombinant HPV-specific remain.
3      Well, okay, so they stated small
4 quantities. But the fact is that Merck
5 never specifically quantified the actual HPV
6 DNA. They made an estimate based on yeast
7 DNA, and Swissmedic had an issue with that
8 and even pointed the flaw in the
9 methodology. And the -- I've cited
10 documents that relate to that in part 2 of
11 my report.
12      And one of the suggestion at one
13 point by some of the Merck people was that,
14 well, maybe we should just -- okay. And
15 Swissmedic was actually recommending a
16 specific protocol to Merck that would
17 estimate the actual HPV DNA.
18      And Merck was -- apparently tried
19 to circumvent that, and there was the
20 suggestion, well, let's just point
21 Swissmedic to the FDA, and then they decided
22 against this because they didn't want to
23 raise issues at the FDA level. So it
24 appears they didn't want the FDA to be aware
25 of the concern the Swissmedic raised

1 concerning their method of estimating the
2 HPV DNA.
3      Q. So to reach the conclusion that you
4 just offered about what was thought and what
5 folks at Merck did or did not want to pass
6 along, you reached that conclusion by
7 reading emails; right?
8      A. Well, the Merck's documents that
9 are --
10      Q. Yes, Merck documents, Merck emails.
11 You read those emails?
12      A. Yeah.
13      Q. And then you offered your personal
14 interpretation of what was happening?
15      A. Yes, yes.
16      Q. Okay.
17      A. And again --
18      Q. Go ahead.
19      A. Again, those are the things that I
20 will not try to spell out from the top of my
21 head. It's part 2 of my report.
22      Q. I just want to understand the
23 methodology you used --
24      A. Yeah.
25      Q. -- involved in reading emails and

1 offering your personal view --
2      A. Yeah.
3      Q. -- of what employees of Merck
4 thought, felt, or believed about DNA
5 fragments.
6      A. Yeah, for sure. Again, it's
7 pretty -- yeah. I'm at the right place.
8 It's pretty black and white. So this is --
9 yeah, so that's on page 24 of part 2. This
10 is the Swissmedic email. So the Swissmedic
11 representative states that the PCR method
12 employed for measuring the amount of
13 residual DNA in Gardasil or in intermediates
14 of the vaccine is, in fact, not entirely fit
15 for purpose in that it is specific for
16 chromosomal marker of yeast of the PRP1
17 gene, and it would not detect residual
18 plasmid DNA.
19      Again, this is Swissmedic saying
20 the method Merck used would not detect
21 residual plasmid DNA. As multicopy plasmids
22 are used as the expression construct,
23 plasmid DNA may represent a substantial
24 proportion of total whole DNA present in the
25 purification process.

1      Further, there is an (albeit low)
2 chance plasmid DNA might get entrapped into
3 the VLPs and thereby become protected from
4 nuclease digestion. Thus, the DNA
5 purification profiles you have sent us with
6 your email dated September 19, 2011, may not
7 be a of the total DNA pool of yeast and
8 should be confirmed by a different
9 analytical methodology. More specifically,
10 the residual amounts of HPV sequences in the
11 product should be quantified. To my
12 knowledge, Merck never did that.
13      Q. Do you know whether Swissmedic
14 agreed that no other tests needed to be done
15 for DNA fragments? Did you look into that?
16      A. I haven't. I haven't examined all
17 the documents related --
18      Q. So you don't -- I'm sorry to
19 interrupt.
20      A. Yeah.
21      Q. So you don't know how this
22 discussion with Swissmedic actually ended?
23 You just read a clip without the full
24 context; is that right?
25      A. It's not without the full context.

Case 3:22-md-03036-KDB    Document 239-10  Filed 01/06/25    Page 44 of 91
877-370-3377                Veritext Technologies                 www.veritext.com
A Veritext Division

1 Again, they had concerns, and Merck never
2 ended up doing this proposed method, whether
3 Swissmedic -- again, they had no power to
4 enforce Merck to do it.
5        And so, again, the fact is if you
6 want to state that the amount of DNA is
7 small, what are you basing that on? Again,
8 estimation of yeast DNA? Well, that's an
9 estimation. You do not know how much HPV
10 DNA is in the product because you never
11 actually measured that.
12    Q. Just to break that down, do you
13 know one way or the other whether Swissmedic
14 agreed that no other test needed to be done
15 for DNA fragments?
16    A. I don't know that.
17    Q. Okay. And you understand that
18 Swissmedic is the national authorization and
19 supervisory authority for drugs and medical
20 products in what? Is that Switzerland?
21    A. Yeah, Switzerland.
22    Q. Okay. Can you point me to a single
23 peer-reviewed publication that has concluded
24 that DNA fragments in Gardasil cause
25 autoimmune disease in humans?

1    A. There is no peer-reviewed
2 publication that conclusively proves it.
3    Q. Can you point me to a single
4 peer-reviewed publication that has concluded
5 that DNA fragment in Gardasil cause POTS?
6    A. There is no publication that DNA
7 fragments cause POTS, but we never claimed
8 the DNA fragments cause POTS. Neither have
9 we ever claimed that aluminum adjuvants
10 alone causes POTS. It's the whole mix.
11 It's the vaccine as a whole that's got the
12 VLPs that contain molecular mimics and that
13 it's got the adjuvants that by Merck's own
14 studies has greater immunostimulating
15 capacity than other adjuvants.
16        So, again, Gardasil is a highly
17 immunogenic vaccine. And given it contain
18 numerous mimics that match receptors that
19 have been involved in the physiology of POTS
20 indicates that it is likely that Gardasil
21 could cause POTS in susceptible individuals.
22    Q. So to break that down -- oh.
23    A. And the -- sorry. And the DNA is
24 just part of the picture because, again, it
25 is known and established in literature that

1 viral and microbial DNA act as a PLR9
2 agonist, and, of course, we know vaccine
3 manufacturers sometimes include them on
4 purpose, DNA, to enhance the immunogenicity
5 of the vaccine.
6        So there is no doubt it is
7 immunogenic. Therefore, if it is present in
8 a vaccine, it could enhance that vaccine's
9 immune response. But I believe that the
10 vaccine would still be -- it would still be
11 immunogenic without DNA, but the DNA -- the
12 DNA adds to the immunogenic response of the
13 vaccine. Likely as to it.
14    Q. Is it your opinion that DNA
15 fragments in Gardasil -- strike that.
16        Are you able to point to any
17 peer-reviewed study that has found that DNA
18 fragments in Gardasil causes clinical harm?
19    A. Not conclusively. But again, if
20 the DNA fragments have been found
21 corresponding to HPV DNA, and this has been
22 sequenced in a patient six months following
23 injections, that shows that DNA is not
24 degraded. It's sticking around. Given
25 that, it is probable that it is

1 immunologically active if I can put it that
2 way.
3    Q. Doctor, yes or no, are you able to
4 point me to any peer-reviewed study that has
5 found that the DNA fragments in Gardasil
6 caused physical harm? Yes or no?
7    A. No, not conclusively.
8    Q. I would like to direct you back to
9 your -- actually your CV. I know we're
10 going a little bit out of order here. Your
11 CV is Exhibit 2 to your deposition. I
12 wanted to ask about the time period in which
13 you were -- the time period from 2017 to
14 2021.
15        How do you describe your work at
16 that time in your CV?
17    A. Independent research scientist.
18    Q. What research did you do after you
19 left Dr. Shaw's lab and before you started
20 working for the Children's Health Defense in
21 2021?
22    A. Again, not research as if
23 affiliated with any academic institution,
24 but just in my private capacity continuing
25 researching about these topics of interest

44 (Pages 170 - 173)

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 45 of 91
877-370-3377                Greher Technologies              www.veritext.com
                           A Veritext Division

1 that I've been working on for the past ten
2 years. Because it's not -- I'm pretty picky
3 where I want to work, and there is just not
4 a lot of research funding supporting this
5 type of work that I do, so . . .
6     Q. Who or what funded your research in
7 your personal capacity from 2017 to 2021
8 when you joined the Children's Health
9 Defense?
10    A. No one funded it, no, in
11 particular. That was from my own savings.
12    Q. So what did you do for work or for
13 money during those four years?
14    A. Well, again, I didn't work in any
15 official capacity; so I wasn't receiving any
16 formal wages, if that's what you're asking.
17    Q. Why did you leave Dr. Shaw's lab in
18 2017?
19    A. Well, again, we ran out of funding,
20 so . . .
21    Q. So the Dwoskin Family Foundation
22 stopped funding you?
23    A. Yeah. And they were pretty much --
24 there was another grant that we received,
25 but that one ran out as well.

1     Q. What other grant did you receive?
2     A. I cannot remember the name, but it
3 was a grant we received in previous years.
4 It was a family estate that they decided to
5 donate to biomedical research.
6     Q. How was it that you were hired by
7 the Children's Health Defense? How did you
8 become hired by them?
9     A. I was approached by them and asked
10 if I was willing to work as a research
11 consultant in the Gardasil litigation.
12    Q. The research that you did in your
13 own capacity from 2017 to 2021, was that
14 solely about Gardasil?
15    A. No, it wasn't about Gardasil. It
16 was general. It was about, again, vaccines
17 in general. I wasn't picking on Gardasil.
18 And I wouldn't qualify -- wouldn't classify
19 it that way, even though that's what some
20 people might say of me.
21    Q. What do you mean when you say you
22 conducted research --
23    A. I pursued -- just because I'm no
24 longer -- I don't have the money to conduct
25 my own research doesn't mean I put my feet

1 on the table or take a hike. I still want
2 to follow the literature that's relevant to
3 my interests such as safety of vaccines, in
4 general, and that's what I studied in the
5 Shaw lab.
6        There were also -- there were
7 some -- there was one big project that we
8 were able to finish that was the last
9 project that I basically designed the study
10 for. And two publications came out of that.
11 That's publication number 3 that came in
12 2021 and publication number 4 that came out
13 in 2020.
14        So I was involved in helping to
15 write up part of that work. Well, write up
16 the papers because, again, that's the
17 project that I designed, and that was
18 finished, but obviously there was some time
19 to analyze the data and write up the papers.
20    Q. You were unemployed from the time
21 you left Dr. Shaw's lab in 2017 until you
22 were hired by the Children's Health Defense
23 in 2021?
24        ATTORNEY BAUM: Objection.
25    Mischaracterizes her testimony.

1        THE WITNESS: In an official
2    capacity, yes. I wasn't employed by
3    any academy research institution.
4 BY ATTORNEY JULIEN:
5    Q. Were you employed by anyone or
6 any --
7    A. No. And part of it was also
8 personal reasons because in late 20- --
9 well, in 2017, my father died, and I just
10 needed to take some time off.
11    Q. Oh, I'm sorry to hear that.
12        Are you able to identify a single
13 peer-reviewed study in the world that has
14 found a statistically significant increased
15 risk of POTS in a Gardasil-vaccinated
16 population versus an unvaccinated
17 population?
18    A. No.
19    Q. Are you able to point me to a
20 single study in the world that has found a
21 statistically significant increased risk of
22 POI, or premature ovarian failure, in a
23 Gardasil-vaccinated population versus an
24 unvaccinated population?
25    A. No, with respect to POTS -- again,

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 46 of 91
877-370-3377                Golkow Technologies                  www.veritext.com
                          A Veritext Division

1 same, because I wanted to get back to that.
2 But I didn't ignore all the studies. I did
3 cite those that were most relevant to POTS,
4 which are the Skufca, Cameron, and Hviid and
5 Thomsen studies.
6     It's true they didn't find an
7 increased risk of POTS. But with Cameron
8 and Skufca, they didn't use the ICD-10 code
9 for POTS because there was no international
10 ICD-10 code for POTS until 2022. So, again,
11 you cannot make a conclusive statement that
12 these studies proved there was no risk of
13 POTS when they didn't even have the ICD-10
14 code for POTS.
15     Again, they used what I called
16 codes that might capture POTS, but they'll
17 capture a lot of other things that we never
18 claimed are associated with Gardasil. So
19 that would dilute the signal.
20     The two studies that did use the
21 ICD-10 code for POTS are the two Danish
22 studies. One is Hviid, et al. and, again,
23 that's part of those articles that I handed
24 to you at the beginning. The Hviid 2020,
25 association between qHPV vaccine and

1 selected syndromes with autonomic
2 dysfunction and also the Thomsen study.
3     Q. Doctor, are you looking at your
4 computer right now?
5     A. Yeah, those are -- those were on
6 the flash drive --
7     Q. Okay.
8     A. -- that I gave at the beginning.
9     Q. Just to go back to what my question
10 was is: Are you able to point me to a
11 single study in the world that has found a
12 statistically significant increased risk of
13 POI or premature ovarian failure in a
14 Gardasil-vaccinated population versus an
15 unvaccinated population? Yes or no?
16     A. Yeah. POTS and POI, no, but,
17 again, one has to consider the quality of
18 the evidence presented, and if it's not very
19 good quality of evidence, then that evidence
20 is not very useful.
21     Q. And I understand that you think
22 there are limitations on every
23 epidemiological study that has been done on
24 Gardasil, but you can confirm that multiple
25 epidemiological studies have been conducted

1 for POTS, POI, and autoimmune disease, and
2 those studies have failed to show an
3 affirmative association between Gardasil in
4 those conditions in a vaccinated population
5 versus an unvaccinated population.
6     You can confirm that; right?
7     A. Well, I confirmed -- what I can
8 confirm is that the studies do not support
9 these conclusions because, again, there's
10 a -- of course, every study has limitation,
11 but the question is whether these
12 limitations are significant so as to
13 basically invalidate the conclusions, and it
14 is my opinion that in -- with respect to
15 these studies that that holds true.
16     For the Thomsen study, for example,
17 their risk period was -- full out period was
18 basically one year, and that sounds like a
19 long time, and it is for most autoimmune
20 diseases, but it is not long enough for POTS
21 because the largest survey on POTS patients
22 that included 4,000 POTS patients showed
23 that the median diagnostic delay is
24 24 months, and the range was six to
25 72 months.

1     Again, if your risk period where
2 you want to capture POTS is just one year,
3 you're missing a whole lot of cases that got
4 diagnosed later. Again, it's documented
5 that POTS patients have to visit multiple
6 doctors, and the diagnostic delays can be
7 over two years. Again, the median
8 diagnostic delay was two.
9     Some patients take five to seven or
10 even ten years to get a diagnosis.
11     Q. Just to be clear, you have never
12 been involved in diagnosing anyone with
13 POTS; right?
14     A. No, I haven't.
15     Q. Okay. Now, I just want to go back
16 to my question. Again, I know you have --
17 in your 338-page report, have detailed your
18 views on the various epidemiological studies
19 that have looked at this, but can you
20 confirm, yes or no, that multiple
21 epidemiological studies have been conducted
22 for POTS, POI, and autoimmune disease and
23 those studies have failed to show an
24 increased risk in a Gardasil-vaccinated
25 population versus an unvaccinated

Case 3:22-md-03036-KDB    Document 239-11    Filed 01/06/25    Page 47 of 91
877-370-3377    Golkow Technologies    www.veritext.com
A Veritext Division

1 population?
2     ATTORNEY BAUM: Objection. Asked
3   and answered.
4 BY ATTORNEY JULIEN:
5   Q. Can you confirm that?
6     I don't think I got an answer.
7     Yes or no?
8     ATTORNEY BAUM: She did answer.
9   You got an answer.
10    Objection. Asked and answered.
11    ATTORNEY JULIEN: I'm going to
12   withdraw my question and ask it again
13   just to make sure this comes in
14   cleanly.
15 BY ATTORNEY JULIEN:
16   Q. Again, I hear you. I know you have
17 your views on all the limitations and the
18 epidemiological studies, and you don't think
19 that they can prove anything, but can you
20 confirm, yes or no, that multiple
21 epidemiological studies have been conducted
22 for POTS, POI, and autoimmune disease, and
23 those studies have failed to show an
24 increased risk in a Gardasil-vaccinated
25 population versus an unvaccinated

1 population?
2     ATTORNEY BAUM: Objection. Asked
3   and answered.
4 BY ATTORNEY JULIEN:
5   Q. You can answer.
6   A. They have not found an increased
7 risk.
8   Q. You are unable to -- strike that.
9     Are you able to point me to a
10 single study in the world that has found a
11 statistically significant increased risk of
12 chronic fatigue syndrome in a
13 Gardasil-vaccinated population versus an
14 unvaccinated population?
15   A. Chronic fatigue syndrome with
16 Gardasil, no, but there was an increased
17 risk with Cervarix.
18   Q. And you understand this lawsuit is
19 about Gardasil; right?
20   A. Yes, yes, I do.
21   Q. Are you able to point me to a
22 single study in the world that has found a
23 statistically significant increased risk of
24 chronic regional pain syndrome in a
25 Gardasil-vaccinated population versus an

1 unvaccinated population?
2   A. No.
3   Q. Are you able to point me to a
4 single study in the world that has concluded
5 that Gardasil causes autoimmune disorders in
6 a Gardasil-vaccinated population versus an
7 unvaccinated population?
8   A. Well, the child study because even
9 after all the statistical trickeries they've
10 done, they could not get rid of the
11 Hashimoto's signal.
12   Q. And there you said signal.
13   A. It was the increased risk.
14   Q. Okay. Are you saying that the Chow
15 study, the authors concluded that Gardasil
16 causes autoimmune disorders?
17   A. They didn't conclude that because
18 they tried to put a different spin on their
19 results as often happens.
20   Q. So they got their data wrong too?
21   A. Well, the data shows a statistical
22 significant risk, and then they got to say,
23 well, there isn't any.
24   Q. Are you able to point me to a
25 single study in the world where the authors

1 have concluded that Gardasil causes
2 autoimmune disorders in a
3 Gardasil-vaccinated population versus an
4 unvaccinated population?
5   A. No.
6   Q. Are you able to point me to a
7 single study in the world that has concluded
8 that Gardasil causes POTS in a
9 Gardasil-vaccinated population versus an
10 unvaccinated population?
11    ATTORNEY BAUM: Objection. Asked
12   and answered. This is maybe the
13   fourth time you've asked her that same
14   question.
15    THE WITNESS: I've already
16   answered, yes, that --
17 BY ATTORNEY JULIEN:
18   Q. That there is no study?
19   A. No, there is no study.
20   Q. Are you able to point me to a
21 single study in the world that has concluded
22 that Gardasil causes POI or POF in a
23 Gardasil-vaccinated population versus an
24 unvaccinated population?
25   A. No.

47 (Pages 182 - 185)

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 48 of 91
Golkow Technologies
877-370-3377                    A Veritext Division                    www.veritext.com

1    Q.  The use of new medical history in
2  the Gardasil clinical trials, that was also
3  approved by the FDA; right?
4    A.  It was.
5    Q.  The monitoring of adverse events in
6  the Gardasil clinical trials was disclosed
7  to the FDA and ultimately approved by the
8  FDA; right?
9    A.  Correct.
10    Q.  The follow-up time after each
11  Gardasil vaccine dose in the Gardasil
12  clinical trials was disclosed to the FDA and
13  approved by the FDA; right?
14    A.  Correct.
15    Q.  You purport to have performed a
16  Bradford Hill analysis in your report; is
17  that right?
18    A.  Yes.
19    Q.  And you say that the Bradford Hill
20  analysis that you performed in your report
21  was related to the Gardasil vaccine
22  POTS/dysautonomia signal; is that right?
23    A.  Correct.
24    Q.  You did not perform a Bradford Hill
25  analysis related to POI or any other

1  diagnosis in your report; correct?
2    A.  No, I didn't.
3    Q.  And you conclude in your report
4  that the fact that the Gardasil
5  vaccine-associated POTS/dysautonomia signal
6  satisfies six of the seven relevant Bradford
7  Hill criteria supports a causal
8  relationship; is that right?
9    A.  Correct.
10    Q.  There are nine Bradford Hill
11  criteria; correct?
12    A.  Correct.
13    Q.  And it's your opinion that Gardasil
14  and POTS -- strike that.
15       It's your opinion that the Gardasil
16  vaccine-associated POTS/dysautonomia signal
17  satisfies six out of nine of the Bradford
18  Hill criteria?
19    A.  Yeah, six out of nine.  But, again,
20  some are irrelevant, like the biological
21  gradient, because it's well recognized in
22  science that some certain compounds do not
23  obey the rules of the dose makes the poison.
24  Aluminum is one of them.
25       It's by no means the only compound

1  because experiments have shown, and
2  particularly with respect to aluminum
3  adjuvants, that lower doses can be more
4  neurotoxic than higher doses.  Again, that
5  has all to do with pharmacokinetics and
6  distribution of aluminum adjuvants.
7       Aluminum adjuvants are
8  nanoparticles that aggregate to
9  microparticles.  And there is a certain size
10  that is optimal for the process of
11  fibrocytosis, which is when the immune cells
12  take up aluminum.  If the microparticle
13  aggregates are of larger size, then the
14  macrophages will not be able to take them up
15  as easily.
16    Q.  Do you mind if we break this down a
17  little bit?  So your Gardasil
18  POTS/dysautonomia signal that you offer in
19  your report, you understand that that does
20  not satisfy three of the Bradford Hill
21  criteria:  specificity, dose response, and
22  experimental evidence; right?
23    A.  Correct.
24    Q.  Now, let's just take this a step at
25  a time.  Specificity in the Bradford Hill

1  criteria is when a single putative cause
2  produces a specific effect; right?
3    A.  Right.
4    Q.  And you recognize that POTS can be
5  the result of various different infections
6  and different causes?
7    A.  Exactly, yeah.  Just like multiple
8  sclerosis.  Yeah, it's been associated with
9  numerous infections.
10    Q.  And other -- you agree that even
11  under your theory we established that there
12  can be a number of causes of POTS that have
13  nothing to do with Gardasil?
14    A.  Absolutely.
15    Q.  The next criteria that -- the next
16  criterion that is not met with your Gardasil
17  signal is dose response; is that right?
18    A.  Yes.
19    Q.  Or biological gradient I think is
20  how you described it?
21    A.  Yeah, biological gradient or dose
22  response, which is -- yeah, it's the same
23  thing.
24    Q.  Now, dose response or biological
25  gradient in the Bradford Hill criteria is

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 49 of 91
Golkow Technologies
A Veritext Division
877-370-3377                                                                    www.veritext.com

1 when increased exposure results in increased
2 risk or incidence of disease?
3    A. Yeah.
4    Q. And sorry, we want to make sure
5 we're not talking over each other.
6    A. Yeah, for sure.
7    Q. You say that traditional -- strike
8 that.
9        You say in your report traditional
10 dose response relationships don't
11 necessarily apply to aluminum-adjuvant
12 vaccines.
13    A. Yeah, again, and not just -- and
14 I'm not saying that aluminum adjuvants are
15 the only one that don't obey this principle
16 because as I write in my report that even
17 this called monotonic biological gradient
18 where increased -- exposure results in
19 increased incidence. Again, it was even
20 acknowledged by Bradford Hill that there
21 is -- there are more complex dose response
22 relationships. Again, recent research
23 experiments verified that.
24        And, again, I just gave an example
25 of aluminum because aluminum is what I'm

1 dealing with, and it's based on experimental
2 data, again, that shows that lower doses of
3 aluminum, because they don't aggregate in
4 big microparticles, they are more
5 effectively taken up by the macrophages and
6 then distributed throughout the body
7 including the brain, and they produced no
8 adverse neurobehaviorial outcomes.
9        Whereas larger doses do not get
10 taken out by the macrophages, and they
11 mostly then stay at the injection site in
12 the form of granulomas. So they don't exert
13 systemic toxicity to the same extent as the
14 lower doses.
15    Q. In layman's terms, there's no
16 evidence that there's some sort of increased
17 risk of dysautonomia, for example, in
18 individuals who have received three doses of
19 Gardasil versus those who have received one?
20    A. Right.
21    Q. Let's move on to experimental
22 evidence.
23    A. It wouldn't be three doses of
24 Gardasil versus one. It depends how much
25 aluminum is -- if the aluminum concentration

1 is above a certain threshold, then those
2 microparticles, once injected, will tend to
3 clump in larger particles. So it depends on
4 the actual dose of aluminum that's in the
5 vaccine.
6        ATTORNEY BAUM: I want to object.
7 You're mischaracterizing her testimony
8 with respect to the aluminum as not
9 being monotonic as opposed to
10 rechallenge from multiple exposures to
11 Gardasil.
12        THE WITNESS: Yeah, that's why I
13 corrected. It's not whether
14 someone -- that someone that receives
15 three doses of Gardasil, that's
16 less risky. It depends on the dose of
17 aluminum because, again, what the
18 experimental research has experimented
19 with is different doses of the
20 aluminum adjuvant.
21        And the aluminum adjuvant in
22 Gardasil does fall into doses that are
23 normal for vaccines. It's not like a
24 lot of the vaccines contain that dose
25 of aluminum. It's not -- they don't

1    contain much -- Gardasil doesn't
2    contain much higher doses aluminum
3    compared to other vaccines.
4 BY ATTORNEY JULIEN:
5    Q. Let's move on to experimental
6 evidence. Experimental evidence in the
7 Bradford Hill criteria is the successful
8 reproduction of a pathology or adverse
9 events related to a drug under controlled
10 conditions; is that right?
11    A. Right.
12    Q. And you write in your report that
13 your Gardasil vaccine POTS/dysautonomia
14 signal does not satisfy the experimental
15 evidence criterion.
16        ATTORNEY BAUM: Objection.
17 Mischaracterizes her report.
18        THE WITNESS: Well, in that strict
19 sense, no. Like POTS has not been
20 reproduced, say, in rabbits with
21 injection of Gardasil. No one has
22 attempted that kind of experiment, to
23 my knowledge, to try and reproduce
24 specifically POTS in some animal
25 model.

49 (Pages 190 - 193)

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 50 of 91
877-370-3377                Golkow Technologies                www.veritext.com
                           A Veritext Division

1  As I said in my report, it would
2  be pretty difficult because you
3  would -- you would need to consider
4  also, again, the choice of animal
5  strain is important and whether you're
6  going to use a genetic or susceptible
7  strain or no.
8  BY ATTORNEY JULIEN:
9  Q.  Just to break that down, POTS has
10  not been reproduced in animal studies with
11  the injection of Gardasil; correct?
12  A.  No, it hasn't.
13  Q.  I want to talk about your strength
14  of association opinion regarding the -- that
15  criterion of the Bradford Hill analysis.
16  A.  Yeah.
17  Q.  And in short, your opinion is that
18  the disproportionality analysis that you
19  performed in this case satisfies or supports
20  the strength of association criterion in the
21  Bradford Hill analysis plus you cite two
22  what you described as epidemiological
23  studies:  Fukushima and Jorgensen; right?
24  A.  Right.
25  Q.  And you also opine that your

1  disproportionality analysis results are
2  consistent with Chandler, Zi, Tatang, Gong,
3  and Bonaldo.
4  A.  Correct.
5  Q.  You believe the results of your
6  disproportionality analysis are epidemiology
7  supported by the Fukushima and Jorgensen
8  studies; correct?
9  A.  Yes.  To a degree.  Simply because
10  Fukushima -- they didn't look at diagnosis
11  of POTS.  They looked at the symptoms, and
12  that was the whole purpose of the -- that
13  part of the algorithm that is symptom-based,
14  recognizing the fact that POTS is
15  underdiagnosed.
16  And the Fukushima study shows that
17  there's a greater rate of incidence of these
18  clusters of symptoms in the vaccinated
19  Japanese girls than the unvaccinated,
20  especially when you -- as the number of
21  symptoms increases because obviously if it's
22  just -- if you are just talking about
23  dizziness, and most teenagers have
24  experienced dizziness in their lives.
25  You would not expect to see a

1  difference just in a single symptom,
2  especially since there are relatively no
3  specific symptoms.  But when you look at the
4  cluster of symptoms, they're significantly
5  overrepresented.
6  To me, the fact that by 2010, even
7  with something that's, again, relatively --
8  there's a lower awareness among physicians,
9  especially among primary care physicians,
10  about dysautonomic syndromes, and they're
11  the primary point of contact for patients.
12  And so by 2010, there were already seven
13  cases in VAERS of POTS following Gardasil,
14  and there were zero associated exclusively
15  with Gardasil for all other vaccines in the
16  vaccination schedule.
17  So if POTS in the
18  Gardasil-vaccinated simply represented
19  background rates, you would expect to see
20  some cases with other vaccines, especially
21  in that target age group, 6- to
22  17-year-olds, because this is where POTS
23  normally or frequently happen.  So how come
24  there is zero?
25  By end of 2010 -- that was before

1  there was any media -- potentially
2  media-stimulated reporting because by 2010,
3  there was only one published case report of
4  POTS, and that was by Svetlana Blitshteyn.
5  Q.  We'll talk about your
6  disproportionality analysis.  I was just
7  asking is it your opinion that the Fukushima
8  and Jorgensen studies are epidemiological
9  support for your disproportionality
10  analysis?
11  A.  Yeah, with the acknowledged
12  limitations.
13  Q.  Okay.  Let's look at Fukushima.
14  I'm going a little bit out of order here.
15  I'm going to come back to Exhibit 16, but
16  I'm marking this as Exhibit 17.
17  (Exhibit Number 17 was marked for
18  identification.)
19  BY ATTORNEY JULIEN:
20  Q.  I'm handing you what's been marked
21  as Exhibit 17 to your deposition.  This is
22  the Fukushima 2022 publication that you
23  indicated in your report is epidemiological
24  support for your disproportionality
25  analysis.

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 51 of 91
877-370-3377    Golkow Technologies    Page 51 of 91    www.veritext.com
A Veritext Division

1 Do you recognize this paper?
2 A. Yeah.
3 Q. If we look at just the abstract,
4 let's look at the method section of the
5 abstract. It says: A two-stage descriptive
6 nationwide epidemiological survey was
7 conducted in 2016 with a six-month target
8 period from July 1 to December 31, 2015, to
9 estimate the prevalence and incidence of
10 diverse symptoms among Japanese adolescents
11 without HPV vaccination.
12 Did I read that correctly?
13 A. Yes.
14 Q. Is it your opinion that Fukushima
15 in 2022 -- strike that.
16 Let's look at the conclusion of the
17 abstract. The conclusion of Fukushima 2022
18 in the abstract is: Adolescent Japanese
19 girls without HPV vaccination also visited
20 hospitals with diverse symptoms similar to
21 those following HPV vaccination. Our
22 findings predict the medical demands for
23 coincident diverse symptoms, which are
24 temporarily associated with but are not
25 caused by HPV vaccination of Japanese

1 adolescents.
2 Did I read that correctly?
3 A. Yes.
4 Q. And if we --
5 A. And, again, yeah, that's too strong
6 statement that's not supported by the data
7 because, again, the fact that in Figure 2,
8 you clearly see a big difference in the
9 prevalence of diverse symptoms between never
10 vaccinated and those that were vaccinated.
11 And when you go -- when it comes
12 to -- when there is about five or six
13 symptoms, it's even greater, but it's clear
14 throughout the whole figure that there's a
15 big difference between the vaccinated and
16 the unvaccinated.
17 Q. Let's look at --
18 A. And --
19 Q. If I can, I'd like to ask you some
20 questions.
21 A. Yeah, yeah.
22 Q. So the authors of Fukushima, if we
23 look at the first page of this publication,
24 Fukushima 2022, they're all affiliated with
25 different schools of medicine in Japan;

1 right?
2 A. Yes.
3 Q. And so you're saying that as
4 someone with no medical training, you didn't
5 go to medical school, you're saying that
6 these authors misinterpreted their study
7 data in reaching their conclusion; is that
8 right?
9 A. Well, if there was no increased
10 risk with Gardasil, I would expect -- and if
11 events that happened with Gardasil or HPV
12 vaccines because, again, in Japan, they use
13 both Gardasil and Cervarix. But, again, if
14 there was no risk with Gardasil whatsoever,
15 then these lines should be sitting. They
16 should overlap. There should not be this
17 difference.
18 Q. Okay. So you refer to Figure 2 and
19 say that there's a big difference between
20 the vaccinated and unvaccinated results.
21 Let's look at Fukushima 2022. Let's go to
22 page 40 of this publication under the
23 Discussion section.
24 A. Yes.
25 Q. And I'd like to go to the third

1 full paragraph that starts with: In
2 addition.
3 A. Okay.
4 Q. That paragraph begins -- strike
5 that.
6 This paragraph in Fukushima 2022
7 states: In addition to the prevalence of
8 diverse symptoms among girls without a
9 history of HPV vaccination group A, we
10 estimated the prevalence among vaccinated
11 girls whose symptoms occurred after
12 vaccination group C.
13 However, these estimates cannot be
14 directly compared between the groups because
15 suspension of the proactive recommendation
16 for HPV vaccination in Japan led to a
17 smaller vaccinated population among girls
18 age 12 to 14 years.
19 Did I read that correctly?
20 A. Yeah.
21 Q. And then if we go to the next
22 paragraph, that paragraph begins with the
23 sentence: There are other reasons why we
24 cannot compare prevalence between
25 unvaccinated and vaccinated girls.

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 52 of 91

1    Did I read that correctly?
2    A.  Yes.
3    Q.  And then if we turn the page and go
4 to the -- just above the acknowledgments on
5 page 42 of Fukushima 2022.
6    A.  Yeah.
7    Q.  And I'd like to direct your
8 attention to the last paragraph says:  In
9 conclusion, but I'd like to go a few lines
10 above that where it says:  Since our survey
11 was subject.
12    Do you see that on the left side?
13    A.  Yes, I do.
14    Q.  This paragraph of Fukushima 2022
15 states:  Since our survey was subject to
16 substantial bias in comparing prevalence of
17 diverse symptoms between unvaccinated and
18 vaccinated girls, the highest priority is
19 appropriate interpretation of the prevalence
20 of diverse symptoms among unvaccinated
21 girls.
22    This priority led us to not attempt
23 estimation of competence intervals, CIs, as
24 well as statistical testing because
25 evaluating the extent of chance would not

1 make sense under the considerable influence
2 of bias.
3    Did I read that correctly?
4    A.  Yes.
5    Q.  So the Fukushima 2022 authors state
6 in their publication that you cannot compare
7 prevalence between vaccinated girls and
8 unvaccinated girls, and that's precisely
9 what you're doing in your report; right?
10    A.  Well, what was the purpose of them
11 even estimating if you absolutely cannot
12 compare it?
13    Q.  I just would like an answer.  The
14 Fukushima 2022 authors stated in their
15 publication that you cannot compare
16 prevalence between vaccinated girls and
17 unvaccinated girls, and you are comparing
18 prevalence between vaccinated girls and
19 unvaccinated girls; right?
20    ATTORNEY BAUM:  Objection.  That
21    mischaracterizes what her report says
22    and does.
23 BY ATTORNEY JULIEN:
24    Q.  You're attempting to compare the
25 prevalence between vaccinated and

1 unvaccinated girls in Fukushima in your
2 report; correct?
3    A.  Yes, I am comparing them.
4    ATTORNEY JULIEN:  Okay.  Next I'd
5    like to mark Jorgensen 2020.
6    (Exhibit Number 18 was marked for
7    identification.)
8 BY ATTORNEY JULIEN:
9    Q.  Doctor, I'm handing you what's been
10 marked as Exhibit 18 to your deposition.
11 This is the Jorgensen 2020 publication.
12    Now, you did not -- if you turn to
13 page, I don't know, 20 -- maybe like halfway
14 in or so, there's another file back
15 here that's entitled Additional File 4.
16    A.  Oh, it's the supplement; right?  I
17 think.
18    Q.  Did you review additional file 4 to
19 Jorgensen in arriving at your opinions?
20    A.  Let me see.  Can I --
21    Q.  Oh, sure.  You can look at this.
22 I'll give you mine.
23    A.  Yeah, that's the supplemental file.
24 That what I thought, yeah.
25    Q.  Okay.

1    A.  Yeah, I have seen the supplemental
2 file.
3    Q.  Okay.  You identified Jorgensen
4 2020 as additional epidemiological support
5 for your disproportionality analysis; right?
6    A.  Yes, again, with the acknowledged
7 limitations.
8    Q.  When did you first see the
9 Supplement Additional File 4?  Was it before
10 or after you wrote your report?
11    A.  I've seen it before.
12    Q.  I'd like to turn to page 20 of the
13 Jorgensen publication.
14    A.  Yes, 20.
15    Q.  And if we go to -- it says
16 Conclusion and then above that, Similar
17 Studies.
18    A.  Right, yeah.
19    Q.  Do you see there that the Jorgensen
20 2020 authors stated:  The analyses do not
21 prove that the HPV vaccines cause POTS and
22 CRPS, but they do provide a signal?
23    A.  Yeah, I see the paragraph, yeah.
24    Q.  We can set that aside.
25    I want to ask a few questions --

Case 3:22-md-03036-KDB    Document 239-00    Filed 01/06/25    Page 53 of 91
Golkow Technologies
877-370-3377              A Veritext Division              www.veritext.com

1 actually, I'm sorry. Let me make sure.
2    A. Again, there's a difference between
3 conclusive proof and just another piece that
4 adds to the whole picture, which is our
5 arguments when you have so many -- yes, you
6 have a lot of -- you have case reports. You
7 have Mehlsen's study with over 800 patients.
8 You have Chandler's study that shows similar
9 symptoms of being reported in different
10 geographical regionals irrespective of the
11 diagnosis.
12    Q. And Mehlsen and Chandler did not
13 involve a comparison of vaccinated
14 individuals versus unvaccinated individuals;
15 right?
16    A. No, they haven't.
17    Q. Okay. And the Jorgensen authors
18 stated in their publication that their
19 analyses provide a signal but do not
20 establish causation; correct?
21    A. Correct.
22    Q. Okay. I'm handing you what has
23 been marked as Exhibit 16 to your
24 deposition. We're going back here. I
25 skipped ahead based on a comment you made.

1    (Exhibit Number 16 was marked for
2    identification.)
3 BY ATTORNEY JULIEN:
4    Q. Now, as part of your -- strike
5 that.
6    To conduct your disproportionality
7 analysis, you used the VAERS, vaccine
8 adverse event reporting system; correct?
9    A. Correct.
10    Q. And VAERS is publicly available;
11 right?
12    A. Yes.
13    Q. You're aware that VAERS is
14 comanaged by the CDC and FDA?
15    A. Yes.
16    Q. You agree that reports of adverse
17 events in the VAERS database have a number
18 of limitations?
19    A. Yes, absolutely, like all other
20 passive adverse reporting systems.
21    Q. Let's look -- I'd like to look at
22 what I marked as Exhibit 16 to your
23 deposition, which is the CDC Wonder website.
24    A. Yeah.
25    Q. Is this the VAERS website that you

1 used to conduct your disproportionality
2 analysis?
3    A. Yes, it is.
4    Q. Now, if we go to page 2, do you see
5 a disclaimer?
6    A. I do.
7    Q. When you went to access the VAERS
8 database to perform your disproportionality
9 analysis, you saw this same disclaimer?
10    A. Yes, I have.
11    Q. Let's walk through it. It says --
12 the CDC's VAERS website says: VAERS accepts
13 reports of adverse events that occur
14 following vaccination. Anyone, including
15 healthcare providers, vaccine manufacturers,
16 and the public, can submit reports to the
17 system.
18    Did I read that correctly?
19    A. Yes.
20    Q. And you're aware of that; right?
21    A. Yes.
22    Q. VAERS also includes lawsuits. You
23 know that; right?
24    A. Yes, I know lawyers can report to
25 VAERS also.

1    Q. If we move on, it says: While very
2 important in monitoring vaccine safety,
3 VAERS reports alone cannot be used to
4 determine if a vaccine caused or contributed
5 to an adverse event or illness.
6    Did I read that correctly?
7    A. Yes.
8    Q. And you agree with that statement
9 from the CDC?
10    A. Yeah, you cannot determine or
11 assert that a VAERS report in and of itself
12 is absolute evidence of a causal
13 association.
14    Q. And then I'd like to move to the
15 next paragraph. The bolded sentence on the
16 CDC VAERS website says: VAERS reports may
17 contain information that is incomplete,
18 inaccurate, coincidental, or unverifiable.
19    Did I read that correctly?
20    A. Yes, correct.
21    Q. Are you aware of that?
22    A. Yes, I am aware of that, and that
23 is not specific to the Gardasil vaccine.
24 There would be equal proportion of
25 inaccuracy and complete reports to other

53 (Pages 206 - 209)

Case 3:22-md-03036-KDB    Document 239-10 Filed 01/06/25    Page 54 of 91
877-370-3377    Golkow Technologies    www.veritext.com
A Veritext Division

1 vaccines. There's no reason why Gardasil
2 reports would be more complete than
3 hepatitis B vaccine reports.
4    Q. Is that based on a study, or that's
5 just your gut feeling?
6    A. It's not the gut feeling because I
7 reviewed reports, VAERS reports, from other
8 vaccines.
9    Q. And it goes on to say that:
10 Reports from VAERS can also be biased. As a
11 result, there are limitations on how the
12 data can be used scientifically.
13    A. Correct.
14    Q. You agree that active litigation
15 would impact the proportion and accuracy of
16 reports in VAERS; right?
17    A. Yes, but there was no active
18 litigation by 2010 or even by 2012 with
19 respect to Gardasil, and yet there was a
20 pretty significant disproportionality signal
21 with respect to Gardasil and POTS and
22 menstrual abnormalities.
23    Q. If we turn back to the disclaimer
24 on the CDC website, it says: Key
25 considerations and limitations of VAERS

1 data.
2    Do you see that? And then there's
3 a bullet point list?
4    A. Yes, I do.
5    Q. One of the key considerations and
6 limitations of VAERS data is that: The
7 number of reports alone cannot be
8 interpreted as evidence of a causal
9 association between a vaccine and an adverse
10 event or as evidence about the existence,
11 severity, frequency, or rates of problems
12 associated with vaccines.
13    Did I read that correctly?
14    A. Yes.
15    Q. Do you agree with that CDC
16 statement?
17    A. Again, yes, if I had VAERS alone,
18 but we don't have VAERS alone. Again, we
19 have case reports and large case series such
20 as Mehlsen and other pieces of data that are
21 part of the picture.
22    Q. Just to be clear, the Mehlsen study
23 you're referring to is the 2022?
24    A. Yeah, because that --
25    Q. Okay.

1    A. I believe that encompasses the
2 previous studies because the patients that
3 have been published in previous reports I
4 believe make the same cohort.
5    (Exhibit Number 19 was marked for
6 identification.)
7 ///
8 BY ATTORNEY JULIEN:
9    Q. I'm handing you what's been marked
10 as Exhibit 19 to your deposition. The title
11 of this publication is Safety Monitoring in
12 the Vaccine Adverse Event Reporting System,
13 VAERS.
14    Do you see that?
15    A. Yes.
16    Q. And this publication is authored by
17 Dr. Shimabukuro and others?
18    A. Yes.
19    Q. And Dr. Shimabukuro and the other
20 individuals listed here are CDC and FDA
21 researchers?
22    A. Yes, the same that asked Merck to
23 inform -- potentially inform them of their
24 strategy how to search VAERS in reference to
25 POTS.

1    Q. Okay. If we go to the abstract of
2 this publication, I want to draw your
3 attention to -- actually, I want to direct
4 your attention to page 4402 of Shimabukuro.
5    A. Sorry. Which one again?
6    Q. 4402.
7    A. 4402. Okay.
8    Q. And I wanted to contextualize the
9 disproportionality analysis you performed in
10 this litigation by directing you to Figure 3
11 in the top right corner.
12    A. Yeah.
13    Q. Do you see the Figure 3 in
14 Shimabukuro's publication is a two-by-two
15 contingency table illustrating a
16 hypothetical signal vaccine -- or single
17 vaccine and AE combination scenario?
18    A. Sorry. Single vaccine and
19 compensation scenario?
20    Q. Yeah, if you look at the
21 description of Figure 3, it says:
22 Two-by-two contingency table illustrating a
23 hypothetical single vaccine and adverse
24 event combination scenario?
25    A. Yes.

54 (Pages 210 - 213)

Case 3:22-md-03036-KDB    Document 239-10 Filed 01/06/25    Page 55 of 91
877-370-3377                  Golkow Technologies             www.veritext.com
A Veritext Division

1    Q.   And you're familiar with two-by-two
2  contingency tables?
3    A.   Yes.
4    Q.   The disproportionality analysis you
5  performed in this litigation only includes
6  adverse events that fall into the category
7  of the small gray area, A2, in Figure 3.
8  Those are individuals who were vaccinated --
9    A.   Yes, reported to VAERS because
10  obviously I cannot know the number of those
11  that did not report to VAERS.
12    Q.   So just to make sure we weren't
13  overlapping.   The disproportionality
14  analysis that you performed in this case
15  only includes the adverse events that fall
16  into section A2 of Figure 3 of Shimabukuro?
17    A.   Right, those that were reported to
18  VAERS.
19    Q.   Your disproportionality analysis
20  only includes vaccinated individuals who had
21  an AE that was reported to VAERS; correct?
22    A.   Correct.
23    Q.   The disproportionality analysis you
24  performed in this litigation did not include
25  individuals in section D who were not

1  vaccinated and did not have an adverse
2  event?
3    A.   Well, it includes obviously
4  individuals who are vaccinated with other
5  vaccines.   And, again, back to the
6  contingency tables which was sourced by --
7  from publications that outlined the methods,
8  how the disproportionality analysis is done.
9  Again, it's a pretty standard method that
10  you have a vaccine of interest and you have
11  a comparator which includes all other
12  vaccines excluding vaccines of interest.
13         And in my case, I excluded also
14  Cervarix because, again, the litigation is
15  with respect to Gardasil.   So I did not want
16  to have Cervarix confounders, even though
17  Cervarix is associated with similar adverse
18  events, but it's also the number of adverse
19  events with Cervarix is -- it's very small.
20         And, again, so that's -- that's a
21  pretty standard contingency table for this
22  kind of analysis, and I've derived it
23  from -- checked different -- several sources
24  that don't deal with just vaccine adverse
25  reactions.   They deal with drug adverse

1  reactions.
2         Again, it's pretty standard.   You
3  have your vaccine or drug of interest, and
4  you have a comparator which excludes that,
5  and then you have the adverse event of
6  interest for both and all other adverse
7  events, so all other adverse events both for
8  the vaccine of interest and for the
9  comparator group.
10    Q.   And just to -- there was a lot
11  there.   I just want to make sure my question
12  was answered.   Section D of Figure 3 -- do
13  you see that, Figure 3 on the Shimabukuro
14  publication?
15    A.   Yeah, I do.   And I'm not -- again,
16  I would like to read the whole paper because
17  what are they referring to when it says not
18  vaccinated?   I'm doing a disproportionality
19  analysis in VAERS.   Everyone who reports to
20  VAERS has been vaccinated with something.
21    Q.   Okay.   And then if we -- maybe I'll
22  direct your attention just below that.
23  Actually, take a step back.   You have not
24  read or considered Shimabukuro 2015; is that
25  right?

1    A.   No, I haven't seen this paper
2  because it was not necessary that I read
3  this particular paper to know how to conduct
4  a disproportionality analysis.   Again, as
5  you know, Martin Kulldorff endorsed the
6  method.   And again, I consider him
7  definitely an expert who is in data mining
8  and vaccine safety analysis as well as
9  epidemiology.
10    Q.   Just to step back, I'm not -- we'll
11  get to questions about your specific
12  analysis.   I'm just trying to contextualize
13  what exactly it is you did in this case.
14         If we look at the language just
15  below the chart on Figure 3, do you see that
16  if we go, I don't, know, six lines down, do
17  you see the sentence that says:   Because
18  VAERS data?
19    A.   Yes, do not include an unvaccinated
20  and comparison group.   It is not possible to
21  calculate and compare rates of adverse event
22  in vaccinated versus unvaccinated.   Yes.
23    Q.   Do you agree that because VAERS
24  data do not include an unvaccinated
25  comparison group, it is not possible to

Case 3:22-md-03036-KDB     Document 239-10 Filed 01/06/25     Page 56 of 91
877-370-3377                Golkow Technologies                www.veritext.com
                           A Veritext Division

1 calculate and compare rates of adverse
2 events in vaccinated versus unvaccinated
3 individuals and determine if vaccination is
4 associated with an increased risk of an
5 adverse event using VAERS data?
6      A. Again, absolute risks are not --
7 these are not -- yes, you are not able to
8 determine them from the disproportionality
9 analysis, and that's not the purpose of this
10 disproportionality analysis because
11 disproportionality analysis reports the
12 frequencies of adverse events, frequencies
13 of reporting of adverse events. It doesn't
14 quantify, obviously, a risk of adverse event
15 in a general population.
16      So these are well-known
17 limitations, but it doesn't invalidate the
18 disproportionality analysis as a tool of
19 pharmacovigilance, and it's being used for a
20 long, long time. It is considered as a
21 cornerstone of pharmacovigilance, again,
22 given its limitations and for the purpose,
23 which is a signal detection.
24      Q. Okay. So you agree that a
25 disproportionality analysis should only be

1 used for signal detection; correct?
2      A. Correct.
3      Q. VAERS is -- strike that.
4      I'd like to direct your attention
5 to the page ending in 4401. And I want to
6 look at the second full paragraph under this
7 ratio on the right side that starts with
8 Disproportionality Analysis.
9      Do you see that?
10      A. Yes.
11      Q. The Shimabukuro authors write:
12 Disproportionality analysis complements
13 clinical reviews and other analyses to
14 identify adverse events that may be more
15 frequently associated with a particular
16 vaccine.
17      A result that exceeds a
18 pre-specified statistical learned threshold
19 might warrant further evaluation such as a
20 clinical review of reports but does not
21 definitively demonstrate a true increased
22 risk of an adverse event, a causal
23 association, or a safety problem.
24      Did I read that correctly?
25      A. Yes.

1      Q. Do you agree with the CDC and FDA
2 researchers?
3      A. I do agree with that, yeah.
4      Q. A disproportionality analysis only
5 considers the reports that were actually
6 made in VAERS; correct?
7      A. Right.
8      Q. It does not include events that
9 occurred but were not reported to VAERS;
10 right?
11      A. Correct.
12      Q. You worked with -- we discussed
13 earlier that you worked with Dr. Brinth on
14 your disproportionality analysis in this
15 case?
16      A. Correct.
17      Q. We received some emails yesterday
18 showing some communications that you had
19 with Dr. Brinth by email in January of 2023.
20      When did you start working with
21 Dr. Brinth to construct the algorithm that
22 you used for your disproportionality
23 analysis in this case?
24      A. I cannot tell you the exact day or
25 month, but it would have been in 2022 for

1 sure because that's not something you can do
2 overnight.
3      Q. And, just for the record, we will
4 be requesting those earlier communications
5 because I believe the earliest we received
6 yesterday was January of 2023.
7      ATTORNEY BAUM: We conveyed to you
8 all the ones she relied upon for
9 generating the algorithm.
10      ATTORNEY JULIEN: She said that
11 she started speaking with her about it
12 about a year before.
13      THE WITNESS: Not an entire year
14 before.
15      ATTORNEY JULIEN: 2022.
16      THE WITNESS: Because January '23,
17 we were already -- well, we were
18 already sometime -- it was -- we
19 already were close to finalizing the
20 algorithm. Yes, there was a lot of
21 discussion, but not like January,
22 2022.
23 BY ATTORNEY JULIEN:
24      Q. Okay. So in January of 2023, you
25 were close to finalizing the algorithm that

56 (Pages 218 - 221)

Case 3:22-md-03036-KDB      Document 239-10      Filed 01/06/25      Page 57 of 91
877-370-3377      Golkow Technologies      www.veritext.com
A Veritext Division

1 you used in your expert report in this
2 litigation?
3    A. Yes.
4    Q. But you had discussed that
5 algorithm and potential search terms with
6 Dr. Brinth earlier than January of 2023;
7 right?
8    A. Yeah, earlier than January '23, we
9 discussed.
10    Q. And had you exchanged written lists
11 of potential search terms that you --
12       ATTORNEY BAUM:  Hold it.  I just
13    want to start objecting again.  You
14    get to have communications she relied
15    upon for her opinions and with respect
16    to her opinions on the algorithm for
17    the disproportional reporting ratio.
18    We gave you the emails she relied upon
19    for those opinions.
20 BY ATTORNEY JULIEN:
21    Q. Doctor, I'm going to come back to
22 that, but first let me lay some foundation
23 here.
24       Dr. Brinth -- excuse me.
25       Dr. Tomljenovic, when did you start

1 preparing the initial list of VAERS search
2 terms for purposes of a disproportionality
3 analysis offered in this case?
4    A. Again, I cannot -- I don't remember
5 the month at the top of my head, but it
6 would have been in 2022.  But, again, all
7 the terms that we considered have been
8 provided in the attachments.
9    Q. Do you agree that you could not
10 have determined the preferred term -- search
11 terms to run in your disproportionality
12 analysis without consulting Dr. Brinth
13 because you're not a medical doctor?
14    A. Yes.
15    Q. Okay.  And how -- tell me who
16 prepared the initial list --
17       ATTORNEY BAUM:  I just want to
18    object.  That is inconsistent with
19    what her report says and is
20    inconsistent with what her work is
21    with respect to creating the
22    algorithm.  We --
23 BY ATTORNEY JULIEN:
24    Q. Go ahead.
25    A. I'm sorry.  I don't want to jump

1 in.
2    Q. I'm just trying to understand who
3 did what here.
4    A. We both work in parallel because I
5 reviewed hundreds and hundreds of POTS
6 reports in VAERS, and that's something I
7 explained at the start.  And I was looking
8 at the MedDRA terms that were used; so I was
9 making a list based on that of what MedDRA
10 terms are used by the reporters to report
11 conditions like POTS.
12       So I had already a huge list of
13 relevant terms.  But, again, as I said, I
14 like to consult with brains that are better
15 than my own, and I knew she was a clinician,
16 and I wanted her input to see if she had any
17 other terms she would add also based on her
18 clinical experience.
19       So that's basically -- yes, she had
20 her own list of terms, and we compared
21 notes, and there was a lot of overlap, and
22 we came with a big list of terms and then
23 made a selection of which terms to include
24 in the algorithm.
25    Q. So back in 2022 when you first

1 started corresponding with Dr. Brinth about
2 your -- the disproportionality analysis that
3 ultimately ends up in your report, did you
4 send her an initial list of search terms, or
5 did you simultaneously exchange a list?  I'm
6 just trying to understand how this process
7 worked.
8    A. Yeah.  From my memory, I mean, we
9 did exchange lists.  Obviously, she had seen
10 mine.  I have seen hers.
11    Q. And you exchanged lists by email?
12    A. Yes.  And, again, I cannot remember
13 off the top of my head whether I actually
14 sent her a list or she sent me hers, and I
15 said:  Oh, yes, I had those, but in addition
16 to these, I found these others.  What do you
17 think?  So I don't remember these exact
18 details.
19    Q. Did you make changes to the initial
20 list of VAERS searches that you proposed
21 based on your discussion with Dr. Brinth
22 back in 2022?
23    A. Well, yes, of course, because there
24 was a lot of other terms -- there was a
25 number of terms that got included in the

Case 3:22-md-03036-KDB    Document 239-10  Filed 01/06/25    Page 58 of 91
Golkow Technologies
A Veritext Division
877-370-3377                                                    www.veritext.com

1 algorithm based on her input.
2     Q.  So based on the input that you got
3 from Dr. Brinth back in 2022, a number of
4 terms got added to --
5     A.  Correct.
6     Q.  -- your algorithm?
7     A.  Correct.
8     Q.  Do you have those emails, those
9 email exchanges today?
10     A.  I've given -- I've downloaded all
11 the emails from 2022 and selected the
12 reliance material and what I understood was
13 not protected by attorney privilege because
14 a lot of these communications I've cc'd with
15 Michael to keep him in the loop.
16     Q.  Okay.  But you do have your 2022
17 email communications with Dr. Brinth?
18     A.  I do.
19     Q.  Saved somewhere?
20     A.  Yeah, I do.  But a lot of this was
21 also done via Zoom, and I didn't record any
22 Zoom meetings.
23     Q.  How many different iterations would
24 you say you have from your initial list of
25 VAERS terms that you initially discussed

1 with Dr. Brinth in 2022 to what we see in
2 your report in 2024?
3     A.  How many different versions?
4     Q.  Yes.
5     A.  I cannot put the number.  It wasn't
6 ten versions certainly.  A few.  But that's
7 the other thing that my primitive
8 versions -- I call them primitive or the
9 very first that I developed and all the
10 other subsequent versions -- they showed the
11 same results.
12         Obviously, when you add more terms,
13 you improve accuracy, but it didn't change
14 the outcome.  It was never that the initial
15 algorithm found no signal and then we made
16 these changes and then all of a sudden
17 there's a signal.  No, it's just the signal
18 got stronger, and, again, of course, I
19 believe it's more accurate when you include
20 all the relevant terms.
21     Q.  So you said --
22     A.  And that's the reason why I went
23 into this process because, again, based on
24 the knowledge I had, I constructed the
25 algorithm, ran it in VAERS.  I said, well,

1 this looks interesting.  I'm picking up the
2 disproportionality signal similar to Rebecca
3 Chandler's.  Let's see if we can improve
4 this algorithm.  And that's why I consulted
5 Louise.
6     Q.  So over the course of time based on
7 the edits that were made to your algorithm,
8 your signal got stronger?  Did I say that
9 correctly?
10     A.  Yeah.  It never -- again, it never
11 disappeared.  It was always a pretty high
12 signal.  It wasn't like disproportionality
13 ratio of 2 or 1.9.
14     Q.  Before arriving -- before arriving
15 at your final list of search terms in your
16 report, did you run any of those search
17 terms or search term combination in VAERS to
18 see how many adverse event reports you got?
19     A.  Sorry.  With my previous versions
20 of the algorithm, did I --
21     Q.  Yes.  From your initial list to
22 your final list that ends up --
23     A.  Right.
24     Q.  -- in your report --
25     A.  Yeah.

1     Q.  -- did you take any of those draft
2 search terms prior to the final --
3     A.  Right.
4     Q.  -- and run them in VAERS?
5     A.  Yes.
6     Q.  And you ran them in VAERS to see
7 how many adverse event reports you got?
8     A.  Well, I was looking -- doing
9 exactly the same thing, the
10 disproportionality analysis, so. . .
11     Q.  So you were --
12     A.  Again, I was using the previous
13 versions to do the disproportionality
14 analysis.
15     Q.  So based on your prior -- strike
16 that.
17         You used -- between your initial
18 list of search terms back in 2022 up until
19 your final search terms in your report, you
20 ran those search terms in VAERS to see what
21 reporting odds ratio you got?
22     A.  Correct.  And, again, because it's
23 not -- certain terms -- and again, I go
24 about that in my report -- are more
25 frequently used than others.  Like for

Case 3:22-md-03036-KDB    Document 239-10  Filed 01/06/25    Page 59 of 91
877-370-3377                Golbeck Technologies        www.veritext.com
                           A Veritext Division

1 increased heart rate, it's palpitations, for
2 example. It's a very frequent term. Unlike
3 orthostatic heart rate response increased,
4 it's not a very frequent term.
5      The terms that are very frequently
6 used by reporters were already in my
7 algorithm. So refining it by adding a bunch
8 of other terms didn't really alter too much
9 the disproportionate ratios.
10      And, again, that's a similar
11 approach that -- similar approach that Merck
12 has done on the advice of the Danish
13 medicines health authorities because the
14 initial report -- sorry, the initial
15 algorithm that Merck used to capture --
16 well, the one based on just the symptoms
17 included only a limited number of symptoms.
18      And then the Danish health
19 medicines authority came to America and
20 said, well, you know, you didn't include all
21 these other relevant terms. And with the
22 algorithm as it is, we find a lot of the
23 Danish cases are not getting captured; so
24 you should include all these other
25 materials.

1      That was the whole purpose of my
2 exercise of examining hundreds and hundreds
3 and hundreds of various POTS reports to
4 select the terms that are being used to
5 report POTS; so I could include those terms
6 in the algorithm again, without being told
7 by the Danish health medicines agencies do
8 so because it's illogical that you would
9 take that approach.
10      You've got to look at the actual
11 reports. You've got to look at actual terms
12 that are used to report POTS and construct
13 your algorithm on the basis of those terms.
14      Q. Over the course of time from your
15 initial draft to the final draft in your
16 report, you tested different search terms
17 and considered different reporting odds
18 ratios; is that right?
19      ATTORNEY BAUM: I'm going to
20      object to the degree you're starting
21      to ask about and try to obtain
22      information on draft reports. I think
23      that those are protected from the
24      protocol.
25 ///

1 BY ATTORNEY JULIEN:
2      Q. Did your reporting odds ratio
3 increase based on edits that you received
4 and relied on from Dr. Brinth?
5      ATTORNEY BAUM: Same objection.
6      ATTORNEY JULIEN: This is directly
7      relevant. She said she relied on
8      Dr. Brinth. I'm entitled to explore
9      that.
10      ATTORNEY BAUM: Same objection.
11      ATTORNEY JULIEN: Okay. We'll
12      plan to come back since she said that.
13      One, we still haven't seen those 2022
14      communications, and she had earlier
15      communications about a fundamental
16      piece of her report.
17      ATTORNEY BAUM: You got the
18      materials that she relied upon.
19      You've got the -- you have the
20      reliance materials.
21 BY ATTORNEY JULIEN:
22      Q. If Merck played --
23      ATTORNEY JULIEN: So just to
24 clarify, are you instructing her not to
25 answer my question?

1      ATTORNEY BAUM: I think those are
2      protected communications.
3      ATTORNEY JULIEN: So we'll just --
4      we'll plan to come back and leave the
5      deposition open on that as well as the
6      earlier communications we did not
7      receive.
8      ATTORNEY BAUM: Maybe we can take
9      a break for a second to let me take a
10      look at something.
11 BY ATTORNEY JULIEN:
12      Q. Let me ask you this: If Merck
13 played around with data to find the best
14 results to support a hypothesis --
15      A. Yeah.
16      Q. -- would you consider that
17 scientific fraud?
18      A. For sure, but that's not what we
19 have done here because, again, it doesn't --
20 it doesn't change -- it doesn't change the
21 disproportionality ratio to that degree. It
22 was still there. This only made it more
23 accurate.
24      If you've seen my report, again,
25 I've done a number of changes to avoid

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 60 of 91
877-370-3377          Golkow Technologies          www.veritext.com
                      A Veritext Division

1 overinflating. I could have done that. I
2 could have just done what Bonaldo has done
3 and not do any age stratification, for
4 example, which hugely inflates the data.
5      I went to exclude the -- did
6 another secondary analysis to exclude the
7 years of stimulated reporting because I've
8 seen a huge signal in the 18- to 29-year-old
9 group that was pretty high. It was, I
10 think, reporting odds ratio 18, and when you
11 exclude those years, then it comes down. It
12 doesn't disappear. It's still big, but it's
13 not 18.
14      So I considered that data more
15 accurate. If I was one day to publish -- if
16 I was one day to write an article on that to
17 publish it, I would only include the data
18 that excludes the period of stimulated
19 reporting.
20      Whether it -- whether the ratio
21 increased or decreased, in order to answer
22 that question most accurately, I would have
23 to go back to the previous versions, but I
24 know for a fact that it didn't go, like,
25 from three to ten because, again, the

1 most -- the most common terms, the ones that
2 are most frequently used to describe POTS,
3 they were already present. And those that
4 are rarely used, they were not as -- some of
5 them were absent, but they are not going to
6 change the outcome so much precisely because
7 they're very rarely used.
8      Q. Okay. We can take a quick break.
9 You said you wanted to.
10      A. To me, it was kind of a robust
11 thing whether you exclude certain terms or
12 include them. You kind of end up with the
13 same results which indicates they're not
14 artificial because these additional terms,
15 again, they do not make it or break it
16 because they are terms that may not be as
17 frequently used by the reporters.
18      And the whole point of -- again,
19 for me it would be manipulating -- or sorry,
20 it wouldn't be the most accurate science if
21 I submitted a report where it was just the
22 algorithm that I designed because, okay, I
23 am -- I don't pretend to be a clinician, but
24 I also am not going to say I don't know
25 anything about POTS because I've published

1 on that, and I've -- for many, many years
2 I've been reading -- reading the literature
3 on POTS.
4      But, again, acknowledging my
5 limitation, I wanted to make it as accurate
6 as possible, and I think that was a
7 responsible thing to do, to consult a
8 clinician to improve my report. And if I
9 was, again, one day to publish this work, I
10 would not publish it with the prior version
11 of the algorithm because I consider this one
12 to be the most scientifically accurate
13 because it got input from a clinician.
14      Q. I do have some follow-up questions.
15 I'm not asking her about what you're
16 objecting to.
17      ATTORNEY BAUM: I thought we were
18 taking a break.
19      ATTORNEY JULIEN: Sure. We can
20 take a break.
21      THE VIDEOGRAPHER: We're now going
22 off the record, and the time is
23 3:13 p.m.
24      (Recess taken from 3:13 p.m. to
25 4:01 p.m.)                    0

1      THE VIDEOGRAPHER: We are now
2 going back on the record, and the time
3 is 4:01 p.m.
4      ATTORNEY JULIEN: We're back on
5 the record after a break.
6      We had some discussions off the
7 record, Mr. Baum and I. I understand
8 that additional documents are being
9 searched for, and once we receive
10 those, you know, we can decide where
11 to go next. But for now, we'll plan
12 to leave the deposition open until
13 we're sure we have all the
14 communications between Dr. Brinth and
15 Dr. Tomljenovic.
16      ATTORNEY BAUM: That she relied
17 upon.
18      ATTORNEY JULIEN: Well, we have a
19 different interpretation of that. We
20 believe we are entitled to receive all
21 the communications regarding the
22 search algorithm that they
23 collectively prepared in
24 Dr. Tomljenovic's report. I
25 understand that if there is an

Case 3:22-md-03036-KDB     Document 239-10   Filed 01/06/25     Page 61 of 91
877-370-3377                Golkow Technologies            www.veritext.com
                           A Veritext Division

1 objection there, we will be seeking
2 those documents and are prepared to
3 raise it with the court.
4     ATTORNEY BAUM: Just also to
5 clarify, my understanding is that the
6 charts that you have began in
7 September of 2022 and is the chart
8 that Louise sent to Lucija, and that's
9 what they operated with. So it's not
10 accurate to say you only have 2023
11 stuff. You have 2022 stuff. But we
12 are looking into it to see if there's
13 additional exchanges of charts that
14 they worked from.
15     ATTORNEY JULIEN: Just to clarify,
16 what I said was that the earliest
17 emails that we had were from January
18 of 2023. Dr. Tomljenovic testified
19 that she exchanged emails with
20 Dr. Brinth earlier than that in 2022.
21 We do not have those.
22     I also understand that there were
23 ten or possibly more iterations of the
24 search terms --
25     ATTORNEY BAUM: She said less than

1 ten.
2     ATTORNEY JULIEN: Less than ten?
3 Okay. Well, it's definitely more than
4 the two that I see in what we have.
5 With that, we'll leave the deposition
6 open. We'll review whatever
7 additional documents we receive, but
8 we do believe we are entitled to any
9 communications regarding the
10 disproportionality analysis and the
11 search algorithm that they
12 collectively worked on and that serves
13 as a linchpin, underpin, to
14 Dr. Tomljenovic's opinions in this
15 case. We'll move on from there.
16     I want to mark as Exhibit 20 to
17 your deposition one of the emails that
18 we received.
19     (Exhibit Number 20 was marked for
20 identification.)
21 BY ATTORNEY JULIEN:
22   Q. Dr. Tomljenovic, this is an email
23 that I received yesterday from plaintiff's
24 counsel, and this email is dated January 16,
25 2023.

1   Do you see that?
2   A. Yes.
3   Q. And the first email in the thread
4 is from you to Dr. Brinth, the email dated
5 January 15, 2023. It's on the first page.
6   A. It's that one, yeah.
7   Q. Your email address here is
8 Christthetruth1611@protonmail.com.
9   A. Correct.
10   Q. And you emailed Dr. Louise Brinth
11 at Louisebrinth@live.dk?
12   A. Correct.
13   Q. Now, looking at the email that you
14 wrote to Dr. Brinth, I want to look at the
15 second paragraph that starts with: Since we
16 discussed.
17   A. Yes.
18   Q. It says: Since we discussed to
19 limit the symptom-based searches to either
20 serious not recovered, or serious permanent
21 disability reports, then the six group
22 consequence of severe disease becomes
23 superfluous. It may be better indeed to
24 leave it out for the purpose of Madigan's
25 analysis. And then it goes on.

1   Did I read at least that portion
2 correctly?
3   A. Yes, you have.
4   Q. Who is Madigan?
5     ATTORNEY BAUM: I'm going to
6 object with respect to any query
7 regarding Madigan.
8     ATTORNEY JULIEN: Are you
9 instructing the witness not to answer?
10     ATTORNEY BAUM: Yeah, there's no
11 reliance relative to Madigan. It's
12 not something that we're -- you can
13 ask about all the analysis, but we're
14 not going to talk about Madigan.
15     ATTORNEY JULIEN: Okay. Just so
16 we're clear, the witness sends an
17 email to Dr. Brinth that says: It may
18 be better indeed to leave it out for
19 the purpose of Madigan's analysis when
20 referring to symptom-based searches,
21 and you're telling me you're
22 instructing her not to answer
23 questions about Madigan's analysis?
24     ATTORNEY BAUM: No. I'm saying --
25 yes, we're not going to discuss

Case 3:22-md-03036-KDB   Document 239-10   Filed 01/06/25   Page 62 of 91
877-370-3377            Century Technologies            www.veritext.com
                                 A Veritext Division

1 Madigan's analysis. That is not
2 something that Lucija had anything to
3 do with.
4 And there's people in the waiting
5 room again.
6 ATTORNEY JULIEN: Is that a basis
7 for an objection that she had nothing
8 to do with it when it's in her email
9 to Dr. Brinth? What basis are you
10 objecting on? Is it privilege? What
11 is the legal basis for your objection?
12 ATTORNEY BAUM: Let me see how I
13 want to do it. It's privileged.
14 ATTORNEY JULIEN: Attorney-client
15 privilege? We need to know because
16 this is something that we're going to
17 probably need to raise with the court,
18 but we don't even know what this is.
19 ATTORNEY BAUM: It's work product
20 privilege, and we can have discussions
21 with it at the next break.
22 ATTORNEY JULIEN: Okay. Let's
23 move on to the next paragraph.
24 BY ATTORNEY JULIEN:
25 Q. You said, looking at your

1 January 15, 2023, email to Dr. Brinth, you
2 say: Next, would you mind sending me the
3 list of PTs that are included in the motor
4 dysfunction group since this is one of the
5 six final groups and also the two separate
6 lists for, one, neurosensory and, two, sleep
7 problems/cognitive/affective. I'd like
8 these latter two for my own use and
9 reference and also would like to play with
10 it in VAERS to see what I get with various
11 combinations.
12 Did I read that correctly?
13 A. Yes, you have.
14 Q. Okay. You can set that document
15 aside.
16 And you wrote that to Dr. Brinth,
17 just to clarify?
18 A. Yes, I have.
19 Q. All right. Did you or Dr. Brinth
20 conduct a clinical review of any of the
21 VAERS reports in your disproportionality
22 analysis?
23 A. Not in the -- no, not in the
24 report.
25 Q. Did either you or Dr. Brinth assess

1 the completeness and quality of any of the
2 VAERS reports in your disproportionality
3 analysis?
4 A. No, we haven't.
5 Q. Did you or Dr. Brinth verify the
6 diagnoses in any of the VAERS reports in
7 your disproportionality analysis?
8 A. We haven't.
9 Q. Did either you or Dr. Brinth assess
10 any of the VAERS reports in your
11 disproportionality analysis for other
12 potential risk factors?
13 A. No.
14 Q. Did either you or Dr. Brinth
15 evaluate the interval between vaccination
16 and the adverse event in any of the VAERS
17 reports in your disproportionality analysis?
18 A. We haven't.
19 Q. Did you include litigation reports
20 in your disproportionality analysis?
21 A. They would have been picked up with
22 search term for POTS.
23 Q. The disproportionality --
24 A. Not the disproportionality analysis
25 that ends with the reporting period of 2010

1 or 2012 because there was no litigation at
2 that point in time.
3 Q. Okay. But to clarify, the
4 disproportionality analysis that you
5 performed for any reports post-2012, let's
6 say, those would include lawsuits?
7 A. Those would include lawsuits, yeah.
8 Q. Okay. Has the disproportionality
9 analysis that you performed in your
10 litigation report been peer-reviewed or
11 published?
12 A. No, but we are planning to.
13 Q. At this time, has the
14 disproportionality analysis that you
15 prepared in your report been peer-reviewed
16 or published?
17 A. No. No, it hasn't.
18 Q. You prepared the disproportionality
19 analysis in your report for purposes of this
20 litigation; correct?
21 A. I have.
22 Q. Your report is certainly not the
23 first time that a disproportionality
24 analysis has been done on Gardasil VAERS
25 reports; right?

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 63 of 91
877-370-3377                    Golkow Technologies                    www.veritext.com
                               A Veritext Division

1   A. Yeah, definitely not the first
2 time.
3   Q. And the disproportionality analysis
4 that you performed in this case is also not
5 the first time that disproportionate
6 reporting has been found with respect to
7 Gardasil and POTS, POI, or autoimmune
8 disease; correct?
9   A. Correct. That's why I cited those
10 other references.
11   Q. In your report, you know that your
12 disproportionality analysis was consistent
13 with the number of peer-reviewed published
14 studies, and you cite Chandler, Zi, Tatang,
15 Gong, and Bonaldo; correct?
16   A. Correct.
17   Q. So in 2024, you performed a
18 disproportionality analysis and found a
19 signal with respect to Gardasil, which is
20 something that independent researchers and
21 FDA and CDC researchers had already done and
22 already published in peer-reviewed
23 literature; right?
24   A. Can you repeat that?
25   Q. In 2024, you performed a

1 disproportionality analysis and found a
2 signal with respect to Gardasil, which is
3 something that independent researchers and
4 FDA and CDC researchers had already done in
5 the peer-reviewed literature?
6   A. The -- well, yeah, the Arana, et
7 al. was one of the -- they are the CDC
8 researchers that published on POTS. Again,
9 based on VAERS data.
10   Q. Doctor, I'm handing you --
11   A. Again, there's something that's
12 relevant to this that I'd like to clarify
13 with the paragraph that you read.
14   Q. Oh, your lawyer can ask you those
15 follow-up questions if he wants.
16     ATTORNEY BAUM: Wait a second. If
17 she wants to complete her answer, let
18 her complete her answer.
19     ATTORNEY JULIEN: We moved on,
20 like, several minutes later, but I
21 think your lawyer will have the
22 opportunity to ask you questions on
23 direct, if he'd like.
24     (Exhibit Number 21 was marked for
25 identification.)

1 BY ATTORNEY JULIEN:
2   Q. I've handed you what's been marked
3 as Exhibit 21 to your deposition, and this
4 is the Wodi 2023 publication entitled
5 Spontaneous Reports of Primary Ovarian
6 Insufficiency After Vaccination: A Review
7 of the Vaccine Adverse Event Reporting
8 System, (VAERS).
9     Do you see that?
10   A. Yes.
11   Q. Did you include Wodi 2023 anywhere
12 in your report or in your materials
13 considered list?
14   A. I haven't.
15   Q. And we see that Wodi is authored by
16 CDC and FDA researchers; correct?
17   A. Correct.
18   Q. If we look at the abstract and
19 specifically at the conclusions, the CDC and
20 FDA authors conclude: POI is rarely
21 reported to VAERS. Most reports contained
22 limited diagnostic information and were
23 submitted after published cases of POI
24 following HPV vaccination. Results of our
25 review do not suggest a safety concern.

1     Did I read that correctly?
2   A. Correct.
3   Q. I'd like to look at --
4   A. And, again, this is similar to what
5 Shimabukuro or Arana. Arana dealt with --
6 did with respect to POTS. Again, here they
7 were applying the diagnostic criteria for
8 POI, and this is something that Arana,
9 et al. had done with respect to POTS; so it
10 ended up out of 129 that they identified
11 with the search term POTS, they ended up
12 with only -- I believe it's about 29 that
13 met the diagnostic criteria.
14     And, again, something similar was
15 done here. It's inappropriate to exclude
16 all the rest because, again, of the
17 acknowledged limitations that these reports
18 are -- rarely contain all the diagnostic
19 detail that would enable someone to tick the
20 box yes, this meets all the diagnostic
21 criteria.
22     And this is something, again, that
23 Ralph Edwards, the former director of the
24 WHO pharmacovigilance center, Uppsala
25 objected to and also the GSK researchers

63 (Pages 246 - 249)

Case 3:22-md-03036-KDB    Document 239-10  Filed 01/06/25    Page 64 of 91
877-370-3377                Veritext Technologies, LLC            www.veritext.com
A Veritext Division

1 Mahaux, et al. that I cited in part 5 of my
2 report, that it's inappropriate to exclude
3 and just dismiss all reports that contain
4 limited information, and there should be
5 always some sensitivity analysis that
6 considers the worst-case scenario or
7 includes them in the analysis.
8   Q. So it's your opinion that the CDC
9 and FDA researchers, again, got it wrong
10 when it came to reviewing the data in Wodi
11 2023?
12   A. Well, according to
13 pharmacovigilance experts, yes, they got it
14 wrong.
15   Q. Let's move on to the clinical
16 review of report, Section 2.2 on page 2 of
17 this publication.
18   A. Where is that?
19   Q. Page 2, Section 2.2 is on the
20 right. Do you see that it says: Each
21 report, including any available medical
22 records, was manually reviewed by CDC
23 physicians?
24   A. Correct, yeah, I see that.
25   Q. If we go to the end of that same

1 section, it says: An FDA physician who is
2 board-certified in gynecology conducted an
3 independent review of all POI cases
4 identified by CDC physicians to adjudicate
5 if each POI case was a confirmed POI,
6 possible POI, or not POI using the
7 guidelines above.
8   A. Correct.
9   Q. Did I read that correctly?
10     We already established neither you
11 nor Dr. Brinth actually did a clinical
12 review of any of the VAERS reports in your
13 disproportionality analysis; correct?
14   A. Correct.
15   Q. And you couldn't perform a clinical
16 review because you're not a medical doctor;
17 correct?
18   A. Correct.
19   Q. Neither you nor Dr. Brinth went and
20 looked at the underlying available medical
21 records for any of the VAERS reports in the
22 disproportionality analysis that you
23 conducted in this case; correct?
24   A. Well, we would have not had access
25 to medical records.

1   Q. Okay. So does that mean that you
2 did not actually look at the medical records
3 for any of the VAERS reports in the
4 disproportionality analysis that you
5 conducted?
6   A. Well, we couldn't have looked at
7 something that was not available to us.
8   Q. And then if we go to the page -- if
9 we go to page 6 -- or excuse me, actually
10 page 5 of this publication, Wodi 2023, I
11 wanted to direct your attention to the last
12 full paragraph on the right side.
13   A. Okay, yeah.
14   Q. So this says -- Wodi 2023 says: To
15 our knowledge, there are six published case
16 reports of POI onset after vaccination, and
17 all were reported in adolescents and young
18 adults after receiving 4vHPV.
19     Did I read that correctly?
20   A. Yes.
21   Q. And 4vHPV refers to Gardasil 9?
22   A. Sorry. It just says 4 --
23 Gardasil 4; right?
24   Q. Excuse me. I'm sorry. 4vHPV in
25 the sentence I just read refers to

1 Gardasil 4, quadrivalent Gardasil?
2   A. Yes.
3   Q. So the CDC and FDA researchers in
4 Wodi 2023 noted here that they were aware of
5 the observation in your expert report that
6 all published case reports of POI after
7 vaccination were reported after receiving
8 Gardasil; correct?
9   A. Correct.
10   Q. And then if we go to the last
11 sentence, the last full sentence that starts
12 with: Similar to the study.
13     Do you see that?
14   A. Yeah.
15   Q. Similar to the study by Gong,
16 et al. data mining in our study observed
17 disproportionate reporting of POI-related
18 PTs in VAERS compared with other vaccines.
19     Did I read that correctly?
20   A. Yes, correct.
21   Q. So both Gong and Wodi found
22 disproportionate reporting of POI-related
23 PTs compared to other vaccines before you
24 did as an expert in this litigation; right?
25   A. Correct.

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 65 of 91

1    Q.  And then if we continue on with
2  although -- or excuse me.  If we go to
3  page 6 of Wodi -- I'm sorry.  Still on the
4  same page, page 5.  Page 5 of Wodi, last
5  full sentence that reads:  However, compared
6  to Gong, et al., our study included clinical
7  review of VAERS reports and medical records,
8  if available.
9       Did I read that correctly?
10  A.  Yes.
11   Q.  If we go on to page 6, the last
12  word is "although" on page 5 and then onto
13  the page 6, Wodi 2023 states:  Although
14  majority of reports identified in our study
15  noted receipt of HPV vaccine with or without
16  other vaccines, clinical review determined
17  that the AEs contained in most reports were
18  either pregnancy related, such as a
19  menorrhea due to pregnant, hearsay reports,
20  or also noted the presence of other
21  conditions that caused symptoms similar to
22  POI, such as pituitary pathology and
23  polycystic ovarian syndrome.
24       Did I read that correctly?
25  A.  Correct.

1    Q.  You don't know how many of the
2  VAERS reports that you included in your
3  disproportionality analysis included these
4  types of alternative explanations; correct?
5  A.  Correct.
6  Q.  And then -- strike that.
7       So to wrap up Wodi 2023, CDC and
8  FDA researchers published in peer-reviewed
9  literature that they found disproportionate
10  reporting of POI-related PTs in VAERS
11  compared to other vaccines, yet concluded
12  that their results do not suggest a safety
13  concern; correct?
14  A.  Correct.
15   Q.  I'd next like to mark Exhibit 22 to
16  your deposition.
17      (Exhibit Number 22 was marked for
18  identification.)
19      ATTORNEY BAUM:  What was 20?
20      ATTORNEY JULIEN:  I thought it
21  was --
22      ATTORNEY BAUM:  Never mind.  I got
23  it.
24      THE WITNESS:  20 is the email.
25  ///

1  BY ATTORNEY JULIEN:
2    Q.  I'm handing you what I've marked as
3  Exhibit 22 to your deposition.  And this is
4  Tatang -- excuse me.  I think I might have
5  given you mine.
6      ATTORNEY BAUM:  I wrote on it.
7      ATTORNEY JULIEN:  It's okay.
8  BY ATTORNEY JULIEN:
9  Q.  This is -- Exhibit 22 is Tatang --
10  A.  Yes.
11  Q.  -- 2021; right?
12      Let's look at the conclusion of
13  Tatang 2021, which is on page 88.  The
14  conclusion of Tatang 2021 states:  This
15  study has detected a strong
16  disproportionality in the reporting of POF
17  events after HPV vaccine in VAERS.
18      Did I read that correctly?
19  A.  Yes.
20  Q.  If we go back to the discussion
21  section on page 85 of Tatang, the discussion
22  section of Tatang 2021 states:  Using the
23  U.S. VAERS data, a high disproportionality
24  in the reports was found, which suggests the
25  presence of a potential signal of an

1  association between HPV vaccine and POF
2  events.
3       Did I read that correctly?
4  A.  Correct.
5  Q.  So the Tatang 2021 authors that you
6  cite in your report determined that the
7  strong disproportionality of POF events
8  after HPV vaccination that they observed
9  suggests the presence of a potential signal;
10  right?
11  A.  Correct.  In their conclusion on
12  page 5, they say that these findings, along
13  with other sources of evidence, such as the
14  published case series and the biological
15  plausibility, lends support to the presence
16  of a safety signal.
17      And the public has been reinsured
18  by health authorities of the absence of a
19  causal relationship between HPV vaccine and
20  POF, not only based on safety studies that
21  lack data on the varying dysfunction, but
22  also those studies with sources of data that
23  were insufficiently powered to detect events
24  of declining ovarian function.
25      So, again, it's the totality of the

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 66 of 91
Golkow Technologies
877-370-3377    A Veritext Division    www.veritext.com

1 evidence that they are also considering
2 rather than just the disproportionality
3 analysis and also the fact that those
4 studies that are being relied on to claim
5 absence of risks, again, have their -- have
6 some significant limitations.
7    Q.  And if we go to the conclusion in
8 the abstract section of Tatang on the first
9 page, it again says:  Our study suggests the
10 presence of a potential safety signal of POF
11 associated with HPV vaccination which may
12 only be partially attributed to notoriety
13 bias; correct?
14    A.  Yes, correct, because they've done
15 the same thing by excluding those years
16 after the publication of reports, which
17 might have stimulated increased reporting.
18 So, again, when they excluded those years,
19 the signal remained, which is pretty much
20 the same what I did to reduce any potential
21 bias that might have occurred due to
22 stimulated reporting and with the same
23 results.
24        Again, I didn't hide the signal
25 of -- one of the signals for peripheral

1 neuropathy, with the exclusion of
2 Guillain-Barre syndrome, disappeared in the
3 18- to 29-year-old group after exclusion of
4 the data from years 2013 to 2016.
5        So I don't believe it's -- well, I
6 doubt that it's a real signal, that it's
7 probably likely might have been an artifact
8 of stimulated reporting.  Just to say that
9 I'm -- now, I am against fraud.  And the
10 reason why I'm sitting here is because in my
11 early post-doc career, I was actually asked
12 to doctor data to make the safety of the
13 drug look better than it is, and I quit my
14 job.
15        And at my point in career, that was
16 considered career suicide, but I didn't
17 spend all the hours and -- long hours and
18 effort on getting my degree so that I would
19 now make my career by lying and
20 manufacturing data.  Like, no.
21    Q.  Okay.  So just to break that down a
22 bit and then I do want to wrap up the
23 discussion of Tatang 2021, who asked you to
24 doctor data?  Which job were you -- which
25 job were you referring to?

1    A.  Well, again, I -- the reason why
2 I'm mentioning it is to explain my position
3 on research fraud.  And it's not my
4 intention to cast -- to bring that person
5 into trouble, but it was my first
6 post-doctoral position, and that was in
7 Australia.
8    Q.  Was that at the dentist -- the
9 school of dentistry, or what are you
10 referring to?
11    A.  It was medical school, yeah.
12 School of Medicine and Dentistry at James
13 Cook University.
14    Q.  Okay.  Can you clarify what you
15 mean by that?
16    A.  Yeah, I can.  So we were actually
17 working on animal models of aortic aneurysm.
18 Or you can induce aortic aneurysm by
19 infusing them with angiotensin II, and these
20 mice were also fed high-fat diet.
21        And what my supervisor was
22 interested in is to see whether drugs that
23 are already approved for other conditions
24 might improve the outcome of aortic aneurysm
25 because the only treatment for aortic

1 aneurysm is surgery.
2        So I think it was a noble goal to
3 see if there was something other than
4 surgery that could help.  And so we were
5 treating these mice with statins,
6 simvastatin and pioglitazone.  And there
7 were placebo mice that were just given
8 water.
9        And more mice were dying on the
10 statin group, and then I was told to
11 basically ignore the dead mice from the
12 statistic because -- from the statistical
13 analysis because the explanation is it's not
14 going to look good on the drug.
15    Q.  Okay.
16    A.  And yes, I quit my job after that
17 because I didn't want to have any part of
18 that.
19    Q.  All right.  Thanks for clarifying
20 that.
21    A.  Again, that's what -- again, this
22 is what made me being skeptical towards a
23 lot of things, and I always -- you know, I
24 don't -- I don't -- okay, it's maybe just
25 me, but because of that experience, if FDA

Case 3:22-md-03036-KDB     Document 239-10 Filed 01/06/25     Page 67 of 91
Golkow Technologies,
A Veritext Division
877-370-3377                                                         www.veritext.com

1 or CDC or whoever says this is safe and
2 effective, I want to see on what basis
3 they're saying that rather than just
4 accepting because they said it.
5     Again, they've been wrong before
6 too. So that's again --
7   Q. Okay. I just want to move through
8 the rest of the study that you cited here.
9   A. Yeah, sure.
10   Q. The other disproportionality
11 analyses.
12     So just to clarify, the Tatang 2021
13 authors did not conclude there was an
14 increased risk of POI with Gardasil;
15 correct?
16   A. So they concluded there was not an
17 increased --
18   Q. The Tatang 2021 authors did not
19 conclude that there was an increased risk of
20 POI with Gardasil compared to unvaccinated
21 individuals.
22     ATTORNEY BAUM: That -- what are
23 you reading from?
24     ATTORNEY JULIEN: I wasn't aware I
25 had to be reading from something.

1     THE WITNESS: Yeah, it was a VAERS
2 analysis. So obviously, there was no
3 unvaccinated population. Again, it
4 was a disproportionality analysis.
5 What they concluded is that there is a
6 presence of a potential signal, which
7 may be partly attributed to
8 notoriety bias.
9     And so what they stated here is
10 that the notoriety bias cannot explain
11 away or cannot entirely account for
12 the signal.
13 BY ATTORNEY JULIEN:
14   Q. And the Tatang 2021 authors --
15 strike that.
16     None of the authors of Chandler
17 2017, Zi 2022, Tatang 2021, Gong 2021, or
18 Bonaldo 2019 concluded that Gardasil causes
19 POTS, CFS, or POI; correct?
20   A. They didn't -- they didn't -- yes.
21 Well, they didn't say it conclusively causes
22 it because, again, they're aware of
23 limitations of passive surveillance
24 databases.
25     But they all, especially Chandler,

1 of course, express strong criticism of the
2 EMA conclusion and stated that their own
3 analysis of VigiBase was dismissed by EMEA
4 on unjustified basis.
5   Q. Okay. We'll get to that later.
6 Your report said that you used data --
7 strike that.
8     You restricted your
9 disproportionality analysis to reports for
10 patients ages 6 through 29; right?
11   A. Correct.
12   Q. You acknowledge that Gardasil is
13 not indicated for individuals under the age
14 of 9; correct?
15   A. Yes, but VAERS does not allow you
16 to refine the age categories because it's --
17 it only gives you the option to select age
18 group 6 to 17 -- 0 to 6, 6 to 17, 18 to 29,
19 30 to 39. So it's what I could work with.
20 If I could have refined it, I would have
21 definitely restricted it to 9.
22     (Exhibit Number 23 was marked for
23   identification.)
24 BY ATTORNEY JULIEN:
25   Q. Doctor, I'm handing you what's been

1 marked as Exhibit 23 to your deposition.
2 Just to clarify, you used the Wonder online
3 search tool to conduct your
4 disproportionality analysis?
5   A. Correct.
6   Q. I've handed you what's been marked
7 as Exhibit 23, and this is the
8 VAERS.HHS.gov/data website.
9     Do you see that?
10   A. Yes, I do.
11   Q. And the VAERS website includes two
12 options for accessing VAERS data; correct?
13     Do you see that? It says: VAERS
14 data is available in two ways.
15   A. Right.
16   Q. And one way, which is what I
17 used, is to search CDC Wonder?
18   A. Search CDC Wonder, yeah.
19   Q. The other way to access VAERS data
20 is to download raw data for import into a
21 database, spreadsheet, or text editing
22 program, and do you see the link there that
23 says download VAERS data?
24   A. Yes, I do.
25   Q. So you know that it's possible to

Case 3:22-md-03036-KDB    Document 239-10  Filed 01/06/25    Page 68 of 91
877-370-3377        Golkow Technologies        www.veritext.com
A Veritext Division

1 download the raw VAERS data files and import
2 them into a program or a spreadsheet; right?
3    A. Yes. Well, I've never done it
4 myself.
5    Q. Have you ever used a software like
6 R or Stata or SAS to conduct your research?
7    A. I did.
8    Q. So you -- but you did not use those
9 statistical software tools to reach your
10 disproportionality-related opinions in this
11 case; correct?
12    A. No, I haven't, no.
13    Q. Okay. Would it surprise you to
14 learn that if you downloaded the raw data,
15 you could filter for age?
16    A. If the age is stated, then yes.
17    Q. So to clarify, before your
18 deposition today, you -- did you, or did you
19 not know that you can download the raw data
20 and filter the reports for age?
21    A. I didn't specifically know that you
22 could because all I ever work was the
23 standard online version. The CDC Wonder
24 where you -- yeah, where you search CDC
25 Wonder.

1    Q. Okay. So would it surprise you to
2 learn that you can, in fact, exclude 6-, 7-,
3 and 8-year-olds from your disproportionality
4 analysis using free tools like R to filter
5 out the raw VAERS data? Would it surprise
6 you to learn that today?
7    A. No, it doesn't particularly
8 surprise me.
9    Q. Okay. And because you did not
10 actually look at the raw VAERS data, you
11 cannot tell me that your results in your
12 disproportionality analysis will remain
13 statistically significant if you remove
14 6-year-olds, 7-year-olds, and 8-year-olds
15 from your analysis; correct?
16    A. I believe they would remain
17 because, again, the 18- to 29-year-old
18 remains significant for most of the signals
19 that are of our interest. So I don't think
20 the 6- to 17-year-old signal would disappear
21 just by filtering out the 6-, 7-, and the
22 9-year-olds. But I will be doing that.
23    Q. You'll do it -- you'll filter out
24 6-, 7-, and 8-year-olds for the first time
25 after your deposition today?

1    A. Well, I will.
2    Q. Okay. But because you didn't
3 actually test whether your ROR remains
4 statistically significant, once you remove
5 6- to 8-year-olds, you can't tell me for
6 certain, as you sit here today, that your
7 results would remain statistically
8 significant; correct?
9    A. No, I cannot tell you for certain,
10 but I find it highly unlikely that they
11 wouldn't.
12    Q. Okay. So -- and you did not test
13 or confirm whether your results would change
14 if you excluded 6-, 7-, and 8-year-olds in
15 forming your opinions in this case; correct?
16    A. Sorry. Can you repeat that?
17    Q. You did not test or confirm whether
18 your results would change if you excluded
19 6-, 7-, and 8-year-olds in forming your
20 opinions in this case; correct?
21    A. Yes, I didn't test or confirm that.
22    Q. You talked a bit about -- you
23 talked a bit about the time frame and your
24 efforts to exclude events, for example, from
25 2013 to 2016 related to media stimulated

1 reporting of AEs related to Gardasil.
2    A. Correct.
3       (Exhibit Number 24 was marked for
4    identification.)
5 BY ATTORNEY JULIEN:
6    Q. I'm handing you what's been marked
7 as Exhibit 24 to your deposition.
8       Exhibit 24 is an article that you
9 coauthored with Christopher Shaw entitled
10 Too Fast or Not Too Fast: The FDA's
11 Approval of Merck's HPV Vaccine Gardasil; is
12 that correct?
13    A. Correct.
14    Q. And you published this in the fall
15 of 2012?
16    A. Yes.
17    Q. And you did not cite this
18 publication in your report; correct?
19    A. I thought I did, but I guess I
20 didn't. I mean, I would need to --
21       ATTORNEY BAUM: Maybe check.
22       THE WITNESS: Yeah.
23 BY ATTORNEY JULIEN:
24    Q. I want to look at the first
25 sentence under the introduction of this 2012

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 69 of 91
877-370-3377    Golkow Technologies    www.veritext.com
A Veritext Division

1 publication. You wrote: There are not many
2 public health issues where views are as
3 extremely polarized as those concerning
4 vaccination policies. Ever since its
5 fast-track approval by the U.S. Food and
6 Drug Administration, FDA, in 2006, Merck's
7 human papillomavirus, HPV, vaccine Gardasil
8 has been sparking controversy.
9     Did I read that correctly?
10    A. Yes.
11    Q. And this was a publication from
12 2012; right?
13    A. Yes. It's on my CV list.
14    Q. Yes. That's where I found it. I
15 found it from your CV.
16    I'm now marking Exhibit 25 to your
17 deposition.
18    (Exhibit Number 25 was marked for
19    identification.)
20 BY ATTORNEY JULIEN:
21    Q. Exhibit 25 is a 2014 publication by
22 Jan Eberth and others entitled: The role of
23 media and the internet on vaccine adverse
24 event reporting: A case study of human
25 papillomavirus vaccination.

1     Did I read that correctly?
2    A. Yes.
3    Q. Did you cite this report -- this
4 publication anywhere in your report?
5    A. No, not this one.
6    Q. And you also did not include this
7 publication in your materials considered
8 list?
9    A. No.
10    Q. I'd like to read the purpose of
11 Eberth 2014. In the abstract, it says:
12 This study aimed to determine the temporal
13 association of print media coverage and
14 internet search activity with adverse event
15 reports -- excuse me, let me restart.
16 Strike that.
17    Purpose: This study aimed to
18 determine the temporal association of print
19 media coverage and internet search activity
20 with adverse events reports associated with
21 the human papillomavirus vaccine Gardasil,
22 HPV4, and the meningitis vaccine, Menactra,
23 MNQ, among United States adolescents.
24    Did I read that correctly?
25    A. Yes.

1    Q. If we look at the results of the
2 abstract section, it says -- Eberth 2014
3 says: Compared with MNQ, Menactra, HPV4
4 Gardasil had more coverage in the print
5 media and internet search activity, which
6 corresponded with the frequency of VAERS
7 events. In February of 2007, we observed a
8 spike in print media for HPV4 although media
9 coverage waned, internet search activity
10 remained stable and predicted the rise in
11 HPV4 associated VAERS reports.
12    Did I read that correctly?
13    A. Yes. And, again, it's important --
14 normally there is -- it is expected to see
15 increased reporting following the launch of
16 a new product, especially if it's -- if that
17 product is -- well, the launch of the
18 product is accompanied by much publicity.
19    But it's important to note that
20 what kind of events will be reported or
21 subject of disproportionate reporting.
22 Again, POTS was not on the radar. By 2010,
23 there was only one report of POTS, a case
24 report in the published literature. So that
25 would not have sparked some massive

1 reporting. This is, again, an
2 underdiagnosed condition, very rarely
3 recognized.
4    Q. I just want to break that down.
5 What do you mean when you say POTS was not
6 on the radar in 2010?
7    A. It was not in the media that there
8 was any association between the HPV vaccine
9 and POTS. There would be no reason -- there
10 could not have been stimulated reporting for
11 POTS when it was not even known that HPV
12 vaccine could trigger POTS, or it was not
13 suspected that HPV vaccine could trigger
14 POTS because, again, there was no reports in
15 the literature before 2010.
16    Q. But your disproportionality
17 analysis didn't just look at POTS; right?
18 You looked at a number of symptoms; correct?
19    A. Yes. And, again, that's why I
20 included things like GBS, anaphylaxis that
21 I -- again, based on literature, I didn't
22 think there was a particular signal in
23 Gardasil, just to exclude the possibility of
24 that, that -- well, there's a signal for
25 just everything you look at. Gardasil, that

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 70 of 91
877-370-3377                                                www.veritext.com
Golkow Technologies
A Veritext Division

1 would certainly raise red flags, but that
2 ended up not being the case.
3    Q. So in 2010, it was not suspected
4 that HPV vaccination could trigger POTS? Is
5 that what you're saying?
6    A. There was only one report, one case
7 report. You don't make a big deal out of
8 one case report.
9    Q. So it was or it was not suspected
10 that HPV vaccination could trigger POTS in
11 2010?
12    A. Again, there was one case report.
13 So one case report would have not provoked a
14 massive media stimulated reporting of POTS.
15 That likely happened 2013 when, again, due
16 to Danish reports that were -- many reports
17 were reported by Jesper and Louise and
18 then -- it was then that POTS became more
19 widely known as a possible adverse event
20 following HPV vaccination.
21       And it's then when the Danish
22 health medicines authority started looking
23 into it; so that would have raised -- and it
24 did raise media interest and media
25 publicity.

1    Q. So in 2010 -- strike that.
2       Before 2013, is it your
3 understanding that there were no data to
4 support that HPV vaccination could trigger
5 POTS?
6       ATTORNEY BAUM: Objection.
7    Mischaracterizes her testimony.
8       THE WITNESS: Yeah, I wouldn't say
9    that before 2013, there were no data,
10    but there was not -- there was no
11    increased media coverage that would
12    influence the frequency of reporting.
13 BY ATTORNEY JULIEN:
14    Q. Okay. And we established that your
15 disproportionality analysis is not just
16 about POTS. It's about a number of symptoms
17 including menstrual irregularities, for
18 example?
19    A. Correct.
20    Q. Now, if we look at Ebert 2014 and
21 go to the discussion section, I do want to
22 clarify one thing. Actually, take a step
23 back.
24       Is today your first time reviewing
25 Ebert 2014?

1    A. Yes, it is.
2    Q. If we look at the discussion
3 section on page 293 -- actually, strike
4 that. We can set it aside.
5       I want to talk about your -- strike
6 that.
7       You excluded any VAERS reports from
8 any COVID vaccines in your analysis;
9 correct?
10    A. Correct.
11    Q. You excluded COVID vaccine-related
12 reports from your disproportionality
13 analysis because you claimed that they were
14 primarily given to those over the age of 60
15 in part?
16    A. In part, in large part. And also
17 because there has been a lot of reports on
18 POTS and chronic fatigue with COVID vaccines
19 as well. Again, they only came on the
20 market in -- on the market -- they only
21 started being administered early 2021.
22       So for most of the lifecycle of
23 Gardasil, they were not -- they were not
24 included. They were not -- they were not
25 relevant, again, because Gardasil was

1 licensed in 2006, and we had, like -- until
2 2021, there were no COVID vaccines in the
3 schedule, so. . .
4    Q. So you excluded VAERS reports from
5 any COVID vaccine because you suspected that
6 COVID-19 vaccines are associated with a
7 disproportionality high number of POTS and
8 CFS reports; right?
9       ATTORNEY BAUM: Objection. That
10    misstates her testimony.
11       THE WITNESS: I didn't use it to
12    commit fraud, if that's what you're
13    implying. And the fact is, again,
14    for -- COVID vaccine did not exist in
15    2006, 2007, all the way up to 2021.
16       When you are asking me about prior
17    disproportionality analysis that I was
18    doing, I was actually doing
19    disproportionality analysis even up to
20    2021. The signals were still there.
21    And the disproportionality signals
22    were still there in 2010, 2012, 2015.
23       So that's before there was any
24    COVID vaccines administered to anyone,
25    so excluding that would not have

1 impacted that. It would have only
2 taken some of the data the last four
3 years.
4    Again, the disproportionality
5 signals for POTS, for menstrual
6 abnormalities, for chronic fatigue
7 syndrome were already there by -- long
8 before COVID vaccines came on the
9 scene. So it didn't skew those
10 results.
11 BY ATTORNEY JULIEN:
12    Q. So then why exclude it? Why
13 exclude COVID vaccine reports if you're
14 saying it wouldn't make a difference?
15    A. They wouldn't make that difference.
16 They might have -- and again, I don't know
17 because I haven't done the analysis. They
18 were, for the most -- well, in the
19 beginning, they were predominantly
20 administered to the elderly, so, again, you
21 wouldn't have that many COVID vaccines given
22 to teenagers. So they would not have skewed
23 much. They certainly wouldn't have gotten
24 rid of the signal because, again, the signal
25 was there in 2015, 2012, 2010.

1    Q. You're aware that COVID vaccines
2 have been indicated for children 5 and up
3 since 2020, 2021?
4    A. Not that early, to my knowledge.
5 That was only -- and certainly it would not
6 have been across the board. As far as I
7 know, they have only been indicated for
8 children somewhat later in the process, not
9 2021.
10    Q. Okay.
11    A. Firstly, it was elderly people and
12 medical staff. And then when the mandates
13 came, most others but not children. Even
14 then for teenagers, at least I know in
15 Canada because I was there, it was for those
16 that wanted participating in sports, but it
17 wasn't kind of universally mandated for
18 teenagers.
19    Q. Did you test any of your
20 algorithms, including the COVID-19 vaccine?
21    A. No, but I'm happy to do it. Again,
22 I'm certain it's not going to change
23 anything because, as I said, the signals
24 were there before the COVID vaccines were on
25 the market. Long, long before.

1    Q. You agree that if you had included
2 COVID vaccine-related reports, there would
3 be additional non-HPV vaccine AE reports of
4 POTS and chronic fatigue; right?
5    A. Very likely. I know there have
6 been reports of chronic fatigue and POTS in
7 COVID infection and COVID vaccines.
8    Q. And then I want to ask some
9 questions about your POI-related searches.
10    You -- one of the POI-related
11 searches that you ran was heavy menstrual
12 bleeding; is that right?
13    A. No, that's with other menstrual
14 abnormalities.
15    Q. Okay. So you ran a search for
16 heavy menstrual bleeding related to other
17 menstrual abnormalities in your
18 disproportionality analysis?
19    A. Correct.
20    Q. And we can agree that if you have
21 heavy menstrual bleeding, that's --
22    A. No.
23    Q. -- not POI?
24    A. No, that's the opposite.
25    Q. Okay. And there are -- I know

1 you're not a medical doctor, but there are a
2 number of reasons why someone may have
3 menstrual irregularities that have nothing
4 to do with Gardasil; right?
5    A. Yes, of course.
6    Q. For example, pregnancy is one
7 reason why a woman might stop having a
8 menstrual cycle?
9    A. Correct. I don't think you would
10 have many pregnant women in the 6- or
11 17-year-old group to that extent, but it's
12 possible. Of course, I'm not denying that
13 pregnancy would manifest amenorrhea.
14    Q. And you also would not have reports
15 of POI in someone under the age of, I don't
16 know, 12?
17    A. Well, no, you wouldn't.
18    Q. Okay. Did Dr. Brinth help you to
19 choose the POI-related searches in your
20 algorithm?
21    A. No, no. I consulted on -- but it
22 was not over email. I consulted about
23 certain things about POI with Dr. Harvey
24 Ward, who is one of the authors of the case
25 reports of -- on primary ovarian failure

1 because he's an OB/GYN and a fertility
2 specialist.
3    Q. Did you mention in your report that
4 you consulted with Dr. Harvey Ward?
5    A. I didn't mention that I consulted
6 because it was -- well, let me go back.
7        I actually asked him about -- yes,
8 I asked him -- I didn't ask him about the
9 terms because the terms I picked up from the
10 research literature on diagnostic criteria
11 for primary ovarian failure and the symptoms
12 from official sources.
13       But I did ask him about things that
14 I didn't end up including in this report,
15 particularly about his criticism of -- his
16 opinion on the animal studies, the rat
17 fertility studies that Merck had conducted.
18 I didn't end up discussing those in my
19 report, but I asked him because simply I
20 wanted to double-check if he -- obviously, I
21 identified certain things that I thought
22 were limitations in this study, such as that
23 they didn't follow rats over more than one
24 reproductive cycle, and I wanted to ask him
25 if he agrees with that, if that's a

1 reasonable objection, or am I just making
2 much ado about nothing?
3        So that's actually what I consulted
4 with him or asked him what was his opinion,
5 and he agreed that for any more solid
6 conclusion about fertility, they should have
7 followed the rats over more than one
8 reproductive cycle because, obviously,
9 primary ovarian failure is not something
10 that develops overnight.
11       But I didn't end up discussing any
12 of the animal studies in my report.
13    Q. Okay. So just to clarify, you
14 consulted Dr. Ward regarding the POI and
15 menstrual irregularity search terms that you
16 used in your algorithm?
17    A. Yeah, no, I haven't --
18       ATTORNEY BAUM: Objection. Hold
19    it. Mischaracterizes her testimony
20    and is calling for things that she --
21    consultation that she did not rely
22    upon for the opinions in her report.
23       ATTORNEY JULIEN: Are you
24    testifying or is she? Because she did
25    not say that.

1       ATTORNEY BAUM: I'm saying that
2    you're starting to go into areas that
3    are covered by the protocol, and she
4    did not -- you're asking for things
5    that were not things she relied upon.
6 BY ATTORNEY JULIEN:
7    Q. Did you, or did you not speak with
8 Dr. Ward regarding the POI and menstrual
9 irregularity search terms that you used in
10 your disproportionality analysis?
11    A. No, not the PO -- not with Harvey
12 Ward. I only discussed the animal studies.
13 And just, again, to clarify, and not with
14 Louise Brinth -- yes specifically on primary
15 ovarian failure, but yes, about menstrual
16 irregularities because if you look at --
17 again, that's --
18    Q. Let me just -- who did you consult
19 with regarding your POI and menstrual
20 irregularity search terms? Anyone?
21    A. So I want to clarify. So there are
22 two different things, POI and menstrual
23 irregularities. Okay? If you want to do a
24 broad bucket, then POI is included in -- if
25 you want to do a broad thing, POI belongs to

1 menstrual irregularities.
2        But, obviously, I wanted to
3 separate and look at POI specifically
4 because, again, heavy menstrual bleeding and
5 POI are two different things. So that's why
6 I separated them out. But with the general
7 menstrual irregularities, that was group
8 that was part of the algorithm that Louise
9 and I designed, and for the simple reason as
10 shown in -- on Table 7 on my expert witness
11 report.
12       They were noticing, both Louise and
13 Jesper and also in the Japanese reports,
14 they found that menstrual irregularities is
15 one other adverse event or symptom that is
16 frequently reported by girls that report
17 these other symptoms that indicate
18 dysautonomia.
19       So again, that's why we have also
20 argued that yes, POTS is part of the
21 picture, but there seems to be also this
22 syndrome that is more complex and more
23 encompassing than POTS. So that's why we
24 were looking at menstrual irregularities.
25    Q. Can I just clarify because I really

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 73 of 91
877-370-3377                    Golkow Technologies                    www.veritext.com
                               A Veritext Division

1 want to know: Did you discuss with
2 Dr. Brinth, yes or no, regarding your
3 primary ovarian failure or --
4     A. Yeah, just the primary ovarian
5 failure, no.
6     Q. Okay. But just to break that down,
7 did you consult with Dr. Brinth regarding
8 the search terms related to what you
9 describe as menstrual irregularities in your
10 disproportionality analysis?
11     A. Yes, and those were -- those were
12 on the list of terms in the algorithm
13 because it was one of the symptom groups, so
14 yes.
15     Q. Okay. I am handing you what has
16 been marked as Exhibit 26 to your
17 deposition.
18     (Exhibit Number 26 was marked for
19     identification.)
20 BY ATTORNEY JULIEN:
21     Q. This is a VAERS report
22 number 0285806-1.
23     Do you see that?
24     A. Yes.
25     Q. Now, this is a report related to

1 Gardasil; right?
2     A. Correct.
3     Q. And under Symptoms, do you see
4 menstruation irregular listed?
5     A. Correct.
6     Q. And if we look at the age, this
7 person was 23.
8     A. Yes.
9     Q. So would this report have fallen
10 within your menstrual irregular search term
11 conducted in your disproportionality
12 analysis?
13     A. Yes, it would.
14     Q. Okay. Let's look at the adverse
15 event description. In reaching your
16 opinions related to -- strike that.
17     In conducting your
18 disproportionality analysis, did you or
19 Dr. Brinth actually go and look at the
20 adverse event descriptions for any of the --
21 any of the reports in your analysis?
22     A. No, we haven't.
23     Q. So if a VAERS report hit on search
24 criteria that you ran, you counted it in
25 your analysis no questions asked; right?

1     A. It's not no questions asked.
2     Q. Well, if a VAERS report hit on
3 search criteria that you ran in VAERS, you
4 included it in your analysis; correct?
5     A. Correct. And that's what Tatang,
6 et al., did as well, and there's a process
7 signal --
8     Q. Okay. Doctor, I just --
9     ATTORNEY BAUM: You're
10     interrupting her answer.
11     ATTORNEY JULIEN: I'm just trying
12     to get a simple yes or no.
13     ATTORNEY BAUM: She has an answer,
14     and you're interrupting her.
15 BY ATTORNEY JULIEN:
16     Q. Okay. Please continue.
17     A. Yeah, so there is a process and
18 signal detection and signal validation. So
19 we didn't do signal validation. I know that
20 in -- again, prior disproportionality
21 analysis that I've done, I also included
22 only primary ovarian failure as a search
23 term, and there was still disproportionality
24 signal.
25     Q. So just to clarify and break this

1 down --
2     A. But for the --
3     Q. Yeah.
4     A. For the purpose of this report, we
5 didn't do a clinical review of the
6 individual reports.
7     Q. And you and Dr. Brinth also did not
8 conduct a signal validation; correct?
9     A. Well, that's part of -- that's
10 clinical review.
11     Q. So there is signal detection, and
12 there is signal validation; right?
13     A. Correct.
14     Q. And you did not conduct signal
15 validation as part of your
16 disproportionality analysis in this report;
17 correct?
18     A. Correct.
19     Q. Now, I want to go back to
20 Exhibit 26. If we look at the adverse event
21 description, I just want to skip down a few
22 lines, maybe about halfway down.
23     Do you see it says: Again,
24 following vaccination?
25     A. Yes.

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 74 of 91
Golkow Technologies
877-370-3377              A Veritext Division              www.veritext.com

1   Q. It says: Again, following
2 vaccination, she experienced a headache,
3 though this headache was stronger. The
4 patient sought treatment for the headache
5 with her primary physician and a urine
6 pregnancy test at that time, date
7 unspecified, indicated that she was
8 pregnant.
9       Did I read that correctly?
10   A. Yes.
11   Q. And then if we go to the next line
12 down, it says: On 30 May, 2007, the patient
13 had an ultrasound that confirmed that she
14 was approximately eight weeks pregnant, and
15 all looked fine; correct?
16   A. Correct.
17   Q. So you included a report of a
18 pregnant person in your menstrual
19 irregularity disproportionality analysis;
20 correct?
21   A. That makes it sound like we
22 deliberately included it, and this is
23 just --
24   Q. I just want a yes or no.
25   A. -- a signal detection they will be

1 included, and they were, likewise, included
2 in the Tatang, et al. study.
3   Q. Just to clarify, you included a
4 report of a pregnant person in your
5 menstrual irregularity disproportionality
6 analysis; correct?
7   A. I didn't personally include it as
8 if, like, you're trying to skew something or
9 to just make up the numbers. It's the
10 nature of the algorithm. Of course, it will
11 pick up things like -- it will pick up a
12 number of these reports.
13   Q. So let me rephrase. A report of a
14 pregnant person was included in the
15 menstrual irregularity disproportionality
16 analysis that you conducted in this report?
17 Yes or no?
18       ATTORNEY BAUM: Objection. That
19    mischaracterize her testimony.
20 BY ATTORNEY JULIEN:
21   Q. I'm going to ask again. A report
22 of a pregnant person was included in the
23 menstrual irregularity disproportionality
24 analysis that you conducted in this report;
25 correct?

1       ATTORNEY BAUM: For both on
2 Gardasil and non-Gardasil.
3       ATTORNEY JULIEN: Are you
4 testifying or is she? Shall we
5 switch?
6       ATTORNEY BAUM: Yeah, go ahead.
7       ATTORNEY JULIEN: Okay. Please.
8 BY ATTORNEY JULIEN:
9   Q. Can you please answer my question?
10   A. Yes, it would be included both in
11 the Gardasil and the non-Gardasil.
12   Q. And that is precise coaching. Just
13 to be clear --
14   A. The same algorithm is applied to
15 pick up Gardasil reports and the
16 comparatively reports. Again, Gardasil --
17 there will be a proportion of Gardasil
18 reports that is incomplete. The same will
19 apply with the non-Gardasil reports.
20   Q. Do you have any evidence that any
21 of the reports that you included in the
22 non-Gardasil portion of your analysis
23 included pregnant people? Do you have any
24 evidence of that?
25   A. Say it again. Do I have any

1 evidence?
2   Q. Do you have any evidence that any
3 of the reports you included in the
4 non-Gardasil portion of your analysis
5 included pregnant people, or is that just a
6 guess?
7   A. Not right now, but, again, it's the
8 same algorithm, and it's the same age group.
9   Q. But, again, do you have any
10 evidence whatsoever that any of the reports
11 you included in the non-Gardasil portion of
12 your analysis included pregnant people?
13   A. Not right now.
14   Q. I'd like to move on to temporality.
15 On page -- we're in part 3, question 5 of
16 your report. I want to look at Table 2.
17   A. Part 3, question 5.
18   Q. It is page -- did you find it?
19 It's page 18 of part 3, question 5 of your
20 report.
21   A. Yeah, the Table 2?
22   Q. Yes. So we're back to talking
23 about the Bradford Hill criteria, and we're
24 looking at the temporality criterion. So
25 you define -- well, strike that.

74 (Pages 290 - 293)

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 75 of 91
Conway Technologies
877-370-3377                    A Veritext Division                    www.veritext.com

1  Temporality within the Bradford
2  Hill criteria is defined as when exposure
3  exceeds the outcome in a plausible, temporal
4  relation.
5  A. Correct.
6  Q. A temporal association by itself is
7  not sufficient to prove causation; correct?
8  A. Not in and of itself.
9  Q. And you conclude that the
10  temporality criterion of the Bradford Hill
11  criteria were satisfied because, quote,
12  relevant studies report a plausible temporal
13  relationship between Gardasil vaccination
14  and the emergence of symptoms indicative of
15  dysautonomia and POTS?
16  A. Correct.
17  Q. Is that right? And you refer the
18  reader to Table 2 on page 18 of part 3,
19  question 5 of your report.
20  A. Correct.
21  Q. You define Table 2 as summary of
22  published reports on post-HPV vaccinal
23  dysautonomic syndromes showing a plausible
24  temporal relationship between Gardasil
25  vaccination and the emergence of relevant

1  symptoms.
2  A. Correct.
3  Q. And in Table 2, you purport to
4  summarize data from Mehlsen 2022, Brinth
5  2015, Martinez-Lavin in 2015, Palmieri 2017,
6  Afrin 2022, Blitshteyn 2014, and Hendrickson
7  2016?
8  A. Correct.
9  Q. And one more. Schofield and
10  Hendrickson 2018.
11  Do you believe that Table 2 on
12  page 18 of your report supports the
13  temporality criterion of the Bradford Hill
14  analysis?
15  A. Based on published literature on
16  POTS, yes, because it's -- again, it's as
17  explained in the table there as POTS can
18  have different modes of onset, either acute,
19  subacute, insidious.
20  Q. Okay. If we look at Table 2, the
21  description above the chart, it says that --
22  you say the studies included in the summary
23  report -- excuse me. Strike that.
24  You say the studies included in the
25  summary report the time elapsed between the

1  vaccine dose most proximate to the emergence
2  symptoms; right?
3  A. Correct.
4  Q. So it's not possible to tell in
5  Table 2 whether any given report occurred
6  after the first dose, the second dose, or
7  the third dose Gardasil; is that correct?
8  A. Yeah.
9  Q. And it's not possible to -- strike
10  that.
11  The time between vaccination and
12  symptom onset in Table 2 ranges from less
13  than 24 hours after a vaccine dose to more
14  than 12 months after a vaccine dose;
15  correct?
16  A. There is only a minor portion that
17  are over 12 months, only 3.4 percent. It's
18  saying 6 to 12 months, it's 4.9 percent.
19  The vast majority are under six months.
20  Q. I understand there might be a minor
21  portion, but the time between vaccination
22  and symptom onset in Table 2, the full range
23  goes from less --
24  (Unreportable simultaneous
25  speaking interrupted by the Certified

1  Stenographer.)
2  ATTORNEY JULIEN: Sorry, if I can
3  finish my question.
4  BY ATTORNEY JULIEN:
5  Q. The time between vaccination and
6  symptom on onset in Table 2 ranges in full
7  from less than 24 hours after a vaccine dose
8  to more than 12 months after a vaccine dose;
9  correct?
10  A. Correct, correct.
11  Q. Do you believe that a range of a
12  year or more amounts to a plausible temporal
13  association with a Gardasil vaccine?
14  A. Well, I included all the temporal
15  relation that was reported; so I didn't want
16  to exclude that. Obviously, that would be
17  misleading and cherry-picking; so I included
18  all that was reported.
19  Those that were over 12 is only
20  3.4 percent. I do not think that's a
21  plausible temporal relation for symptom
22  onset after vaccination. It would be
23  plausible for diagnosis because diagnosis
24  can be delayed, but if a symptom is related
25  to vaccination, it will be -- it would occur

Case 3:22-md-03036-KDB    Document 239-11    Filed 01/06/25    Page 76 of 91
Golkow Technologies
A Veritext Division
877-370-3377                                                        www.veritext.com

1 quicker that a year after.
2　　But, again, I wanted to include
3 everything so that I would not be accused of
4 cherry-picking; so for transparency, I need
5 to include everything that is reported.
6　　Q. Even under your theory, the
7 development of new symptoms more than three
8 or five years after Gardasil vaccination is
9 unlikely to be related to Gardasil?
10　　A. No. I don't think it's related to
11 Gardasil if it's that long after
12 vaccination.
13　　Q. I want to ask a few questions about
14 analogy, the analogy criterion. You
15 generally refer back to parts 1 and 2 of
16 your report to satisfy your analogy
17 criterion of your Bradford Hill analysis;
18 right?
19　　A. Yeah.
20　　Q. In support of the analogy
21 criterion, you say that POTS has been
22 reproduced in animals by immunization with
23 peptides from the alpha-1 and beta-1
24 adrenergic receptors adjuvanted with
25 complete Freund's adjuvant.

1　　A. Yes.
2　　Q. And I'm going to call complete
3 Freund's adjuvant CFA. Okay?
4　　A. Yeah.
5　　Q. CFA is not an aluminum adjuvant;
6 right?
7　　A. No.
8　　Q. Is CFA an aluminum adjuvant?
9　　A. No, it's not.
10　　Q. CFA is not approved for use in
11 humans; correct?
12　　A. Yeah, it's not approved for use in
13 humans. And that's, again, the difference
14 because these animals were not genetically
15 susceptible or they have no particular
16 susceptibility factor, and it goes back to
17 the argument that we are not arguing that
18 POTS can happen just to anyone following
19 Gardasil because then, again, everyone
20 vaccinated with the Gardasil would end up
21 with POTS.
22　　And when you're using animals, and
23 a special limited number of animals, then
24 yes, of course, you have to employ a much
25 stronger adjuvant that would overcome

1 even -- overcome the fact that it's not even
2 a genetically susceptible animal.
3　　You want to provoke a really
4 exaggerated immune response to get induction
5 of autoimmunity. But when we're talking
6 about humans with susceptibility factors,
7 then you don't necessarily need a Freund's
8 adjuvant.
9　　The very fact that natural
10 infections can induce autoimmunity is a
11 proof for that. Not everyone who gets
12 infected gets an autoimmune disease, but
13 certain people do.
14　　So if someone is going to argue
15 that autoimmunity does not happen unless you
16 have a Freund's adjuvant, then you have to
17 refute tons of research that supports the
18 link between infections and autoimmunity.
19 And something like Gardasil provokes, again,
20 a much more potent immune response than a
21 natural HPV infection.
22　　Q. The World Health Organization has a
23 committee known as the Global Advisory
24 Committee on Vaccine Safety, or GACVS for
25 short?

1　　A. Correct.
2　　Q. GACVS is comprised of experts from
3 around the world on a range of issues
4 including epidemiology, pediatrics,
5 immunology, and autoimmunity?
6　　A. Correct.
7　　Q. Do you agree that WHO, the World
8 Health Organization's GACVS is a reputable
9 source of information on vaccines?
10　　A. I don't -- I don't agree with that
11 because, again, I find a lot of their
12 statements conflict with research data such
13 as statements on the safety of aluminum
14 adjuvants.
15　　Q. I'm handing you what has been
16 marked as Exhibit 27 to your deposition.
17　　(Exhibit Number 27 was marked for
18　　identification.)
19 BY ATTORNEY JULIEN:
20　　Q. WHO GACVS has publicly criticized
21 three of your publications; correct?
22　　A. Yeah, correct.
23　　Q. And I've handed you one of them,
24 which is the WHO 2012 Weekly Epidemiological
25 Record, July 27, 2012. And if we turn to

76 (Pages 298 - 301)

Case 3:22-md-03036-KDB　　Document 239-10　Filed 01/06/25　　Page 77 of 91
Conkwright Technologies
877-370-3377　　　　　　A Veritext Division　　　　　www.veritext.com

1 page 282 through 283, that's where I'd like
2 to direct your attention.
3    A.  282 to 283, yes.
4    Q.  And you recognize the document I've
5 marked as Exhibit 27; right?
6    A.  Let me -- yeah, I do.  It's
7 actually what I referred to earlier in my
8 deposition.  Yes, I am familiar.
9    Q.  If we go to the bottom of 282, do
10 you see the header Aluminum Adjuvants?
11    A.  Yes.
12    Q.  Exhibit 27 states that:  The GACVS
13 reviewed two published papers alleging that
14 aluminum in vaccines is associated with
15 autism spectrum disorders, and the evidence
16 generated from quantitative risk assessment
17 from a U.S. FDA pharmacokinetic model of
18 aluminum-containing vaccines.
19        Did I read that part correctly?
20        ATTORNEY BAUM:  You said from
21    instead of by.
22        ATTORNEY JULIEN:  Sorry.  Let me
23    read it again.
24 BY ATTORNEY JULIEN:
25    Q.  This states -- this GACVS document

1 states:  GACVS reviewed two published papers
2 alleging that aluminum in vaccines
3 associated with autism spectrum disorders,
4 and the evidence generated from quantitative
5 risk assessment by a U.S. FDA
6 pharmacokinetic model of aluminum-containing
7 vaccines.
8        Did I read that correctly?
9    A.  Yes.
10    Q.  And then moving on, it says:  GACVS
11 considers that these two studies, 3 and 4,
12 are seriously flawed.
13        Did I read that correctly?
14    A.  Yes.
15    Q.  And the two studies that GACVS is
16 referring to are yours and Dr. Shaw's.  The
17 first is Do Aluminum Vaccine Adjuvants
18 Contribute to the Rising Prevalence of
19 Autism?
20        That's one of the articles that
21 GACVS described as seriously flawed?
22    A.  Correct.
23    Q.  And the other article that GACVS
24 described as seriously flawed is your
25 article published with Dr. Shaw entitled

1 Aluminum Vaccine Adjuvants, Are They Safe;
2 correct?
3    A.  Correct.
4    Q.  And if we continue, it says:  The
5 core argument made in these studies is based
6 on ecological comparisons of aluminum
7 content in vaccines and rates of autism
8 spectrum disorders in several countries.
9        Did I read that correctly?
10    A.  Yes, correct.
11    Q.  GACVS continues:  In general,
12 ecological studies cannot be used to assert
13 a causal association because they do not
14 link exposure to outcome in individuals and
15 only make correlations of exposure in
16 outcomes on population averages.
17    A.  Correct.
18    Q.  GACVS continues:  Therefore, their
19 value is primarily for hypothesis
20 generation.
21    A.  Correct.  And that's exactly what
22 we stated in our paper; so I don't know
23 what's the basis of their criticism.
24    Q.  Okay.  Well, it continues:
25 However, there are additional concerns with

1 those studies that limit any potential value
2 for hypothesis generation.  These include
3 incorrect assumptions about known
4 associations of aluminum with neurological
5 disease, uncertainty of the accuracy of the
6 autism spectrum disorder prevalence rates in
7 different countries, and accuracy of
8 vaccination schedules and resulting
9 calculations of aluminum doses in different
10 countries.
11        Did I read that correctly?
12    A.  Yeah, so I would like to answer
13 that.
14    Q.  Well, I think your lawyer can ask
15 you questions about that if you want.  I
16 just asked if I read it correctly.
17    A.  Well, yeah, you have read it
18 correctly.  But, again, I have --
19        ATTORNEY JULIEN:  Next I'd like to
20    mark Exhibit Number --
21        THE WITNESS:  It's like I am
22    basically being attacked without an
23    opportunity to answer these
24    criticisms.
25 BY ATTORNEY JULIEN:

Case 3:22-md-03036-KDB    Document 230-10    Filed 01/06/25    Page 78 of 91
Golkow Technologies
877-370-3377                                  A Veritext Division                                  www.veritext.com

1   Q. Just to clarify, Mr. Baum, your
2 lawyer, can give you the opportunity to
3 explain, but I asked you: Did I read that
4 correctly?
5   A. Okay.
6   Q. Okay. All right. So I am moving
7 on to Exhibit Number 28.
8     (Exhibit Number 28 was marked for
9   identification.)
10 BY ATTORNEY JULIEN:
11   Q. I'm handing you what has been
12 marked as Exhibit 28 to your deposition.
13     Have you seen this statement from
14 GACVS before?
15   A. I believe I have.
16   Q. Do you see this exhibit is dated
17 March 12, 2014?
18   A. Yes.
19   Q. And the title is Global Advisory
20 Committee on Vaccine Safety Statement on the
21 Continued Safety of HPV Vaccination.
22     Did I read that correctly?
23   A. Yes.
24   Q. And WHO GACVS opens by stating: As
25 with all new vaccines, the Global Advisory

1 Committee on Vaccine Safety has been
2 reviewing the safety of HPV vaccines since
3 they were first licensed in 2006.
4     Did I read that correctly?
5   A. Yes.
6   Q. And then if we go to the last
7 sentence of the first paragraph, it says:
8 While safety concerns about HPV vaccines
9 have been raised, these have systemically
10 been investigated. To date, the GACVS has
11 not found any safety issue that would alter
12 any of the current recommendations for the
13 use of the vaccine.
14     Did I read that correctly?
15   A. Correct.
16   Q. If we go to the last paragraph on
17 the first page of this GACVS statement, it
18 says: In 2012, the GACVS reviewed two
19 studies claiming an association between
20 aluminum and vaccines and autism spectrum
21 disorder. It found serious flaws in the two
22 studies that limited their value even for
23 hypothesis generation.
24     Did I read that correctly?
25   A. Yes.

1   Q. And if we look at the citations,
2 they are referring to your publications with
3 Dr. Shaw, your 2011 -- your two 2011
4 publications with Dr. Shaw; correct?
5   A. Correct.
6   Q. And then the paragraph continues:
7 In December, 2013, the GACVS reviewed
8 evidence related to HPV vaccine and
9 autoimmune disease specifically in multiple
10 sclerosis. While there remain case reports
11 in the literature, multiple epidemiologic
12 studies have not demonstrated any increased
13 risk of autoimmune diseases, including MS,
14 in studies. Some of which have included
15 girls who have received HPV vaccine compared
16 to those who have not.
17     Did I read that correctly?
18   A. Yes.
19   Q. Then it moves on. GACVS continues:
20 Several papers have also been published
21 pertaining to the finding of HPV L1 gene,
22 DNA fragments in clinical specimens
23 following HPV vaccination.
24     Did I read that correctly?
25   A. Yeah, and it's a misquotation

1 because reference 13 is the study published
2 by Dr. Shaw and I. We never claimed --
3 well, we didn't claim DNA fragments in that
4 publication because it was -- it was about
5 something else.
6     We were hypothesizing that there is
7 crosser activity and that Gardasil --
8 Gardasil antibodies recognized or
9 cross-react with human antigens, and we
10 also, based on histology results, had
11 reasons to believe that VLPs, in some cases,
12 can enter the brain or central nervous
13 system; so it wasn't about DNA fragments.
14     That was Dr. Lee's publication,
15 which is reference number 14.
16   Q. Okay. In this document, reference
17 13 is your paper with Dr. Shaw entitled
18 Death After Quadrivalent Hyper -- Human
19 Papillomavirus Vaccination: Causal or
20 Coincidental; right?
21   A. Correct.
22   Q. Now, it continues, the GACVS
23 statement continues: These papers claimed
24 an association with clinical events of an
25 inflammatory nature including cerebral --

Case 3:22-md-03036-KDB    Document 239-10   Filed 01/06/25    Page 79 of 91
877-370-3377      Golkow Technologies    www.veritext.com
A Veritext Division

1 strike that.
2      The GACVS document states: These
3 papers claimed an association with clinical
4 events of an inflammatory nature, including
5 cerebral vasculitis. While the GACVS has
6 not formally reviewed this work, both the
7 finding of DNA fragments and the HPV vaccine
8 and their postulated relationship to
9 clinical symptoms have been reviewed by
10 panels of experts.
11      Did I read that correctly?
12   A. Correct.
13   Q. And then it continues: First, the
14 presence of HPV DNA fragments has been
15 addressed by vaccine regulatory authorities
16 who have clearly outlined it as an expected
17 finding given the manufacturing process and
18 not a safety concern.
19      Did I read that correctly?
20   A. Yes.
21   Q. The GACVS statement continues:
22 Second, the case reports -- and then they
23 reference your publication with Dr. Shaw --
24 of adverse events hypothesized to represent
25 a causal relationship between the HPV L1

1 gene DNA fragments and death were flawed in
2 both clinical and laboratory methodology.
3      Did I read that correctly?
4   A. Correct.
5   Q. GACVS continues: The paper
6 described two fatal cases sudden death in
7 young women following HPV vaccine, one after
8 ten days and one after six months, with no
9 autopsy findings to support death as a
10 result of cerebral vasculitis or
11 inflammatory syndrome.
12      Did I read that correctly?
13   A. Yes.
14   Q. GACVS continues: Thus, the
15 hypotheses raised in this paper are not
16 supported by what is understood by the
17 residual DNA fragments left over following
18 vaccine production. Given the extremely
19 small quantities of residual HPV DNA in the
20 vaccine and no evidence of inflammation on
21 autopsy, ascribing a diagnosis of cerebral
22 vasculitis and suggesting it may have caused
23 death is unfounded.
24      Did I read that correctly?
25   A. Yeah, and I don't know why they --

1 when they referred to our paper, they keep
2 referring to DNA fragments because that was
3 not what we talked about in our paper.
4      And, again, they didn't even review
5 the paper. They acknowledged that. I felt
6 they would have at least reviewed the paper
7 rather than relied on someone else's opinion
8 that didn't even get facts correct about the
9 paper.
10      ATTORNEY JULIEN: Can we take a
11 quick break?
12      ATTORNEY BAUM: Yeah, how long?
13      ATTORNEY JULIEN: Five minutes.
14 Thanks.
15      THE VIDEOGRAPHER: We are now
16 going off the record, and the time is
17 5:30 p.m.
18      (Recess taken from 5:30 p.m. to
19 5:47 p.m.)
20      THE VIDEOGRAPHER: We are now
21 going back on the record, and the time
22 is 5:47 p.m.
23 BY ATTORNEY JULIEN:
24   Q. Dr. Tomljenovic, I asked you
25 earlier if there were data from randomized

1 control trials or epidemiological studies on
2 the safety of aluminum, and you referenced
3 three papers: One, a paper whose first
4 author was Glanz at the CDC?
5   A. Right.
6   Q. You reference a meta-analysis of
7 randomized control trials with vaccines with
8 aluminum adjuvants versus placebo or no
9 intervention?
10   A. Correct.
11   Q. And you referenced a review by
12 Jefferson looking at the safety of adjuvants
13 in vaccines; correct?
14   A. Correct.
15      ATTORNEY BAUM: Before you -- can
16 you check to make sure everybody is
17 in?
18      THE VIDEOGRAPHER: We've got
19 three.
20      ATTORNEY BAUM: Okay. Go ahead.
21 Sorry.
22 BY ATTORNEY JULIEN:
23   Q. I'm handing you what has been
24 marked as Exhibit 29 to your deposition.
25 ///

1    (Exhibit Number 29 was marked for
2    identification.)
3  BY ATTORNEY JULIEN:
4    Q. And I have marked all three of
5  those studies.
6       Do you see that?
7    A. Yes.
8    Q. So just to be clear, Exhibit 29 is
9  the three studies that you referenced when I
10  asked you earlier if there were data from
11  randomized control trials or epidemiological
12  studies on the safety of aluminum; correct?
13    A. Correct.
14    Q. Okay. One of the questions that I
15  had for you is that there appears to be
16  highlighting on the Jefferson publication.
17    A. Yeah.
18    Q. Whose highlighting is that?
19    A. That was my highlighting. I didn't
20  have an unhighlighted copy.
21    Q. And one of the sentences that you
22  highlighted is -- strike that.
23       One of the sentences that you
24  highlighted in the Jefferson -- was it 2004
25  publication?

1    A. Yes, 2004.
2    Q. You highlighted: Despite a lack of
3  good quality evidence, we do not recommend
4  that any further research on this topic is
5  undertaken.
6    A. Correct.
7    Q. Is that right?
8       Are you aware that Dr. Brinth
9  submitted a written response to the EMA
10  related to Article 20?
11    A. Written response? I think that's
12  the Dr. Brinth response documents?
13    Q. Yes.
14    A. Yeah.
15    Q. Have you seen that before?
16    A. Yes, I have. I cited it in my
17  report.
18       ATTORNEY BAUM: Allyson, what are
19    the numbers on these three?
20       ATTORNEY JULIEN: I just marked
21    them all Exhibit 29.
22       ATTORNEY BAUM: They're all 29?
23    They're one exhibit?
24       ATTORNEY JULIEN: Yes.
25  ///

1  BY ATTORNEY JULIEN:
2    Q. I am handing you what has been
3  marked as Exhibit 30 to your deposition.
4       (Exhibit Number 30 was marked for
5    identification.)
6  BY ATTORNEY JULIEN:
7    Q. Do you recognize Exhibit 30 as
8  Dr. Brinth's response to the EMA?
9    A. I do.
10    Q. Okay. And this response was
11  related to the Article 20 procedure in 2015?
12    A. Correct.
13    Q. If we go to -- I'd like to direct
14  your attention to page 10 of Dr. Brinth's
15  response.
16    A. Page 10?
17    Q. Yes.
18    A. Yes, I got it.
19    Q. I'd like to take a look at the last
20  paragraph on page 10. Dr. Brinth writes: I
21  have made very clear in my communication
22  with colleagues, authorities, and patients
23  that my work is a description of an
24  observation and a formulation of a question.
25  I am working on the lowest steps of the

1  ladder.
2       Did I read that correctly?
3    A. Yes.
4    Q. And the ladder that she's referring
5  to is on the prior page, this image that has
6  steps one through five?
7    A. Correct.
8    Q. Dr. Brinth goes on to say:
9  Therefore, my findings should not be seen as
10  proof of anything.
11       Did I read that correctly?
12    A. Yes.
13    Q. And you didn't mention that
14  Dr. Brinth said that her findings should not
15  be seen as proof of anything in your report;
16  did you?
17    A. No, I haven't.
18    Q. Okay. You have been a -- strike
19  that.
20       You agree with me that neither the
21  EMA nor the Danish Health Authority has
22  concluded that Gardasil causes POTS or CRPS;
23  correct?
24    A. Correct.
25    Q. And you have been a vocal opponent

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 81 of 91
877-370-3377                    Golkow Technologies                    www.veritext.com
                               A Veritext Division

1 of Gardasil since 2011; right?
2    A. A vocal opponent?
3    Q. Yes.
4    A. I had my concerns regarding
5 Gardasil efficacy and safety.
6    Q. And those date back to 2011?
7    A. 2011? Well, I'm just trying to
8 find my CV. Maybe I should --
9    Q. Is it fair to say you've been
10 publishing opinions for Gardasil for more
11 than ten years?
12    A. Yeah, that's what I've been trying
13 to find, when was my first publication of
14 Gardasil. I don't think it was 2011. It
15 would have been 2012. Yeah, there was
16 nothing before 2012.
17    Q. Okay. So you --
18    A. Anyway, yeah, for a long time.
19    Q. You've published many of the
20 opinions in your report for more than the
21 last decade; right?
22    A. Yes.
23    Q. You've presented all around the
24 world on many of the opinions in your
25 report; correct?

1    A. Correct.
2    Q. You're aware that many of your
3 criticisms about Article 20 have already
4 been published by others; right?
5    A. Correct.
6    Q. Can you identify a single medical
7 organization in the world that has concluded
8 that Gardasil causes POTS, POI, CRPS,
9 dysautonomia, or autoimmune disease?
10    A. To my knowledge, no medical
11 organization has.
12    Q. Can you identify a single
13 scientific organization in the world that
14 has concluded that Gardasil causes POTS,
15 POI, CRPS, dysautonomia, or autoimmune
16 disease?
17       ATTORNEY BAUM: Objection. Vague.
18       THE WITNESS: That is pretty
19    vague. But there is, again, a number
20    of research scientists who believe
21    that concerns are justified and that
22    it's likely that Gardasil is
23    responsible for these adverse events.
24 BY ATTORNEY JULIEN:
25    Q. And can you identify a single

1 science -- I know that you understand -- I
2 see that you're saying there are research
3 scientists who believe similar to you do
4 about Gardasil, but can you point me to a
5 single scientific organization in the world
6 that has concluded that Gardasil causes
7 POTS, POI, CRPS, dysautonomia, or autoimmune
8 disease?
9    A. Not to my knowledge. I don't --
10 I'm not aware of any.
11    Q. Can you identify a single public
12 health authority anywhere in the world that
13 has concluded that Gardasil causes POTS,
14 POI, CRPS, dysautonomia, or autoimmune
15 disease?
16       ATTORNEY BAUM: Objection. Vague.
17       THE WITNESS: Again, I'm not aware
18    of any.
19 BY ATTORNEY JULIEN:
20    Q. Can you identify a single
21 regulatory authority with responsibility for
22 Gardasil anywhere in the world that has
23 concluded that Gardasil causes POTS, POI,
24 CRPS, dysautonomia, or autoimmune disease?
25    A. I'm not aware of any.

1       ATTORNEY JULIEN: That concludes
2    the questions that I have for today.
3    I am going to leave the deposition
4    open.
5       ATTORNEY BAUM: Hold that thought.
6    I determined that the chart that we
7    gave you is the earliest chart that
8    was exchanged with Louise Brinth, and
9    I'm getting you the email that it was
10    sent from, and we can go from there.
11       ATTORNEY JULIEN: I mean, it's
12    6 o'clock, the end of the deposition,
13    and we are just going to go ahead and
14    hold the deposition open. There are a
15    number of issues, including the
16    communications with Dr. Brinth, that
17    we believe we are entitled to, the
18    questions about those communications,
19    as well as the emails and other
20    communications themselves.
21       We also have questions about
22    the -- what was it? The Madigan
23    analysis that you instructed her not
24    to testify about, and we also will be
25    following up about your instruction

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 82 of 91
877-370-3377                  Golkow Technologies                  www.veritext.com
                              A Veritext Division

1 for the witness not to answer
2 questions related to her belief that
3 evolution is a lie.
4 So with that, I'll conclude for
5 today and hold the deposition open.
6 Thank you.
7 ATTORNEY BAUM: So wait a second.
8 What if I have questions?
9 ATTORNEY JULIEN: I'm concluding
10 my portion. You're welcome to ask
11 away.
12 ATTORNEY ROSS: Can we go off the
13 record for one second?
14 ATTORNEY BAUM: Yes.
15 THE VIDEOGRAPHER: Shall we go
16 off?
17 ATTORNEY ROSS: I think we want to
18 know where we are on the record first.
19 THE VIDEOGRAPHER: Yeah, you're
20 ten minutes into where we started.
21 You have a little less than -- like
22 59 minutes left in yours.
23 ATTORNEY BAUM: So, like, 6:01,
24 something like that?
25 THE VIDEOGRAPHER: Yeah. Probably

1 6:02.
2 ATTORNEY JULIEN: So for the
3 record, it appears that I reserved
4 59 minutes.
5 (Discussion off the record.)
6
7 EXAMINATION
8 BY ATTORNEY BAUM:
9 Q. So I have a couple of questions for
10 you. Relative to Exhibit 27, you were asked
11 if -- Ms. Julien had read some of the
12 portions of this document improperly into
13 the record. You wanted to respond to some
14 of the things that were read into the record
15 and were not given the opportunity to
16 respond.
17 What was it you intended to say?
18 A. 283, 282. Yeah, so it was about
19 the GACVS criticism of our papers, that they
20 were seriously flawed -- okay. In general,
21 epidemiological studies cannot be used to
22 assert causal association because they do
23 not link exposure to outcome in individuals
24 and only make correlations of exposure and
25 outcomes on population averages.

1 Therefore, their value is primarily
2 for hypothesis generation. However, there
3 are additional concerns with those studies
4 that limit any potential value for
5 hypothesis generation. And so these
6 concerns, according to the WHO advisory
7 committee, is incorrect assumptions about
8 nonassociation of aluminum with neurological
9 disease. Again, this is very vague.
10 Uncertainty of the accuracy of the
11 autism spectrum disorder prevalence rates in
12 different countries and accuracy of
13 vaccination schedules and resulting
14 calculations of aluminum doses in different
15 countries.
16 Again, when they state the
17 epidemiological studies are primarily for
18 hypothesis generation, we never claimed
19 anything different. In the conclusion of
20 our paper, we say clearly we cannot draw
21 definite conclusions regarding the link
22 between aluminum adjuvants in autism based
23 on epidemiological study such as the present
24 one, and, hence, the validity of our results
25 remains to be confirmed.

1 A case control study would detail
2 examination of vaccination records and
3 aluminum body burden measurements, such as
4 in hair, urine, and blood, you know, this
5 taking a control group of children would be
6 one step towards this goal.
7 And then skipping to the last
8 paragraph of our paper. We have thus
9 provided a hypothesis, which we hope will
10 encourage further research into this area in
11 order to resolve the issue of whether or not
12 vaccines might be responsible in some part
13 for the growing prevalence of autism in the
14 developed world. And then such future
15 research to consider blah, blah, blah.
16 So, again, we didn't draw
17 conclusions that, again, go beyond the data.
18 So this is hypothesis. We think it should
19 be further looked into.
20 And then going further to their
21 criticism that their concerns regarding
22 incorrect assumptions about known
23 association of aluminum with neurological
24 disease. Again, it's impossible to answer
25 that because it's so vague. I mean, what

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 83 of 91
877-370-3377                    Golkow Technologies    www.veritext.com
                                A Veritext Division

1 has been established in the research
2 literature for decades is that aluminum is a
3 neurotoxin. It's very hard to dispute that
4 if you look at the data.
5        So if aluminum is a neurotoxin,
6 it's not so outlandish to propose that it
7 can be associated with neurological disease.
8 But, again, it's very vague. Give me some
9 specifics so I can answer.
10        But going to their other criticism
11 that there are uncertainties of the accuracy
12 of the autism spectrum disorder prevalence
13 rates in different countries. Well, again,
14 we can only work with what is published in
15 the peer-reviewed literature.
16        There was data at the time of --
17 about prevalence of autism in different
18 countries. That's what we used. If you
19 want to criticize that there are
20 uncertainties and inaccuracies, well, why
21 don't you apply, then, the same standard to
22 Merck's estimate of POTS incidence during
23 the EMEA Article 20 assessment, which was
24 entirely speculative. 100 percent
25 speculative because, at that time, there was

1 not a single published study on POTS
2 incidence. Not a single one.
3        So that makes the whole observed
4 versus expected analysis, again, an
5 exercise -- a highly speculative exercise.
6 Of course, because there were no published
7 studies on incidence of POTS, what about the
8 uncertainty of, again, the background
9 incidence rates of POTS?
10        And what Merck has done, they've
11 used chronic fatigue syndrome or background
12 incidence of chronic fatigue syndrome to try
13 and estimate the background incidence of
14 POTS.
15        But chronic fatigue syndrome is a
16 different disease with different sets of --
17 different sets of diagnostic criteria. So,
18 again, to try and estimate the incidence of
19 POTS based on chronic fatigue syndrome is
20 pretty flawed.
21        So my problem is that, again, there
22 seems to be a double standard where studies
23 that are critical of vaccine safety -- I
24 don't mind being scrutinized, but then why
25 don't you apply the same scrutiny to the

1 other side?
2        But everything they produce grows,
3 even when it's evidently flawed. How can
4 you say the conclusion of the Article 20
5 assessment is that an HPV vaccine does not
6 increase the incidence of POTS, and
7 everything we see from after HPV vaccination
8 is consistent with background incidence
9 when, at the time, you didn't have any data
10 on the background incidence of POTS. Like
11 hello?
12        And then their last criticism was,
13 again, they doubt the accuracy of
14 vaccination schedules and resulting
15 calculations of aluminum doses in different
16 vaccines.
17        Again, what we have done is what
18 were the estimates based on? Data that
19 comes from vaccine product information
20 leaflets. That's what is available. So
21 that's the only thing I can base my estimate
22 on. If you think it's inaccurate, well,
23 what? What the manufacturer declared, you
24 think it's inaccurate? Again, we based our
25 estimation on what we considered was the

1 best available information.
2        I go to the manufacturer and see
3 what he states are the amounts aluminum in
4 different vaccines.
5        And then they go as a final
6 paragraph, they quote the study of the U.S.
7 FDA risk assessment model of aluminum in
8 vaccines. The FDA calculations incorporate
9 the most recently published aluminum risk
10 assessments by adjusting for
11 gastrointestinal absorption and uptake from
12 site of injection, and the FDA analysis
13 indicates that the body burden of aluminum
14 following injections of aluminum-containing
15 vaccines never exceeds the safe U.S.
16 regulatory thresholds based on orally
17 ingested aluminum, even for low birth-weight
18 infants.
19        The GACVS concludes that this
20 comprehensive risk assessment further
21 supports the clinical trial and
22 epidemiological evidence of the safety of
23 aluminum in vaccines. Current research on
24 pharmacokinetics aluminum in vaccines is
25 ongoing and should be encouraged as a means

1 of further validating and approving
2 this model.
3      So they even, again, acknowledge
4 here that there should be further research
5 around making this model, and they refer to
6 here by Keith, et al. study, which these are
7 scientists by the U.S. CDC that is being
8 wildly quoted by Merck.
9      And I'm not just going to point the
10 finger at Merck because it's not just Merck
11 that quotes it as almost like an unequivocal
12 proof of the safety of aluminum in vaccines.
13      Again, it's a theoretical model and
14 study with a number of -- with a number of
15 assumptions. So they used as a threshold --
16 it's a minimal risk level of aluminum under
17 which it is assumed that there is no adverse
18 events.
19      This was derived by a particular --
20 from a particular study by the ATSDR. But
21 research that was already available at that
22 time showed that that level was actually too
23 high because there were already published
24 studies at that time showing neurotoxicity
25 at the levels lower than the threshold that

1 was used in this study.
2      And the second thing is that the
3 whole premise that they're trying to assess
4 the risk of injected aluminum based on the
5 safety levels for ingested aluminum. So
6 again, it's comparing apples and oranges
7 because ingested aluminum does not behave
8 the same as injected aluminum. They have
9 completely different pharmacokinetic
10 properties.
11      So it doesn't consider -- again,
12 mostly these studies will say, and rightly
13 so, that if you inject aluminum from
14 vaccines, you did not detect much change in
15 the plasma level of aluminum. Well, I would
16 not expect it because it doesn't end up
17 there. It gets captured by the macrophages,
18 and then it gets transferred into different
19 organs.
20      Even the ATSDR, they have
21 different -- they acknowledge the
22 different -- there are different routes of
23 exposure and not much is known about the
24 levels for injected aluminum in contrast to
25 data for orally taking aluminum.

1      So again it's a flawed assumption.
2 If you want to assess properly the
3 toxicological risk of injected aluminum, you
4 have to determine the threshold that this
5 minimal risk level for injected aluminum
6 rather than using the threshold for ingested
7 aluminum.
8      Again, I do get frustrated by this
9 double standard where, again, why don't
10 you -- do you not acknowledge the serious
11 limitations of the studies that you yourself
12 quote as well. This is kind of the final
13 nail in the coffin of people like myself who
14 are saying that the science is not entirely
15 settled as it's been proclaimed by various
16 health authorities.
17 Q. Okay. Relative to this particular
18 weekly epidemiological record that you were
19 shown, these are the things you would have
20 said if you had the opportunity to answer?
21    A. Yes, I would have because anyone
22 can criticize you, but what's the basis of
23 their criticism? I think that's important
24 to determine.
25 Q. Okay.

1    A. I mean, that's what we are here
2 also because obviously. . .
3 Q. Have you seen any evidence of
4 individuals whose conditions worsened as
5 they received subsequent doses of Gardasil?
6      ATTORNEY JULIEN: Objection.
7 Vague.
8      THE WITNESS: Well, conditions of
9 POTS in particular because that's what
10 I was most focused on. And yes, there
11 was -- there was a number of published
12 cases, like Svetlana Blitshteyn, her
13 case report of six cases, and I do
14 cite them in my report, where the
15 conditions did worsen after subsequent
16 doses.
17      And that actually -- again, that's
18 the positive rechallenge, which is a
19 strong indicator of causal association
20 because, again, even though case
21 reports in and of themselves are a low
22 level of evidence, but this is what is
23 done even in looking at case reports.
24      There are certain things that are
25 looked at, certain criteria, to

84 (Pages 330 - 333)

Case 3:22-md-03036-KDB     Document 239-10   Filed 01/06/25     Page 85 of 91
877-370-3377                Golkow Technologies                 www.veritext.com
A Veritext Division

1 determine -- and, again, Merck does it
2 all the time. That's also the purpose
3 of clinical review. Is there a
4 plausible temporal relation? Is there
5 evidence of positive rechallenge?
6 And, again, that's one of the
7 pretty strong indicators of causality,
8 if symptoms worsened. There's also a
9 number of MARS reports of POTS where
10 same symptoms got substantiated
11 following additional doses of the
12 vaccine.
13 BY ATTORNEY BAUM:
14 Q. So you did review in MARS of POTS
15 events that were reported in Merck's adverse
16 event reporting system for Gardasil;
17 correct?
18 ATTORNEY JULIEN: Objection.
19 Leading and vague.
20 THE WITNESS: Correct. I did
21 review MARS reports and case
22 narratives.
23 BY ATTORNEY BAUM:
24 Q. And among those were -- among those
25 were there events showing worsening of

1 symptoms as additional doses were given to
2 patients?
3 A. Yes.
4 ATTORNEY JULIEN: Objection.
5 Vague.
6 THE WITNESS: Yes, worsening of
7 POTS-related symptoms with subsequent
8 doses.
9 BY ATTORNEY BAUM:
10 Q. That's evidence of causation?
11 ATTORNEY JULIEN: Objection.
12 Leading and vague.
13 THE WITNESS: Well, it's one of
14 the evidence. One of the strong
15 indicators of causality that's, again,
16 recognizing the expert literature.
17 BY ATTORNEY BAUM:
18 Q. Okay. That's all I have for you.
19 THE VIDEOGRAPHER: Do you want to
20 conclude?
21 ATTORNEY JULIEN: Yes.
22 THE VIDEOGRAPHER: This concludes
23 Volume 1 of the video deposition of
24 Lucija Tomljenovic, and we are now
25 going off the record, and the time is

1 6:15 p.m.
2 (Whereupon the deposition
3 concluded at 6:15 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 REPORTER'S CERTIFICATE
2
3 The undersigned Certified Shorthand
4 Reporter licensed in the states of
5 California, Nevada, Illinois, and Washington
6 does hereby certify:
7 That the foregoing deposition was
8 taken before me at the time and place
9 therein set forth, at which time the witness
10 was duly sworn by me;
11 That the testimony of the witness
12 and all objections made at the time of the
13 examination were recorded stenographically
14 by me and were thereafter transcribed, said
15 transcript being a true copy of my shorthand
16 notes thereof;
17 That if this is a Federal case, a
18 request [ ] was [X] was not made to read and
19 correct said deposition.
20 I further declare that I have no
21 interest in the outcome of the action.
22 In witness whereof, I have
23 subscribed my name this 20th day of October,
24 2024.
25

85 (Pages 334 - 337)

Case 3:22-md-03036-KDB    Document 239-10    Filed 01/06/25    Page 86 of 91
877-370-3377                    Golkow Technologies                    www.veritext.com
                                A Veritext Division

1

2 _[signature: Lisa Moskowitz]_

3 LISA MOSKOWITZ
California CSR 10816, RPR, CRR, CLR

4 Washington CCR 21001437, Nevada CCR 991,
Illinois CSR 084.004982

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

1 E R R A T A   S H E E T

2 - - - - - -

3

4 PAGE     LINE   CHANGE

5 _____  _____  _____

6     REASON: _____

7 _____  _____  _____

8     REASON: _____

9 _____  _____  _____

10    REASON: _____

11 _____  _____  _____

12    REASON: _____

13 _____  _____  _____

14    REASON: _____

15 _____  _____  _____

16    REASON: _____

17 _____  _____  _____

18    REASON: _____

19 _____  _____  _____

20    REASON: _____

21 _____  _____  _____

22    REASON: _____

23 _____  _____  _____

24    REASON: _____

25

---

1           INSTRUCTIONS TO WITNESS

2

3       Please read your deposition over

4 carefully and make necessary corrections.

5 You should state the reason in the

6 appropriate space on the errata sheet for

7 any corrections that are made.

8       After doing so, please sign the

9 errata sheet and date it.

10      You are signing same subject to the

11 changes you have noted on the errata sheet,

12 which will be attached to your deposition.

13      It is imperative that you return

14 the original errata sheet to the deposing

15 attorney within thirty (30) days of receipt

16 of the deposition transcript by you.  If you

17 fail to do so, the deposition transcript may

18 be deemed to be accurate and may be used in

19 court.

20

21

22

23

24

25

---

1        ACKNOWLEDGMENT OF DEPONENT

2

3       I, LUCIJA TOMLJENOVICH, PH.D., do

4 hereby certify that I have read the

5 foregoing pages, 1-341, and that the same is

6 a correct transcription of the answers given

7 by me to the questions therein propounded,

8 except for the corrections or changes in

9 form or substance, if any, noted in the

10 attached Errata Sheet.

11

12

_____  _____

13 LUCIJA TOMLJENOVICH, PH.D.   DATE

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:22-md-03036-KDB   Document 239-11   Filed 01/06/25   Page 87 of 91
877-370-3377                Golkow Technologies                www.veritext.com
                            A Veritext Division

```
 1              LAWYER'S NOTES
 2  PAGE      LINE
 3  _____    _____  _____
 4  _____    _____  _____
 5  _____    _____  _____
 6  _____    _____  _____
 7  _____    _____  _____
 8  _____    _____  _____
 9  _____    _____  _____
10  _____    _____  _____
11  _____    _____  _____
12  _____    _____  _____
13  _____    _____  _____
14  _____    _____  _____
15  _____    _____  _____
16  _____    _____  _____
17  _____    _____  _____
18  _____    _____  _____
19  _____    _____  _____
20  _____    _____  _____
21  _____    _____  _____
22  _____    _____  _____
23  _____    _____  _____
24  _____    _____  _____
25  _____    _____  _____
```

Case 3:22-md-03036-KDB    Document 239-11    Filed 01/06/25    Page 88 of 91

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.